UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EXECUTIVE AIRLINES | : | CIVIL ACTION NO. |
| | : | 02-CV-194 (JCH) |
| Plaintiff, | : | |
| VS. | : | |
| | : | |
| ELECTRIC BOAT CORPORATION, | : | |
| | : | |
| Defendant. | : | OCTOBER 29, 2004 |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure the defendant, Electric Boat Corporation ("EB"), respectfully moves for summary judgment with respect to liability on its counterclaim of breach of contact against the plaintiff Executive Airlines (the "Plaintiff") and on the two claims asserted by Plaintiff in the Second Amended Complaint dated June 14, 2004.

As more fully set forth in the accompanying memorandum of law, EB is entitled to summary judgment on its counterclaim because there is no genuine issue of material fact that Plaintiff breached the contract in the following two ways: (i) by not complying with all Federal Aviation Administration regulations while providing its contracted for air charter services to EB; and (ii) by not having aircraft and pilots acceptable to EB's chief pilot and management. For these reasons, EB is entitled to judgment as a matter of law.

EB is also entitled to summary judgment on Plaintiff's claims for breach of contract in its first cause of action and accounts stated in its second cause of action. Despite this Court's prior ruling in this case and the clear language of the Contract, Plaintiff insists that EB breached the contract by refusing to pay almost $500,000 to Plaintiff for services it never rendered. There is no

ORAL ARGUMENT IS REQUESTED

genuine issue of material fact that the Contract does not provide a basis for Plaintiff's claims.

Accordingly, EB is entitled to judgment as a matter of law on both of these claims.

For these reasons, this Court should grant this motion for summary judgment.

In support of this Motion, EB submits its Memorandum of Law, Local Rule 56(a)1

Statement together with the exhibits attached thereto, including the affidavits of Ms. Dorothy

Stillman and Mr. Aaron Goodwin Olmsted.

DEFENDANT, ELECTRIC BOAT
CORPORATION

By _____
        Francis H. Morrison III (ct04200)
        William H. Erickson (ct18117)
        Day, Berry & Howard LLP
        CityPlace I
        Hartford, Connecticut 06103-3499
        (860) 275-0100
        Fax:  (860) 275-0343
        E-mail:  fhmorrison@dbh.com
                   wherickson@dbh.com
        Its Attorneys

## CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was mailed, postage prepaid, on
October 29, 2004, to:

Leonard Feigenbaum, Esq.
1670 Old County Road
Suite 224
Plainview, NY  11803

_____
William H. Erickson

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EXECUTIVE AIRLINES | : | CIVIL ACTION NO. |
| | : | 02-CV-194 (JCH) |
| Plaintiff, | : | |
| VS. | : | |
| | : | |
| ELECTRIC BOAT CORPORATION, | : | |
| | : | |
| Defendant. | : | OCTOBER 29, 2004 |

**DEFENDANT ELECTRIC BOAT CORPORATION'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

The defendant, Electric Boat Corporation ("EB"), respectfully submits this Memorandum

of Law in support of its Motion for Summary Judgment with respect to liability on its counterclaim

of breach of contact against the plaintiff Executive Airlines (the "Plaintiff") and each of the two

claims asserted by Plaintiff in the Second Amended Complaint dated June 14, 2004.

EB is entitled to summary judgment on its counterclaim because there is no genuine issue

of material fact that Plaintiff breached the Contract (as defined below) to provide air charter

services to EB.  The parties do not dispute that they entered into the Contract, that the Contract

required Plaintiff to comply with all Federal Aviation Administration regulations, and that each of

Plaintiff's assigned aircraft and pilots were subject to the approval of EB's management and chief

pilot.  Additionally, the deposition testimony of three witnesses -- EB's chief pilot, Mr. Aaron

Goodwin Olmsted (the only testifying expert in this case), and Plaintiff's own president -- together with the other undisputed facts, indicate that there is no genuine issue of material fact that Plaintiff failed to fulfill both of these provisions of the Contract.

EB is also entitled to summary judgment with respect to Plaintiff's claims for breach of contract in its first cause of action and accounts stated in its second cause of action. First, this Court has already determined that EB did not breach the Contract by exercising its right to terminate and that the parties did not agreed to liquidate damages. (See Executive Airlines v. Electric Boat Corporation, 271 F. Supp.2d 392, 397-399 (D. Conn. 2003)) Second, even if EB's termination of the Contract were ruled a termination for convenience rather than a termination for default, Plaintiff cannot show that EB breached the Contract by failing to pay termination costs, because Plaintiff never presented its proposed termination costs to EB as required by the Contract.

