UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EXECUTIVE AIRLINES | : | CIVIL ACTION NO. |
| | : | 02-CV-194 (JCH) |
| Plaintiff, | : | |
| VS. | : | |
| | : | |
| ELECTRIC BOAT CORPORATION, | : | |
| | : | |
| Defendants. | : | OCTOBER 29, 2004 |

## LOCAL RULE 56(A)1 STATEMENT

In support of its Motion for Summary Judgment and pursuant to Rule 56(a)1of the Local Civil Rules of the United States District Court for the District of Connecticut, Defendant Electric Boat Corporation ("EB") respectfully submits this statement of material facts as to which EB contends there is no genuine issue to be tried:

1.    On February 9, 2000, EB issued a Purchase Order to Executive Airlines ("Plaintiff"), number SNL022-096 (the "February Purchase Order").  (Affidavit of Dorothy A. Stillman ("Stillman Aff."), ¶ 3.)  The Stillman affidavit is attached to this statement as Exhibit A.[1]

---

[1] The statements in the Stillman Affidavit submitted with this Local Rule 56(a)1 statement are identical to statements in an earlier affidavit, dated February 24, 2003, submitted by Ms. Stillman in support of EB's previous motion for summary judgment.

2. On March 14, 2000, EB reissued purchase order number SNL022-096 to Plaintiff along with a "Purchase Order Supplement Number 1" which incorporated certain changes to the February Purchase Order (collectively, the "March Purchase Order"). (Stillman Aff., ¶ 4.)

3. Both the February Purchase Order and the March Purchase Order incorporate a document entitled "Purchase Order Terms and Conditions" also known as GDC 410 (Rev 3/87) and Attachment (7/86) to GDC 410 3/87 (the "Terms and Conditions"). (Stillman Aff., ¶ 5.)

4. The February Purchase Order, the March Purchase Order, and the Terms and Conditions constitute the entire agreement between EB and Plaintiff regarding the charter air service and are collectively referred to as the "Contract." (Stillman Aff., ¶ 6.) Copies of the February Purchase Order, the March Purchase Order, and the Terms and Conditions are attached to EB's Answer, Affirmative Defenses and Counterclaim dated October 8, 2004 as Exhibits C, D, and A respectively.

5. EB issued the February Purchase Order, the March Purchase Order, and the Terms and Conditions from its facility in Groton, Connecticut. (Stillman Aff., ¶ 7.)

6. On April 10, 2000, Plaintiff commenced its flights for EB using a BAE Systems Jet Stream 3101, registration number N16EJ (the "Aircraft"). (Stillman Aff., ¶ 8.)

7. On May 21, 2000, six weeks after its first flight for EB, Plaintiff was operating the Aircraft on a charter flight from Atlantic City, New Jersey to Wilkes-Barre/Scranton International Airport when the Aircraft crashed, killing all passengers and crew on board. (Stillman Aff., ¶ 9.)

8. On the morning of May 21, 2000, before the crash, there was confusion regarding how much fuel should have been put on the Aircraft and how much fuel was actually put on the Aircraft. (Deposition testimony of Mr. Michael Peragine, Plaintiff's president, given on December 16, 2003 (the "Peragine Depo."), at 67-68.) Copies of the pages of the Peragine deposition transcript referenced in this statement are attached hereto as Exhibit B.

9. On the morning of May 21, 2000, the Aircraft was originally scheduled to depart Farmingdale, New York for Atlantic City, New Jersey and then return to Farmingdale, New York. (Summary of interview given by Mr. Peragine to the National Transportation Safety Board ("NTSB") on May 22, 2000 in connection with the NTSB's investigation of the fatal crash of the Aircraft (the "Peragine Interview Summary"), a copy of which is attached to this statement as Exhibit C.)

10. On the morning of May 21, 2000, Mr. Peragine informed the crew of the Aircraft that they would have to operate an additional roundtrip flight between Atlantic City, New Jersey and Wilkes-Barre, Pennsylvania. (Peragine Interview Summary.)

11. On the morning of May 21, 2000, before the Aircraft departed Farmingdale, New York, one of the two pilots of the Aircraft informed Mr. Peragine that the pilots of the Aircraft were going to add 90 gallons of fuel to each of the two fuel tanks on the Aircraft before departing Farmingdale, New York. (Deposition of Mr. Peragine given on multiple days in litigation captioned In re Air Accident at Bear Creek, Pennsylvania on May 21, 2000, 3:00-CV-5000 (M.D. PA.) (the "Peragine Accident Litigation Depo."), at 695-698; Peragine Interview Summary.) Copies of the pages of the Peragine Accident Litigation deposition transcript referenced in this statement are attached hereto as Exhibit D.

