UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EXECUTIVE AIRLINES,

                                                AFFIDAVIT

        Plaintiff,

— against —                              Docket #02-CV-1 94(JCH)

ELECTRIC BOAT CORPORATION,

                                                31 October 2004

        Defendant.

STATE OF NEW YORK    )
                              ) ss.:
COUNTY OF NASSAU    )

    MICHAEL S. PERAGINE, being duly sworn, deposes and says:

1.     I am the president of Executive Airlines and have been involved in all aspects of the events which gave rise to this action. I make this affidavit in support of plaintiff's motion for summary judgment dismissing defendant's counterclaim and granting judgment to plaintiff on its claim. Annexed hereto as Exhibit 1 is plaintiff's Second Amended Complaint and Exhibit 2 is defendant's Answer and Counterclaim thereto.

2.     At all times relevant to this matter, plaintiff was a charter airline company operating out of Republic Airport in Farmingdale New York. Defendant Electric Boat is a major defense contractor maintaining its offices for the conduct of business in Groton Connecticut. In October 1999, defendant issued a request for proposals to provide charter air shuttle service for Electric Boat employees from New London, Connecticut to Newport News, Virginia. Plaintiff responded to the request and engaged in initial negotiations which resulted in the draft Purchase Order dated 9 February 2000 (a copy of which is annexed to Exhibit 2 as

        defendant's Exhibit C, the "February Draft"), in which plaintiff was the Seller and defendant the Buyer.

3. Because we were to make a very large investment in facilities and equipment in order to have the capability to perform the required services, we could not accept the provision contained in the February draft purchase order which gave defendant the right to terminate the contract on seven days notice (see page 9 of Exhibit C). Further negotiations resulted in the 14 March 2000 Purchase Order (defendant's Exhibit D annexed to Exhibit 2, the "March Purchase Order") which incorporated Purchase Order Supplement No. 1 containing paragraph 2 (Exhibit D, page 6) in which (A) was changed and defendant added (B) and which states :

"TERMINATION:   (A) BUYER RESERVES THE RIGHT TO TERMINATE THIS SERVICE WITHOUT PENALTY UPON SIX (6) MONTHS WRITTEN NOTICE TO SELLER.
                (B) BUYER RESERVES THE RIGHT TO TERMINATE THIS SERVICE WITHOUT PENALTY UPON TEN (10) DAYS WRITTEN NOTICE TO SELLER DUE TO DEFAULT BY SELLER PER ELECTRIC BOAT TERMS AND CONDITIONS, GDC 410, 03/87."

4. GDC 410 turned out to be a boilerplate document entitled Purchase Order Terms and Conditions (defendant's Exhibit A annexed Exhibit 2, "Terms and Conditions") which I did not see until well after execution of the contract. Plaintiff had no input into that document and it stands exactly as it was written by defendant.

5. The entire contract (the "Contract") consists of the March Purchase Order which incorporated the provisions from the February Draft (see Exhibit D, page 1) and contained Supplement No. 1, which referenced the terms and conditions of GDC 410, comprising Exhibits A, C and D. The Contract was for a term of one year (Exhibit D, page 5), had an estimated value of $1,500,000 (Exhibit D, page 1), and provided for a minimum monthly

billing by plaintiff for fifteen round trips at $4,895 per round trip flight, amounting to $73,425 per month.

6. We commenced operations for defendant on 10 April 2000 using three Jetstream 3100 aircraft (a fourth had also been acquired as a backup) and continued those operations for approximately a month until 21 May 2000. On that date, one of the aircraft we had been using in the New London – Newport News shuttle for defendant crashed killing all aboard. That aircraft had been on a charter flight having nothing to do with defendant. I spoke to Robert Januska from Electric Boat on the day of the crash and advised him we were still capable of fulfilling our obligations, as soon as the next day. See Exhibit 3, 24 May 2000 Electric Boat inter-office memo by Kevin Hanrahan.

