UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EXECUTIVE AIRLINES,

                                   CIVIL ACTION NO.
                Plaintiff,       02-CV-1 94 (JCH)

    — against —

ELECTRIC BOAT CORPORATION,

                                 7 November 2004
                Defendant.

## PLAINTIFF EXECUTIVE AIRLINES' MEMORANDUM OF LAW ON ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTORY STATEMENT

This action seeks the six month contractual payments due to plaintiff based on a minimum one-year agreement (the "Contract"[1]) pursuant to which plaintiff was to provide continuing air charter services to defendant between defendant's facilities in Groton, Connecticut and Newport News, Virginia. The Contract granted to defendant the unqualified right to terminate the Contract on six months' notice as well as the right to terminate for plaintiff's default on ten days' notice. By letter sent to plaintiff, defendant claimed it was immediately terminating the Contract and has refused to make any payments since then. Defendant counterclaimed against plaintiff for breach of the Contract.

Both plaintiff's action and defendant's counterclaim are predicated on interpretation of the three documents comprising the Contract and two subsequent letters comprising the termination by defendant. It will be shown that plaintiff's position is based solely on analysis and interpretation of

---

[1] As explained in the Affidavit of Michael S. Peragine submitted herewith, the Contract consists of several parts which are hereinafter described.

1

those documents while defendant relies on extrinsic events to make its claim.  For clarity, defendant's counterclaim must be dealt with first since it raises a host of irrelevant events and relies on evidence inadmissible in the Contract interpretation.

Defendant's counterclaim must fail since defendant did not comply with the provisions of its own "boilerplate" Terms and Conditions.  Working back from that, since defendant's termination must be deemed for other than default, the six month termination provision[2] controls and the Terms and Conditions do not apply to a termination other than for default.  Defendant argues that even if the Contract were terminated by it for reasons other than default, paragraph 14 of the Terms and Conditions controls, but that paragraph is not referenced in and does not apply to the six month termination provision[3].  Since paragraph 14 would render the six month termination provision meaningless and since paragraph 23 of the Terms and Conditions provides that the March Purchase Order takes precedence over the Terms and Conditions, the six month termination provision must control and plaintiff is therefore entitled to payment for the monthly minimum.

<u>HISTORY OF THE MATTER</u>

There is virtually no dispute as to the basic relevant operative facts of this matter.  As set forth in the Peragine affidavit and as detailed in prior motions, defendant issued its Request for Quotations, plaintiff responded, the parties negotiated and finally agreed to enter into the Contract, which consists of the 14 March 2000 Purchase Order (defendant's Exhibit D annexed to Exhibit 2, the "March Purchase Order") which incorporated the provisions from the February Draft Purchase

---

[2] Paragraph 2(A) of Purchase Order Supplement No. 1, hereinafter described.

[3] The reference to the Terms and Conditions is contained in Paragraph 2(B) of Purchase Order Supplement No. 1.

Order (defendant's Exhibit C annexed to Exhibit 2) and contained Supplement No. 1, which referenced the terms and conditions of GDC 410, (the Terms and Conditions) comprising Exhibits A, C and D to Exhibit 2.

On 21 May 2000, a little more than one month after plaintiff commenced its shuttle service for defendant, plaintiff suffered a fatal crash of one of the Jetstream aircraft which it had been using for defendant's flights. Despite the crash, plaintiff remained capable of performing its obligations under the Contract (Peragine Aff., ¶ 6, Exhibit 3.). Mr. Peragine also met with defendant's personnel to update them on the crash investigation and plaintiff's continuing capabilities. (Peragine Aff., ¶ 7, Exhibit 5.) Nevertheless, on 7 June 2000, defendant sent its letter (Exhibit 6) terminating the Contract (the "Termination Letter").

THE CONTRACT PROVISIONS

Paragraph 2 of Supplement No. 1, contained in the March Purchase Order (Exhibit 2 D, page 6), is particularly significant. As described by Mr. Peragine (Peragine Aff., ¶ 3.), it was critical to plaintiff to change the blanket seven day termination provision of the February Draft Purchase Order (Exhibit 2C, page 9) to increase the termination period to six months, if termination was to be based on anything other than plaintiff's default. As part of the deal, defendant then added in a termination on default provision. Paragraph 2 states (plaintiff is Seller and defendant is Buyer throughout the Contract) as follows:

> "TERMINATION:    (A) BUYER RESERVES THE RIGHT TO TERMINATE THIS SERVICE WITHOUT PENALTY UPON SIX (6) MONTHS WRITTEN NOTICE TO SELLER.
>                  (B) BUYER RESERVES THE RIGHT TO TERMINATE THIS SERVICE WITHOUT PENALTY UPON TEN (10) DAYS WRITTEN NOTICE TO SELLER DUE TO DEFAULT BY SELLER PER ELECTRIC BOAT TERMS AND CONDITIONS, GDC 410, 03/87."

