UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EXECUTIVE AIRLINES,

          Plaintiff,

— against —

ELECTRIC BOAT CORPORATION,

          Defendant.

AFFIDAVIT

Docket #02-CV-194(JCH)

18 November 2004

STATE OF NEW YORK    )
                               ) ss.:
COUNTY OF NASSAU     )

        MICHAEL S. PERAGINE, being duly sworn, deposes and says:

1. I am the president of Executive Airlines and make this affidavit in response to defendant's motion for summary judgment.

2. I have been advised that since this action is based on an integrated contract, only the contract documents and the documents effecting its termination are admissible in evidence. Based on that principle, almost all of the documents, testimony and arguments presented by defendant in support of its motion are completely irrelevant to the issues involved in defendant's motion. I will, nevertheless, and without dignifying defendant's claims, respond to defendant's allegations which are incorrect or distorted.

3. Paragraph 8 of the affidavit of Dorothy Stillman is incorrect in stating that Executive Airlines commenced its flights for defendant using a single aircraft since we actually employed three Jetstreams and acquired a fourth. The affidavit misleads by implying that only one airplane was utilized, which was the one that subsequently crashed.

1

4. The most significant aspect of the Stillman Affidavit is what it did not say. Strangely, Ms. Stillman did not acknowledge that the termination letter bore her signature. The letter does not contain a notice of default in accordance with the Contract terms, nor a statement as to what acts of plaintiff constituted a default under the Contract, nor a ten day period to cure any alleged default, nor our right to subcontract our services. Her affidavit did not even identify who wrote the letter which she signed.

5. Turning to defendant's Local Rule 56(a)1 Statement (the "Statement"), the bulk of it is a recitation of speculation and events concerning the crash of one of our airplanes and is completely irrelevant to the Contract and its termination.

6. Paragraphs 8 through 14 of the Statement contain significant distortions of what are purported to be statements of fact. Paragraph 8, for instance, quotes me as saying as an absolute: "...there was confusion..." when my actual testimony (which was clearly speculation on my part) was "... there may have been some confusion ...". (Defendant's Exhibit B, page 68, line 3). Further in the same page I said "I was led to believe ..." and "... so I thought there may have been some confusion ...", clearly indicating I had no definitive answers and was basing my testimony on my recollection of what I may have been told over three years earlier. The same comments apply to the statements in paragraph 11.

7. The statement attributed to Can Basat in paragraph 13 is outrageous hearsay from someone who had her own axe to grind and was hoping to bring a law suit for herself. Mr. Basat was an experienced and professional pilot who would not have made such a statement, especially since it would have reflected on his knowledge of the aircraft and his ability to accurately determine the aircraft's fuel load. During the entire time he worked for Executive Airlines

he was upbeat and positive about his job, the company and the aircraft he flew. The statement demeans him, his familiarity with the aircraft and his professionalism.

8. On 21 May 2000, I spoke to Kevin Hanrahan. His memo (defendant's Exhibit H) written three days later contains certain inaccuracies in addition to the "cherry picking" of statements I made. Although I told him we were ready to fly the next day, we agreed it would be best to temporarily suspend operations. Obviously, since I was on Long Island and the crash occurred in Pennsylvania that morning, I could not possibly have had any knowledge whatsoever as to its cause. As quoted in Mr. Hanrahan's letter, I said: "At this time [I] had no idea how this accident could have happened". I could only speculate as to possible causes and I speculated as to fueling. I never informed Mr. Hanrahan that the pilot told me the fuel gauges were not operating the way they should have. Mr. Hanrahan's memory is either faulty or is overly influenced by who signs his paycheck.

9. Defendant's Exhibit G did not include part of the transcript of Mr. Hanrahan's testimony as to the best methods of determining fuel quantity on a Jetstream 31. Mr. Hanrahan referred to the pilot having "stuck" the fuel tank, but he had no idea what the term meant as to a Jetstream. Plaintiff's Exhibit 1 is pages 109 and 110 of Mr. Hanrahan's deposition testimony in which he finally acknowledges his ignorance of the Jetstream fuel measuring system.

and however far-fetched, in an attempt to retroactively justify defendant's termination of the Contract. In his deposition, (despite hours of intensely evasive answers) Mr. Olmsted finally admitted there were no complaints to the FAA about Executive Airlines and nothing adverse was found in 2000 as to Executive Airline's training in the course of the accident investigations (Exhibit 2, pages 193 through 201 of the 14 October 2004 deposition of Mr. Olmsted at page 193).

17. In his zeal to find any Executive Airlines violation (despite the absence of any such finding by the FAA or NTSB), Mr. Olmsted was determined to ignore any documents, evidence or testimony which contradicted his foregone conclusions. A particularly egregious example of pushing his partisan "investigation" to the point of absurdity is in his conclusion that First Officer Can Basat (First Officer on the crash flight) was unqualified for duty at Executive Airlines from November 1998 through 21 May 2000 (defendant's Exhibit O, page 3 ¶ 7) because the required training he actually received was not recorded on his Duty Log. Duty Logs are <u>not</u> part of the required training documentation under Executive Airlines training program and are not maintained to for the purpose of proving such training. In fact, Duty Logs are not required to be kept until the initial training and check rides are complete since a pilot cannot be assigned to duty until such training has been completed.

18. F/O Basat applied for employment with Executive Airlines on 9 November 1998 and indicated on his application that he was available to start on that day. F/O Basat offered to pay for his own Jetstream training if Executive Airlines would hire him on satisfactory completion of training and check ride. We agreed to do so. The documents required under the Executive Airlines training program, the Training Certificate (Exhibit 3) signed by F/O

6

Neither the statements of Mr. Olmsted's testimony nor his affidavit or letter should have been submitted in defendant's Statement.

24. At the time of my meeting with defendant's personnel on 26 May 2001, I explained to them that the FAA and NTSB had, within hours after the crash, visited our offices in Farmingdale and taken all of our airman training and maintenance records. Over the next several days they put us under a microscope and found nothing negative in our operations or training, and nothing warranting suspending or curtailing our operations — which indicated they believed the crash was the result of some anomaly other than a training, pilot qualification or maintenance failure. Having looked through the reports I brought with me, Mr. Hanrahan was aware the FAA had not accused Executive Airlines of any violations and neither he nor anyone else at Electric Boat mentioned (let alone cited) any violation by Executive Airlines of any FAA regulations at any time prior to the termination letter.

25. None of the information or findings on which defendant now relies existed at the time defendant terminated the contract. Consequently, none of it had anything to do with the termination and all of it is therefore irrelevant to this case.

26. Based on the Contract terms and the facts existing at the time of the Contract termination on 7 June 2000, defendant's termination could not have been for plaintiff's default, and defendant failed to terminate the Contract in accordance with its terms. It is therefore respectfully submitted that defendant's motion for summary judgment must be denied.

_____
MICHAEL S. PERAGINE

Sworn to before me
on 18 November 2004

_____
I. LEONARD FEIGENBAUM
NOTARY PUBLIC, STATE OF NEW YORK
NO. 52-5253050, SUFFOLK COUNTY
TERM EXPIRES 28 FEBRUARY 2007

9