UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EXECUTIVE AIRLINES | : | CIVIL ACTION NO. |
| | : | 02-CV-194 (JCH) |
| Plaintiff, | : | |
| VS. | : | |
| | : | |
| ELECTRIC BOAT CORPORATION, | : | |
| | : | |
| Defendant. | : | NOVEMBER 30, 2004 |

**<u>DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

In its Motion for Summary Judgment dated November 7, 2004, Plaintiff Executive Airlines, Inc. ("Plaintiff") argues that it is entitled to judgment as a matter of law on the breach of contract counterclaim filed by defendant Electric Boat Corporation ("EB") and on both of its claims of breach of contract and accounts stated.  Plaintiff attempts to divert this Court's attention from the tragic event that lead to this litigation – the crash of an aircraft operated by Plaintiff and flown by Plaintiff's employees on May 21, 2000, killing all passengers and crew members onboard.  Plaintiff also ignores the fact  that there is <u>no</u> competent evidence to contradict EB's position that Plaintiff breached the Contract by not complying with all applicable FAA regulations and by not being able to provide aircraft and pilots that met with EB's chief pilot's approval.

With respect to EB's counterclaim, Plaintiff's motion fails because regardless of whether EB complied with the termination for default notice provision, EB is entitled to pursue a claim for breach of contract.  This is so because EB and Plaintiff agreed in the Contract (section 12(f)

**ORAL ARGUMENT IS REQUESTED**

of the Terms and Conditions[1]) that in addition to exercising its right to terminate the Contract for default, EB is entitled to pursue any other right or remedy provided by law or under the Contract – such as an action for breach of contract. In addition, EB has presented ample evidence – uncontroverted in Plaintiff's motion – that Plaintiff breached the Contract. The facts and arguments in support of this position are set forth in detail in EB's Summary Judgment motion and supporting memorandum. Noticeably, Plaintiff presents no evidence to the contrary.

With respect to Plaintiff's claims for breach of contract and accounts stated, Plaintiff incorrectly argues that the Contract specifically provides that if EB exercised its right to terminate the Contract for convenience, EB was obligated to pay to Plaintiff an amount equal to 15 round-trip flights per month for six months <u>even though Plaintiff never rendered such services and accordingly incurred no costs associated with them</u>. This argument finds no support in the Contract, in the law, or in this Court's prior ruling.

### A. There Exists A Factual And Legal Basis For EB's Counterclaim Notwithstanding Plaintiff's Argument To The Contrary.

1. <u>EB Is Entitled To Sue For Breach Of The Contract.</u>

As Plaintiff correctly points out, the Contract provided EB with the right to terminate the Contract as a result of Plaintiff's default. (Plaintiff's Brief, at 4.) Even if EB did not provide proper notice of default, however, it retained the right to sue for breach of contract. Plaintiff ignores the fact that the parties agreed that EB's right to terminate for default was not exclusive and did not preclude EB from exercising any other remedies available to it. Specifically, EB and

---

[1] Capitalized terms used in this Opposition Memorandum have the same meanings ascribed to them in EB's Memorandum of Law in Support of its Motion for Summary Judgment dated October 29, 2004 (the "Memorandum of Law").

Plaintiff agreed that, "the rights and remedies of [EB] provided in this paragraph [paragraph 12] shall not be exclusive and are in addition to any other rights and remedies provided by law or under this order." (Terms and Conditions, ¶ 12(f).) Accordingly, regardless of whether EB provided the proper notice of default as set forth in paragraph 12, the parties specifically agreed that EB retained, among other things, the common law right to sue for breach of contract. Plaintiff's summary judgment motion regarding EB's counterclaim fails for this reason.

Plaintiff also incorrectly argues that proper notice of default and an opportunity to cure were "conditions precedent" to EB's right to terminate the Contract. The cases cited by Plaintiff do not support its position. For instance, Plaintiff cites only a portion of the Court's holding in Blitz v. Sublkew, 74 Conn. App. 183 (2002). A fuller review of that decision reveals that Plaintiff's argument is specious at best.

In Blitz, the Court noted that the contract between the parties required the landlord plaintiff to obtain a written verification from the town that the tenant defendant could use the leased property to run an auto sales and repair business. Id. at 184. The contract stated, "If Landlord is unable to obtain such commitment from municipality, then this agreement shall be deemed null and void." Id. The Court held that the "plaintiff's obligation to obtain written approval was a condition precedent to the leasing agreement" and plaintiff's failure to fulfill this condition made the agreement unenforceable. Id. at 189. The Court then set forth the definition of a "condition precedent" stating:

> A condition precedent is a fact or event which the parties intend must exist or take place before there is *a right to performance*. . . . A condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor. . . . *If the condition is not fulfilled, the right to enforce the contract does not come into existence*. . . . Whether a provision in a contract is a condition the nonfulfilment of which excuses performance depends upon the

intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances when they executed the contract. (Citations omitted. Internal quotations omitted. Emphasis added.) Id. at 189.

