UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EXECUTIVE AIRLINES,

         Plaintiff,

— against —

ELECTRIC BOAT CORPORATION,

         Defendant.

CIVIL ACTION NO.
02-CV-1 94 (JCH)

13 December 2004

**PLAINTIFF EXECUTIVE AIRLINES' MEMORANDUM
OF LAW IN REPLY TO DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

  In its opposition to plaintiff's motion for summary judgment, defendant continues its efforts to dramatize and emotionalize this contract matter by referring to "... the tragic event that lead [sic] to this litigation ...". The event which led to this litigation was the termination of the Contract by defendant, not the crash of an airplane. The simple matter before the Court in this contract action is whether that termination was proper and what were its consequences.

**POINT I**

DEFENDANT'S RIGHTS TO TERMINATE THE CONTRACT WERE
LIMITED TO THE PROVISIONS OF SUPPLEMENT NO. 1, PARAGRAPH 2

  Defendant incorrectly argues that paragraph 12(f) of the Terms and Conditions grants to it the right to sue for breach of contract. Examination of defendant's argument demonstrates its fallacies. On page 2 of its 30 November 2004 Memorandum in Opposition (the "Opposing Memorandum"), defendant claims: "Even if EB did not provide proper notice of default, however, it retained the right to sue for breach of contract". Defendant's counterclaim for breach of contract

1

is based on a claim for damages incurred by defendant after it allegedly properly terminated the Contract with plaintiff.  A claim of "breach of contract" does not exist in a vacuum and this Contract covers <u>all</u> circumstances under which the Contract could have been legally terminated by defendant. Paragraph 2(B) of Supplement No. 1 covers termination based on plaintiff's default (equivalent to plaintiff's breach of contract) and paragraph 2(A) covers termination for any and all other reasons (and is not limited to termination for convenience).  Accordingly, defendant's "right to sue for breach of contract" is not an alternate remedy since it is covered by its right to terminate.

Defendant is in the extraordinary position of attempting to differentiate between the extremely broad default provisions[1] contained in paragraph 12 (a) of the Terms and Conditions (which is defendant's own "boilerplate") and "breach of contract".  It is a distinction without a difference.  Defendant is silent as to any authority[2] for the claim that it retained the right to sue for breach of contract since that right is subsumed into the termination provisions of the Contract.  If defendant's termination was based on plaintiff's default, defendant can pursue no claim against plaintiff without complying with the termination provision which it wrote and with which, it concedes, it did not comply.  If the termination was for other than plaintiff's default, defendant is bound by the six-month termination provision of Supplement No. 1, paragraph 2(A).  Defendant has no independent right to sue for breach of contract since defendant's own boilerplate contract terms spell out its procedures for pursuing a default by plaintiff.

---

[1] 12(a) "... or (ii) if Seller fails to perform any of the other provisions of this order, ..."

[2] Defendant was coyly silent as to any authority in its Opposing Memorandum, relying instead on its Reply Memorandum on its motion for summary judgment to make the same point and to cite three out-of-jurisdiction cases, all of which are both factually and legally inapposite.

**POINT II**

DEFENDANT'S TERMINATION OF THE CONTRACT WAS IMPROPER

In its Opposing Memorandum, Defendant claims plaintiff breached "... the Contract in two ways: (1) by not providing to EB aircraft and pilots that met with EB's chief pilot's approval; and (2) by not complying with all FAA regulations. Defendant then devoted over three pages of its Opposing Memorandum to a recitation of purported "facts" which have been disputed by plaintiff and consist primarily of distorted and self-serving statements having no probative value. Their sole significance is as a distraction from the real issue here, which is the Contract.

Defendant apparently relies on the provision on page 2 of the Contract which states:

"PROVIDE AIR CHARTER SERVICE BETWEEN GROTON (GON) CT AND NEWPORT NEWS (PHF) VA, AND NEWPORT NEWS (PHF) VA AND GROTON (GON) CT ON A CONTINUING BASIS FOR A TERM OF NOT LESS THAN ONE (1) YEAR COMMENCING 4/17/00 (OR SOONER) PER BUYER AND SELLER AGREEMENT. AIRCRAFT WILL, AT A MINIMUM, SEAT 19 PASSENGERS, BE PRESSURIZED AND TURBO-PROP. ALTERNATE AIRCRAFT CONFIGURATION OPTIONS WILL BE CONSIDERED AND EVALUATED BY THE BUYER. CHARTER AIRCRAFT, CHARTER OPERATOR AND CHARTER PILOTS MUST MEET ALL FAA REGULATIONS. EACH ASSIGNED AIRCRAFT AND PILOT IS SUBJECT TO ELECTRIC BOAT (EB) MANAGEMENT AND CHIEF PILOT APPROVAL."

Nothing in the record indicates that on 7 June 2000, Executive Airlines as the operator, its aircraft and its pilots did not meet all FAA regulations. To the contrary, the FAA had not in any way curtailed plaintiff's operations although plaintiff, its aircraft, pilots, and operations were under a microscope as part of the crash investigation (18 November 2004 Peragine affidavit, page 9), and the absence of any FAA action against plaintiff prior to 7 June 2000 or any time thereafter is *prima facie* proof that plaintiff, its pilots and aircraft met all FAA regulations. As of 20 May 2000, defendant's chief pilot had accepted that plaintiff, its pilots and aircraft met all FAA regulations.

