UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EXECUTIVE AIRLINES, | : | |
|     Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:02-cv-194 (JCH) |
| | : | |
| ELECTRIC BOAT CORPORATION, | : | |
|     Defendant. | : | JULY 12, 2005 |

**RULING ON MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 87 and 91]**

The plaintiff, Executive Airlines, initiated this lawsuit, alleging breach of contract against the defendant, Electric Boat Corporation ("Electric Boat"). Pending before the court are cross-motions for summary judgment. The court has previously addressed a motion for summary judgment by Electric Boat, which motion was denied in part and granted in part. Executive Airlines v. Electric Boat Corporation, 271 F. Supp. 2d 392 (D. Conn. 2003) (Goettel, J.).

**I.    FACTS**

Electric Boat issued a request for quotation for air charter service between Groton, Connecticut and Newport News, Virginia in October of 1999. In response, Executive Airlines submitted an offer in November of 1999. In March of 2000, the parties entered into an agreement (the "Contract") consisting of a February Purchase Order, Purchase Order Supplement No. 1, and the Purchase Order Terms and Conditions. The Contract provided that Executive Airlines would provide Electric Boat a minimum number of flights per month for the term of the contract. On April 10, 2000, Executive Airlines began providing flights for Electric Boat.

On May 21, 2000, one of Executive Airlines' planes, being operated on a charter

1

flight, not for Electric Boat, from Atlantic City, New Jersey to Wilkes-Barre/Scranton International Airport, crashed, killing all aboard. While the original flight itinerary consisted of a roundtrip flight from Farmingdale, New York to Atlantic City, that morning an additional roundtrip flight from Atlantic City to Wilkes-Barre was added to the itinerary. The flight left Farmingdale, New York for Atlantic City with ninety gallons of fuel. No additional fuel was added prior to the flight from Atlantic City to Wilkes-Barre. That day, Electric Boat's chief pilot, Kevin Hanrahan, spoke with Executive Airline's president, Michael Peragine, regarding the crash. On May 24, Electric Boat suspended its use of Executive Airlines' services pending an "explanation of facts surrounding the Wilkes-Barre crash." May 24, 2000 Ltr. [Dkt. No. 88, Ex. I]. Peragine met with Hanrahan and other Electric Boat personnel on May 26, 2000 to discuss the crash.

On June 7, 2000, Electric Boat terminated its contract with Executive Airlines. The letter of termination states that, "Pursuant to the article entitled 'Termination' of Electric Boat Conditions of Purchase invoked in the subject purchase order by reference, the subject purchase order is hereby terminated in its entirety." June 7, 2000 Ltr. [Dkt. No. 92, Ex. 6]. Executive Airlines responded by letter on July 10, 2000. In relevant part, that letter states that, "under the terms of the Agreement, Electric Boat must provide six months advance written notice in the event it chooses to voluntarily cancel the Agreement without cause" and expresses Executive Airlines' intent to submit invoices for what it believed to be the relevant six month period. July 10, 2000 Ltr. [Dkt. No. 92, Ex. 7]. On August 1, 2000, Electric Boat responded and stated "[Electric Boat] reserved its rights in our agreement to approve aircraft and pilots in advance and Executive [Airlines] and its pilots and aircraft were required to comply with all FAA

regulations. The plane which was the subject of our agreement crashed on May 21, 2000, and the [NTSB] has yet to issue its opinion as to the cause of the crash and Executive's compliance with FAA regulations." August 1, 2000 Ltr. [Dkt. No. 92, Ex. 8]. At no point did Electric Boat send Executive Airlines a written notice of default conforming to the requirements of paragraph 12(a) of the Terms and Conditions. Executive Airlines billed Electric Boat for the minimum monthly payment of $73,425 for each of the months from June through December 2000. These bills were not paid.

On August 26, 2002, the National Transportation Safety Board adopted its Aircraft Accident Brief in connection with the May 21, 2000 crash.

> The Safety Board conclude[d] that because of miscommunication between the flight crew and the fueler about the amount of fuel to add at FRG and the flight crew's failure to ensure an adequate fuel supply, the airplane departed [Farmingdale] with less fuel than the flight crewmembers stated on the load manifest and with less fuel than they believed they had. Further, the Safety Board concludes that the flight crewmembers failed to adequately monitor the airplane's fuel state en route and at [Atlantic City] based on the expectation that they had sufficient fuel to complete both flights. . . .The National Transportation Safety Board determines that the probable cause of this accident was the flight crew's failure to ensure an adequate fuel supply for the flight, which led to the stoppage of the right engine due to fuel exhaustion and the intermittent stoppage of the left engine due to fuel starvation. Contributing to the accident were the flight crew's failure to monitor the airplane's fuel state and the flight crew's failure to maintain directional control after the initial engine stoppage.

