UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EXECUTIVE AIRLINES | : | CIVIL ACTION NO. 3:02cv194 (JCH) |
| Plaintiff, | : | |
| v. | : | |
| GENERAL DYNAMICS CO., ET AL. | : | |
| Defendants. | : | DECEMBER 23, 2005 |

**JOINT PRETRIAL MEMORANDUM**

**1. TRIAL COUNSEL**

Counsel for Plaintiff:

I. Leonard Feigenbaum
1670 Old County Road, Suite 224
Plainview, NY 11803
(516) 420-6900

Counsel for Defendant:

Francis H. Morrison III
Michelle I. Turner
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103-3499
(860) 275-0100

**2. JURISDICTION**

Plaintiff asserts that jurisdiction is based on 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000. The Court has jurisdiction over defendant's counterclaim pursuant to 28 U.S.C.§ 1367(a).

**3. JURY TRIAL**

The case has been claimed for a jury trial.

**4. LENGTH OF TRIAL**

The parties estimate that the trial testimony will last four days.

**5. FURTHER PROCEEDINGS**

No further depositions or discovery are anticipated. The defendant has filed a motion to compel the plaintiff to pay the deposition fees and travel expenses of defendant's expert, Aaron G. Olmsted, and each party is filing one or more motions in limine with this memorandum. No other proceedings are expected to be required prior to trial.

**6. NATURE OF CASE**

**A. <u>Joint Statement of the Case to Be Read to Jury</u>**

This case involves a contract between Executive Airlines and Electric Boat. Under the contract, Executive Airlines agreed to provide air charter services for Electric Boat's employees traveling between its facilities in Groton, Connecticut and Newport News, Virginia. Just six weeks after Executive Airlines began providing the contracted for air charter services, one of the airplanes Executive Airlines was using to provide such services crashed, killing all 17 passengers and the two crew members. Electric Boat terminated the contract, claiming that Executive Airlines was no longer able to provide services as required by the contract. Executive Airlines has sued Electric Boat, claiming that Electric Boat breached the contract. It claims that Electric Boat must pay the costs of all of the flights it would have flown during that six-month period. Electric Boat has argued that it was entitled to terminate the contract without the six months' notice and that Executive Airlines is therefore not entitled to any damages. Electric Boat has also counterclaimed that Executive Airlines was in breach because it could no longer provide safe services under the contract. Electric Boat claims that it was damaged as a result of that

breach, because it was forced to pay significant travel expenses for its employees to travel by commercial airlines until other charter airline arrangements could be made.

**B. Plaintiff's Statement of the Nature of the Case**

a. All claims are asserted by plaintiff Executive Airlines against defendant Electric Boat Corporation.

b. Plaintiff's first count is for breach of contract and seeks damages of $494,395. Plaintiff's second count is for an account stated in the amount of $494,395. Prior to amendment of plaintiff's complaint, its third count for liquidated damages was dismissed by the 17 July 2003 Ruling on Motion for Summary Judgment by Hon. Gerard L. Goettel. By its amended complaint, plaintiff withdrew its fourth count for actual damages.

c. Plaintiff's defense to defendant's counterclaim is based on the failure of defendant to allege or demonstrate facts constituting a breach by plaintiff of the Contract between the parties or to allege or demonstrate defendant's compliance with the Contract provisions governing Termination for Default. In its Ruling on Motions for Summary Judgment, this Court found: "At no point did Electric Boat send Executive Airlines a written notice of default conforming to the requirements of paragraph 12(a) of the Terms and Conditions."

d. In October 1999, defendant issued a request for quotation (the "RFQ") for air charter service between Groton, Connecticut and Newport News, Virginia. On or about 11 November 1999, plaintiff submitted its offer to provide such air charter services in response to the RFQ. On 9 February 2000, defendant issued draft Purchase Order number SNLO22-096 to plaintiff (the "February Draft"). On 14 March 2000, defendant reissued the Purchase Order as Supplement 001 (the "March Purchase Order"), incorporating "Purchase Order Supplement No. 1", which referenced GDC-410 entitled Purchase Order Terms and Conditions (the

"Terms and Conditions"). The March Purchase Order modified, in certain respects, the February Draft, including changing defendant's right to terminate plaintiff's services from seven days to six months and defendant added a provision giving it the right to terminate on ten day's notice for default. On 14 March 2000, plaintiff and defendant entered into an agreement consisting of the March Purchase Order, which incorporated the terms of the February Draft and the Terms and Conditions (collectively, the "Contract"). The Contract contained a provision granting to plaintiff the right and responsibility to subcontract of the services plaintiff was to supply to defendant in the event plaintiff is unable to provide those services. On 10 April 2000, plaintiff commenced its flights for defendant. In the course of those flights from 10 April 2000 through 20 May 2000, plaintiff utilized several BAE Systems Jet Stream 31 airplanes (the "Aircraft"). On 15 May 2000, plaintiff subcontracted one of its flights for defendant to another carrier who was accepted by defendant. On 21 May 2000, one of the Aircraft being operated by plaintiff on an unrelated charter flight from Atlantic City, New Jersey to Wilkes-Barre/Scranton International Airport in Pennsylvania crashed, killing all aboard. On 21 May 2000, plaintiff notified defendant that plaintiff believed it was still capable of fulfilling its obligations under the Contract. On 24 May 2000, defendant sent to plaintiff a letter which, among other things, stated defendant was temporarily suspending plaintiff's service. On 7 June 2000, defendant sent to plaintiff a letter stating it was terminating the Contract between Plaintiff and Defendant. On 7 June 2000, plaintiff had three other Jet Stream Aircraft capable of handling defendant's flights. As determined by the Court, defendant did not send to plaintiff a written notice of default conforming to the requirements of paragraph 12(a) of the Terms and Conditions. Prior to terminating the Contract, defendant did not notify plaintiff specifying plaintiff's alleged failure under paragraph 12(a)(i) or (ii) of

the Terms and Conditions, nor did it provide to plaintiff the ten day period to cure as required therein. Prior to terminating the Contract, defendant did not ask or allow plaintiff to subcontract the services it was to provide for defendant. Plaintiff wrote to defendant on 10 July 2000 and, among other things, asserted its right to bill defendant for six months of the minimum monthly contracted flights. Defendant responded by its letter of 1 August 2000 in which defendant claimed a right to terminate the Contract. Plaintiff billed defendant for the minimum monthly payment of $73,425 for each of the months from June through December 2000. Defendant did not reject plaintiff's June through December 2000 bills to defendant and did not pay those bills.

## C. Defendant's Statement of the Nature of the Case

### 1. Factual Background

This dispute involves a contract between Executive Airlines and Electric Boat pursuant to which Plaintiff agreed to provide air charter services to Electric Boat between its facilities in Groton, Connecticut and Newport News, Virginia.

The contract between the parties consisted of three documents: a document entitled "Purchase Order Terms and Conditions" known as GDC 410 (REV. 3/87) (the "Terms and Conditions"); a February 9, 2000 purchase order, number SNL022-096 (the "February Purchase Order"); and a March 14, 2000 purchase order number SNL022-096, along with a "purchase order supplement number 1" (collectively, the "March Purchase Order."). The March Purchase Order modified, in certain respects, the February Purchase Order. Both the February Purchase Order and the March Purchase Order incorporated the conditions set forth in the Terms and

Conditions. This contract (the "Agreement") is the only contract that existed between the parties.

On April 10, 2000, Plaintiff commenced its flights for Electric Boat using a BAE Systems Jet Stream 3101, registration number N16EJ (the "Aircraft"). On May 21, 2000, six weeks after its first flight for Electric Boat, Executive Airlines was operating the Aircraft on a charter flight from Atlantic City, New Jersey to Wilkes-Barre/Scranton International Airport when the Aircraft crashed, killing all passengers and crew on board.

On the day of that crash, Electric Boat's chief pilot, Mr. Kevin Hanrahan, spoke with Executive Airlines' president, Mr. Peragine, concerning the crash of the Aircraft. Mr. Hanrahan informed Mr. Peragine at that time that Electric Boat was suspending service with Executive Airlines. Despite Electric Boat's efforts over the next few weeks, in Kevin Hanrahan's words, to "get information that would exonerate Mike Peragine's company Executive Airlines and allow me to feel comfortable starting to utilize their service", Mr. Peragine was never able to provide an explanation of the cause of the crash. In a letter dated June 7, 2000, Electric Boat notified Executive Airlines that because the safety of its employees "is of paramount importance" and because the findings of the FAA and the NTSB likely would not be available for some time, Electric Boat terminated the Contract.

On August 26, 2002, the NTSB finalized its Aircraft Accident Brief (the "Brief") regarding the crash of the Aircraft. In the Brief, the NTSB stated the following:

> The National Transportation Safety Board determines that the probable cause of this accident was the flight crew's failure to ensure an adequate fuel supply for the flight, which led to the stoppage of the right engine due to fuel exhaustion and the intermittent stoppage of the left engine due to fuel starvation. Contributing to the accident were the flight crew's failure to monitor the airplane's fuel state and the flight crew's failure to maintain directional control after the initial engine stoppage.

2. Plaintiff's Complaint

The plaintiff's operative Second Amended Complaint contains two counts. In the first cause of action, Plaintiff alleges that EB breached the Contract by "virtue of its failure to fulfill its obligations under the purchase order agreement for a period of six months after written notice of its decision to terminate the services provided for thereunder." (Second Am. Compl., first cause of action, ¶ 19.) As a result of such failure, Plaintiff continues, "Plaintiff has been damaged in the amount of $494,395.00." (Second Am. Compl., first cause of action, ¶ 20.) In its second cause of action, Plaintiff similarly alleges that it sent invoices to EB "detailing defendant's obligation for the six months following" termination of the Contract and that such "invoices demonstrate that the amount of $494,395.00 remains unpaid." (Second Am. Compl., second count, ¶¶ 22-23.)

Pursuant to the Terms and Conditions, however, Plaintiff had agreed that the "charter aircraft, charter operator and charter pilots must meet all FAA regulations" and that "each assigned aircraft and pilot is subject to Electric Boat (EB) management and chief pilot approval." The NTSB's report suggests that Electric Boat's chief pilot was correct in believing that the Plaintiff's operation did not meet with all FAA regulations. Electric Boat's expert witness has opined, and will testify at trial, that the Plaintiff was not in compliance with many FAA regulations at the time of the termination, not only because of its failure to fuel the Aircraft properly but also in its failure to properly hire, train or certify its pilots. Electric Boat will present such expert testimony at trial to support its claim that it properly terminated the Agreement for cause.

Moreover, even if plaintiff were correct that Electric Boat breached the contract, its claim for damages has no basis in the Agreement. Plaintiff claims that it is entitled to damages in the

amount of $494,395, which represents the full cost of 15 round-trip flights per month for six months plus 11 additional round-trip flights which Plaintiff alleges were not taken during May and June, 2000. However, Paragraph 14 of the Terms and Conditions provides that

> If this order is terminated, in whole or in part, for [Electric Boat's] convenience, [Plaintiff] shall be paid an amount, to be mutually agreed upon, which shall be adequate to cover the reasonable costs of [Plaintiff's] actual performance of work under this order to the effective date of termination, plus a reasonable profit thereon

The Agreement does not support Plaintiff's position as to the measure of damages. At best, if Electric Boat does not succeed in proving termination for cause, the Agreement clearly allowed Electric Boat to terminate for convenience, in which case Electric Boat is obligated to pay only the amount set forth in Paragraph 14 of the terms and conditions. Because Plaintiff did not provide any "actual performance of work", it is not entitled to any compensation under Paragraph 14.

3. Defendant's Counterclaim

EB's operative Answer, Affirmative Defenses and Counterclaim (the "Counterclaim") includes its counterclaim for breach of contract. EB alleges that "[A]s a result of the crash and the ensuing, and ongoing, investigation, [Plaintiff] has been unable to provide the service it agreed to under the [Contract]." (Counterclaim, ¶ 27.) EB further alleges that "[A]s a result of [Plaintiff's] inability to provide the services it agreed to provide under the [Contract], Electric Boat, for approximately seven months, was forced to use commercial air carriers to provide for its travel needs between Groton and Newport News" and "incurred significant travel-related expenses associated with traveling on such commercial carriers, expense it would not have incurred if [Plaintiff] had been able to provide the contracted for charter services." (Counterclaim, ¶ 30.) For approximately seven months, EB was forced to use commercial air carriers to provide for its travel needs between Groton and Newport News, and it incurred

significant travel-related expenses associated with traveling on such commercial carriers. The costs associated with Plaintiff's breach are approximately $300,000. Electric Boat will prove these costs through two current employees, Mr. Medeiros and Mr. Chacharone, both of whom have been disclosed as expert witnesses.

4. Defenses

In addition to the defenses described above, Electric Boat has also interposed the following affirmative defenses:

1. As to plaintiff's second Count, Executive Airlines fails to state a cause of action against Electric Boat upon which relief can be granted.

2. As to plaintiff's second Count, the account stated claim is precluded by a valid agreement between the parties.

3. As to all causes of action, Executive Airlines is a foreign corporation which, at all times relevant to this action, has been transacting business in the state of Connecticut without first obtaining a certificate of authority to do so from the Secretary of State for the state of Connecticut. Accordingly, pursuant to Conn. Gen .Stat. § 33-921, Executive Airlines may not maintain this action in this Court.

4. As to all causes of action, Executive Airlines has failed to comply with all of the provisions of the purchase order and the documents incorporated into the purchase order under which it asserts its claims. Executive Airlines is therefore barred from any recovery against Electric Boat.

5. As to all causes of action, Executive Airlines has failed to mitigate, minimize or avoid any damages it allegedly incurred, and any recovery against Electric Boat must be reduced thereby.

## 7. TRIAL BY MAGISTRATE JUDGE

The parties do not consent to the trial of this matter by a Magistrate Judge.

## 8. LIST OF WITNESSES

A. Plaintiff's Anticipated Witnesses

Plaintiff's witness will be Michael S. Peragine, 42 Berry Hill Road, Oyster Bay Cove, New York 11771, who will testify to the negotiation of the Contract, plaintiff's compliance with its terms, its breach by defendant and the damages being sought.

Plaintiff does not anticipate calling any other witnesses.

B. Defendant's Anticipated Witnesses

1. Kevin Hanrahan, Electric Boat Corporation, 75 Eastern Point Road, Groton, CT. Mr. Hanrahan is Electric Boat's chief pilot. Mr. Hanrahan is expected to testify regarding his communications with Executive Airlines after learning of the crash, as well as his investigation to determine whether Executive Airlines could provide safe transportation for Electric Boat's employees and the subsequent termination of the contract. Mr. Hanrahan will also testify as to Electric Boat's damages due to Executive Airlines' inability to provide the contract services.

2. Ronald Kiely, 75 Eastern Point Road, Groton, CT. Mr. Kiely is expected to testify regarding the request for quotation and the contracting process with Executive Airlines. He will also testify regarding certain meetings held at Electric Boat with Executive Airlines' president after the crash, as well as Electric Boat's termination of the contract. Mr. Kiely will also testify as to Electric Boat's damages due to Executive Airlines' inability to provide the contract services.

3. Aaron Goodwin Olmsted, 91 Hopkins Road, Ellington, CT. Mr. Olmstead has been disclosed by Electric Boat as an expert witness. He will testify as to his expert opinion that Executive Airlines operated the Aircraft on May 21, 2000, in violation of FAA regulations in that the Aircraft failed to reach its intended destination due to fuel starvation. He is also expected to testify as to Executive airlines' multiple other violations of FAA regulations in providing services to Electric Boat under the contract.

4. James Ahlfeld, 96 Laural Avenue, Larchmont, NY. Mr. Ahlfeld, who was Executive Airlines' accountant, is expected to testify regarding financial issues relating to Executive Airlines and its claimed damages.

5. Michael Peragine, Executive Airlines, Route 109, Hangar 3, Farmingdale, NY. Mr. Peragine is the president of Executive Airlines and is expected to testify regarding the request for quotation and the contracting process between Executive Airlines and Electric Boat, as well as regarding his discussions with Electric Boat after the crash and the factual basis for his claims.

6. David Medeiros, Eastern Point Road, Groton, CT. Mr. Medeiros has been disclosed as an expert witness and is expected to testify as to Electric Boat's damages as a result of plaintiff's contract breach.

7. Nicholas Chacharone, Eastern Point Road, Groton, CT. . Mr. Chacharone has been disclosed as an expert witness and is expected to testify as to Electric Boat's damages as a result of plaintiff's contract breach.

D. Defendant's Possible Witnesses

1. Dorothy Stillman, 75 Eastern Point Road, Groton, CT. Ms. Stillman may testify regarding the request for quotation and the contracting process with Executive Airlines. She will

also testify regarding certain meetings held at Electric Boat with Executive Airlines' president after the crash, as well as Electric Boat's termination of the contract.

2. Ronald Berlam, 75 Eastern Point Road, Groton, CT. Mr. Berlam may testify regarding the request for quotation and the contracting process with Executive Airlines.

3. Russel Mulcahey, Eastern Point Road, Groton, CT. Mr. Mulcahey may testify regarding the request for quotation and the contracting process with Executive Airlines.

4. Michael Leeds, Syosset, NY. Mr. Leeds may testify regarding his knowledge of Executive Airlines and Michael Peragine.

9. **DEPOSITION TESTIMONY**

Plaintiff has no witness to testify by deposition.

The Defendant anticipates that portions of the following depositions may be used in lieu of live testimony during the course of the trial, as follows:

Videotaped Deposition of Stacy Lynn Suazo given on March 20, 2003 in the litigation captioned *In re Air Accident at Bear Creek, Pennsylvania on May 21, 2000*, 3:00-CV-5000 (M.D. PA) at 65-66. Ms. Suazo was formerly the fiancé of the co-pilot killed in the crash and testified at his deposition regarding statements he made to her regarding the poor condition of the fuel gauges aboard the Aircraft.

In addition, deposition testimony given by Mr. Peragine in the course of this case or the Pennsylvania litigation may be used for purposes of impeachment.

## 10. INTERROGATORIES AND REQUESTS TO ADMIT

Plaintiff does not intend to introduce at trial any interrogatories or requests to admit.

The Defendant anticipates the possible use of the plaintiff's November 6, 2002 Answers to Defendant's First Set of Interrogatories at trial.

## 11. EXHIBITS

Plaintiff's Exhibits

The plaintiff's list of anticipated exhibits is attached hereto as Ex. A.

Defendant's Exhibits

The defendant's list of anticipated exhibits is attached hereto as Ex. B.

## 12. ANTICIPATED EVIDENTIARY PROBLEMS

Plaintiff anticipates no evidentiary problems, except as set forth in its motion in limine.

The defendant objects to plaintiff's anticipated efforts to introduce evidence or testimony regarding (a) Executive Airlines' costs in equipping itself and training personnel in preparation for entering into the contract with Electric boat; (b) Executive Airlines' claimed consequential damages; and (c) parol evidence regarding the meaning of the contract and/or liquidated damages. As discussed in the next section, these issues will be the subject of motions in limine.

Plaintiff states in response that it is not making claims as to (a) and (b).

## 13. MOTIONS IN LIMINE

Plaintiff is submitting a motion in limine to preclude introduction of certain documents and testimony. It is attached hereto as Ex. C.

Attached hereto as Ex. D is the defendant's motion to preclude evidence as to (a) Executive Airlines' costs in equipping itself and training personnel in preparation for entering into the contract with Electric boat; and (b) Executive Airlines' claimed consequential damages. Also attached hereto as Ex. E is the defendant's motion to preclude parol evidence regarding the parties' intentions in negotiating their contract.

## 14. GLOSSARY

The parties do not anticipate that any testimony in this case will require the use of difficult technical terminology.

## 15. STIPULATION OF UNCONTROVERTED FACTS

1. In October 1999, defendant Electric Boat issued a request for quotation (the "RFQ") for air charter service between Groton, Connecticut and Newport News, Virginia.

2. On or about 11 November 1999, plaintiff Executive Airlines submitted its offer to provide such air charter services in response to the RFQ.

3. On 9 February 2000, Electric Boat issued draft Purchase Order number SNLO22-096 to Executive Airlines (the "February Purchase Order").

4. On 14 March 2000, Electric Boat reissued the Purchase Order as Supplement 001 (the "March Purchase Order"), incorporating "Purchase Order Supplement No. 1", which referenced GDC-410 entitled Purchase Order Terms and Conditions (the "Terms and Conditions").

5. The March Purchase Order modified, in certain respects, the February Purchase Order.

6. The written contract at issue in this case consists of the following documents: (a) the February 9, 2000 Purchase Order issued to Executive Airlines, number SNL022-096 (the "February Purchase Order"); (b) the March 14, 2000 purchase order number SNL022-096 and "Purchase Order Supplement Number 1" (collectively, the "March Purchase Order"); and (c) the "Purchase Order Terms and Conditions" also known as GDC 410 (Rev 3/87) and Attachment (7/86) to GDC 410 3/87 (the "Terms and Conditions").

7. Electric Boat issued the February Purchase Order, the March Purchase Order, and the Terms and Conditions from its facility in Groton, Connecticut.

8. On April 10, 2000, Plaintiff commenced its flights for Electric Boat using several BAE Systems Jet Stream aircraft.

9. On May 21, 2000, six weeks after its first flight for Electric Boat, Plaintiff was operating one of its aircraft, BAE Systems Jet Stream 3101, registration number N16EJ, on a charter flight from Atlantic City, New Jersey to Wilkes-Barre/Scranton International Airport when the Aircraft crashed, killing all passengers and crew on board.

10. On May 24, 2000, Electric Boat sent to Executive Airlines a letter stating it was temporarily suspending Executive Airlines' service because of safety concerns.

11. On 7 June 2000, Electric Boat sent to Executive Airlines a letter stating it was terminating the Contract between Executive Airlines and Electric Boat.

**16. PROPOSED VOIR DIRE QUESTIONS**

See Plaintiff's Proposed Voir Dire Questions, attached hereto as Exhibit F.

See Defendant's Proposed Voir Dire Questions, attached hereto as Exhibit G.

**17. PROPOSED JURY INSTRUCTIONS**

See Plaintiff's Proposed Jury Instructions, attached hereto as Exhibit H.

See Defendant's Proposed Jury Instructions, attached hereto as Exhibit I.

**18. PROPOSED JURY INTERROGATORIES**

See Plaintiff's Proposed Jury Interrogatories, attached hereto as Exhibit J.

See Defendant's Proposed Jury Interrogatories, attached hereto as Exhibit K.

**19. PARTY STATEMENTS OF CONTESTED ISSUES OF FACT AND LAW.**

Counsel have attempted to prepare a joint statement of contested issues of fact and law but have not been able to reach agreement. Their party statements are therefore set forth below.

The plaintiff believes that that the following issues of fact and law are contested:

i. Was the intent of the change in the termination provision of the Contract from seven days in the February Draft to six months under paragraph 2 (A) of Supplement No. 1 intended to provide an income stream to Executive Airlines on termination if such termination was other than for Executive Airlines' default?

ii. Were the provisions of paragraph 2 (A) of Supplement No. 1 inconsistent with the provisions of paragraph 14 of the Terms and Conditions?

iii. Did the provisions of paragraph 2 (A) of Supplement No. 1 take precedence over the provisions of paragraph 14 of the Terms and Conditions?

iv. Did Electric Boat have the right under the Contract to terminate as a result of Executive Airlines' crash?

v. Was the termination of the Contract by Electric Boat on 7 June 2000 properly based on a default by Executive Airlines?

vi. Is Electric Boat entitled to damages from Executive Airlines?

vii. Is Executive Airlines entitled to six months of the minimum monthly charge after Electric Boat's termination of the Contract?

The defendant believes that the following issues of fact and law are contested:

1. Whether Electric Boat terminated the contract for default or for convenience.

2. Whether Executive Airlines breached the contract.

3. Whether Executive Airlines is entitled to any damages as a result of Electric Boat's termination of the contract.

4. If Executive Airlines breached the contract, whether Electric Boat is entitled to any damages as a result of that breach.

PLAINTIFF, EXECUTIVE AIRLINES

By ______________________

I. Leonard Feigenbaum (ct25807)
leefeig@aol.com
1670 Old County Road, Suite 224
Plainview, NY 11803
(516) 420-6900
(516) 420-8444 (fax)
Its Attorney

DEFENDANT, ELECTRIC BOAT CORPORATION

By ______________________

Francis H. Morrison III (ct04200)
fhmorrison@dbh.com
Michelle I. Turner (ct24012)
miturner@dbh.com
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103-3499
(860) 275-0100
(860) 275-0343 (fax)
Its Attorneys

**CERTIFICATION**

This is to certify that on this date a copy of the foregoing was mailed, first class postage prepaid, to:

I. Leonard Feigenbaum, Esq.
1670 Old County Road, .Suite 224
Plainview, NY 11803

Michelle I. Turner