# EXHIBIT 4

LEXSEE 2000 U.S. DIST. LEXIS 13372

NEZHAT H. HAFEZ, d/b/a AMERICAN MARKETING & TRADING COMPANY, v. LATICRETE INTERNATIONAL, INC., Defendant.

98-CV-438

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK

2000 U.S. Dist. LEXIS 13372

September 14, 2000, Decided
September 15, 2000, Filed

**DISPOSITION:** [*1] Defendant's motion for summary judgment GRANTED. Plaintiff's cross-motion for breach of contract on his breach of contract claims DENIED.

**COUNSEL:** For Plaintiff: STEPHEN HELMER, ESQ., JENNIFER McCOOMBS, ESQ., MACKENZIE SMITH LEWIS MICHELL & HUGHES, LLP, Syracuse, New York.

For Defendant: KEVIN ENGLISH, ESQ., TRACY SENDOR, ESQ., PHILLIPS, LYTLE, HITCHCOCK BLAINE & HUBER, LLP, Buffalo, New York.

**JUDGES:** HOWARD G. MUNSON, SENIOR U.S. DISTRICT JUDGE.

**OPINIONBY:** HOWARD G. MUNSON

**OPINION:**

### MEMORANDUM-DECISION & ORDER

Currently before the Court are two motions. Defendant moves for summary judgment on plaintiff's claims under the Connecticut Unfair Trade Practices Act ("CUTPA"), as well as his claims for tortious interference with business and contractual relations. Defendant also asks the Court to dismiss plaintiff's application emotional suffering or injury to business reputation damages, and further insists that punitive damages are unwarranted. Plaintiff, who opposes most of defendant's motion, counters with his own motion for summary judgment on his breach of contract claims. For the reasons that follow, the Court grants defendant's motion and denies plaintiff's cross-motion.

### BACKGROUND [*2]

Essentially, this case, premised on diversity jurisdiction, amounts to a contract dispute. The relevant facts appear to be as follows. In early 1994, plaintiff, a New York resident, met Erno DeBruijin, one of defendant's regional managers, at a conference in California. At this meeting, the pair discussed the possibility of establishing an agency relationship whereby plaintiff would drum up business for defendant, a Connecticut-based corporation, in Saudi Arabia. Sometimes plaintiff received a commission for the business he solicited for defendant, who would sell its wares directly to Saudi Arabian consumers; other times he conducted business directly with those consumers, selling them defendant's products himself. In this latter manner, plaintiff made his money as the ubiquitous "middle man."

Originally, plaintiff and defendant conducted business *sans* contract. At some point, however, plaintiff decided that he wished to develop an agency agreement between the parties. After an exchange of proposed agreements in spring 1996, plaintiff telecopied a modified and signed proposed agency agreement to defendant in June 1996. Though neither party has been able to find a copy of the [*3] ultimate agency agreement that both parties signed, they acknowledge that--at least for some time--they did business with each other "as if the [negotiated] agreement had been signed." Dft's Statement of Material Facts at P 11.

At about the same the parties were negotiating their agency agreement, another company appeared on the scene. The International Company of Chemicals & Binex ("Binex") is a manufacturer and distributor with operations in Saudi Arabia. In early 1996, Steve Parslow, a Binex representative, contacted defendant and indicated that his company was interested in pursuing a business relationship with defendant. DeBruijin informed Parslow that he should speak with plaintiff, its agent in Saudi

Case 3:02-cv-00194-WWE    Document 119-9    Filed 12/27/2005    Page 3 of 8

Page 2
2000 U.S. Dist. LEXIS 13372, *

Arabia. Not until summer 1996 did Binex contact DeBruijin. Abdul Rahman, another representative from Binex, called DeBruijin and, in the course of their conversation, confided that he was confused about defendant's relationship with plaintiff. Apparently, Rahman thought that while he was negotiating with plaintiff, he was negotiating to enter into a direct contract with defendant. The subsequent distributorship agreement he signed, however, indicated that it was in force only [*4] between Binex and plaintiff. n1

> n1 Plaintiff insists that these contacts between defendant and Binex violated their agency agreement.

Subsequently, in late August 1996, DeBruijin met with plaintiff at Dubai, United Arab Emirates. During this meeting, DeBruijin and plaintiff conferenced with Rahman by telephone. The gist of their conversation was that there should be a relationship between the three parties, and the intent of their discussions was memorialized in a letter from DeBruijin to plaintiff dated August 22, 1996. It stated that plaintiff was to be defendant's agent in Saudi Arabia.

The parties' relationship soon began to sour, however. Defendant submits that although plaintiff acknowledged it could appoint licensed manufacturers in Saudi Arabia, plaintiff jealously did not want any direct contact between defendant and Binex. Plaintiff counters that he was to be defendant's exclusive agent in Saudi Arabia, and Binex and defendant went "behind his back" to deprive him of that contractual entitlement. In [*5] any event, on December 18, 1996, defendant terminated its relationship with plaintiff by letter. Plaintiff's lawsuit, alleging breach of contract, tortious interference with business and contractual relationships, and a violation of the CUTPA followed.

The Court addresses the merits of these claims *seriatim*.

DISCUSSION

I. Standard for Summary Judgment

If ever a standard of law was well-settled, it is the standard for summary judgment. Rule 56 allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)*. A motion for summary judgment may be granted when the moving party carries its burden of showing that no triable issues of fact exist. *Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990)*. In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. Id.; *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962)* [*6] (*per curiam*). If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*.

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson, 477 U.S. at 248, 106 S. Ct. at 2510*. When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *Id., at 250-251, 106 S. Ct. at 2511*.

II. Plaintiff's Breach of Contract Claims

Plaintiff moves for summary judgment on its breach of contract claims. His argument is twofold: first, that defendant breached the agency agreement by sending plaintiff a termination letter which did not identify a single provision that plaintiff breached; and second, defendant [*7] waived its affirmative defense of breach of agency agreement by not raising it in its answer.

The latter argument is specious. The defendant denies breaching the agreement in its answer, which surely must have put plaintiff on notice that it would argue that it was justified in terminating the contract.

As to the termination letter itself, while it may be compelling evidence of a breach, in and of itself, it is not enough. Defendant submits that plaintiff breached his fiduciary duty when he interfered with its ability to form a licensing agreement with Binex to manufacture its products. Specifically, defendant points to provisions of the agency agreement that allow for it to assign and appoint licensed manufacturers, and call for plaintiff to promote the sale and marketing of defendant's products in Saudi Arabia. In a letter dated August 12, 1996 and sent to plaintiff, Binex purportedly expressed an interest in manufacturing defendant's products. Plaintiff, defendant insists, deliberately withheld this letter until October 7, 1996--or for almost two months. Meanwhile, plaintiff allegedly accused defendant of breaching the agency agreement by talking with Binex, which defendant seems [*8] to characterize as insubordination.

Plaintiff certainly has a different take on these events, but the issue here is whether factfinders could find defendant's allegations persuasive. Ultimately, they

Case 3:02-cv-00194-WWE    Document 119-9    Filed 12/27/2005    Page 4 of 8

Page 3
2000 U.S. Dist. LEXIS 13372, *

may not, but then again, they could. Questions of fact preclude granting summary judgment. Plaintiff's cross-motion is denied.

### III. Plaintiff's Tortious Interference Claims

Both parties concede that New York law applies to plaintiff's tortious interference claims. A tortious interference with contract claim under New York law comprises four elements: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's "intentional inducement" of the third party to breach the contract; and (4) damages. *See Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993); Union Carbide Corp. v. Montell N.V., 944 F. Supp. 1119, 1136 (S.D.N.Y.1996); Foster v. Churchill, 87 N.Y.2d 744, 749-50, 642 N.Y.S.2d 583, 665 N.E.2d 153 (1996).* Plaintiff has not pleaded tortious interference with contractual relations adequately because he has failed to allege that defendant's [*9] knowing conduct caused an actual breach by Binex of its aforementioned agreement with plaintiff. n2

---

n2 Plaintiff argues, unpersuasively, that defendant's alleged breach of the agency agreement "improperly" procured the breach of plaintiff's distribution agreement with Binex. Again, Binex *itself* did not breach any agreement; rather, what plaintiff is contending here is that defendant breached its agency agreement with plaintiff, causing him to lose his contract with Binex. This argument is *not* an argument for tortious interference with a contract: it is an allegation of damages plaintiff suffered by defendant's supposed breach.

---

Plaintiff's tortious interference with business relations claim is misguided as well. New York law holds that the elements of such a claim are: (1) business relations with a third party; (2) defendant's interference with those business relations; (3) defendant's acting with the sole purpose of harming the plaintiff or using dishonest, unfair, or improper means; and (4) an injury [*10] to the business relationship. *See Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 1999) (citing Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)).* Even if plaintiff could prove every other required element, he has shown absolutely no evidence that would allow a reasonable factfinder to believe that defendant intended him harm, or that it used "dishonest, unfair, or improper means." Case law clearly states that "wrongful means" include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *Hannex Corp. v. GMI, Inc., 140 F.3d 194, 205 (2d Cir. 1998)* (citation omitted). Nothing plaintiff has alleged amounts to these kinds of nefarious activities.

As plaintiff's claims for tortious interference with contract and business relations are without merit, defendant's motion is granted and these claims are dismissed.

### IV. Plaintiff's CUTPA Claims

Plaintiff does not oppose defendant's motion for summary judgment his CUTPA claim, therefore the Court obliges defendant and dismisses that claim.

### V. Damages

Lastly, defendant [*11] decries plaintiff's claims for extraordinary damages. Specifically, defendant insists damages relating to emotional suffering or injury to business reputation, as well as punitive damages, are unrecoverable here. Insofar as the only remaining claims are for breach of contract, the Court applies Connecticut law, the law dictated by the terms of the agency agreement, to its analysis.

Punitive damages are not ordinarily recoverable for breach of contract under Connecticut law because "punitive or exemplary damages are assessed by way of punishment, and the motivating basis does not usually arise as a result of the ordinary private contractual relationship." *Barry v. Posi-Seal International, Inc., 40 Conn. App. 577, 584, 672 A.2d 514, cert. denied, 237 Conn. 917, 676 A.2d 1373 (1996).* If punitive damages are available in a breach of contract claim, the breach of contract must be founded on tortious conduct. *See L.F. Pace & Sons, Inc. v. Travelers Indemnity Co., 9 Conn. App. 30, 48, 514 A.2d 766, cert. denied, 201 Conn. 811, 516 A.2d 886 (1986).* Again, nothing plaintiff alleges in this matter amounts to tortious conduct. [*12] Punitive damages are unavailable to plaintiff.

Nor are emotional or business reputation damages available to plaintiff. Connecticut follows the venerable axiom set forth in *Hadley v. Baxendale, 9 Ex. 341, 354, 156 Enc. Rep. 145 (1854):* "The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed." Only if a plaintiff pleads special circumstances are extraordinary damages available. For a plaintiff to collect emotional damages in a breach of contract claim, he "must allege and prove the elements of intentional infliction of emotional distress or negligent or unintentional infliction of emotional distress, as the case may be." *Smith v. Bridgeport Futures Initiative, Inc., 1996 Conn. Super. LEXIS 2158, *7, No. 326697, 1996 WL 493229, *2 (Conn.Super. Aug. 16,*

Case 3:02-cv-00194-WWE    Document 119-9    Filed 12/27/2005    Page 5 of 8

Page 4
2000 U.S. Dist. LEXIS 13372, *

1996). Damages to business reputation in a breach of contract are available only if plaintiff alleges the elements of a claim for defamation. Id. Again, as elucidated above, no reasonable factfinder could infer from the circumstances alleged that defendant [*13] is liable to plaintiff under any theory intentional or unintentional infliction of emotional distress, nor could the factfinder reasonably find that defendant defamed plaintiff. n3

n3 To state claim for defamation under Connecticut law, plaintiff must show that false statement was made which caused him harm, and that defendant was not privileged to do so. *See generally Caesar v. Hartford Hosp., 46 F. Supp. 2d 174 (D.Conn. 1999)*.

For plaintiff to prevail on a claim of intentional infliction of emotional distress, he would have to show four elements. "It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986)*. The elements of negligent and intentional infliction of emotional distress, incidently, differ as to the state of mind of the actor and not to the conduct claimed to be extreme and outrageous. *See Muniz v. Kravis, 1995 Conn. Super. LEXIS 2517, 1995 WL 542120, * (Conn.Super. Sep. 6, 1995) aff'd, 59 Conn. App. 704, 757 A.2d 1207, (Conn.App. 2000)*. Plaintiff simply cannot meet these thresholds because he cannot show "extreme and outrageous" conduct.

[*14]

Defendant's motion for summary judgment against plaintiff's claim for punitive damages, damages related to emotional suffering, and damages to business reputation is granted.

### CONCLUSION

After careful review of the foregoing, the Court **GRANTS** defendant's motion for summary judgment as to plaintiff's claims under the Connecticut Unfair Trade Practices Act, as well as his claims for tortious interference with business and contractual relations, and his application for emotional suffering, harm to business reputation, and punitive damages. The Court **DENIES** plaintiff's cross-motion for breach of contract on his breach of contract claims. As discovery has been completed, the Court sets this matter for trial, commencing at 10:00 am, November 1, 2000, in the Federal Courthouse in Syracuse, New York.

**IT IS SO ORDERED.**

DATED: September 14, 2000

Syracuse, New York

HOWARD G. MUNSON

SENIOR U.S. DISTRICT JUDGE

LEXSEE 2002 U.S. APP. LEXIS 18618

UNITED STATES OF AMERICA, Appellee, v. MARYANN ROMASZKO, Defendant-Appellant.

No. 01-1606

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

2002 U.S. App. LEXIS 18618

September 6, 2002, Decided

**NOTICE:** [*1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Western District of New York (William M. Skretny, Judge).

**DISPOSITION:** Affirmed.

**COUNSEL:** For Appellant: David R. Addelman, Addelman & Marszalkowski, P.C., Buffalo, N.Y.

For Appellee: Mary Ellen Kresse, Assistant United States Attorney (Michael A. Battle, United States Attorney for the Western District of New York), Buffalo, NY.

**JUDGES:** PRESENT: HON. CHESTER J. STRAUB, HON. THOMAS J. MESKILL, HON. ROBERT A. KATZMANN, Circuit Judges.

**OPINION:**

**SUMMARY ORDER**

AFTER ARGUMENT AND UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the District Court is hereby AFFIRMED.

Defendant-Appellant Maryann Romaszko appeals from a judgment of conviction entered on November 19, 2001, in the United States District Court for the Western District of New York (William M. Skretny, *Judge)*, following a jury trial. Romaszko argues that the District Court erred in excluding from evidence two annual reports prepared by the United States Postal Service Inspector and [*2] that the evidence at trial was insufficient to sustain her conviction.

The redacted indictment, * reflecting the charges ultimately considered by the jury, charged Romaszko with three counts of intentional and unlawful conversion of Postal Service funds, on or about May 25, June 4 and June 11, 1999, all in violation of *18 U.S.C. § 1711*. Romaszko's case proceeded to a five-day jury trial that began on July 10, 2001.

* Several other charges were dismissed prior to trial and at the close of the Government's case.

The evidence at trial established the following. In May and June of 1999, Romaszko was employed by the United States Postal Service as a regular window clerk at the Niagara Square Post Office in Buffalo, New York. As part of its investigation of cash shortages at the Niagara Square Post Office, the United States Postal Inspection Service installed surveillance cameras in the gallery above the window clerks and in the post office vault. The surveillance cameras recorded Romaszko [*3] and another employee, Anthony Vacanti, removing money from their cash drawers in the vault. Specifically, on May 25, 1999, between 5:13 and 5:15 p.m., the cameras showed Romaszko crumple money out of her cash drawer into her left hand and place it in her left pants pocket. The camera also recorded Romaszko walk out of the vault and past the "van account" area of the vault after taking the money. ** At about 8:38 a.m. on June 4, 1999, the surveillance cameras recorded Romaszko in the vault moments before an audit of her cash drawer. Again, Romaszko reached into the drawer with her left hand and removed money.

** The "van account" was the account used for the sale of stamps from a mobile van.

The Government presented testimony from Robert Langham, an Audio and Imaging Specialist in the United States Secret Service, as to the methods used to make the images captured on videotape more readily viewable. The Government also presented testimony from Inspector Ralph Tyler of the United States Postal Inspection Service. [*4] Tyler testified as to his investigation of the missing funds at the Niagara Square Station, which totaled approximately $ 123,000 during a three-year period, and Romaszko's role in the losses. Tyler also testified that he had reviewed the videotapes, which showed Romaszko removing money from her cash drawer in the vault. Rose Gorman, the Manager of the Niagara Square Station, testified as to the general procedures used at the Niagara Square Station from 1997 through June 1999. Gorman testified that window clerks counted money at the window and not in the vault area, which was simply a repository.

Romaszko's testimony at trial confirmed: that she was the person in the images presented by the Government; that she was left-handed; that she was seen crumpling the money into her left hand and removing it from the drawer; and that the money removed from the drawer belonged to the Postal Service. Romaszko, however, denied stealing the money. Instead, Romaszko testified that she was in the process of transferring funds to reconcile her "van account," which was used for the sale of stamps from a mobile van.

On July 16, 2001, the jury convicted Romaszko on two counts of the redacted indictment, [*5] for the unlawful conversion of Postal Service funds on May 25 and June 4, 1999, and acquitted her on the conversion count pertaining to June 11, 1999. At a hearing on November 13, 2001, the District Court sentenced Romaszko to a term of two years' probation on each count, to run concurrently, and imposed a fine of $ 1,000 and a special assessment of $ 50. Judgment was entered on November 19, 2001, and Romaszko timely appealed to this Court.

On this appeal, Romaszko first argues that the District Court erred when it granted the Government's motion *in limine* to preclude the introduction into evidence of excerpts from the 1999 and 2000 Annual Reports prepared by the United States Postal Service Inspector. This Court reviews a District Court's exclusion of evidence for abuse of discretion. See *United States v. Ramirez, 894 F.2d 565, 569 (2d Cir. 1990)*. A District Court abuses its discretion where it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence. See *Raishevich v. Foster, 247 F.3d 337, 344 (2d Cir. 2001); Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 729 (2d. Cir. 1998),* [*6] *cert. denied, 526 U.S. 1146, 143 L. Ed. 2d 1033, 119 S. Ct. 2022 (1999).*

The excluded reports attributed the loss of the money at the Niagara Square Branch to Anthony Vacanti, who had entered into a plea bargain with the United States Attorney's Office for embezzling approximately $ 1,900 of postal funds. *** The 1999 Annual Report of Investigations of the United States Postal Inspection Service noted Vacanti's "role" in the embezzlement of over $ 123,000. The 2000 Annual Report simply stated that Vacanti had embezzled $ 123,191.

*** While the Annual Reports do not use Vacanti's name, the record evinces that Vacanti is the "postal store clerk" referred to in the reports.

Romaszko argues that this evidence was critical to her case in that it showed that the Postal Inspection Service had attributed the entirety of the missing funds to another individual and that therefore, Romaszko had not taken any of the missing funds. Specifically, Romaszko asserts that the excluded reports were admissible [*7] under Rule 403 because the probative value of the evidence was not substantially outweighed by the risk of confusing the jury, and under any of four hearsay exceptions - *Federal Rules of Evidence 803(6), 803(8), 803(23),* and *807*. **** In response, the Government contends that to admit the annual reports as evidence would improperly suggest that Vacanti took all of the funds, when in fact he pled guilty to taking only a portion of the funds. The Government argues that the District Court properly excluded the evidence, pursuant to Rule 403, because the probative value of the Annual Reports was substantially outweighed by the danger of confusing or misleading the jury. Furthermore, the Government asserts that Rules 803(6), 803(8) and 807 include a "trustworthiness component" whereby hearsay information that is inherently unreliable is not admissible.

**** Romaszko asserts for the first time, on appeal, that the annual reports were admissible under Rule 803(23). This Court does not ordinarily consider issues not presented below; nevertheless, this assertion fails for substantially the same reasons the annual reports are not admissible under 803(6), 803(8) and 807.

[*8]

As to Rule 403, trial judges have broad discretion to exclude "even relevant evidence if its probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury."

*United States v. Esdaille*, 769 F.2d 104, 108 (2d Cir.), cert. denied, 474 U.S. 923, 88 L. Ed. 2d 264, 106 S. Ct. 258 (1985). The District Court, then, properly found that the probative value of the reports was substantially outweighed by the danger of confusing or misleading the jury to believe that Vacanti was responsible for all of the missing funds, given that Vacanti had pled guilty to taking only $ 1,900 of the missing $ 123,191. *Cf. id. at 104-108*. We also agree with the District Court that the annual reports lacked the requisite element of trustworthiness under Rules 803(6), 803(8) and 807, given the "circumstances under which [the documents] were produced." In particular, the reports provide no indication that an investigator or someone with personal knowledge of the facts of the case prepared them. In fact, the section of the reports that Romaszko attempted to use at trial incorrectly quoted United States [*9] Postal Inspection Service press releases recounting the facts of the Vacanti plea agreement and sentencing.

Secondly, Romaszko contends that the evidence at trial was insufficient to sustain her conviction.

> A defendant challenging the sufficiency of the evidence bears a heavy burden. ... An appellant must demonstrate that no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. ... The task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court.

*United States v. McDermott*, 245 F.3d 133, 136-37 (2d Cir. 2001) (citations and internal quotation marks omitted). In other words, the jury's verdict must be sustained if any rational trier of fact could have found the "essential elements of the crime beyond a reasonable doubt." *United States v. Finley*, 245 F.3d 199, 202-203 (2d Cir. 2001) (citing *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998)), cert. denied, 122 S. Ct. 1101 (2002). In considering the legal sufficiency of the evidence, every permissible inference should be drawn in favor of the government. [*10] *See United States v. Walker*, 142 F.3d 103, 112 (2d Cir.), cert. denied, 525 U.S. 896, 142 L. Ed. 2d 181, 119 S. Ct. 219 (1998), and 525 U.S. 988 (1998).

The evidence showed and Romaszko admitted that she removed funds belonging to the United States Postal Service from her cash drawer in the vault area of the post office while she was employed as a postal window clerk. While Romaszko asserted that she took the money to compensate for sales made with van account resources at her window, there is also evidence to show that Romaszko did not stop at the van account area of the vault after removing cash from her drawer. Viewing the evidence in the light most favorable to the Government, we find that a rational jury could have found the elements of conversion, under *18 U.S.C. § 1711*, to have been proved beyond a reasonable doubt, and therefore we reject Romaszko's challenge to the sufficiency of the evidence.

We have considered all of Romaszko's claims on appeal and find them to be without merit. For the reasons stated, we AFFIRM.