# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____X

EXECUTIVE AIRLINES          :   DOCKET NUMBER
VS.                 :   02-CV-194
ELECTRIC BOAT CORPORATION        :   (GLG)
_____X
VOLUME I, PAGES 1 - 187

DEPOSITION OF:  MICHAEL PERAGINE
DATE:  DECEMBER 16, 2003
HELD AT:  DAY, BERRY & HOWARD
ONE CANTERBURY GREEN
STAMFORD, CONNECTICUT

Reporter:  Margaret A. Sharpe, LSR 00023
BRANDON SMITH REPORTING SERVICE
44 Capitol Avenue
Hartford, CT  06106
(860) 549-1850
john@brandonreporting.com

134

1     Q     So let me just ask you, okay, Mr. Peragine,

2  you would agree with me, if I hear you right, that what you

3  are telling me is that the damages you've given me were not

4  calculated in accordance with Section 14, the termination

5  for convenience provision.  They were not calculated in

6  accordance with that?

7     A     Right; exactly.  Because I think that was

8  tied to liquidated damages provision.  If you take away

9  that and you take away the liquidated damage provision,

10  what you are left with is a one point five million dollars

11  that was breached and what damages flowed from that breach.

12     Q     Why, Mr. Peragine, aren't you limited to six

13  months of expenses after termination?  Why aren't you

14  limited to that?

15     A     Why should I be?  Is a better question.  We

16  have a one-year contract for a million and a half dollars.

17     Q     Well, --

18     A     If you were serious about it when you signed

19  the contract, you have an obligation to perform -- for you

20  to perform on the contract and we had an obligation to

21  perform.  We were ready, willing, and able.  The airplanes

22  were there, the crews were there, the training was done, we

23  were ready to perform under that contract.

24          You said, You know what?  We don't want to

25  do this any more.  That's after we went and spent all of

BRANDON SMITH REPORTING SERVICES

135

1  that money.  Aside from the law, just think of the equity.

2  We went out and spent two million dollars and geared up for

3  the contract.  When you say four weeks into the contract,

4  you know, we're going in another direction and there were

5  lots of circumstances.

6      Q    Have you made any allowance in these damages

7  that you've calculated for use of the two airplanes for

8  other accounts?

9      A    Yes.

10      Q    Okay.

11      A    First of all, I want to tell you that the

12  answer is yes.

13      Q    Okay.  And how have you done that?

14      A    Because we included in the damage analysis,

15  in the operating expenses, revenue, and cost.  So any

16  revenue that was generated is in there as an offset against

17  cost.  If we had just calculated cost, the number would be

18  higher.  You are going to have to go through it line item

19  by line item.

20      Q    We are going to have to do that.  I

21  understand that.

22      A    Okay.

23      Q    I'm trying to understand where you came from

24  and how you calculated it.  Okay.  What you've done is, you

25  have taken the entire year and the entire year of expenses

BRANDON SMITH REPORTING SERVICES

149

1    Q    I'm sorry.  Withdrawn.  When did you start

2  mitigating damages?  When did you start to -- mitigate

3  means reduce, right?

4    A    Yes.

5    Q    Okay.  When did you start trying to reduce

6  your damages by reason of the EB termination?

7    A    When did we start?  I mean, immediately.  We

8  always strive to maximize revenue minimize expense.

9    Q    Understood.

10    A    Always.  So with these airplanes, from

11  before May 21st to after May 21st, we always, you know, we

12  always tried to mitigate our expenses.  We had a decision

13  to make after -- at some point, I guess it evolved.  It's

14  not something that happened overnight.  We had a decision

15  to make at some point and it was continuing decisions had

16  to be made on how to mitigate; how to reduce our expenses;

17  how to survive.  You know, this was a major, major, trauma

18  to our company to have EB just quit after we spent that

19  kind of money.

20    Q    What steps did you take to mitigate your

21  expenses for those two aircrafts, golf Juliet and echo

22  November?  What specific steps did you take?

23    A    First, we tried to generate revenue from

24  other sources.  We tried selling the ships.  We tried to

25  determine whether or not they could be sold.  We listed

150

1  them with the company called Amstat.  Amstat is the number

2  one source for aircraft on the market nationwide.  We

3  listed them with several brokers.  We had conversations

4  with other operators.  You know, it's something you do

5  every day.  You can't say when did it start, you know.

6      Q    Fair enough.  Let me ask you:  Do you have

7  copies of listing agreements or discussions or

8  communications with Amstat or others who sold airplanes,

9  brokers who sold airplane at the time?

10      A    Yes.

11      Q    Would you produce them to us, please?

12      A    I will give you all I have, sure.

13      Q    And do you know, Mr. Peragine, when it was

14  that you first tried to sell these airplanes?

15      A    Certainly, by the end of the year.

16      Q    By the end of 2000?

17      A    I mean, we began as soon as we realized that

18  we -- what we were up against, we began talking to people.

19  This happened in May.  We were still dealing with the

20  dynamics, you know, of the crash and of EB's cancellations,

21  because it was major adjustments had to be made.  We had to

22  make sure we were going to survive because we spent a lot

23  of money.  And then we got hit and I think it was September

24  or October, with you know, with other financial dynamics.

25      Other airlines that had -- that were

BRANDON SMITH REPORTING SERVICES

151

1  starting to put aircraft on the market, and we realized

2  that we were in for a long haul, that these airplanes had

3  been so devalued that air lines that collapsed by the stock

4  market crash that took a couple of trillion dollars out of

5  the market in late 2000.  It was an on-going process to try

6  and maximize revenues and reduce expenses.

7          There's some expenses you can't reduce, you

8  got to insure the airplane.  You don't have to put fuel if

9  you are not flying, but you still have to pay the crews and

10  you have to have mechanics and mechanics have to be

11  trained; and most of them want contracts -- they don't want

12  to work day-to-day, they go wherever they can get a

13  contract.

14      Q      Did you lay off any crew in the year 2000?

15      A      Two of them perished in the accident.

16      Q      You lost two?

17      A      Obviously, we lost two.

18      Q      How about the rest of your compliment?  Did

19  you lay anybody off?

20      A      We struggled to maintain minimum staffing to

21  keep three airplane flying.  Even if they weren't flying,

22  you have to have the -- you couldn't take bookings if you

23  have an airplane and somebody wants to book three weeks

24  from now or two weeks from now, a thirty thousand dollar

25  trip, you can't train crews in three weeks.  Doesn't work

BRANDON SMITH REPORTING SERVICES

152

1   that way.  The crews get scheduled for training.  Their

2   training is two or three weeks in-dock, a week or two, so

3   you have to maintain staffing levels in the hopes that that

4   revenue will come in.  If you do it correctly, you mitigate

5   your damages.  Not only if you do it correctly, but if the

6   revenue is there.  And those are decisions that  you have

7   to make on an on-going basis.  Decision we would not have

8   to make if EB was flying, obviously.

9       Q      We're talking about mitigation now?

10      A      Um-Hum.

11      Q      My question is:  Did you reduce your crew,

12  staffing, okay, during 2000 and into 2001?

13      A      Reduce crew staffing below the level

14  required to operate three airplanes?  That  would have been

15  totally irresponsible.

16      Q      So you needed --

17      A      We went to minimum staffing.

18      Q      All right.  Did you consider operating with

19  two airplanes?

20      A      We basically did operate with two airplanes.

21  One airplane flew very, very little, very, very little.  We

22  only had enough business to keep two going.

23      Q      Did you ever do an analysis of whether or

24  not the crash and the unfortunate publicity and everything

25  else, whether or not that would reduce your revenues?

153

1    A    Wasn't much of an analysis necessary.  EB

2  cancelled its contract -- Jetstreams are not like many

3  other airplanes.  They exist mostly for contract purposes.

4  People who charter airplanes don't go out and charter

5  Jetstreams frequently.  They charter small jets, and small

6  piston equipment.  A 19-passenger airplane is either used

7  for a commuter service or, at least in my experience,

8  contract service.

9    Q    Okay.

10    A    And the kind of contract service that you go

11  out -- I would never ever have gone out and bought two

12  airplanes if it weren't for the Electric Boat contract; and

13  even then, I was very cautious about it.  I did not run out

14  -- when they told us in November they were going to give us

15  a contract for the rest of your life and buy airplanes, we

16  talked, we went through it, we negotiated, we came up with

17  these provisions before we went and spent that much money,

18  knowing that what you have, if -- when EB cancelled a

19  contract, a situation where you are going -- that's why we

20  negotiated the liquidation.  You are going to have expenses

21  and you don't how long you are going to have them because

22  you can't park the airplane in your back yard.  You have to

23  have mechanics and pilots and insurance.  You need the

24  resources to manage and maintain the airplane.

25    Q    Mr. Peragine, revenue-wise, have you ever
         BRANDON SMITH REPORTING SERVICES

154

1  sat down and said, okay, how did our revenue -- however you

2  measure things, flight hours for the airplanes, hours

3  flying -- did you ever sit down and take your business and

4  look at it in the twelve months before this contract, the

5  rolling twelve months?  That is, up to April of 1999, to

6  April of 2000, and compare it to the twelve months, April

7  2000, to April 2001, without regard -- take Electric Boat

8  out of the equation -- what was the comparison between

9  those two twelve month periods, in terms of revenue?

10      A    Okay.  First, the company was formed in

11  January of 2000, four months before the crash.  That's when

12  Millenium -- Millenium Aviation was formed.

13      Q    Okay.

14      A    Then, the joint venture was put together

15  then.  So what you have to look at really just those months

16  before -- the three or four months before.  I believe that

17  we made a three or four hundred thousand dollar profit.  I

18  don't -- I want to be clear that I'm just doing it from

19  memory, but I believe we had a very significant profit

20  margin for that period of time.

21          If EB had performed in the contract, it

22  would have been quite a spectacular year and years to

23  follow.  So I don't know how you can compare apples and

24  oranges.

25      Q    Don't you -- do you know -- don't you know
            BRANDON SMITH REPORTING SERVICES

155

1  in the rolling twelve months before, whatever the entity

2  was that was flying the airplanes, don't you know what your

3  gross business revenue was?

4      A     Completely different operation, though.  It

5  really -- I mean, if you want to compare the year before to

6  this year, you would have to speculate as to so many things

7  because it wasn't the same operation.  We were pretty

8  determined on January 1st to go in a different direction.

9  We were determined not to have the adventure of charter,

10  where you buy an airplane and you hope, you know, put your

11  merchandise in the front window and you hope someone's

12  going to come and buy it.

13          We went looking for security.  We were

14  looking for contracts, and so we made some what of a --

15  when I say "we," I made somewhat of a metamorphosis.  I

16  made a commitment to contract work.  Contracts like

17  Ceasar's and Electric Boat and spent a bloody fortune to

18  see that happen.  And so -- how can you compare it to

19  before?  All you can say is this -- you can say that we

20  entered into the contract for a million and a half dollars.

21  We should have made four hundred and six hundred thousand

22  dollars profit, minimum, on that.  That's what we went into

23  it for, with a promise from Electric Boat that that would

24  grow over the years.  The program was going to grow.

25          They talked about things like a sixty
          BRANDON SMITH REPORTING SERVICES

156

1    trillion dollar contract to build the next trident

2    submarine and aircraft carriers, and they held a lot out --

3    and we signed on to it. We bought these airplanes, and we

4    should have made that money.

5        Q    What were the other financial dynamics that

6    went on in the year 2000 and 2001 that you started telling

7    me about before that were affecting your business?

8        A    Not affecting the business, affecting our

9    ability to sell the airplanes.

10       Q    Okay. Tell me what those financial dynamics

11   were?

12       A    I guess one of the biggest events were -- I

13   mean, there were really small airlines, commuter airline

14   that operated J31s that started dumping them into the

15   market. Pan Am, up here in Portsmouth bought eighteen J31s

16   for a hundred and fifty thousand dollars a piece. That

17   wrecked the -- it wrecked the J31 market.

18       Q    When did that happen?

19       A    In this period of time.

20       Q    2000 and 2001?

21       A    In that period of time.

22       Q    In the contract period?

23       A    Yes.

24       Q    How did that -- I'm sorry. How did that

25   wreck the value of other Jetstreams?

BRANDON SMITH REPORTING SERVICES

157

1    A    We were paying a million bucks for these

2   airplanes.  These airplanes had a price tag of a million

3   plus before, and that was one of the reasons I was very

4   cautious about buying these airplanes.  I knew we were

5   buying them, we were going to pay the premium, we were

6   buying them at peak.  I told Electric Boat that it's not a

7   good time to buy an airplane; and the comfort that they

8   gave me was, don't worry.  Over the long run, it's going to

9   be worth it.  The program's going to increase.  All these

10  great things are going to happen.  You're going to do a lot

11  of flying.  So we paid the price for it.

12    Q    Why were Jetstreams being dumped on the

13  market?

14    A    Because commuter airlines that were

15  operating under lease arrangements with British Aerospace

16  prior to the end of 2000 and beginning of 2001, the leases

17  were coming to an end.  They weren't renewing them and so

18  they starting parking airplanes.  This is now six months to

19  twelve months after we signed the contract with EB.  They

20  were starting to park airplanes in the desert.

21       And the price -- you know, you don't need a

22  degree from the Chicago school of economics to understand

23  supply and demand controls price.  And when we bought them,

24  there was little supply and we paid a high price.  Now we

25  had to sell them, we were up against the forces of supply

BRANDON SMITH REPORTING SERVICES

158

1   and demand that were working against us.  We were stuck

2   with airplanes that EB said only -- we had to sell and

3   there wasn't a market to sell them; so we had to continue

4   maintaining them.

5        Q    Didn't the fact that airplanes were being

6   parked, reflect decreased demand for services in the

7   market; isn't that one of the things reflected in this time

8   frame?

9        A    No, because the reason that the airplanes

10  were being parked was that the demand existed -- the demand

11  that existed was being met by new equipment entering the

12  market, that was either larger -- RJs coming into the

13  market.  I mean, this all happened after, you know, quite a

14  while after Electric Boat; and I began talking a year and

15  year and a half later and continues today.  A hundred

16  Jetstreams parked in the desert right now.

17       Q    The RJs are regional jets?

18       A    Yes.

19       Q    And those are not turbo props.  Those are

20  jets?

21       A    Yes. But you are asking about demand for

22  service.

23       Q    I am.

24       A    Well, there is no demand.  There wasn't

25  demand for 19-passenger Jetstream airplanes in contract

BRANDON SMITH REPORTING SERVICES

159

1  service that we could find.  We looked and we couldn't find

2  it.

3      Q    I don't know the aviation industry as well

4  as you do, Mr. Peragine; but my understanding was that the

5  regional jets were really replacing turbo props in the

6  industry?

7      A    J31 is a turbo prop.

8      Q    I understand.  And didn't that reflect the

9  fact that people didn't want to fly on turbo props; they

10  wanted to fly on jets?  Isn't that part of what's been

11  going on in the industry and wasn't it going on in 2000 and

12  2001?

13      A    Why didn't Electric Boat contract with

14  someone for regional jet?  They obviously wanted turbo

15  props.  In fact, the contract provides for four different

16  types of airplanes.  Every one happens to be a turbo prop.

17      Q    I understand that.  I'm talking about the

18  market and the industry.  I mean --

19      A    I will tell you what the market was in

20  1999, --

21      Q    Right.

22      A    -- the market was fairly strong for

23  operators of 19-passenger turbo props because Electric Boat

24  solicited, not just me but many other people, I would not

25  say they begged, but I would say that they went a distance

BRANDON SMITH REPORTING SERVICES

160

1  to encourage us to take this contract.  There wasn't a lot

2  of supply.

3          The 19-passenger turbo props that were in

4  operation were in operation for commuter operations, where

5  they were committed to a schedule.  They couldn't take on

6  Electric Boat or anyone else because they had to fly a

7  schedule.  So EB talked us into agreeing to provide them

8  service based on this long-range thing.  EB talked about a

9  future that involved larger equipment and expanded service

10  for us, doing it together.  They talked about a somewhat of

11  a partnership in this endeavor of moving their people back

12  and forth as the company grew.  Then they made this

13  decision to change; and, in their words, to change

14  direction.  That's something that's certainly curious.

15      Q     Why did they tell you they changed

16  direction?

17      A     Why did they tell me they were changing

18  direction?

19      Q     Yeah.

20      A     It's in their letters you have to read them.

21      Q     Was it about the crash, that they wanted to

22  change direction?

23      A     I'm not going to comment on it.  I don't

24  know what was in their mind.  You know, I would like to

25  know what's in their mind; I'm not going to speculate.

BRANDON SMITH REPORTING SERVICES

161

1      Q     We saw some of the letter -- and it didn't

2  -- didn't they talk about concerns about safety after the

3  crash?

161

1     Q     We saw some of the letter -- and it didn't

2     -- didn't they talk about concerns about safety after the

3     crash?

4     A     They say what they say.

5     Q     Okay.  And assuming that they did say that,

6     did anybody ever suggest to you any reason, other than

7     safety, other than the crash, or changes in direction at

8     Electric Boat?

9     A     Yes.

10     Q     Who?

11     A     Quite a few people.

12     Q     And what was the change in direction that

13     they suggested other than the crash, other than safety

14     concerns about the airplane and about your operation?

15     A     They started talking about the displeasure

16     with the aircraft immediately.  They didn't like the

17     seating configuration, it's all in the documents -- just

18     read the stuff that you sent me.

19     Q     And so your suggestion is that they just

20     didn't like the airplanes and they were going to go

21     somewhere else?

22     A     I'm not suggesting anything.  I would like

23     to know -- I don't know what was in their mind.  I don't

24     know.

25     Q     Do you think the questions to you about the

BRANDON SMITH REPORTING SERVICES

162

1   crash and safety concerns to the extent they asked them

2   were legitimate questions?

3       A       Some.

4       Q       Okay.  What, if anything, happened to your

5   business?  I mean, you've continued to own some of these

6   airplanes up until, according to the documents, pretty

7   recently?

8       A       I have been trying to sell them since after

9   EB --

10      Q       Understood.  But it looks like you sold them

11  in 2003, sometime in 2003?

12      A       Yes.

13      Q       This year?

14      A       Yeah.

15      Q       What effect --

16      A       I had two more for sale, by the way, if you

17  are interested.

18      Q       Right now?

19      A       One more.  I apologize.  One more.

20      Q       So you are going to be out of your Jetstream

21  3100s, right?

22      A       Yes.

23      Q       You are going to sell them all.  You would

24  have sold them all?

25      A       Yes.
        BRANDON SMITH REPORTING SERVICES

163

1     Q     Is that because you can't keep any of them

2  busy?

3     A     It's because I made the decision to get out

4  of the Jetstream business.  A tough couple of years since

5  EB canceled.  I don't know if you ever invested two million

6  and had somebody tell you, hey, only kidding guys.

7     Q     You invested two million.  It's all your

8  money?

9     A     Yes.  Well, when you say all my money, two

10  million dollars and then some was invested in this -- in

11  trying to make this whole organization work.

12     Q     How did 9/11 affect your business?

13     A     It demolished the helicopter business

14  because the heliports in the City were closed.

15     Q     How about your contract business, your

16  charter business?

17     A     I don't think it changed the contract

18  business.  That wasn't -- that single event probably

19  elevated demand for private aircraft, but the Jetstream

20  doesn't fit the niche.  The Jetstream only had a two

21  hundred mile range, two hundred and fifty mile range. I

22  think the aircraft with coast-to-coast range got busier.  I

23  don't believe it had a very big impact on the Jetstream.  I

24  think considering that our business at that point was

25  primarily casino activities, it didn't really have a big

BRANDON SMITH REPORTING SERVICES

164

1  impact on the casinos.

2      Q    Mr. Peragine, what effect, if any -- and I'm

3  not going to discuss what it is, I know you refuse to do

4  that -- what effect did the release of the NTSB probable

5  cause determination have on your business?

6      A    I don't think anybody even ever read it.  I

7  mean, it wasn't published anywhere, that I know of.

8      Q    When you say it wasn't published, isn't it

9  online?

10     A    Say again?

11     Q    Isn't it on line? Can't you go on line and

12  read it?  You can go and read  it this afternoon?

13     A    If you go looking for it, yes, how many

14  people would, our customers didn't.

15     Q    Did it get in the newspaper when they made

16  their probable cause determines?

17     A    I don't think so, I don't know.

18     Q    Did it get on television?

19     A    By the way, you are talking about three

20  years later.

21     Q    When was it?  In 2002?

22     A    I'm going by what you said.  I thought it

23  was this year.

24     Q    Now, are we talking about selling your

25  airplanes, the probable cause determination, I saw it here

165

1   a minute ago date of release is August 26, 2002?

2       A    Okay.  Shows you what a big event it was to

3   me.

4       Q    Was it -- did it get -- did it appear on the

5   news on Long Island?

6       A    Not to my knowledge.  No one mentioned it to

7   me, let me put it that way.

8       Q    So do you think yourself, based on talking

9   to people, do you think that EB terminated this contract

10  for reasons other than legitimate safety concerns?

11      A    I don't know what was in their head.  I

12  would love to know.

13      Q    And I'm not asking you that.  Okay?

14      A    Yep.

15      Q    My question to you is:  What's in your head?

16  I mean, do you think that they terminated this for reasons

17  other than concerns about safety after the crash?

18           MR. MAHLER:  Are you asking for his opinion?

19  BY MR. MORRISON:

20      Q    I'm asking him what he thinks, yeah.

21      A    Well, all I can share with you is this, we

22  started flying in early April and immediately got

23  blistering complaints from people who said, that they --

24  and it's in the documents that you sent to us -- that they

25  didn't want to sit next to anyone.  For years, they flew in

           BRANDON SMITH REPORTING SERVICES

187

1  My Notary Expires: _____

2  STATE OF CONNECTICUT    :

3  COUNTY OF HARTFORD    :

4

5      I, MARGARET A. SHARPE, a Commissioner duly

6  commissioned and qualified in and for the State of

7  Connecticut, do hereby certify that pursuant to notice

8  there came before me on the 16th day of December, 2003, the

9  following-named person, to wit:  Michael Peragine, who was

10  by me duly sworn to testify to the truth and nothing but

11  the truth; that he was thereupon carefully examined upon

12  his oath and his examination was reduced to writing under

13  my supervision; that this deposition is a true record of

14  the testimony given by the witness.

15      I further certify that I am neither attorney nor

16  counsel for nor related to nor employed by any of the

17  parties to the action in which this deposition is taken;

18  and further, that I am not a relative or employee of any

19  attorney or counsel employed by the parties hereto or

20  financially interested in this action.

21      IN WITNESS THEREOF, I have hereunto set my hand and

22  affixed my seal this 2nd day of January, 2004.

23

24      _____

25      MARGARET A. SHARPE, Commissioner
    BRANDON SMITH REPORTING SERVICES

193

1    A   It's plus interest.

2    Q   I said to include.  I said to include.

3   That's what your claim is.

4        And then the second category of damages is

5   called "Actual Damages."  It includes three categories:

6   aircraft acquisition losses, increase in necessary

7   resources, and additional losses.  And the amount of

8   that category is $1,562,000.

9        My question to you is:  Are you still

10  claiming both of those categories of damages today?

11   A   I don't understand your question.

12   Q   Are you still seeking in this lawsuit as the

13  plaintiff to recover aircraft acquisition losses,

14  increase in necessary revenues, and additional losses,

15  those three categories under number 2?

16   A   Can we go off the record for a second?

17   Q   Sure.

18       (Discussion off the record.)

19       MR. FEIGENBAUM:  On the record, I want

20  to make a statement on behalf of Mr. Peragine regarding

21  the plaintiff's claim.  It's my view that the plaintiff

22  actually has no claim for anything below the line; in

23  other words, the claim is essentially limited to number

24  1, which amount to the contract obligation under the

25  contract and the actual losses that were suffered are

194

1    not recoverable under the contracts that are

2    applicable, which is --

3            MR. MORRISON:  So that means that you

4    are not pursuing in this case a claim for the items

5    that are listed on Exhibit 2 as actual damages?

6            MR. FEIGENBAUM:  That's correct.

7            MR. MORRISON:  Is that what you're

8    telling me?

9            MR. FEIGENBAUM:  They may be actual

10   losses, but they are not recoverable damages, in my

11   view.

12           MR. MORRISON:  And let me also say to

13   you that because the court has ruled -- it's on page 11

14   of the decision -- that the provisions of the contract

15   have to be read together, that is, the six-month notice

16   provision, the termination for convenience provision,

17   the court has said they have to be read together, we

18   don't know, I don't think, exactly what the court meant

19   and how the court viewed that that would happen.

20           I only raise that because section 14,

21   which deals with terminations for convenience, provides

22   that payments which are due under that provision

23   include actual expenses, expenses actually incurred in

24   the performance of the order --

25           MR. FEIGENBAUM:  Work actually done, if

208

1      If somebody then flies one or two flights and

2    says, "Well, you know, you paid him X per day and his

3    training should be divided by 200 and I want to pay ten

4    two hundredths of that because I only used him for two

5    days," the answer to the question is no, I have not

6    been paid for the expenses to perform the work under

7    the contract.

8          THE WITNESS:  Reasonable answer?

9          MR. FEIGENBAUM:  No.

10   BY MR. MORRISON:

11     Q   Let me just ask you, okay, what did -- and

12   you've listed one for me, training.  What are the other

13   categories of cost that are in that same area, okay?

14   Why don't you tell me what you think they are?  Then

15   we'll try to deal with them.

16     A   Categories of cost to perform the flights

17   under the contract?

18     Q   That's what you're telling me, isn't it?

19     A   Yes.  I want you to define your question for

20   me, and I'll answer it for you.

21     Q   You gave me an example --

22     A   Right.

23     Q   One of your examples was to train the pilots.

24     A   Yes.

25     Q   Are there other examples?

209

1    A    Of what?

2    Q    Of reasonable cost of your actual performance

3    of work under this order to the effective date of

4    termination.

5    A    Yes, there are other costs.

6    Q    Okay.  What are they?

7    A    Aircraft costs.

8    Q    Aircraft cost meaning?

9    A    Acquisition costs, yes.  Acquisition and the

10   cost of ownership.

11   Q    Okay.  What else?

12   A    Any contracts that were executed to -- by the

13   company that were required to -- to have the resources

14   to perform the contract.  That would be contract

15   with -- contracts with maintenance personnel,

16   employment contracts if they -- to the extent they

17   existed, insurance contracts to the extent they're

18   noncancellable.  There's a penalty for cancellation of

19   the lease.

20   Q    Sir, that's fine.

21   A    Okay.

22   Q    So, really, we're back to the -- I don't

23   agree that they're recoverable, but we're back to the

24   list?

25   A    In terms of the recoverable, that's between

210

1  the lawyers to argue.  You asked what the losses were;

2  I told you what they were.

3      Q   I asked you reasonable costs for the actual

4  performance of services under the contract to the date

5  of termination, okay?  That's what section 14 says.

6      A   Yes.

7      Q   If date of termination becomes something else

8  because of the other provision, it does; but that's --

9  that's what it is.  So let me -- let me ask you the

10  questions.  I've got to ask you some questions about

11  this, okay?

12     A   Okay.

13         MR. FEIGENBAUM:  I have to go off the

14  record for a minute.  I want to talk to you.

15         THE WITNESS:  Okay.

16         (Recess:  11:14 a.m. to 11:27 a.m.)

17         (Discussion off the record.)

18     Q   Mr. Peragine, just to make clear something we

19  talked about off the record just a minute, and that is

20  if I understand correctly what you've told me, it is

21  that these damages that we're talking about, these

22  actual damages in Exhibit 2, that it is your contention

23  that -- when I say contention, I don't mean to make it

24  argumentative, but it's your view that those are the

25  reasonable costs that are referred to in paragraph 14

211

1    of the contract?

2        A    Okay.  You first referred to them as damages.

3    Now you're referring to them as reasonable costs.

4        Q    Here's where I'm coming from, okay, and

5    that's a legal issue, okay?  But here's my position.

6    You have listed some things in Exhibit 2 under number

7    2, all right, and whatever the label that's on these

8    things, the label is "Actual Damages," but what you're

9    telling me is that those items under number 2 in your

10   view are reasonable costs within the meaning of section

11   14, the termination for convenience provision.  That's

12   what you're telling me?

13       A    They are the costs incurred to perform the

14   work -- these were the costs that needed to be incurred

15   to perform the work under the contract.

16       Q    Okay.

17       A    Everything else that you mix in, paragraph

18   14, convenience, I'm not commenting on any of that.

19   I'm only saying that these were the costs.

20           MR. FEIGENBAUM:  For the record, I have

21   previously made a statement, which has turned out not

22   to be consistent with the position of Mr. Peragine, and

23   that statement as to actual damages is, how should we

24   put it, no longer operable.

25           MR. MORRISON:  Well, at the end of the

375

1

2

                    STATE OF CONNECTICUT

3

4

     I, JAMES A. SCALLY, a Registered Professional

5  Reporter/Commissioner within and for the State of
   Connecticut, do hereby certify that I took the

6  deposition of MICHAEL S. PERAGINE on March 20, 2004, at
   the offices of Day, Berry & Howard, LLP, One Canterbury

7  Green, Stamford, Connecticut.

8      I further certify that the above-named deponent
   was by me first duly sworn to testify to the truth, the

9  whole truth, and nothing but the truth concerning his
   knowledge in the matter of the case of EXECUTIVE

10  AIRLINES VS ELECTRIC BOAT CORPORATION, now pending in
   the United States District Court, District of

11  Connecticut.

12      I further certify that the within testimony was
   taken by me stenographically and reduced to typewritten

13  form under my direction by means of COMPUTER ASSISTED
   TRANSCRIPTION; and I further certify that said

14  deposition is a true record of the testimony given by
   said witness.

15

       I further certify that I am neither counsel for,

16  related to, nor employed by any of the parties to the
   action in which this deposition is taken; and further,

17   that I am not a relative or employee of any attorney or
   counsel employed by the parties hereto, nor financially

18  or otherwise interested in the outcome of the action.

19      WITNESS my hand and affixed my seal this 29th day
   of March, 2004.

20

21

22              James A. Scally, RPR, CRR
                Commissioner

23

24  My commission expires
   May 31, 2004

25