UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EXECUTIVE AIRLINES | : | CIVIL ACTION NO. 3:02cv194 (WWE) |
| Plaintiff, | : | |
| v. | : | |
| GENERAL DYNAMICS CO., ET AL. | : | |
| Defendants. | : | JANUARY 13, 2006 |

**MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION IN LIMINE**

Defendant, Electric Boat Corporation ("Electric Boat"), hereby opposes the plaintiff's motion in limine dated December 22, 2005.

**I.    FACTUAL BACKGROUND**

This dispute involves a contract between Executive Airlines and Electric Boat pursuant to which plaintiff agreed to provide air charter services to Electric Boat between its facilities in Groton, Connecticut and Newport News, Virginia.

On April 10, 2000, plaintiff commenced its flights for Electric Boat using a BAE Systems Jet Stream 3101, registration number N16EJ (the "Aircraft"). On May 21, 2000, six weeks after its first flight for Electric Boat, Executive Airlines was operating the Aircraft on a charter flight from Atlantic City, New Jersey to Wilkes-Barre/Scranton International Airport when the Aircraft crashed, killing all passengers and crew on board.

On the day of that crash, Electric Boat's chief pilot, Mr. Kevin Hanrahan, spoke with Executive Airlines' president, Mr. Peragine, concerning the crash of the Aircraft. Mr. Hanrahan informed Mr. Peragine at that time that Electric Boat was suspending service with Executive Airlines. That conversation was confirmed in a May 24, 2000, letter from Ronald Kiely to plaintiff stating that "Confirming our Kevin Hanrahan's recent phone conversation with you, we

feel that suspension of the air charter service pending your explanation of facts surrounding the Wilkes-Barre crash is prudent." (May 24, 2000 letter from Ronald Kiely to plaintiff, attached hereto as Ex. A.)

Despite Electric Boat's efforts over the next few weeks, in Kevin Hanrahan's words, to "get information that would exonerate Mike Peragine's company Executive Airlines and allow me to feel comfortable starting to utilize their service", Mr. Peragine was never able to provide an explanation of the cause of the crash. In a letter dated June 7, 2000, Electric Boat notified Executive Airlines that because the safety of its employees "is of paramount importance" and because the findings of the FAA and the NTSB likely would not be available for some time, Electric Boat terminated the Contract.

On August 26, 2002, the NTSB finalized its Aircraft Accident Brief (the "Brief") regarding the crash of the Aircraft. In the Brief, the NTSB stated the following:

> The National Transportation Safety Board determines that the probable cause of this accident was the flight crew's failure to ensure an adequate fuel supply for the flight, which led to the stoppage of the right engine due to fuel exhaustion and the intermittent stoppage of the left engine due to fuel starvation. Contributing to the accident were the flight crew's failure to monitor the airplane's fuel state and the flight crew's failure to maintain directional control after the initial engine stoppage.

Electric Boat's operative Answer, Affirmative Defenses and Counterclaim (the "Counterclaim") includes its counterclaim for breach of contract. Electric Boat alleges that "[A]s a result of the crash and the ensuing, and ongoing, investigation, [plaintiff] has been unable to provide the service it agreed to under the [Contract]." (Counterclaim, ¶ 27.) Electric Boat further alleges that "[A]s a result of [plaintiff's] inability to provide the services it agreed to provide under the [Contract], Electric Boat, for approximately seven months, was forced to use commercial air carriers to provide for its travel needs between Groton and Newport News" and

"incurred significant travel-related expenses associated with traveling on such commercial carriers, expense it would not have incurred if [plaintiff] had been able to provide the contracted for charter services." (Counterclaim, ¶ 30.) For approximately seven months, Electric Boat was forced to use commercial air carriers to provide for its travel needs between Groton and Newport News, and it incurred significant travel-related expenses associated with traveling on such commercial carriers. The costs associated with plaintiff's breach are approximately $300,000.

## II.  ARGUMENT

### A.  Plaintiff's Motion in Limine Should Be Denied as an Improper Attempt to Relitigate its Motion for Summary Judgment.

As the Court is aware, on December 22, 2005, the plaintiff filed a Motion for Summary Judgment not only as to its claim against the defendant but also as to the defendant's counterclaim. In its motion for summary judgment, the plaintiff made exactly the same arguments as to defendant's counterclaim that it now makes in its motion in limine. Indeed, portions of plaintiff's motion in limine have been cut and pasted verbatim from plaintiff's Motion for Summary Judgment.

However, this Court *denied* the plaintiff's Motion for Summary Judgment in its entirety. The plaintiff's attempt to raise the exact same issues again is an impermissible attempt to appeal that decision and should be denied for that reason alone.

Moreover, as an attempt to preclude the defendant from presenting any evidence whatsoever on its counterclaim, the motion in limine is essentially a motion for summary judgment in disguise. Not only is a dispositive motion such as this entirely inappropriate at this late stage of pretrial proceedings, but the plaintiff's motion also utterly fails to comply with the strict evidentiary requirements for summary judgment motions. *See* Fed. R. Civ. P. 56.

District courts in this circuit have rejected such attempts to relitigate arguments unsuccessfully made on summary judgment by repacking them into a motion in limine. In *Rattigan v. Commodore Int'l Ltd.*, No. 87-CIV-2729, 1989 U.S. Dist. LEXIS 14645, *12-13 (S.D.N.Y. Dec. 8, 1989)[1], the plaintiff filed a motion in limine requesting preclusion of all evidence on the defendant's counterclaim on the grounds that the defendant had failed to satisfy certain conditions precedent in the contract. The court denied the motion in limine not only on substantive grounds but also because of the way in which the argument was presented:

> [P]laintiff in essence has filed a summary judgment motion in the guise of a motion in limine by asking for preclusion of evidence based on defendant's failure to state a claim. Plaintiff has done so despite this court's previous denial of summary judgment motions to dismiss defendant's counterclaims. The counterclaims are to be decided by the jury in this case; thus, evidence that will help the jury decide [the counterclaims] will not be excluded now based on arguments about the merits of the counterclaim itself.

*Rattigan v. Commodore Int'l Ltd.*, No. 87-CIV-2729, 1989 U.S. Dist. LEXIS 14645, *12-13 (S.D.N.Y. Dec. 8, 1989); *see also Torah Soft Ltd. v. Drosnin*, No. 00Civ.0676, 2003 U.S. Dist. LEXIS 16273, *12 (S.D.N.Y. Aug. 28, 2003) ("While the defendant's legal theory is sound . . . these facts have not been established, and it is inappropriate for Mr. Drosnin to seek what is effectively partial summary judgment in the guise of a motion in limine.")

The plaintiff's motion must therefore be denied as a procedurally improper attempt to relitigate the exact same arguments it unsuccessfully espoused in its Motion for Summary Judgment.

---

[1] All unreported cases are attached hereto as Exhibit B.

> B. **Contrary to Plaintiff's Argument, Notice of a Default was Not a Condition Precedent, and Whether or Not it Was Given Is Not Determinative of the Viability of Defendant's Counterclaim.**

Plaintiff incorrectly argues that proper notice of default and an opportunity to cure were "conditions precedent" to Electric Boat's right to terminate the Contract. The plaintiff appears to be completely confused about what constitutes a "condition precedent" and in any case does not explain why that would have any significance. In fact, whether or not notice of default was given has no bearing on the viability of the defendant's counterclaim.

Plaintiff cites only a portion of the holding in *Blitz v. Sublkew*, 74 Conn. App. 183 (2002). A fuller review of that decision reveals plaintiff's error. In *Blitz,* the court noted that a contract between the parties required the landlord plaintiff to obtain a written verification from the town that the tenant defendant could use the leased property to run an auto sales and repair business. *Id.* at 184. The contract stated, "If Landlord is unable to obtain such commitment from municipality, then this agreement shall be deemed null and void." *Id.* The court held that the "plaintiff's obligation to obtain written approval was a condition precedent to the leasing agreement" and plaintiff's failure to fulfill this condition made the agreement unenforceable. *Id.* at 189. The court then set forth the definition of a "condition precedent" stating:

> A condition precedent is a fact or event which the parties intend must exist or take place before there is *a right to performance.* . . . A condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor. . . . *If the condition is not fulfilled, the right to enforce the contract does not come into existence.* . . . Whether a provision in a contract is a condition the nonfulfilment of which excuses performance depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances when they executed the contract. (Citations omitted. Internal quotations omitted. Emphasis added.)

*Id.* at 189.

The requirement to provide notice of default and ten days to cure in order for Electric Boat to exercise its right to terminate the Contract does not amount to a condition precedent as defined under Connecticut law. Rather, it is merely a mechanism by which the parties agreed that Electric Boat would notify plaintiff of its decision to terminate the Contract as a result of a default by plaintiff.

In *Blitz*, the failure of the plaintiff to obtain written approval from the town completely relieved defendant of any obligation under the agreement. Here the notice of default provision has no such similar impact. Even if Electric Boat failed to fully comply with such provision, such failure would not erase the underlying breach committed by plaintiff or remove Electric Boat's right to sue for such breach.

At all times prior to Electric Boat's termination, plaintiff was contractually required to fulfill its obligations under the Contract, including providing pilots and aircraft that met all FAA regulations and met with Electric Boat's chief pilot's approval. As discussed below, plaintiff failed to fulfill these contractual obligations.

### C. Electric Boat's Counterclaim is Viable Under the Terms of the Parties' Agreement, and Evidence Relating to the Counterclaim is Therefore Highly Relevant.

As a factual matter, the defendant disputes plaintiff's assertion that no notice of default was provided to Executive Airlines. On the contrary, a written letter of May 24, 2000 informed the plaintiff of Electric Boat's decision that "we feel that suspension of the air charter service pending your explanation of facts surrounding the Wilkes-Barre crash is prudent." (*See* Ex. A.) A series of discussions between Electric Boat and Executive Airlines then ensued. According to Electric Boat's chief pilot, Kevin Hanrahan, Executive Airlines was never able to provide a

satisfactory explanation of the cause of the crash. Mr. Hanrahan gave the following testimony at his deposition:

> Q: In what manner was Executive Airlines unable to provide the services to which it contracted?
>
> A: After the crash they were unable to satisfy me as to the use of the airplane and the flight crews due to the questions that we had existing from the crash as to the cause.
>
> Q; What services could it not provide?
>
> A: It could not provide air service or shuttle service for Electric Boat.
>
> Q: Why not?
>
> A: Because I wasn't satisfied as to the cause of the crash and that it would not recur.
>
> . . .

Hanrahan Depo., attached hereto as Ex. C, at 145.

> Q: In the discussion of termination, what was said?
>
> A: Just that until we had word that this was not a repeatable accident or incident that we can be assured that it wouldn't happen again he [Robert Januska, Mr. Hanrahan's supervisor] also was no longer comfortable in continuing service and that was it.
>
> Q: Was there a discussion of a basis for termination?
>
> A: I was asked specifically if I had concerns and if they justified at that time our continuing service and I said I cannot continue service based on the accident and not having a better understanding of it.
>
> . . .

Ex. C, Hanrahan Depo., at 53.

When Electric Boat terminated the contract by letter of June 7, 2000, it did so in direct follow-up to the May 24, 2000 letter seeking an explanation of the crash.

Moreover, even if Electric Boat did not provide notice of default, it nonetheless retained the right to sue for a breach of contract. Plaintiff ignores the fact that the parties agreed that Electric Boat's right to terminate for default was not exclusive and did not preclude Electric Boat from exercising any other remedies available to it.

Electric Boat and plaintiff expressly agreed that, "the rights and remedies of [Electric Boat] provided in this paragraph [paragraph 12] shall not be exclusive and are in addition to any other rights and remedies provided by law or under this order." (Terms and Conditions, ¶ 12(f), attached hereto as Ex. D.) Accordingly, regardless of whether Electric Boat provided notice of default as set forth in paragraph 12, the parties specifically agreed that Electric Boat retained, among other things, the common law right to sue for breach of contract.

Plaintiff breached the Contract in two ways: (1) by not providing to Electric Boat aircraft and pilots that met with Electric Boat's chief pilot's approval; and (2) by not complying with all FAA regulations. (Electric Boat's Answer, Affirmative Defenses and Counterclaim, counterclaim, ¶¶18-19). As discussed above, plaintiff was never able to satisfy Kevin Hanrahan that its aircraft and pilots were safe.

The second breach, failure to comply with FAA regulations, is particularly relevant here since that is the evidence that the plaintiff seeks to preclude. The parties' contract specifically requires that, "Charter aircraft, charter operator and charter pilots must meet all FAA regulations." (March Purchase Order, at 2, attached hereto as Ex. E.) Mr. Olmsted, Electric Boat's disclosed expert, has concluded that in his expert opinion, plaintiff operated the Aircraft on May 21, 2000, in violation of FAA regulations in that the Aircraft failed to reach its intended destination due to fuel starvation as a result of an insufficient fuel quantity onboard the Aircraft. (See June 11, 2004 Report of Aaron Goodwin Olmsted attached hereto as Ex. F.)

The plaintiff argues that Olmsted's conclusions are not relevant because they were not rendered until four years after the termination of the contract. Obsessively focusing on the termination, the plaintiff is missing the point that Olmsted's opinions are highly relevant to the question of whether Executive Airlines was in breach of the contract independently of whether or not it was the grounds for termination.

## III.  CONCLUSION

This Court has previously denied the plaintiff's motion for summary judgment on the same grounds set forth in this motion in limine. Because the Court has held that the defendant's counterclaim must be determined by the jury rather than the Court, it must also permit the jury to hear the evidence that supports the counterclaim. For that reason, and for all the other reasons set forth herein, the plaintiff's motion in limine should be denied.

DEFENDANT, ELECTRIC BOAT
CORPORATION

By _/s/ Michelle I. Turner_____
Paul D. Williams (ct#05244)
pdwilliams@dbh.com
Michelle I. Turner (ct24012)
miturner@dbh.com
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103-3499
(860) 275-0100
Its Attorneys

## **CERTIFICATION**

This is to certify that on this date a copy of the foregoing was mailed, first class postage prepaid, to:

I. Leonard Feigenbaum, Esq.
1670 Old County Road, Suite 224
Plainview, NY  11803

                                                                                                    Michelle I. Turner