## II.    BACKGROUND AND PROCEDURAL HISTORY

### A.    The Contract

This dispute involves a contract between Plaintiff and EB pursuant to which Plaintiff agreed to provide air charter services to EB between its facility in Groton, Connecticut and Newport News, Virginia. On February 9, 2000, EB issued a Purchase Order to Plaintiff, number SNL022-096 (the "February Purchase Order"). (Local Rule 56(a)1 Statement, ¶ 1; Affidavit of Dorothy A. Stillman ("Stillman Aff."), ¶ 3.)[1] On March 14, 2000, EB reissued purchase order

---

[1]  The Stillman Affidavit is attached to the Local Rule 56(a)1 Statement as Exhibit A.

number SNL022-096 to Plaintiff along with a "Purchase Order Supplement Number 1" which incorporated certain changes to the February Purchase Order (collectively, the "March Purchase Order"). (Local Rule 56(a)1 Statement, ¶ 2; Stillman Aff., ¶ 4.) Both the February Purchase Order and the March Purchase Order incorporate a document entitled "Purchase Order Terms and Conditions" also known as GDC 410 (Rev 3/87) and Attachment (7/86) to GDC 410 3/87 (the "Terms and Conditions"). (Local Rule 56(a)1 Statement, ¶ 3; Stillman Aff., ¶ 5.) The February Purchase Order, the March Purchase Order, and the Terms and Conditions constitute the entire agreement between EB and Plaintiff regarding the charter air service, and are collectively referred to as the "Contract." (Local Rule 56(a)1 Statement, ¶ 4; Stillman Aff., ¶ 6.)

On April 10, 2000, Plaintiff commenced its flights for EB using a BAE Systems Jet Stream 3101, registration number N16EJ (the "Aircraft"). (Local Rule 56(a)1 Statement, ¶ 6; Stillman Aff., ¶ 7.)

### B.    The May 21, 2000 Crash

On May 21, 2000, six weeks after its first flight for EB, Plaintiff was operating the Aircraft on a charter flight from Atlantic City, New Jersey to Wilkes-Barre/Scranton International Airport when the Aircraft crashed, killing all passengers and crew on board. (Local Rule 56(a)1 Statement, ¶ 7; Stillman Aff., ¶ 9.) Just two days prior to the crash, the Aircraft had been used by Plaintiff to provide air charter services to EB pursuant to the Contract.

-3-

On the morning of May 21, 2000, before the crash, there was confusion regarding how much fuel should have been put on the Aircraft and how much fuel was actually put on the Aircraft. (Local Rule 56(a)1 Statement, ¶ 8; Deposition testimony of Mr. Michael Peragine, Plaintiff's president, given on December16, 2003 (the "Peragine Depo."), at 67-68.)[2] The Aircraft was originally scheduled to depart Farmingdale, New York for Atlantic City, New Jersey and then return to Farmingdale, New York, but that morning Mr. Peragine informed the crew of the Aircraft that they would have to operate an additional roundtrip between Atlantic City, New Jersey and Wilkes-Barre, Pennsylvania. (Local Rule 56(a)1 Statement, ¶¶ 9 and 10; Summary of interview given by Mr. Peragine to the National Transportation Safety Board ("NTSB") on May 22, 2000 in connection with the NTSB's investigation of the fatal crash of the Aircraft (the "Peragine Interview Summary."))[3] Before the Aircraft departed Farmingdale, New York, one of the two pilots of the Aircraft informed Mr. Peragine that the pilots of the Aircraft were going to add 90 gallons of fuel to each of the two fuel tanks on the Aircraft before departing Farmingdale, New York. (Local Rule 56(a)1 Statement, ¶ 11.; Deposition of Mr. Peragine given on multiple days in the litigation captioned In re Air Accident at Bear Creek, Pennsylvania on May 21, 2000, 3:00-

---

[2] Copies of the pages of the Peragine deposition transcript referenced in this memorandum are attached to the Local Rule 56(a)1 statement as Exhibit B.

[3] A copy of the Peragine Interview Summary is attached to the Local Rule 56(a)1 Statement as Exhibit C.

CV-5000 (M.D. PA.) (the "Peragine Accident Litigation Depo."), at 695-698; Peragine Interview

Summary.)[4]  Despite this, however, a total of only 90 gallons of fuel was added to the Aircraft in

Farmingdale, New York before the Aircraft commenced its first flight of that day.  (Local Rule

56(a)1 Statement, ¶ 12; Peragine Depo., at 68; Executive Airlines receipt and invoice from Million

Air, the fueler at Farmingdale, New York, for fuel purchased the morning of the crash.)[5]

On the morning of May 21, 2000, before the Aircraft began its first flight of the day, Mr.

Can Basat,  the first officer of the Aircraft on the day of the crash, stated, "This airplane is a piece

of *****.  You can't even tell how much fuel you have on board."  (Local Rule 56(a)1 Statement,

¶ 13; Deposition testimony of Stacy Lynn Suazo (formerly Stacy Kisby), former fiancé of Mr.

Basat, given on March 20, 2003 in the litigation captioned In re Air Accident at Bear Creek,

Pennsylvania on May 21, 2000, 3:00-CV-5000 (M.D. PA.) ("Suazo Depo."), at 65-66.)[6]  (Mr.

Basat was killed as a result of the crash.)  After the Aircraft landed in Atlantic City, New Jersey,

no additional fuel was added to the Aircraft before it commenced what was to be its final flight of

---

[4] Copies of the pages of the Peragine Accident Litigation deposition transcript referenced in this memorandum are attached to the Local Rule 56(a)1 Statement as Exhibit D.

[5] Copies of both of these documents are attached to the Local Rule 56(a)1 Statement as Exhibit E.

[6] Copies of the pages of the Suazo deposition transcript referenced in this memorandum are attached to the Local Rule 56(a)1 Statement as Exhibit F.

the day, the fatal flight from Atlantic City, New Jersey to Wilkes-Barre, Pennsylvania.  (Local

Rule 56(a)1 Statement, ¶ 14; Peragine Accident Litigation Depo., at 578.)

      C.      <u>EB's Discussions with Plaintiff Regarding the Crash</u>

      EB was understandably concerned when it learned that the operator who provided the

charter service for EB's employees had experienced a fatal crash in which all 17 passengers and

the two crew members were killed.  This was especially so because the Aircraft had been used by

Plaintiff to provide air charter services to EB and, in fact, had been used just two days before the

crash to fly EB employees from Newport News to Groton.  Accordingly, on May 21, 2000, after

learning about the crash, EB's chief pilot, Mr. Kevin Hanrahan, spoke with the Plaintiff's

president, Mr. Peragine, concerning the crash of the Aircraft.  (Local Rule 56(a)1 Statement, ¶ 15;

Deposition testimony of Mr. Kevin Hanrahan given on June 15, 2004 (the "Hanrahan Depo."),

at18-21.)[7]  During that conversation, Mr. Peragine informed Mr. Hanrahan that he was concerned

that the fueler may have misfueled the Aircraft or not fueled it at all and that on the morning of the

crash, the fuel gauges on the Aircraft were not operating the way they should have been.  (Local

Rule 56(a)1 Statement, ¶¶ 17 and 18; internal memorandum authored by Mr. Hanrahan and dated

_____

      [7] Copies of the pages of the Hanrahan deposition transcript referenced in this memorandum
are attached to the Local Rule 56(a)1 Statement as Exhibit G.

May 24, 2000 (the "May 24 Memorandum"), ¶ 2; Hanrahan Depo., at 41-42, 96.)[8]  Mr. Hanrahan

informed Mr. Peragine at that time that EB was suspending service with Plaintiff.  (Local Rule

56(a)1 Statement, ¶ 19; Hanrahan Depo., at 22.)

On May 24, 2000, EB sent a letter to Plaintiff stating that "Confirming our Kevin

Hanrahan's recent phone conversation with you, we feel that suspension of the air charter service

pending your explanation of facts surrounding the Wilkes-Barre crash is prudent."  (Local Rule

56(a)1 Statement, ¶ 21; May 24, 2004 letter from Ronald Kiely to Plaintiff.)[9]  On May 26, 2000,

Mr. Peragine came to EB's facility and met with Mr. Hanrahan, Ms. Jan Stimac of EB, and other

EB personnel to discuss the crash.  (Local Rule 56(a)1 Statement, ¶ 22; Hanrahan Depo., at 26-27.)

During that meeting, Mr. Peragine reported to Mr. Hanrahan and the other EB personnel that on

the morning of the crash, fuel had been removed from the Aircraft in order to accommodate the

weight associated with adding additional passengers to the Aircraft.  (Local Rule 56(a)1 Statement,

¶ 24;. Hanrahan Depo., at 94; May 26, 2000 memorandum memorializing the issues discussed

---

[8] A copy of the May 24 Memorandum is attached to the Local Rule 56(a)1 Statement as Exhibit H.

[9] A copy of the May 24, 2000 letter was marked as exhibit 5 at the Hanrahan deposition and is attached to the Local Rule 56(a)1 statement as Exhibit I.

with Mr. Peragine on May 26, 2000 (the "May 26 Memorandum"), at EB00135.)[10]  Mr. Peragine

also reported to Mr. Hanrahan and the other EB personnel that on the day of the crash, as the

Aircraft made its initial approach to land at Wilkes-Barre, one engine lost power and subsequently,

during a second approach, the second of the two engines lost power.  (Local Rule 56(a)1

Statement, ¶ 25; Hanrahan Depo., at 28.)

       At the May 26, 2000 meeting, Mr. Peragine reported to Mr. Hanrahan and the other EB

personnel that the fuel which had been on the Aircraft on the day of the crash had been tested and

determined not to be contaminated.  (Local Rule 56(a)1 Statement, ¶ 26; Hanrahan Depo., at 28

and 39.)  Either during the May 21, 2000 conversation with Mr. Peragine or during the May 26,

2000 meeting at EB, Mr. Peragine reported to Mr. Hanrahan that the fuel gauges on the Aircraft

had problems associated with moisture in that when moisture is present, the fuel gauges were not

accurate.  (Local Rule 56(a)1 Statement, ¶ 27; Hanrahan Depo., at 46-47.)

       Based on the information provided to him by Mr. Peragine on May 21 and May 26, 2000

and his knowledge and experience as a professional pilot and chief pilot for EB, Mr. Hanrahan had

serious concerns regarding the Plaintiff's operations.  In particular, Mr. Hanrahan was concerned

about:  (i) the possibility of problems associated with the fueling of the Aircraft before the crash on

---

[10] A copy of the May 26 Memorandum is attached to the Rule 56(a)1 Statement as Exhibit
J.

May 21, 2000; (ii) the possibility of deficiencies in training of the Plaintiff's pilots due to the fact that it could not be determined if the Plaintiff's pilots confirmed the fuel level of the Aircraft on the morning before the crash; and (iii) the possibility of deficiencies in the training of Plaintiff's line service personnel and/or maintenance personnel. (Local Rule 56(a)1 Statement, ¶ 28; Hanrahan Depo., at 75-76.) Additionally, Mr. Hanrahan believed that the fact that the Aircraft experienced a dual engine failure evidenced that the Aircraft did not satisfy the minimum fuel requirements which is a violation of the Federal Aviation Administration ("FAA") Regulations. (Local Rule 56(a)1 Statement, ¶ 29; Hanrahan Depo., at 100.) Mr. Hanrahan concluded that Plaintiff was unable to provide the services called for under the Contract due to the concerns regarding fueling. (Local Rule 56(a)1 Statement, ¶ 30; Hanrahan Depo., at 145-146.) Accordingly, on or about June 7, 2000, in a letter dated June 7, 2000, EB notified Plaintiff that because the safety of its employees "is of paramount importance" and because the findings of the FAA and the NTSB likely would not be available for some time, EB terminated the Contract. (Local Rule 56(a)1 Statement, ¶ 31; June 7, 2000 letter.)[11]

---

[11] A copy of the June 7, 2000 letter was marked as exhibit 14 at the Hanrahan deposition and is attached to the Local Rule 56(a)1 Statement as Exhibit K.

D.    Expert Disclosure's and Opinions

On or about June 15, 2004, EB disclosed to Plaintiff's counsel Mr. Olmsted as its testifying

expert in this case and provided Plaintiff's counsel with a copy of Mr. Olmsted's expert report.

Mr. Olmsted has concluded that in his expert opinion, Plaintiff operated the Aircraft on May 21,

2000, in violation of FAA regulations in that the Aircraft failed to reach its intended destination

due to fuel starvation as a result of an insufficient fuel quantity onboard the Aircraft.  (Local Rule

56(a)1 Statement, ¶ 34; Deposition testimony of Aaron Goodwin Olmsted given on October 14,

2004 (the "Olmsted Depo."), at 36; Affidavit of Aaron Goodwin Olmsted dated October 28, 2004,

¶¶ 11-17; Mr. Olmsted's June 11, 2004 report.)[12]  Plaintiff has disclosed no expert to testify in this

case and the date for such disclosure has passed.[13]

E.    Relevant Allegations

On September 2, 2004, the Court granted Plaintiff's motion to file its Second Amended

Complaint (the "Second Am. Compl.").  In the first cause of action, Plaintiff alleges that EB

breached the Contract by "virtue of its failure to fulfill its obligations under the [Contract] for a

---

[12] The pages of the Olmsted deposition transcript referenced in this memorandum, the Olmsted Affidavit, and Mr. Olmsted's June 11, 2004 report are attached to the Local Rule 56(a)1 Statement as Exhibits M, N, and O respectively.

[13] Mr. Olmsted has also reached other expert opinions that he discussed at length during his deposition and concerning which he is prepared to testify at trial.  Those other opinions are not being raised in support of EB's pending summary judgment motion.

period of six months after written notice of its decision to terminate the services provided for thereunder." (Second Am. Compl., first cause of action, ¶ 19.) As a result of such failure, Plaintiff continues, "Plaintiff has been damaged in the amount of $494,395.00." (Second Am. Compl., first cause of action, ¶ 20.) In its second cause of action, Plaintiff similarly alleges that it sent invoices to EB "detailing defendant's obligation for the six months following" termination of the Contract and that such "invoices demonstrate that the amount of $494,395.00 remains unpaid." (Second Am. Compl., second cause of action, ¶¶ 22-23.)

On October 8, 2004, EB filed its Answer, Affirmative Defenses and Counterclaim (the "Counterclaim").[14] In that pleading, EB sets forth its counterclaim for breach of contract. EB alleges that "[A]s a result of the crash and the ensuing, and ongoing, investigation, [Plaintiff] has been unable to provide the service it agreed to under the [Contract]." (Counterclaim, ¶ 27.) EB further alleges that "[A]s a result of [Plaintiff's] inability to provide the services it agreed to provide under the [Contract], Electric Boat, for approximately seven months, was forced to use commercial air carriers to provide for its travel needs between Groton and Newport News" and "incurred significant travel-related expenses associated with traveling on such commercial carriers, expense it would not have incurred if [Plaintiff] had been able to provide the contracted for charter services." (Counterclaim, ¶ 30.)

---

[14] The October 8, 2004 Answer, Affirmative Defenses and Counterclaim is substantially identical to EB's earlier Answer, Affirmative Defenses and Counterclaim filed on September 10, 2002.

III.    **ARGUMENT**

A.    **Summary Judgment Standard**

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"Once the moving party has met its burden, in order to defeat the motion the nonmoving party must 'set forth specific facts showing that there is a genuine issue for trial' and present such evidence as would allow a jury to find in his favor."  Munck v. New Haven Savings Bank, 251 F. Supp. 2d 1078, 1081 (D. Conn. 2003); quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); citing Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  Munck, 251 F. Supp. 2d at 1081 (internal quotations omitted; citations omitted.)  "Additionally, a party may not rest on the 'mere allegations or denials' contained in his pleadings."  Munck, 251 F. Supp. 2d at 1081; quoting Goenaga v. March of Dimes Birth Defects

Found., 51 F.3d 14, 18 (2d Cir. 1995).  See also Ying Jing Gan v. City of New York, 996 F.2d

522, 532 (2d Cir. 1993) (party may not rely on conclusory statements or an argument that the

affidavits in support of the motion for summary judgment are not credible in an effort to defeat

summary judgment).

Summary judgment is especially appropriate in disputes concerning plainly worded

contracts.  "Where the language of a contract is clear, summary judgment is appropriate, and the

fact that one party may have a different interpretation of the language does not make it any less

plain."  Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 970 F.2d 1138, 1147-48 (2d

Cir. 1992).

**B.     EB Is Entitled To Summary Judgment On Its Breach of Contract Claim**

"Breach of contract is an unjustified failure to perform all or any part of what is promised

in a contract."  Martin v. DuPont Flooring Sys., Inc., 2004 U.S. Dist. LEXIS 5486, at *8 (D. Conn.

Mar. 31, 2004).[15]  "In Connecticut, a plaintiff claiming breach of contract must prove the

following elements:  the existence of a contractual agreement; breach of such agreement; and the

plaintiff suffered resulting damages."  Chem-Tek, Inc. v. General Motors Corp., 816 F. Supp. 123,

131 (D. Conn. 1993); Martin v. DuPont Flooring Sys., Inc., 2004 U.S. Dist. LEXIS 5486, at *8.

---

[15] Copies of all unreported decisions cited herein are attached to this memorandum as Exhibit A.

In determining whether a breach of contract has occurred, this Court must consider the basic principles of contract interpretation under Connecticut law.  As the Connecticut Supreme Court has stated:

> The intention of the parties to a contract governs the determination of the parties' rights and obligations under the contract.  Analysis of the contract focuses on the intention of the parties as derived from the language employed.  Where the intention of the parties is clearly and unambiguously set forth, effect must be given to that intent.  Contract language is unambiguous when it has a "definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion."  Levine v. Advest, Inc., 244 Conn. 732, 745-46, 714 A.2d 649 (1998) (citations omitted).

In this case, this Court has already determined that the terms of the Contract are not ambiguous.  This Court stated, "were the terms of the [Contract] ambiguous, we would [look beyond the four corners of the Contract], but they are not."  Executive Airlines v. Electric Boat, 271 F. Supp. 2d. at 398-399.  This Court also noted that if "the language of the contract is ambiguous, the Court must defer to a jury to determine the intent of the parties."  Id. (citations omitted.)  "However, 'where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law' for the Court to decide."  Id., quoting Thompson & Peck Company v. Harbor Marine Contracting Corp., 203 Conn. 123, 131 (1987).

In addition, as this Court previously noted the Contract contains an integration clause which provides, "[T]his order and all documents incorporated by reference constitute the entire

-14-

agreement of the parties as to the subject matter hereof." (Terms and Conditions, ¶ 23.) The presence of the integration clause in the Contract "evidences the parties' intent to create a fully integrated contract." Executive Airlines v. Electric Boat, 271 F. Supp. 2d at 399, citing Tallmadge Bros., Inc. v. Iroquois Gas Transmission System, L.P., 252 Conn. 479, 502-505, 746 A.2d 1277 (2000) and Benvenuti Oil Co. v. Foss Consultants, Inc., 64 Conn. App. 723 781 A.2d 435, 439 (2001).

Here, EB is entitled to summary judgment on its breach of contract claim for two separate reasons. First, Plaintiff failed to provide aircraft and pilots that met with EB's chief pilot's approval. Second, Plaintiff failed to comply with all FAA regulations.

1.    Plaintiff Breached the Contract By Not Meeting EB's Chief Pilot's Approval

In the Contract, the Plaintiff agreed that it would "provide air charter service between Groton, Connecticut and Newport News, Virginia. (March Purchase Order, at 2.) In connection with providing that service, Plaintiff agreed that "each assigned aircraft and pilot is subject to Electric Boat (EB) management and chief pilot approval." (March Purchase Order, at 2.)

After the fatal crash on May 21, 2000, EB's chief pilot, Mr. Hanrahan, had grave and legitimate concerns regarding Plaintiff's operations. These concerns stemmed from, not only the fact that the fatal crash had occurred, but from the information that Mr. Peragine provided to him shortly after the crash. Mr. Hanrahan spoke with Mr. Peragine on the day of the crash and then

met with Mr. Peragine a few days later to get as much information regarding the cause of the crash as he could.

As Mr. Hanrahan stated at his deposition, the fact that both engines had failed on the Aircraft suggested to him that the cause of the crash was something related to both engines such as a problem associated with the fuel. (Hanrahan Depo. at 39; Local Rule 56(a)1 Statements, ¶ 20.) Mr. Peragine reported to Mr. Hanrahan that there was confusion regarding how much fuel should have been put on the Aircraft and how much fuel was actually put on the Aircraft on the morning of the crash. (Local Rule 56(a)1 Statement, ¶ 8; Peragine Depo., at 67-68.) Mr. Peragine also reported that the fuel on the Aircraft on the day of the crash had been tested and was not contaminated, thus ruling out that possible cause for the crash. (Local Rule 56(a)1 Statement, ¶ 26; Hanrahan Depo. at 28 and 38-39.) Mr. Peragine informed Mr. Hanrahan that he was concerned that the fueler may have misfueled the Aircraft or not fueled it at all and that the pilot of the Aircraft had reported to Mr. Peragine on the morning of the accident that the fuel gauges on the Aircraft were not operating the way they should have been. (Local Rule 56(a)1 Statement, ¶ 17 and 18; Hanrahan Depo., at 41-42, 96.)

A few days after the crash, Mr. Hanrahan and other EB personnel met with Mr. Peragine. At that meeting, Mr. Peragine informed them that on the morning of the crash, fuel had been removed from the Aircraft in order to accommodate for the additional weight of adding additional

passengers to the Aircraft.  (Local Rule 56(a)1 Statement, ¶ 24; Hanrahan Depo., at 94; May 26

Memorandum, at EB00135.)  Mr. Peragine also reported to Mr. Hanrahan that the fuel gauges on

the Aircraft had problems associated with moisture in that when moisture is present, the fuel

gauges were not accurate.  (Local Rule 56(a)1 Statement, ¶ 27; Hanrahan Depo., at 46-47.)

Based on all of this information, Mr. Hanrahan determined that Plaintiff could not provide

the services called for under the Contract because Plaintiff could not meet with Mr. Hanrahan's

approval.  Mr. Hanrahan gave the following testimony at his deposition:

> Q: In what manner was Executive Airlines unable to provide the services to which it contracted?
>
> A:  After the crash they were unable to satisfy me as to the use of the airplane and the flight crews due to the questions that we had existing from the crash as to the cause.
>
> Q; What services could it not provide?
>
> A:  It could not provide air service or shuttle service for Electric Boat.
>
> Q:  Why not?
>
> A:  Because I wasn't satisfied as to the cause of the crash and that it would not recur.
>
> . . .
>
> Hanrahan Depo., at 145.
>
> Q:  In the discussion of termination, what was said?

A:  Just that until we had word that this was not a repeatable accident or incident that we can be assured that it wouldn't happen again he [Robert Januska, Mr. Hanrahan's supervisor] also was no longer comfortable in continuing service and that was it.

Q:  Was there a discussion of a basis for termination?

A:  I was asked specifically if I had concerns and if they justified at that time our continuing service and I said I cannot continue service based on the accident and not having a better understanding of it.

      . . .

Hanrahan Depo., at 53.

Based on this testimony, and the information that Plaintiff provided to Mr. Hanrahan before he made this decision, there is no genuine issue that the aircraft and pilots Plaintiff proposed to use to perform the services called for under the Contract did not meet with Mr. Hanrahan's approval.  Mr. Hanrahan's decision was not made in haste nor arbitrarily.  Quite the opposite is true.  As noted above, Mr. Hanrahan consulted with Mr. Peragine by telephone and in person to determine if  there was an explanation for the crash that was beyond Plaintiff's control. In fact, Mr. Hanrahan testified that in his discussions with Mr. Peragine after the crash, he was "hoping to get information that would exonerate Mike Peragine's company Executive Airlines and allow me to feel comfortable starting to utilize their service. . . . I was looking for something that was beyond the control of either his company or pilots or personnel that we could point to and easily say this is something that is not repeatable."  (Hanrahan Depo., at 38.)  Neither Mr. Hanrahan nor anyone else at EB ever received such information.

-18-

Considering the information that was provided to Mr. Hanrahan by Mr. Peragine at that time, Mr. Hanrahan's decision was reasonable and justified. As such Plaintiff was unable to provide, as required under the Contract, aircraft and pilots that met with Mr. Hanrahan's approval. Accordingly, Plaintiff breached the Contract.

2.     Plaintiff Breached the Contract by Not Complying With All FAA Regulations

Plaintiff also agreed that, "Charter aircraft, charter operator and charter pilots must meet all FAA regulations." (March Purchase Order, at 2.) In addition to the breach set forth in Section II. B. 1 above, Plaintiff breached the Contract by not complying with this provision.

In compliance with this Court's scheduling order, on June 15, 2004, EB disclosed to Plaintiff's counsel that Mr. Olmsted would be a testifying expert in this case and provided to Plaintiff's counsel a copy of Mr. Olmsted's report. On October 14, 2004, Plaintiff deposed Mr. Olmsted.

Mr. Olmsted is currently employed by the Transportation Security Administration - United States Department of Homeland Security as the Assistant Federal Security Director for Screening for the Connecticut and western Massachusetts region and has held that position continuously since July, 2002. (Olmsted Depo., at 10-11; Olmsted Aff. ¶ 4.) A copy of Mr. Olmsted's complete, current résumé is attached to his affidavit as Exhibit A. From 1985 to 1986 and from 1989 through 1994, Mr. Olmsted was employed by the FAA as an air carrier and general aviation

-19-

principal operations inspector.  (Olmsted Depo., at 10; Aff., ¶ 5.)  Mr. Olmsted has completed

formal FAA courses on the following subjects at the Mike Maroney Aeronautical Center in

Oklahoma City, Oklahoma: FAA Air Carrier; General Aviation Operations Inspector; Compliance

and Enforcement of the FAA Regulations; the FAA's Transportation Safety Institute Introduction

to Aircraft Accident Investigation; Advanced Aircraft Accident Investigation; and Rotorcraft

Accident Investigation.  (Olmsted Aff., ¶ 6.)  As an FAA inspector, Mr. Olmsted has served as the

inspector in charge on approximately 40 aircraft related accidents.  (Olmsted Depo., at 13;

Olmsted Aff. ¶ 7.)  Mr. Olmsted holds the following certificates:  FAA Airman Certificate; Airline

Transport Pilot Certificate; Aircraft Dispatcher Certificate; Flight Instructor Certificate; and

Ground Instructor Certificate.  (Olmsted Aff., ¶ 8.)

    In forming his expert opinion Mr. Olmsted reviewed the following: the applicable FAA

regulation; deposition testimony of various persons including the Plaintiff's president, one of

Plaintiff's former pilots, and the former fiancé of the first officer of the Aircraft during its fatal

flight; the Aircraft Accident Brief adopted by the National Transportation Safety Board (the

"NTSB") on August 26, 2002; and the NTSB's file regarding its investigation of the crash,

including summaries of interviews conducted by the NTSB, and documents concerning the fueling

of the Aircraft on May 21, 2000.  (Olmsted Depo., at 39; Olmsted Aff., ¶ 18.)

    Mr. Olmsted has concluded that it is his expert opinion that Plaintiff operated the Aircraft

on May 21, 2000, in violation of FAA regulations in that the Aircraft failed to reach its intended

destination due to fuel starvation as a result of an insufficient fuel quantity onboard the Aircraft. (Olmsted Depo., at 36 and 37; Olmsted Aff., ¶¶ 11.)  Specifically, §§ 91.167 and 135.223 of the FAA regulations (which are contained in Parts 91 and 135 respectively) in effect in May, 2000, provide, with certain exception, that an operator may not operate an aircraft in instrument flight rules ("IFR") conditions unless it carries enough fuel (considering weather reports and forecasts and weather conditions) to "complete the flight to the first airport of intended landing," "fly from that airport to the alternate airport," and "fly after that for 45 minutes at normal cruise speed." The fatal flight of the Aircraft was an IFR flight.

Mr. Olmsted concluded, based on all of the information he reviewed and his knowledge of the FAA regulations and his experience with FAA investigations, that it is his expert opinion that Plaintiff did not comply with § 91.167 and § 135.223 on May 21, 2000 because the Aircraft did not have a sufficient quantity of fuel on board as required under these regulations.  (Olmsted Aff., ¶¶ 14-17.)

Based on Mr. Olmsted's expert opinion, there is no genuine issue that Plaintiff did not meet all FAA regulations as it was required to do under the Contract.  Moreover, Mr. Olmsted's expert opinions are consistent with Mr. Hanrahan's concerns regarding Plaintiff's operations as a result of the crash and the information provided by Plaintiff regarding the fueling of the Aircraft.  Plaintiff has disclosed no expert to render an opinion concerning this issue and Plaintiff's deadline to

disclose such an expert was July 20, 2004.[16]  Accordingly, there is no competent evidence to contradict Mr. Olmsted's findings.  For these reasons, there is no genuine issue of material fact concerning Plaintiff's violations of the applicable FAA regulations.  As such, EB is entitled to judgment as a matter of law.

### C.     EB Is Entitled To Summary Judgment On Both Of Plaintiff's Claims

Both of Plaintiff's claims fail for two separate reasons.  First, there is simply no support in the Contract for Plaintiff's argument that EB breached the Contract by failing to pay for six-months' worth of flights that Plaintiff never provided.  In fact, this Court's prior ruling that the parties did not agree to liquidate damages precludes Plaintiff's claims.  Second, even if EB's termination of the Contract were ruled a termination for convenience (which EB does not concede), Plaintiff cannot show that EB breached the Contract by failing to pay termination costs, because Plaintiff never presented its proposed termination costs to EB as required by the Contract.

### 1.     The Contract And This Court's Prior Ruling Defeat Plaintiff's Claims

Plaintiff alleges that EB breached the Contract by "virtue of its failure to fulfill its obligations under the [Contract] for a period of six months after written notice of its decision to terminate the services provided for thereunder."  (Second Am. Compl., first cause of action, ¶ 19.)

_____

[16] See April 8, 2004 Order granting Joint Motion for Extension of Scheduling Order Deadlines.

In its second cause of action, Plaintiff similarly alleges that it sent invoices to EB "detailing defendant's obligation for the six months following" termination of the Contract and that such "invoices demonstrate that the amount of $494,395.00 remains unpaid." (Second Am. Compl., second count, ¶¶ 22-23.) This alleged amount of damages is equal to the per round-trip cost set forth in the Contract multiplied by the minimum number of flights for six months.

As this Court has already ruled in this case, "[W]e agree with Electric Boat that regardless of the reason that it terminated the [Contract], it had a right to do so." <u>Executive Airlines v. Electric Boat</u>, 271 F. Supp. 2d at 397. The Court concluded that "Electric Boat did not breach the [Contract] by invoking its right of early termination." <u>Id.</u> at 397.

This Court also determined that the parties did not include a provision for liquidated damages in the Contract. The Court stated, "there is no express provision in the [Contract] indicating that the parties intended to fix liquidated damages in the event of a breach." <u>Id.</u> at 398. In particular, the Court noted that the presence of ¶ 14 in the Terms and Conditions, "which sets forth the manner in which damages are to be calculated" further supports the conclusion that the parties did not agree to liquidate damages. <u>Id</u>. The Court found "no ambiguity regarding the absence of liquidated damages." <u>Id</u>. at 399. The Court concluded, "we hold that Electric Boat's early termination of the [Contract] did not constitute a breach of contract and that Executive Airlines is not entitled to an award of six months' income as liquidated damages." <u>Id</u>.

Despite this ruling, Plaintiff continues to assert that EB breached the contract "<u>by virtue of its failure to fulfill its obligations under the [Contract] for a period of six months.</u>" It is beyond doubt, based on this Court's prior ruling and the language of the Contract, that EB had <u>no</u> obligation to pay for flights it did not use for a period of six months after exercising its contractual right to terminate the Contract. For this reason alone, EB is entitled to summary judgment on both of Plaintiff's claims.

    2.    <u>The Contract Provisions That Set Forth The Parties' Rights And Obligations In the Event EB Exercises Its Right To Terminate Defeat Each of Plaintiff's Claims</u>

With this Court's ruling finding that EB did not breach the Contract by terminating it and that the Contract does not provide for liquidated damages, the only liability issue remaining with respect to Plaintiff's two claims is whether Plaintiff established quantified entitlement to convenience termination costs under the Contract such that EB's failure to pay these costs constituted a breach of the Contract. Plaintiff, however, never established quantified entitlement to convenience termination costs under the Contract because it refused to present any such costs for negotiation with EB as required by the Contract.

Every Federal Government procurement contract contains a termination for convenience clause. As a contractor to the United States Government, EB likewise includes a termination for convenience clause in its contracts or subcontracts with vendors and suppliers. A standard "termination for convenience" clause provides a party with broad rights to terminate a contract. <u>A.</u>

-24-

J. Temple Marble & Tile v. L.I.R.R., 172 Misc. 2d. 422, 424 (N.Y. Spr. Ct. 1997), citing Maxima

Corp. v United States, 847 F.2d 1549, 1552 (Fed. Cir. 1998); Reiner & Co. v United States, 325

F.2d 438, 442 (Ct. Cl. 1963)  "These clauses limit a contractor's recovery to the costs incurred as a

result of the termination, payment for completed work, and the cost of preparing a termination

settlement proposal."  A. J. Temple Marble & Tile v. L.I.R.R., 172 Misc. 2d. at 424.  Termination

for convenience clauses "often preclude recovery of punitive damages or anticipated profits, thus

limiting . . . liability for a termination action that would otherwise constitute a breach of contract."

Id., citing Krygoski Constr. Co. v United States, 94 F3d 1537, 1540-154 (Fed. Cir. 1996); Maxima

Corp. v United States, 847 F.2d at 1552.

The parties here agreed to a standard termination for convenience clause set forth in ¶ 14 of

the Terms and Conditions.  It provides:

> [EB] may at any time by written notice terminate all or any part of this order for
> [EB's] convenience.  If this order is terminated, in whole or in part, for [EB's]
> convenience, [Plaintiff] shall be paid an amount, to be mutually agreed upon, which
> shall be adequate to cover the reasonable costs of [Plaintiff's] actual performance of
> work under this order to the effective date of termination, plus a reasonable profit
> thereon provided that no amount shall be paid to [Plaintiff] for (I) any anticipatory
> profits relate to work under this order not yet performed, or (II) costs incurred due
> to [Plaintiff's] failure to terminate work as ordered on the effective date of
> termination.

Plaintiff has consistently ignored this provision of the Contract.  Indeed, rather than

presenting EB with evidence of the "reasonable costs of [Plaintiff's] actual performance of work"

under the Contract or evidence of what a "reasonable profit thereon" would be, Plaintiff has

-25-

consistently insisted that it is entitled to the entire amount it would have been paid under the Contract if it had provided 15 round-trip flights per month for six months – <u>even though it never performed any such services for EB during that time period</u>.

Payments for convenience termination costs are not breach damages to be determined for the first time in litigation.  Rather they are contract payments to be determined by the parties in accordance with the procedure set forth in the Contract.  Permitting Plaintiff to sue for convenience termination costs without ever having presented and negotiated those costs with EB fundamentally frustrates the function of the Termination for Convenience Clause.  These costs are not known to EB.  EB has no basis for determining Plaintiff's convenience termination costs where Plaintiff refuses to present them for negotiation. Plaintiff is not entitled effectively to have a jury administer the contractual procedure (negotiating claimed convenience termination costs) that it agreed to undertake as part of the Contract.

Plaintiff in this case has refused to abide by the Contract and has refused to heed the rulings of this Court.  EB's failure to pay unknown convenience termination costs that it has never seen cannot constitute breach of contract, even if the termination is assumed to be a termination for convenience.  Plaintiff's "accounts stated" claim fails because, as this Court has ruled, it simply states the wrong account (i.e., the contract price of six months' air charter service after the crash).  The only remaining "account" to which Plaintiff possibly could show entitlement under the

Court's rulings (i.e., convenience termination costs) has never been "stated" at all.  For these

reasons, this Court should grant summary judgment in EB's favor on each of these claims.

**IV.    CONCLUSION**

       For all of these reasons, EB respectfully requests that the Court grant its Motion for

Summary Judgment.

                                                    DEFENDANT, ELECTRIC BOAT
                                                    CORPORATION

                                   By _____
                                         Francis H. Morrison III (ct04200)
                                         William H. Erickson (ct18117)
                                         Day, Berry & Howard LLP
                                         CityPlace I
                                       Hartford, Connecticut 06103-3499
                                       (860) 275-0100
                                       Fax:  (860) 275-0343
                                       Email:  fhmorrison@dbh.com
                                                   wherickson@dbh.com
                                       Its Attorneys

## **CERTIFICATION**

THIS IS TO CERTIFY that a copy of the foregoing was mailed this 29th day of October, 2004, postage prepaid, to:

Leonard Feigenbaum, Esq.
1670 Old County Road
Suite 224
Plainview, NY  11803

_____
William H. Erickson