-3-

12. On the morning of May 21, 2000, a total of only 90 gallons of fuel was added to the Aircraft in Farmingdale, New York before the Aircraft commenced its first flight of that day. (Peragine Depo., at 68; Executive Airlines receipt and invoice from Million Air, the fueler at Farmingdale, New York, for fuel purchased the morning of the crash, both of which are attached to this statement as Exhibit E.)

13. On the morning of May 21, 2000, before the crash, Mr. Can Basat, an employee of Plaintiff and the first officer of the Aircraft on the day of the crash, stated, "This airplane is a piece of *****.  You can't even tell how much fuel you have on board." (Deposition testimony of Stacy Lynn Suazo (formerly Stacy Kisby), former fiancé of Mr. Basat, given on March 20, 2003 in the lawsuit In re Air Accident at Bear Creek, Pennsylvania on May 21, 2000, 3:00-CV-5000 (M.D. PA.) ("Suazo Depo."), p. 65-66.) (Mr. Basat was killed as a result of the crash.) Copies of the pages of the Suazo deposition transcript referenced in this statement are attached hereto as Exhibit F.

14. On the morning of May 21, 2000, after the Aircraft landed in Atlantic City, New Jersey, no additional fuel was added to the Aircraft before it commenced what was to be its final flight of the day, the fatal flight from Atlantic City, New Jersey to Wilkes-Barre, Pennsylvania. (Peragine Accident Litigation Depo., at 578.)

15. On May 21, 2000, EB's chief pilot, Mr. Kevin Hanrahan, spoke with Mr. Peragine concerning the crash of the Aircraft that had happened earlier that day. (Deposition testimony of Mr. Kevin Hanrahan given on June 15, 2004 (the "Hanrahan Depo."), at 18-21.) The pages of the Hanrahan deposition transcript referenced in this statement are attached to this statement as Exhibit G.

16.     Mr. Hanrahan memorialized his May 21, 2000 conversation with Mr. Peragine in an internal memorandum dated May 24, 2000 (the "May 24 Memorandum"). (Hanrahan Depo., at 24.) A copy of the May 24 Memorandum was marked as Exhibit 1 at the Hanrahan deposition and is attached to this statement as Exhibit H.

17.     During the May 21, 2000 conversation between Mr. Hanrahan and Mr. Peragine, Mr. Peragine informed Mr. Hanrahan that he was concerned that the fueler may have misfueled the Aircraft or not fueled it at all. (May 24 Memorandum, ¶ 2; Hanrahan Depo., at 96.)

18.     During the May 21, 2000 conversation between Mr. Hanrahan and Mr. Peragine, Mr. Peragine informed Mr. Hanrahan that the pilot of the Aircraft had reported to Mr. Peragine on the morning of the accident that the fuel gauges on the Aircraft were not operating the way they should have been. (Hanrahan Depo., at 41-42.)

19.     During the May 21, 2000 conversation between Mr. Hanrahan and Mr. Peragine, Mr. Hanrahan informed Mr. Peragine that EB was suspending service with Plaintiff. (Hanrahan Depo., at 22.)

20.     Based on the fact that both engines on the Aircraft had failed, Mr. Hanrahan believed that the likely cause of the crash was something related to both engines, such as fuel. (Hanrahan Depo., at 39.)

21.     On May 24, 2000, Mr. Ronald Kiely, Director of Materials Acquisition for EB, sent a letter to Plaintiff stating that "as the [Aircraft] had most recently been in service between Groton and Newport News, Electric Boat is deeply concerned over the possible cause(s) of the crash." Mr. Kiely also stated in that letter, "Confirming our Kevin Hanrahan's recent phone

conversation with you, we feel that suspension of the air charter service pending your explanation of facts surrounding the Wilkes-Barre crash is prudent." (May 24, 2004 letter.) A copy of the May 24, 2000 letter was marked as exhibit 5 at the Hanrahan deposition and is attached to this statement as Exhibit I.

22.     On May 26, 2000, Mr. Peragine came to EB's facility and met with Mr. Hanrahan, Ms. Jan Stimac of EB, and other EB personnel to discuss the crash that had occurred on May 21, 2000. (Hanrahan Depo., at 26-27.)

23.     On May 29, 2000, Ms. Stimac created an e-mail memorandum (the "May 29 Memorandum") memorializing the issues discussed with Mr. Peragine at the May 26, 2000 meeting. (Hanrahan Depo., at 34-35.) A copy of the May 29 Memorandum was marked as Exhibit 4 at Mr. Hanrahan's deposition and is attached to this statement as Exhibit J.

24.     During the May 26, 2000 meeting, Mr. Peragine reported to Mr. Hanrahan and other EB personnel that on the morning of the crash, fuel had been removed from the Aircraft in order to accommodate the weight associated with adding additional passengers to the Aircraft. (Hanrahan Depo., at 94; May 26 Memorandum, at EB00135.)

25.     At the May 26, 2000 meeting, Mr. Peragine reported to Mr. Hanrahan and the other EB personnel that on the day of the crash, as the Aircraft made its initial approach to land at Wilkes-Barre, one engine lost power and subsequently, during a second approach, the second of the two engines on the Aircraft lost power. (Hanrahan Depo., at 28.)

26. At the May 26, 2000 meeting, Mr. Peragine reported to Mr. Hanrahan and the other EB personnel that the fuel which had been on the Aircraft on the day of the crash had been tested and determined not to be contaminated. (Hanrahan Depo., at 28 and 38-39.)

27. Either during the May 21, 2000 conversation with Mr., Peragine or during the May 26, 2000 meeting at EB, Mr. Peragine reported to Mr. Hanrahan that the fuel gauges on the Aircraft had problems associated with moisture in that when moisture is present, the fuel gauges were not accurate. (Hanrahan Depo., at 46-47.)

28. After his discussions with Mr. Peragine on May 21 and May 26, 2000, Mr. Hanrahan had the following concerns regarding the Plaintiff's operations: the possibility of problems associated with the fueling of the Aircraft before the crash on May 21, 2000; the possibility of deficiencies in training of the Plaintiff's pilots due to the fact that it could not be determined if the Plaintiff's pilots confirmed the fuel level of the Aircraft on the morning before the crash; and the possibility of deficiencies in the training of Plaintiff's line service personnel and/or maintenance personnel. (Hanrahan Depo., at 75-76.)

29. After his discussions with Mr. Peragine on May 21 and May 26, 2000, Mr. Hanrahan believed that the fact that the Aircraft experienced a dual engine failure evidenced that the Aircraft did not satisfy the minimum fuel requirements which is a violation of the Federal Aviation Administration (the "FAA") Regulations. (Hanrahan Depo., at 100.)

30. After his discussions with Mr. Peragine on May 21 and May 26, 2000, Mr. Hanrahan concluded that Plaintiff was unable to provide the services called for under the Contract due to the concerns regarding fueling. (Hanrahan Depo., at 145-146.)

31. On or about June 7, 2000, in a letter dated June 7, 2000, EB notified Plaintiff that because the safety of its employees "is of paramount importance" and because the findings of the FAA and the NTSB likely would not be available for some time, EB terminated the Contract. (Stillman Aff., ¶ 12; June 7, 2000 letter.) A copy of the June 7, 2000 letter was marked as exhibit 14 at the Hanrahan deposition and is attached to this statement as Exhibit K.

32. On August 26, 2002, the NTSB adopted its Aircraft Accident Brief in connection with the crash of the Aircraft. (August 26, 2002 NTSB Aircraft Accident Brief.) A copy of the August 26, 2002 NTSB Aircraft Accident Brief is attached to this statement as Exhibit L.

33. In its August 26, 2002 Aircraft Accident Brief, the NTSB determined that "the probable cause of this accident was the flight crew's failure to ensure an adequate fuel supply for the flight, which led to the stoppage of the right engine due to fuel exhaustion and the intermittent stoppage of the left engine due to fuel starvation. Contributing to the accident were the flight crew's failure to monitor the airplane's fuel state and the flight crew's failure to maintain directional control after the initial engine stoppage." (August 26, 2002 NTSB Aircraft Accident Brief, at 27.)

34. Mr. Olmsted, EB's disclosed testifying expert, has concluded that in his expert opinion, Plaintiff operated the Aircraft on May 21, 2000, in violation of FAA regulations in that the Aircraft failed to reach its intended destination due to fuel starvation as a result of an insufficient fuel quantity onboard the Aircraft. (Deposition testimony of Aaron Goodwin Olmsted given on October 14, 2004 (the "Olmsted Depo."), at 36; Affidavit of Aaron Goodwin Olmsted dated October 28, 2004, ¶¶ 11-17. (Mr. Olmsted's June 11, 2004 report.) The pages of the Olmsted deposition transcript referenced in this statement are attached to this statement as

Exhibit M. The Olmsted Affidavit is attached to this statement as Exhibit N. Mr. Olmsted's June 11, 2004 report is attached to this statement as Exhibit O.

35. Plaintiff has disclosed no expert to testify in this case and the date for such disclosure has passed.

          DEFENDANT, ELECTRIC BOAT
          CORPORATION

By_____
    Francis H. Morrison III (ct04200)
    William H. Erickson (ct18117)
    Day, Berry & Howard LLP
    CityPlace I
    Hartford, Connecticut 06103-3499
    (860) 275-0100
    Fax: (860) 275-0343
    Email: fhmorrison@dbh.com
            wherickson@dbh.com
    Its Attorneys

## CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was mailed this 29th day of October, 2004, postage prepaid, to:

Leonard Feigenbaum, Esq.
1670 Old County Road
Suite 224
Plainview, NY 11803

          _____
                William H. Erickson