7. Shortly after the crash, defendant notified plaintiff by letter dated 24 May 2000 (Exhibit 4) that it was temporarily suspending plaintiff's services. In response to defendant's concerns, I met with Electric Boat personnel, including their chief pilot, on 26 May 2000 for a lengthy discussions about the crash and my company's history and capabilities. In the course of that meeting, I answered all questions asked of me as best I could and read directly from draft reports written by the National Transportation Safety Board investigators. I also told Electric Boat personnel that we had three other Jetstreams available and that Pan Am was prepared to back us up. See Exhibit 5, 1 June 2000 e-mail from Robert C. Januska to Ron Kiely containing a description of the meeting.

8. As a result of the initial investigations, neither the NTSB nor the Federal Aviation Administration made any negative findings against plaintiff nor took any action against plaintiff and did not in any way curtail its operations. I so advised defendant's personnel at

the 26 May 2000 meeting with them.

9. As a result of investigations completed in August 2002, neither the NTSB nor the FAA took any action against plaintiff and did not in any way curtail its operations.

10. With no advance warning, by letter dated 7 June 2000 (Exhibit 6), defendant terminated the Contract. We did not believe defendant had the right to immediately terminate the Contract, did not accept the termination, remained capable of providing the contracted services and continued billing defendant, taking the position that the Contract could only be canceled on six months notice. I wrote to defendant on 10 July 2000 (Exhibit 7) setting forth our position. Defendant responded by its letter of 1 August 2000 (Exhibit 8). Defendant never contested our monthly bills other than claiming an entitlement to terminate the Contract. Defendant refused to pay for the six-month period after we received their termination letter and this action ensued.

11. Plaintiff's complaint originally contained four causes of action: Count One - breach of contract, Count Two - accounts stated, Count Three - liquidated damages, Count Four - actual damages. By order dated 17 July 2003, Hon. Gerard L. Goettel dismissed the claim for liquidated damages. Thereafter, plaintiff withdrew its claim for actual damages, thereby leaving only the first two causes of action. In its response to the complaint, defendant counterclaimed for breach of contract.

12. Defendant's counterclaim is based on paragraph 12 of the Terms and Conditions under the heading Termination for Default. It is submitted there are no factual issues to be determined, the only question being interpretation of the Contract by the Court in light of the undisputed facts. Paragraph 12 empowers defendant, under certain conditions, to terminate the Contract

by written notice of default to seller. No such notice was given to us. Paragraph 12 also provides for a ten day period to cure the default. No such time period was given to us. More importantly, we did not default under the terms of the Contract and defendant did not inform us of any default on our part. We had the capability of performing our obligations under the Contract with other aircraft and crews. In addition, we had both the right and mandate to subcontract our services under the provisions on page 2 of the March Purchase Order (Exhibit D), which states:

"IN THE EVENT THE SELLER IS UNABLE TO PROVIDE THESE SERVICES, THE SELLER WILL BE RESPONSIBLE TO SUBCONTRACT THE SERVICES, WITHOUT EXCEPTION OF TERMS AND CONDITIONS, OF THIS CONTRACT AT NO ADDITIONAL COST TO THE BUYER.

13. We were never given the opportunity to subcontract our services after the crash although we had done so, with defendant's approval, prior to termination of the contract. See Exhibit 10, 15 May 2000 e-mail referring to Pan Am pilots.

14. Since we did not default and defendant did not follow the procedure which it set forth in the Terms and Conditions it wrote, the termination letter was ineffective and can only be deemed a six-month termination pursuant to paragraph 2 (A) of Supplement No. 1. We are therefore entitled to the contract payment of $73,425 per month for six months after the improper termination of the Contract. I therefore respectfully request the Court dismiss defendant's counterclaim and grant judgment to plaintiff on its complaint for $440,550 together with interest thereon and such other and further relief as the Court deems just and proper..

                                              MICHAEL S. PERAGINE

Sworn to before me
on 31 October 2004