3

The Terms and Conditions contained two separate paragraphs dealing with termination of the Contract, paragraph 12 entitled "Termination for Default" and paragraph 14 entitled "Termination for Convenience". Relevant parts of paragraph 12 are subparagraphs (a) and (b) which state in full:

12.   TERMINATION FOR DEFAULT (a)  Buyer may, subject to the provisions of subparagraph (c) below, by written notice of default to Seller, terminate the whole or any part of this order in any one of the following circumstances: (i) If Seller fails to make delivery of the goods or to perform this order within the time specified herein or any extension thereof, or (ii) if Seller fails to perform any of the other provisions of this order, or so fails to make progress as to endanger performance of this order in accordance with its terms and does not cure such failure within a period of ten (10) days (or longer period as Buyer may authorize in writing) after receipt of notice from Buyer specifying such failure.

(b) In the event Buyer terminates this order in whole or in part as provided In subparagraph (a) above, Buyer may procure, upon such terms and in such manner as Buyer may deem appropriate, supplies or services similar to those so terminated, and Seller shall be liable to Buyer for any excess casts for the same; provided, that Seller shall continue the performance of this order to the extent not terminated hereunder.

Paragraph 14 states, in full:

14. TERMINATION FOR CONVENIENCE:  Buyer may at any time by written notice terminate all or any part of this order for Buyer's convenience. If this order is terminated, in whole or in part, for Buyer's convenience, Seller shall be paid an amount, to be mutually agreed upon, which shall be adequate to cover the reasonable cost of Seller's actual performance of work under this order to the effective date of termination, plus a reasonable profit thereon provided that no amount shall be paid to Seller for (i) any anticipatory profits related to work under this order not yet performed, or (ii) costs incurred due to Seller's failure to terminate work as ordered on the effective date of termination. In no event shall the total amount paid under this provisions exceed the prices set forth in this order for the work terminated. If a Government contract number is cited on the face hereof, a termination for Buyer's convenience shall be accomplished in accordance with DAR 8-706 or FAR52-249, as in effect on the date of this order, which shall be controlling over any conflicting provisions hereof.

4

In addition to the termination provisions, the Purchase Order Terms and Conditions contained one other relevant paragraph, paragraph 23, which states, in its entirety:

> 23.  ORDER OF PRECEDENCE: this letter and all documents incorporated by reference constitute the entire agreement of the parties as to the subject matter hereof. In the event of any inconsistency among the foregoing the inconsistency shall be resolved by getting precedence in the following order: (i) the purchase order to which these terms and conditions are attached; (ii) these terms and conditions; (iii) the specifications; (iv) the drawings; and (v) the other documents incorporated by reference.

It is plaintiff's position that, as a matter of law as well as a matter of facts, defendant's purported termination of the contract could not have been for plaintiff's default and must therefore have been for defendant's convenience.  As such, plaintiff is entitled to six months of the minimum monthly payment pursuant to paragraph 2(A) of Supplement No. 1 to the March Purchase Order. The definitive point is the fact that paragraph 2(A) does not refer to the Terms and Conditions while paragraph 2(B) does.  Beyond that, since paragraph 14 of the Purchase Order Terms and Conditions is inconsistent with and would render the six-month termination provision of the Purchase Order meaningless, the Purchase Order must take precedence.

## POINT 1

### SUMMARY JUDGMENT IS APPLICABLE

_____Since there appears to be no dispute between the parties as to any factual issue, summary judgment must apply[4].  "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[4] Since both parties are moving for summary judgment and in light of the discussion by Judge Goettel in this case as to the summary judgment standard and the application of Connecticut law, plaintiff will not belabor those points since they have been more than adequately covered.

judgment as a matter of law." Fed. R. Civ. P. 56(c). *Celotex v. Catrett,* 477 U.S. 317 (1986). The

issue here is the application of the Contract terms, not the irrelevant events which occurred.

### POINT II

THE UNDISPUTED FACTS ESTABLISH THERE IS NO
FACTUAL OR LEGAL BASIS FOR DEFENDANT'S COUNTERCLAIM

Defendant's counterclaim alleges breach of the Contract by plaintiff (Exhibit 2, ¶ 32) and

further alleges defendant terminated the Contract on 7 June 2000 (Exhibit 2, ¶ 28). Defendant

claimed the right to terminate pursuant to Terms and Conditions ¶ 12(a) (Exhibit 2, ¶ 20) and

entitlement to damages pursuant to Terms and Conditions ¶ 12(b) (Exhibit 2, ¶ 21). Whatever rights

defendant may have had under the Contract, they had to be exercised according to its terms.

Although defendant quoted part of paragraph 12(a) in its counterclaim, it omitted the

mandate for "written notice of default". The counterclaim fails to allege any actions on plaintiff's

part which constituted a default under the Contract and it failed to allege service of a notice of

default. Instead of alleging facts, it alleges in paragraph 27 the unsupported conclusion: "As a result

of the crash and the ensuing, and ongoing, investigation, Executive Airlines has been unable to

provide the service it agreed to under the Purchase Order Agreement". Proper notice of default and

ten days to cure were conditions precedent to termination of the Contract. *Blitz v. Sublkew,* 74 Conn.

App. 183, 810 A.2d 841 (2002).

> "A condition precedent is a fact or event which the parties intend must exist or take
> place before there is a right to performance. *Christophersen v. Blount, 216 Conn.
> 509, 512, 582 A.2d 460 (1990),* quoting *Lach v. Cahill, 138 Conn. 418, 421, 85 A.2d
> 481 (1951),* if the condition does not take place, the right to enforce the contract does
> not come into existence." *Scoville v. Shop Rite Supermarkets, Inc.,* 2001 Conn.
> Super. LEXIS 3518

Defendant failed to give notice of default.  The 7 June 2000 Termination Letter (Exhibit 6) referenced the 24 May 2000 suspension letter (Exhibit 4) so they should be read together.  Neither document referred to a default, neither document spelled out any act or failure to act on plaintiff's part, neither document mentioned an opportunity to cure the unnamed default, and neither document acknowledged the contractual period to cure.  Neither document (nor the two together) constituted a notice of default as contemplated in paragraph 12(a) of the Terms and Conditions which defendant wrote.

Analysis of the Termination Letter will show its ambiguity and failure to specify anything other than a voluntary termination by defendant.  It states:

> "Pursuant to the article entitled "Termination" of Electric Boat Conditions of Purchase invoked in the subject purchase order by reference, the subject purchase order is hereby terminated in its entirety."

The only article entitled "Termination" is paragraph 2 of Supplement No. 1 and the letter fails to identify whether the reference is to subparagraph (a) or (b).  Defendant's intention could not have been to refer to either paragraphs 12 or 14 of the Terms and Conditions since one is entitled "Termination for Default" and the other is entitled "Termination for Convenience".

The only other significant statement in the Termination Letter is: "As the findings of the FAA and NTSB will likely not be available in the near future, we feel we must proceed in other directions."  That statement establishes the reason for defendant's action is not a default on the part of plaintiff, but the unavailability of FAA and NTSB reports[5].  Finally, the last phrase indicates defendant's action was deliberately voluntary and based on its own choice.  Since defendant's words

---

[5] As stated in paragraph 8 of the Peragine Affidavit, defendant was advised on 26 May 2000 that neither the FAA nor NTSB had made any negative findings against plaintiff nor curtailed its service.

must be construed against defendant, it is clear the termination was for its own unstated and amorphous reasons under paragraph 2(A) of Supplement No. 1.

In relying on the crash, speculation, and long-after-the-fact Monday morning quarterbacking, defendant is seeking to avoid the four corners of the Contract and its specific notice of default provision and to substitute therefor parol evidence, primarily consisting of speculation and information derived long after 7 June 2000. By doing so, defendant is seeking to subvert the clear terms of an integrated contract[6].

> "Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant." ...
> "Generally, however, "we continue to adhere to the general principle that the unambiguous terms of a written contract containing a merger clause may not be varied or contradicted by extrinsic evidence." *Tallmadge Bros., Inc. v. Iroquois Gas Transmission System, L.P., 252 Conn. 479, 503, 746 A.2d 1277 (2000).*" *Alstom Power, Inc. v. Balcke-durr, Inc.,* 269 Conn. 599 at 609, 849 A.2d 804, (2004)

As a matter of law, defendant's failure to comply with the notice of default provision of paragraph 12(a) of the Terms and Conditions precludes any claim by defendant under paragraph 12(b) since such compliance is a condition precedent to seeking recourse and all of defendant's extrinsic and inadmissible evidence will not change that. When a party to a contract seeks to enforce its provisions, it must abide by the contract's preconditions to bringing suit. In *Elm Haven Construction Limited Partnership, v. Neri Construction LLC.,* 376 F.3d 96 (2004) the Second Circuit held, at 100:

> "In order to trigger USF&G's liability under the Performance Bond, two conditions had to be met. First, Neri had to be "in default" under the subcontract agreement, and second, Elm Haven had to "declare [Neri] to be in default under the" subcontract

---

[6] Such a finding was made previously in this case. See *Executive Airlines, v. Electric Boat Corporation,* 271 F. Supp. 2d 392 at 399 (2003).

agreement. Such a declaration of default had to be made to USF&G in precise terms." ...

"In Braspetro, this court quoted L & A Contracting for the proposition that "'evidence [is] insufficient as a matter of law to establish a declaration of default' where 'none of the letters [obligee-general contractor] sent to [principal-subcontractor] and [surety] even contained the word "default" and where 'other items of correspondence' did not contain an 'unequivocal declaration of default.'" *Braspetro, 369 F.3d at 57* (quoting *L & A Contracting, 17 F.3d at 111*)."

Furthermore, plaintiff had the right and obligation to subcontract its services if necessary and defendant's precipitous action precluded plaintiff from exercising that right.

At the risk of beating a dead horse, it is worth examining the factual situation regarding defendant's counterclaim. The uncontested facts based on defendant's own documents prove there could not have been a default by plaintiff at the time of defendant's termination. The 24 May 2000 memo (Exhibit 3) of Kevin Hanrahan, defendant's chief pilot, acknowledges plaintiff was prepared to perform under the Contract the day after the crash and the notes of the 26 May 2000 meeting (Exhibit 5) establish that plaintiff had three Jetstream aircraft available for the shuttle. No documents indicate any inability on plaintiff's part to perform the Contract services. Further, the absence of any negative finding or curtailment of plaintiff's operations by the FAA prior to 7 June 2000 or at any time thereafter precludes any possibility that the aircraft, the pilots or plaintiff had failed to meet all FAA regulations (as required by Exhibit 2(D), page 2), since the burden was on defendant to establish such failure and that it existed on or before 7 June 2000 (and that it so notified plaintiff of it in a notice of default).

Since the Termination Letter was written on 7 June 2000, it had to have been based on the facts as they existed on that date. Obviously, events which occurred or information gained after 7 June 2000 could not have been part of defendant's decision to terminate. Despite defendant's

attempt to retroactively base its termination on events which occurred months or years later, everything after that date is totally and completely irrelevant to this Contract and its termination by defendant.  The issue as to defendant's counterclaim is whether, as a matter of fact, plaintiff had defaulted under the Contract and whether, as a matter of law, defendant had a claim against defendant on 7 June 2000 and had taken all steps required by the Contract to pursue such a claim.  Clearly, defendant did not pass either the factual or legal threshold.  Defendant's counterclaim must therefore be dismissed.

**POINT III**

DEFENDANT'S VOLUNTARY TERMINATION
<u>DOES NOT IMPLICATE THE TERMS AND CONDITIONS</u>

As noted above, paragraph 2 of Purchase Order Supplement No. 1 contains two separate termination provisions entitling defendant to terminate the Contract.  The voluntary termination provision contained in subparagraph (A) did not contain the reference to the Terms and Conditions specified in subparagraph (B).  The difference between the two subparagraphs is intentional and clearly the Terms and Conditions were not intended to apply to a voluntary termination.  The reference to the Terms and Conditions in subparagraph (B) cannot be added by the Court.  In an analogous situation dealing with two separate but similar provisions of a contract, the Supreme Court of Connecticut said:

> "Terms cannot be added to a contract by interpretation.  (Citations omitted.)  The contract expressly made stage 3 the final step of the job evaluation appeal procedure, and it was not for the court to import another and different final step."  *The Connecticut Union of Telephone Workers, Inc. v. The Southern New England Telephone Company,* 148 Conn. 192; 169 A.2d 646 (1961).

10

Subparagraph 2(A) therefore stands alone and defendant's obligation for payment for six months after termination is absolute.

Even if the Terms and Conditions were generally applicable, paragraph 14 would still not apply. The intention of subparagraph 2(A) was clearly to provide a six-month stream of income to plaintiff even in the event of an early termination. Any other interpretation would render the clause ineffectual. Examination of the boilerplate Terms and Conditions will show they were intended to apply to all vendors dealing with defendant and were oriented toward suppliers of goods, rather than services. (See paragraph 12(a) above: "If Seller fails to make delivery of the goods ...".) Since all of plaintiff's services were prospective and could only be performed in the future in accordance with a schedule controlled by defendant (as opposed to, for example, a lawyer writing a contract), application of paragraph 14 which provides for compensation only to the date of termination and only for work actually done, would have the effect of rendering subparagraph 2(A) meaningless and of no effect. Application of paragraph 14 to this Contract would amount to giving defendant the right of immediate, rather than six month termination, which is clearly not the intent of the Contract.

Obviously, paragraph 14 is inconsistent with subparagraph 2(A). Fortunately, the Terms and Conditions specifically deal with inconsistencies in paragraph 23 and resolve this inconsistency by giving precedence to the specifically negotiated Purchase Order over the boilerplate Terms and Conditions. Accordingly, paragraph 14 cannot apply to defendant's voluntary termination under subparagraph 2(A). Similarly, in *Alstom,* the court also held at 611:

> Finally, § 5.1 of the supply agreement establishes the priority of documents in the event of an inconsistency with regard to their terms. Notably, that section provides that the purchase order takes precedence over all other documents, including the supply agreement."

In accepting and agreeing to operate under the six-month termination provision of subparagraph 2(A), defendant accepted a specific financial responsibility under the contract. That provision contemplated that plaintiff would have at least a six month cash flow even if the Contract were cancelled early in its term. In *Habetz v Condon,* 224 Conn. 231 at 238, 618 A.2d 501 (1992), the court said:

> "The law does not permit the exercise of a right to repudiate a contract when the exercise of such a right in bad faith would work an injustice. Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement."

If defendant's termination was deliberately intended to deprive plaintiff of the benefits of the Contract by an immediate, rather than six month termination, it cannot be upheld by the Court.

## POINT IV

### PLAINTIFF'S MOTION IS NOT INCONSISTENT WITH THE COURT'S PRIOR DECISION

Defendant's prior motion for summary judgment in this case was very limited, as is stated in the decision of Judge Goettel:

> "Electric Boat has now moved for summary judgment [**Doc. # 34**] on the grounds that there is no genuine issue of material fact concerning its right to terminate the contract and there is nothing in the contract that would entitle Executive Airlines to liquidated damages." Page 394.

Judge Goettel held that defendant had a contractual right to terminate the Contract and that the Contract did not provide for liquidated damages. Specifically, Judge Goettel did not deal with the basis for defendant's termination of the Contract but simply that it had the unqualified right to terminate and the termination was therefore not a breach. While Judge Goettel discussed Terms and Conditions paragraph 14, he made no finding regarding it but instead considered and discussed

12

plaintiff's prior claim as to liquidated damages and found nothing in the Contract to support that claim. In Judge Goettel's conclusion, he said:

> "... we hold that Electric Boat's early termination of the Agreement did not constitute a breach of contract and that Executive Airlines is not entitled to an award of six months' income as liquidated damages. Accordingly, we grant summary judgment in favor of Defendant, Electric Boat, on Count Three of the Amended Complaint. However, we reach no decision as to whether there was a default by Executive Airlines or to what damages Executive Airlines may be entitled as a result of this early termination. Likewise, Electric Boat's counterclaim remains pending. These are matters on which the parties have not submitted any proof and which cannot be resolved on summary judgment." Page 399.

The issues before this Court were not considered by Judge Goettel. In particular, Judge Goettel did not consider that subparagraph 2(A) did not contain the reference to the Terms and Conditions contained in subparagraph 2(B), nor was such consideration necessary to the determination of the only two issues before him: whether a liquidated damages provision existed, and whether defendant had a right to terminate the Contract. Judge Goettel did not say plaintiff is not entitled to an award of six months' income, but did say that plaintiff is not entitled to an award of six months' income <u>as liquidated damages</u>. In leaving open all questions relating to the balance of plaintiff's complaint and defendant's counterclaim, this Court is unimpeded in its consideration of the issues discussed here in plaintiff's motion to dismiss defendant's counterclaim and for judgment on plaintiff's complaint.

13

## CONCLUSION

For the foregoing reasons, plaintiff Executive Airlines respectfully requests the Court grant plaintiff's motion dismissing defendant Electric Boat's counterclaim and granting judgment to plaintiff on its complaint.

PLAINTIFF, EXECUTIVE AIRLINES

By:_____
I. Leonard Feigenbaum (ct25807)
Visiting Attorney for Plaintiff
1670 Old Country Road - Ste 224
Plainview, New York 11803
Tel. (516) 420-6900
Fax (516) 420-8444
leefeig@aol.com

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was mailed on 8 November 2004 to the following:

Day, Berry & Howard LLP
CityPlace I
Hartford CT 06103-3499

_____
I. LEONARD FEIGENBAUM