The requirement to provide notice of default and ten days to cure in order for EB to exercise its right to terminate the Contract does not amount to a condition precedent as defined under Connecticut law. Rather, it is merely a mechanism by which the parties agreed that EB would notify Plaintiff of its decision to terminate the Contract as a result of a default by Plaintiff. Unlike in Blitz, where the failure of the plaintiff to obtain written approval from the town relieved defendant of its obligations under the agreement, here the notice of default provision has no such similar impact. Even if EB failed to fully comply with such provision, such failure would not erase the underlying breach committed by Plaintiff or remove EB's right to sue for such breach.

The other case cited by Plaintiff is equally distinguishable because it concerns a notice of default in the context of a three party relationship in which one party's obligations, the surety, do not come into existence unless and until the principal under the bond commits a default and proper notification of such default is provided to the surety. In Elm Haven v. Neri Construction LLC., 376 F.3d 96 (2004) the plaintiff, as general contractor, entered into a subcontract with one of the defendants, Neri Construction LLC. In connection with this subcontract, Neri purchased a performance bond from United States Fidelity & Guaranty Company ("USF&G"). The court noted that "before a surety's obligations under a bond can mature, the obligee must comply with any conditions precedent." Id. at 100. The court further noted that in order for USF&G's obligations under the performance bond to be triggered, two conditions had to be met: "Neri had to be 'in default' under the subcontract agreement, and second, Elm Haven had to 'declare [Neri] to be in default under the' subcontract agreement." Id. at 100. The Court determined that the

notice of default requirement of the performance bond had not been met and, accordingly, because such notice was a condition precedent to USF&G's obligations under the performance bond, USF&G was excused from performance. Id. at 101.

Here, the facts are quite different. Unlike in Elm Haven, a proper notice of termination for default was not a condition precedent to either party's obligation to perform under the Contract. At all times prior to EB's termination, Plaintiff was contractually required to fulfill its obligations under the Contract, including providing pilots and aircraft that met all FAA regulations and met with EB's chief pilot's approval. As discussed below, Plaintiff failed to fulfill these contractual obligations.

  2.  <u>Plaintiff Breached the Contract.</u>

As EB argued in its Memorandum of Law and as it alleged in its counterclaim, Plaintiff breach the Contract in two ways: (1) by not providing to EB aircraft and pilots that met with EB's chief pilot's approval; and (2) by not complying with all FAA regulations. (Memorandum of Law, at 6-10; 15-22; EB's Answer, Affirmative Defenses and Counterclaim dated October 8, 2004, counterclaim, ¶¶18-19). In the Memorandum of Law, EB's Local Rule 56(a)1 Statement, and the supporting affidavits, documents, and deposition testimony, EB has presented ample evidence in support of its argument that Plaintiff breached the Contract in both of these ways. That evidence is summarized below.

<u>EB's Chief Pilot Did Not Approve Additional Flights With Plaintiff After The Fatal Crash on May 21, 2000</u>

- On May 21, 2000, after learning about the crash, EB's chief pilot, Mr. Kevin Hanrahan, spoke with the Plaintiff's president, Mr. Peragine, concerning the crash of the Aircraft. (Local Rule 56(a)1 Statement, ¶ 15; Deposition testimony

-5-

of Mr. Kevin Hanrahan given on June 15, 2004 (the "Hanrahan Depo."), at18-21.)[2]

- During that conversation, Mr. Peragine informed Mr. Hanrahan that he was concerned that the fueler may have misfueled the Aircraft or not fueled it at all and that on the morning of the crash, the fuel gauges on the Aircraft were not operating the way they should have been. (Local Rule 56(a)1 Statement, ¶¶ 17 and 18; internal memorandum authored by Mr. Hanrahan and dated May 24, 2000 (the "May 24 Memorandum"), ¶ 2; Hanrahan Depo., at 41-42, 96.)[3]

- Mr. Hanrahan informed Mr. Peragine at that time that EB was suspending service with Plaintiff. (Local Rule 56(a)1 Statement, ¶ 19; Hanrahan Depo., at 22.)

- On May 24, 2000, EB sent a letter to Plaintiff stating that "Confirming our Kevin Hanrahan's recent phone conversation with you, we feel that suspension of the air charter service pending your explanation of facts surrounding the Wilkes-Barre crash is prudent." (Local Rule 56(a)1 Statement, ¶ 21; May 24, 2004 letter from Ronald Kiely to Plaintiff.)[4]

- On May 26, 2000, Mr. Peragine came to EB's facility and met with Mr. Hanrahan, Ms. Jan Stimac of EB, and other EB personnel to discuss the crash.

---

[2] Copies of the pages of the Hanrahan deposition transcript referenced in this memorandum are attached to the Local Rule 56(a)1 Statement as Exhibit G.

[3] A copy of the May 24 Memorandum is attached to the Local Rule 56(a)1 Statement as Exhibit H.

[4] A copy of the May 24, 2000 letter was marked as exhibit 5 at the Hanrahan deposition and is attached to the Local Rule 56(a)1 statement as Exhibit I.

(Local Rule 56(a)1 Statement, ¶ 22; Hanrahan Depo., at 26-27.) During that meeting, Mr. Peragine reported to Mr. Hanrahan and the other EB personnel that on the morning of the crash, fuel had been removed from the Aircraft in order to accommodate the weight associated with adding additional passengers to the Aircraft. (Local Rule 56(a)1 Statement, ¶ 24;. Hanrahan Depo., at 94; May 26, 2000 memorandum memorializing the issues discussed with Mr. Peragine on May 26, 2000 (the "May 26 Memorandum"), at EB00135.)[5]

- Mr. Peragine also reported to Mr. Hanrahan and the other EB personnel that on the day of the crash, as the Aircraft made its initial approach to land at Wilkes-Barre, one engine lost power and subsequently, during a second approach, the second of the two engines lost power. (Local Rule 56(a)1 Statement, ¶ 25; Hanrahan Depo., at 28.)

- At the May 26, 2000 meeting, Mr. Peragine reported to Mr. Hanrahan and the other EB personnel that the fuel which had been on the Aircraft on the day of the crash had been tested and determined not to be contaminated. (Local Rule 56(a)1 Statement, ¶ 26; Hanrahan Depo., at 28 and 39.)

- Either during the May 21, 2000 conversation with Mr. Peragine or during the May 26, 2000 meeting at EB, Mr. Peragine reported to Mr. Hanrahan that the fuel gauges on the Aircraft had problems associated with moisture in that when

---

[5] A copy of the May 26 Memorandum is attached to the Rule 56(a)1 Statement as Exhibit J.

moisture is present, the fuel gauges were not accurate. (Local Rule 56(a)1 Statement, ¶ 27; Hanrahan Depo., at 46-47.)

- Based on the information provided to him by Mr. Peragine on May 21 and May 26, 2000 and his knowledge and experience as a professional pilot and chief pilot for EB, Mr. Hanrahan had serious concerns regarding the Plaintiff's operations. In particular, Mr. Hanrahan was concerned about: (i) the possibility of problems associated with the fueling of the Aircraft before the crash on May 21, 2000; (ii) the possibility of deficiencies in training of the Plaintiff's pilots due to the fact that it could not be determined if the Plaintiff's pilots confirmed the fuel level of the Aircraft on the morning before the crash; and (iii) the possibility of deficiencies in the training of Plaintiff's line service personnel and/or maintenance personnel. (Local Rule 56(a)1 Statement, ¶ 28; Hanrahan Depo., at 75-76.)

- Additionally, Mr. Hanrahan believed that the fact that the Aircraft experienced a dual engine failure evidenced that the Aircraft did not satisfy the minimum fuel requirements which is a violation of the Federal Aviation Administration ("FAA") Regulations. (Local Rule 56(a)1 Statement, ¶ 29; Hanrahan Depo., at 100.) Mr. Hanrahan concluded that Plaintiff was unable to provide the services called for under the Contract due to the concerns regarding fueling. (Local Rule 56(a)1 Statement, ¶ 30; Hanrahan Depo., at 145-146.)

Plaintiff Did Not Meet All FAA Regulations

- Mr. Olmsted, EB's disclosed expert, has concluded that in his expert opinion, Plaintiff operated the Aircraft on May 21, 2000, in violation of FAA regulations in that the Aircraft failed to reach its intended destination due to fuel starvation as a result of an insufficient fuel quantity onboard the Aircraft. (Local Rule 56(a)1 Statement, ¶ 34; Deposition testimony of Aaron Goodwin Olmsted given on October 14, 2004 (the "Olmsted Depo."), at 36; Affidavit of Aaron Goodwin Olmsted dated October 28, 2004, ¶¶ 11-17; Mr. Olmsted's June 11, 2004 report.)[6]

- Plaintiff has disclosed no exert witnesses in this case.

EB believes this evidence is more than sufficient for this Court to render judgment in EB's favor on this claim. At a minimum, however, this evidence is sufficient to defeat Plaintiff's claim for summary judgment. This is especially so because Plaintiff has presented no evidence to the contrary.

### B.  Plaintiff Is Not Entitled To Judgment on Its Claims Of Breach Of Contract And Accounts Stated.

Plaintiff argues that the Contract clearly, and unambiguously provides that if EB exercised its right to terminate for convenience, EB was obligated to pay Plaintiff nearly $500,000 even if Plaintiff provided no services in exchange for this payment. Remarkably, Plaintiff would also have this Court believe that this argument is not inconsistent with this

---

[6] The pages of the Olmsted deposition transcript referenced in this memorandum, the Olmsted Affidavit, and Mr. Olmsted's June 11, 2004 report are attached to the Local Rule 56(a)1 Statement as Exhibits M, N, and O respectively.

Court's prior ruling determining that the parties did not agree to liquidate damages. Plaintiff's arguments are incorrect as a matter of law.

1.  <u>The Terms and Conditions Are Applicable to the Entire Contract.</u>

Plaintiff appears to argue that the Terms and Conditions do not apply to paragraph 2(A) of the purchase order supplement contained in the March Purchase Order. (Plaintiff's Brief, at 10.) The clear language of the Contract undermines this argument. The February Purchase Order states on the first page, "Conditions of purchase forming part of this order are: GDC 410 (Rev 3/87) [the Terms and Conditions]." The March Purchase Order provides, "Conditions of purchase forming part of this order are: the same terms and conditions as those previously referenced in this purchase order." (March Purchase Order, at 1.) Plaintiff agrees that the Terms and Conditions form part of the Contract, stating in its Local Rule 56(a)1 Statement, "On March 14, 2000, plaintiff and defendant entered into an agreement consisting of the March Purchase Order, which incorporated the terms of the February Draft and the Terms and Conditions (collectively, the "Contract"). (Plaintiff's Local Rule 56(a)1Statement, ¶6.) Based on these undisputed facts, the Terms and Conditions are a part of the integrated Contract. There is simply no basis for Plaintiff's argument that the "Terms and Conditions were not intended to apply to a voluntary termination." (Plaintiff's Brief, at 10.)

2.  <u>Paragraph 14 Of The Terms And Conditions And The Purchase Order Supplement Can And Must Be Read Together.</u>

As this Court has stated in discussing paragraph 14 of the Terms and Conditions and the purchase order supplement contained in the March Purchase Order, "the Agreement must be read so as to give effect to both of these provisions." <u>Executive Airlines v. Electric Boat</u>, 271 F. Supp. 2d 392, 397-98 (D. Conn. 2003) (see also <u>Dainty Rubbish Serv., Inc. v. Beacon Hill Ass'n</u>,

32 Conn. App. 530, 534 (1993) ("Parties do not ordinarily insert meaningless provisions in their agreements and, therefore, if it is reasonably possible to do so, every provision must be given effect"); Arledge v. Stratmar Sys., Inc., 948 F.2d 845, 850 (2d Cir. 1991) ("A contract should be interpreted in a way that ascribes meaning, if possible, to all of its terms, and where it is susceptible to more than one reasonable interpretation, its construction is a question of fact for trial, and summary judgment is inappropriate.") (internal citations omitted)).

> Paragraph 14 provides:
>
> [EB] may at any time by written notice terminate all or any part of this order for [EB's] convenience. If this order is terminated, in whole or in part, for [EB's] convenience, [Plaintiff] shall be *paid* an amount, to be mutually agreed upon, which shall be adequate to cover the reasonable costs of [Plaintiff's] actual performance of work under this order to the effective date of termination, plus a reasonable profit thereon provided that no amount shall be paid to [Plaintiff] for (I) any anticipatory profits relate to work under this order not yet performed, or (II) costs incurred due to [Plaintiff's] failure to terminate work as ordered on the effective date of termination.
>
> The purchase order supplement provides, in relevant part:
>
> (A) Buyer reserves the right to terminate this service without penalty upon six (6) months' written notice to Seller.

Reading these provisions together and giving both of them effect, produces the following, quite reasonable, interpretation. EB could properly exercise its contractual right to terminate the Contract for EB's convenience. If it did so and provided Plaintiff with six months' notice, no compensation for EB's termination for convenience would be owing to Plaintiff. If it did so without providing such six months' notice, EB would be obligated to pay to Plaintiff compensation for its termination for convenience. Paragraph 14 provides how the parties are to determine what compensation would be paid. Plaintiff and EB would have to mutually agree on what the compensation payment would be and such payment would have to be adequate to cover

the reasonable costs of Plaintiff's actual performance of work to the effective date of termination and a reasonable profit on such amount. Neither of these provisions provides what, if anything, either party is obligated to do during the six months notice period.

If EB had used Plaintiff's services during that time period, EB would have been obligated, pursuant to paragraph 14, to pay Plaintiff the reasonable costs of Plaintiff's actual performance of work under the Contract. This amount may have been less than the contract price of $4,895.00 per round trip flight but not greater than that amount. (Terms and Conditions, ¶14.) EB would also be obligated, again pursuant to paragraph 14, to pay Plaintiff a reasonable profit on such costs. EB, however, decided not to avail itself of such services and Plaintiff incurred no costs associated with such services because none were rendered. Reading these provisions together, the only reasonable interpretation is that if EB exercised its right to terminate the Contract for convenience it would be obligated to pay Plaintiff an amount, to be mutually agreed upon, adequate to cover a reasonable profit Plaintiff would have made on the flights it would have flown for EB in that six month termination period if EB had not exercised its right to terminate the Contract. Under these circumstances, such a payment would be an amount, mutually agreed to by the parties, that would cover Plaintiff's profit margin for the minimum number of flights it would have flown during such six month period.

As EB pointed out in its Memorandum of Law, Plaintiff has ignored paragraph 14 of the Terms and Conditions and has never sought to follow its procedure for determining what, if anything, EB is obligated to pay in the event that it is determined that EB exercising its right to terminate for convenience.

-12-

      3.      <u>Paragraph 14 Of the Terms And Conditions And The Purchase Order Supplement Are Not Inconsistent.</u>

Plaintiff argues that Paragraph 14 and the purchase order supplement are inconsistent, allowing Plaintiff to invoke the order of precedence provision (paragraph 23 of the Terms and Conditions) and ignore paragraph 14 altogether. Plaintiff is simply wrong. Paragraph 14 provides EB with the contractual right to terminate the Contract for convenience. It also provides that EB may be responsible for the payment of money to Plaintiff under certain circumstances if it exercises such right. For this reason, paragraph 14 provides a mechanism for determining what payment, if any, EB will be obligated to pay in the event that it exercises its right to terminate the Contract for convenience. The purchase order supplement, on the other hand, provides that EB must give six months' notice to Plaintiff if it decides to exercise such right. The purchase order supplement is silent regarding the consequences, if any, for EB's failure to provide such notice. Paragraph 14, however, provides precisely what the consequences of EB's termination would be – that is, payment for costs associated with work actually performed and a reasonable profit thereon.

This interpretation is the only reasonable one. Plaintiff advocates that the parties intended that Plaintiff would receive "six months cash flow" (Plaintiff's Memorandum, at 12)– even when, as here, Plaintiff incurred no costs and performed no services in such six month period. Plaintiff's interpretation is patently unreasonable because Plaintiff would receive a windfall of almost $500,000 for performing no services under the Contract.

Plaintiff's arguments also conflict with this Court's prior ruling. As this Court observed, there is nothing in the Contract "indicating that the parties intended to fix liquidated damages in the event of a breach" and the provision in the Contract of a "formula for the calculation of

damages in the event of termination by Electric Boat for convenience" further defeats Plaintiff's claim that the parties agreed to fix damages at a certain amount. Executive Airlines v. Electric Boat, 271 F. Supp. 2d 392, 398 (D. Conn. 2003). Here, while Plaintiff does not use the term "liquidated damages" that is precisely the remedy for which it advocates. This Court has already stated, "to read the six months' notice provision as a liquidated damages provision is to ignore § 14 of the Terms and Conditions, which sets forth the manner in which damages are to bee calculated." Id. at 398. Plaintiff's arguments conflict with this Court's prior ruling.

### C. Conclusion

For all of these reasons, Plaintiff's motion for summary judgment must be denied.

DEFENDANT, ELECTRIC BOAT
CORPORATION


By_____
Francis H. Morrison III (ct04200)
William H. Erickson (ct18117)
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103-3499
(860) 275-0100
Fax: (860) 275-0343
Email: fhmorrison@dbh.com
        wherickson@dbh.com
Its Attorneys

## **CERTIFICATION**

THIS IS TO CERTIFY that a copy of the foregoing was mailed this 30th day of November, 2004, postage prepaid, to:

Leonard Feigenbaum, Esq.
1670 Old County Road
Suite 224
Plainview, NY  11803

_____
William H. Erickson