The long after-the-fact conclusions by defendant's "expert" are irrelevant for two reasons beyond their not having been involved in defendant's decision to terminate the Contract. First, they are based primarily on the NTSB finding of "probable cause" (as opposed to fact), which is inadmissible and conclusory. Second, the contractual requirement was to "meet all FAA regulations" within the context of qualifying under the terms of the Contract. Read in the context of the entire paragraph quoted above, it is clear the intent of "meet all FAA requirements" was not a continuing test as to whether or not any regulation had been violated in the course of plaintiff's operations, but rather that plaintiff was qualified to handle the job. If the intent had been to require that neither plaintiff nor its aircraft nor pilots were ever to violate any FAA regulation at any time on pain of termination of the Contract, that could have been so spelled out in the Contract.

The question of meeting the chief pilot's approval is another issue. Even with the distorted recitation on pages 5 through 8 of the Opposing Memorandum, there is still no claim that defendant's chief pilot (or anyone else from defendant) advised plaintiff that the chief pilot did not approve of plaintiff, its aircraft or its pilots and, of course, there is no explanation of the basis of such disapproval. The failure of such notification alone defeats defendant's claim since defendant is treating the lack of the chief pilot's approval as tantamount to a default by plaintiff, which would then require written notice, ten days to cure, etc., all of which defendant concedes was not done.

The unstated essence of defendant's approach is that the chief pilot was never going to approve plaintiff, or its aircraft or its pilots, regardless. The word "approval" connotes a rational process as opposed to an absolute and unfettered discretion. There is no question, for example, that the chief pilot could not deny his approval based on racial or religious parameters. As a matter of good faith and fair dealing, defendant could not arbitrarily withhold its approval of plaintiff, its

aircraft and pilots on a blanket basis. This situation is analogous to that in *Warner v. Konover,* 210 Conn. 150, 553 A.2d 1138 (1989) where the Connecticut Supreme Court, applying the duty of good faith and fair dealing, held that a landlord could not arbitrarily withhold its consent to an assignment of a lease but must exercise its discretion in a manner consistent with good faith and fair dealing.

Applying the *Warner* standard here, defendant was required to set forth the reason for the chief pilot's disapproval and the specifics as to plaintiff, or its aircraft or its pilots. Despite the crash, the FAA found no fault with plaintiff and, however "uncomfortable" the chief pilot may have been, his discomfort was not a legal basis for terminating the Contract. At worst, had defendant been exercising good faith, it would have suggested or temporarily allowed the subcontracting of plaintiff's services (as was specifically provided in the Contract) rather than arbitrarily terminating the Contract.

## POINT III

### PLAINTIFF IS ENTITLED TO THE SIX MONTH MINIMUM PAYMENT

Defendant argues that the Terms and Conditions are applicable to the entire Contract but is silent as to paragraph 2 of Supplement No. 1. The specific takes precedence over the general, the Purchase Order and Supplement No. 1 take precedence over the Terms and Conditions and the specific reference to the Terms and Conditions in paragraph 2(B) clearly implies its non-application to 2(A). As previously explained, since this is a Contract for services, application of paragraph 14 of the Terms and Conditions would have the unquestioned effect of eliminating all payment for future work and would render paragraph 2(A) meaningless. Despite that, on pages 11 and 12 of its Opposing Memorandum, defendant incorrectly details a scenario where defendant would agree to pay the profit plaintiff lost on the minimum number of flights it did not fly as a result of the early

5

termination, and simply ignores the provision in paragraph 14 which precludes such a payment, saying: "... provided that no amount shall be paid to Seller for (i) any anticipatory profits related to work under this order not yet performed ...".

The prior holding that there is no liquidated damage clause is not inconsistent with plaintiff's position. Liquidated damages involve a specific single amount where this case involves six separate monthly bills. The situation here is analogous to a lease where the tenant unilaterally elects to move out and refuses to pay the monthly rent. At any time during those six months defendant could have changed its mind and demanded performance from plaintiff. The refusal to do so was a series of individual decisions which defendant alone had the opportunity to change.

Defendant expresses shock at the concept that plaintiff could receive "... a windfall of almost $500,000 for performing no services under the contract" but ignores the fact that it was defendant's deliberate decision, made with knowledge of the six month termination provision, to ignore it and to terminate immediately. Whether or not defendant received any services from plaintiff for the six month's payment is as irrelevant to plaintiff as plaintiff's "very large investment in facilities and equipment in order to have the capability to perform the required services" (31 October 2004 Peragine affidavit, page 2) is to defendant. Defendant claims plaintiff "incurred no costs" during the six month period but ignores the investment plaintiff was required to make and the facilities and equipment it was required to obtain in order to be able to perform the Contract.

## CONCLUSION

For the foregoing reasons, plaintiff's plaintiff Executive Airlines respectfully requests the Court grant plaintiff's motion dismissing defendant Electric Boat's counterclaim and granting judgment to plaintiff on its complaint.

PLAINTIFF, EXECUTIVE AIRLINES

By:_____
I. Leonard Feigenbaum (ct25807)
Visiting Attorney for Plaintiff
1670 Old Country Road - Ste 224
Plainview, New York 11803
Tel. (516) 420-6900
Fax (516) 420-8444
leefeig@aol.com

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was mailed on 13 December 2004 to the following:

Day, Berry & Howard LLP
CityPlace I
Hartford CT 06103-3499

_____
I. LEONARD FEIGENBAUM