Aircraft Accident Brief NTSB/AAB-02/05 [Dkt. No. 88, Ex. L] at 27.

Electric Boat's expert, Aaron Goodwin Olmstead, concluded that Executive Airlines violated FAA regulations on May 21, 2000 such that the plane crash occurred due to fuel starvation as a result of an insufficient fuel quantity onboard the aircraft.

## II.  DISCUSSION

### A.  Standard of Law

In a motion for summary judgement, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). The burden of showing that no genuine factual dispute exists rests upon the moving party. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994)). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134.  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

**B.     The Contract**

The contract consists of a February Purchase Order, Purchase Order Supplement No. 1, and the Purchase Order Terms and Conditions. [Dkt. No. 92, Ex. 1]. The Purchase Order provides that "Charter aircraft, charter operator and charter pilots must meet all FAA regulations" and that "each assigned aircraft and pilot is subject to Electric Boat (EB) management and chief pilot approval." Contract [Dkt. No. 92, Ex. 1] at Purchase Order page 2. The term of the contract was one year, from April 17, 2000 through April 16, 2001. Id. at Purchase Order pages 5, 6.

The Purchase Order's Termination Clause reads as follows:

> Termination: (A) Buyer reserves the right to terminate this service without penalty upon six (6) months written notice to seller. (B) Buyer reserves the right to terminate this service without penalty upon ten (10) days written notice to seller due to default by seller per Electric Boat Terms and Conditions, GDC 410, 03/87.

Id. at Purchase Order page 6. This clause was changed from the original contract draft, which provided Electric Boat the right to terminate without penalty upon just seven days notice.

The Terms and Conditions, expressly referenced in the Purchase Order's Termination Clause, describes termination for default in greater detail. Paragraph 12 of the Terms and Conditions is entitled "Termination for Default" and reads, in relevant part, as follows:

> Buyer may, subject to the provisions of subparagraph (c) below, by written notice of default to Seller, terminate the whole or any part of this order . . . if Seller fails to perform any of the other provisions of this order, or so fails to make progress as to endanger performance of this order in accordance with its terms, and does not cure such failure within a period of then [sic] (10) days (or longer period as Buyer may authorize in writing) after receipt of notice from Buyer specifying such failure.

Id. at Purchase Order Terms and Conditions ¶ 12(a).  The Terms and Conditions also provide for Termination for Insolvency, at paragraph 13, and Termination for Convenience, at paragraph 14.  The contract provides for termination for convenience as follows:

> Buyer may at any time by written notice terminate all or any part of this order for Buyer's convenience.  If this order is terminated, in whole or in part, for Buyer's convenience, Seller shall be paid an amount, to be mutually agreed upon, which shall be adequate to cover the reasonable cost of Seller's actual performance of work under this order not yet performed, or (ii) costs incurred due to Seller's failure to terminate work as ordered on the effective date of termination.

Id. at Purchase Order Terms and Conditions ¶ 14.

For purposes of its earlier Motion for Summary Judgment [Dkt. No. 34], Electric Boat asked the Court to assume that its termination was for convenience, pursuant to paragraph 14.  The court has previously found that "regardless of the reason that [Electric Boat] terminated the Agreement, it had the right to do so, even if only for its own convenience."  271 F.Supp.2d at 397 (Goettel, J.).  The court further found, however, that "that does not absolve Electric Boat from the consequences associated therewith."  Id.  The court concluded that the Purchase Order's Termination Clause did not provide for liquidated damages, as then argued by Executive Airlines.  Furthermore, at that time, the court expressed "no opinion as to whether there was a default by Executive Airlines or whether the termination by Electric Boat was pursuant to the default or convenience provisions."  Id. at n. 5.

Under Connecticut law, which the court has already determined governs this contract, id. at 396, "ordinarily the question of contract interpretation, being a question

6

of parties' intent, is a question of fact." Levine v. Massey, 232 Conn. 272, 277 (1995). Where, however, "there is definitive contract language, the determination of what the parties intended by their contractual commitment is a question of law." Id. at 277-78 (internal quotation marks and citation omitted).

The contract language in this case is not definitive. The language of the Purchase Order and Terms and Conditions is potentially contradictory and must be reasonably resolved. The court cannot do so, however, as a matter of law. It is for the finder of fact to decipher the parties' intent in entering into the Contract. As such, the court cannot conclude as a matter of law which, if either, of the two parties breached the Contract. While the court cannot conclude, as a matter of law, which party breached the Contract, this court's prior ruling regarding liquidated damages, 271 F. Supp. at 399, as well as the contract language cause the court to question the measure of damages suggested by Executive Airlines should it prove Electric Boat's breach.

### C.    Conclusion

For the foregoing reasons, the Motions for Summary Judgment [Dkt. Nos. 87 and 91] are DENIED.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 12th day of July, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge