# EXHIBIT C

LEXSEE 2004 U.S. DIST. LEXIS 16788

**BROOKRIDGE FUNDING CORP., Plaintiff, v. NORTHWESTERN HUMAN SERVICES, INC., Defendant.**

Civil Action No. 3:99 CV 2339(CFD)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

2004 U.S. Dist. LEXIS 16788

**August 18, 2004, Decided**

**SUBSEQUENT HISTORY:** Affirmed in part and reversed in part by, Remanded by, Vacated by, in part Brookridge Funding Corp. v. Northwestern Human Res., Inc., 2006 U.S. App. LEXIS 5481 (2d Cir. Conn., Mar. 2, 2006)

**PRIOR HISTORY:** Brookridge Funding Corp. v. Northwestern Human Servs., 175 F. Supp. 2d 355, 2001 U.S. Dist. LEXIS 20180 (D. Conn., 2001)

**DISPOSITION:** Findings of fact, conclusions of law, and judgment.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a factoring firm, brought an action against defendant debtor under Connecticut law, seeking to collect on two outstanding invoices for a construction project. The court's jurisdiction was based upon diversity.

**OVERVIEW:** The factoring firm purchased a portion of the two outstanding invoices from its assignor, the project's general contractor. The debtor acknowledged that the invoices were accurate. The court concluded that the parties entered into a contract when the debtor signed the acknowledgment. Although the debtor argued that it did not receive a benefit from executing the acknowledgment, the court found that there was consideration for the parties' contract because, in reliance upon the promise made by the debtor, the factoring firm incurred a significant detriment by advancing a substantial sum to its assignor. The court declined to rule on whether the factoring firm had claims for account stated or under the Uniform Commercial Code. Because the factoring firm did not reasonably expect to receive the full amount of the invoices when it entered into the agreement and would have been obliged to remit the difference to its assignor in any event, the court held that the proper measure of damages was the amount that the factoring firm had paid to its assignor. The court denied prejudgment interest under Conn. Gen. Stat. § 37-3a, observing that the sum recovered was not a liquidated amount.

**OUTCOME:** The court entered judgment in favor of the factoring firm for the amount that it had paid to its assignor.

**COUNSEL:** [*1] For Brookridge Funding Corp, Plaintiff: Douglas M. Poulin, Pepe & Hazard, Hartford, CT. Douglas R. Steinmetz, Pepe & Hazard, Southport, CT. William J. Hagan, Danbury, CT.

For Northwestern Human Resources, Inc, Defendant: Charles Francis Gfeller, Donald E. Frechette, Janet Marie Helmke, Edwards & Angell, Hartford, CT. Nicole R. Rodrigue, Schnader, Harrison, Segal & Lewis, LLP, Philadelphia, PA. Robert B. Bodzin, Kleinbard, Bell & Brecker, Philadelphia, PA.

**JUDGES:** CHRISTOPHER F. DRONEY, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** CHRISTOPHER F. DRONEY

**OPINION: MEMORANDUM OF DECISION**

This case arises out of a financing transaction to fund the construction of a minor league baseball stadium in the Lehigh Valley in Pennsylvania. Jurisdiction exists in this Court pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties n1 and the amount in controversy is in excess of $ 75,000. n2

---

n1 The plaintiff, Brookridge Funding Corp. is incorporated in Delaware and has a principal

place of business in Connecticut. The defendant, Northwestern Human Services, Inc., is incorporated in, and has its principal place of business in, Pennsylvania.

[*2]

n2 The Second Amended Complaint contains three counts: 1) breach of contract, 2) account stated; and 3) unjust enrichment.

After a bench trial, the Court makes the following findings of fact and conclusions of law.

**I. Findings of Fact**

A. "Factoring" as Non-Debt Financing

The plaintiff, Brookridge Funding Corp. ("Brookridge") is a factoring firm located in Danbury, Connecticut. "Factoring" is a form of non-debt financing based on the transfers of accounts receivable. In a typical factoring transaction, Brookridge advances between seventy and eighty percent of the face amount of receivables purchased from its client. Upon receipt of payment of the receivables from the client's debtors, Brookridge then pays over the remaining balance to the client, less its "factoring fee," which increases based on the amount of time between when Brookridge advanced the money and when it received payment of the receivables from the debtors. n3

n3 The purchase agreement between Brookridge and its clients also provides that in the event Brookridge is ultimately unsuccessful in collecting payment on the purchased receivables, the clients are responsible for payment. See Brookridge v. Contracting Systems, Inc., Civil No. 3:00cv2252(CFD) (D. Conn. filed November 27, 2000 ).

[*3]

It is Brookridge's practice in factoring involving construction contracts to require an "acknowledgment" or "notice of purchase of accounts receivable" ("Acknowledgment") to be executed by Brookridge, the debtor, and Brookridge's client prior to funding to confirm that the debtor does in fact owe the account receivable or invoice to the client and that there is no dispute as to the amount owed or the liability of the debtor. The Acknowledgment asks the debtor to verify that it owes the amount to the client, that it owes the debt absolutely (or that any defenses have been waived), and that the debtor will pay Brookridge directly.

B. The Stadium Project

The defendant, Northwestern Human Services, Inc. ("NHS") is a non-profit corporation in Pennsylvania. Its original purpose was to provide mental health services to adults and children suffering from mental illnesses, mental retardation, and behavioral disorders. However, at some point NHS began to expand its operations to many other fields. According to its 1998 annual report, NHS operates a residential complex for delinquent youths, provides adoption services, offers temporary staffing services to its subsidiaries and to other [*4] non-profits and hospitals, arranges automobile, furniture, and equipment leasing, and develops real estate projects. By the end of 1998, NHS had gross annual revenues of over $ 183 million and operated programs in forty-six Pennsylvania counties, as well as in New Jersey and Washington, D.C. In that year it had 6,435 staff members and 336 program sites.

In 1998, as part of the expansion of NHS into other areas of operation, Robert Panaccio, then the President and Chief Executive Officer of NHS, and Thomas X. Flaherty, at the time a real estate developer and member of NHS's Board of Trustees, devised a plan for NHS to sponsor the construction of a minor league baseball stadium in Williams Township, part of the Lehigh Valley, in Pennsylvania (the "Stadium Project"). The principal benefit of the involvement of NHS was that, as a non-profit entity, it qualified for a $ 5,000,000 development grant from the State of Pennsylvania. NHS also pursued the project to raise its profile in the community and showcase its programs.

At its Board of Directors meeting of July 30, 1998, NHS approved a plan under which NHS was to become the owner of the stadium after its development by Federal Development [*5] Corp. ("Federal"), an entity owned by Flaherty. In October 1998, NHS purchased the land for the project. However, as a result of a dispute with its primary lender, First Union National Bank, NHS was forced to reduce its role in the project. n4 The resulting agreement with Federal purported to release NHS from any obligations pursuant to the Stadium Project. See Def. Ex. 39. However, it is clear that NHS never completely removed itself from the Stadium Project. For example, on December 15, 1998, Federal executed a contract with Contracting Systems, Inc. II ("CSI") for the construction of the baseball stadium (the "Stadium Contract") in which Federal indicated that it was an "agent" for NHS. While there was insufficient evidence presented at trial that the NHS Board of Trustees authorized Federal to act as its agent in executing the Stadium Contract, NHS still apparently believed it would qualify for

the $ 5,000,000 state grant upon completion of the Stadium Project, it still owned the land on which the Stadium was being constructed, and wished to benefit from the completion of the Stadium Project in many indirect ways. In any event, Federal proceeded as the developer of the project, [*6] but NHS still had a significant, although at times unclear, role.

> n4 NHS secured a loan from an entity other than First Union and purchased the land on which the partially completed stadium currently rests. First Union, upon learning of this transaction, informed NHS that the purchase of the land violated the loan covenants between NHS and First Union. By an agreement dated December 1998, First Union prohibited NHS from continuing in its role as the developer of the Stadium Project.

C. Brookridge Financing

The Stadium Project stalled in 1999 because of Federal's difficulty in obtaining financing. As a means of keeping the project moving while Federal sought "permanent" financing, CSI sought factoring services from Brookridge concerning outstanding invoices it claimed should be paid by NHS. CSI first contacted Brookridge sometime in the first half of 1999. On June 17, 1999, Brookridge sent a factoring application form to CSI. The same day, CSI faxed Brookridge the completed application form, including [*7] background information about NHS. On June 18, 1999, Brookridge's President, John McNiff, forwarded a Purchase Agreement to CSI's president John Clarke for his signature. That Purchase Agreement, among other things, stated that the maximum amount Brookridge would advance to CSI for purchased receivables was one million dollars. On June 21, 1999 CSI paid Brookridge's application fee and sent Brookridge the executed Agreement along with a copies of the invoices n5 that CSI proposed Brookridge purchase. The records provided by CSI to Brookridge indicated that all the previous invoices for the Stadium Project had been paid directly by NHS to CSI. Brookridge completed due diligence reviews of both CSI and NHS. In particular, the review of NHS by Brookridge confirmed that NHS had a substantial net worth, had a favorable rating from Standard and Poor's, and owned the land on which the baseball stadium was being built.

> n5 The invoices were identified as invoices five and six and totaled $ 2,759,024.43. Invoice five was for $ 1,425,112.60 and invoice six was for $ 1,333,911.83. The invoices are completed American

[*8]

Brookridge was aware that the Stadium Contract was between Federal and CSI. However, it also was presented with documents and other information that indicated that although Federal was the developer of the stadium project, it appeared to be acting as an agent for NHS. This included the contract between Federal and CSI which stated Federal was acting as the agent for NHS, statements made to McNiff by Flaherty and Panaccio, by Flaherty's status as a trustee of NHS, the unpaid invoices which recited that they are due from NHS to CSI, and NHS's apparent direct payment to CSI for previous invoices related to the Stadium Project. n6

> n6 It was not clear whether NHS actually funded the payments for invoices one through four or whether Federal made those payments. However, it was reasonable for McNiff and Brookridge to conclude that NHS had provided that funding, based on the information provided to Brookridge.

On July 2, 1999, at a meeting of the Executive and Finance Committees of the NHS Board of Trustees, Panaccio [*9] reviewed the status of the Stadium Project, noting that it had "all but stopped" because of unpaid invoices of subcontractors and because of the inability to obtain further financing. He then outlined the plan to acquire factoring financing from Brookridge. After reviewing the Acknowledgment, the Committees authorized Panaccio to sign it, which he did on July 6, 1999 . The Institute of Architects Application and Certificate for Payment forms. While invoices five and six were both signed by CSI, they were not signed by any representative of either NHS or Federal. See Ex. 5 (invoices five and six). Acknowledgment indicated that the subject "invoice" (totaling $ 2,759,024.43) was accurate and was owed by NHS to CSI. Although NHS claims that the Committees authorized the execution of the Acknowledgment only because Panaccio assured them at the July 2, 1999 meeting that its purpose was solely to verify that the amounts owed from Federal to CSI were correctly stated-not to either indicate that NHS owed the amounts stated to CSI or to agree that NHS would pay those amounts to Brookridge-the Court finds that the language of the document, though ambiguous in some respects, was made clear [*10] as to its essential terms by the surrounding circumstances and the evidence of the parties' intent presented at trial. n7 Thus, the Court finds that the Acknowledgment obligated NHS to pay Brookridge

up to $ 2,759,024.43 in amounts owed to CSI. On July 29, 1999, the full Board of Trustees approved the actions taken by the Executive and Finance Committees at the July 2, 1999 meeting.

> n7 See Part II.A.1., infra. See also Brookridge Funding Corp. v. Northwestern Human Servs., 175 F. Supp. 2d 355, 365-67 (D. Conn. 2001) (discussing ambiguity).

After receiving the Acknowledgment from NHS and before funding CSI, McNiff spoke with Panaccio on July 7, 1999 to confirm that it was his signature that appeared on the Acknowledgment and that Panaccio-and NHS-understood the significance of the document. Panaccio confirmed that he had signed the Acknowledgment on behalf of NHS, that the invoices were owed by NHS, and that NHS would pay them to Brookridge within 90 days of Brookridge's purchase of amounts [*11] owed to CSI. Panaccio did not mention any dispute over NHS's liability for invoices five or six or over the quality of CSI's work.

On July 7, 1999, after receiving the Acknowledgment and after McNiff's conversation with Panaccio, Brookridge purchased a portion of the two outstanding invoices from CSI in the amount of $ 1,428,571.43 n8 and sent wire transfers to CSI totaling $ 1,000,000.

> n8 Apparently, the amount of $ 1,428,571.43 was based on a funding amount of $ 1,000,000, the maximum permitted under the Brookridge/CSI contract. See Pl.'s Ex. 18. The funding amount was seventy percent of $ 1,428,571.43. The Acknowledgment recited that Brookridge "purchased" $ 2,759,024.43 (which would have been the total of invoices five and six), but Brookridge only forwarded $ 1 million in funds to CSI. See also Section II.C., infra (discussing damages).

On December 1, 1999, Brookridge made an unsuccessful demand upon NHS for full payment of $ 2,759,024.43 and this action followed.

## II. Conclusions of [*12] Law

Brookridge claims that the Acknowledgment constitutes a contract between the parties, through which NHS agreed to pay the amounts owed to CSI to Brookridge. In the alternative, Brookridge claims that NHS was unjustly enriched by Brookridge's reliance upon the executed Acknowledgment. NHS claims that the Acknowledgment did not constitute a contract because 1) the was no meeting of the minds and 2) there was no consideration. As to Brookridge's claim of unjust enrichment, NHS argues that 1) Brookridge's reliance on the representations in the Acknowledgment was not reasonable and 2) there was no benefit to NHS.

### A. Contract

"The existence of a contract is a question of fact to be determined by the trier on the basis of all evidence." See Fortier v. Newington Group, Inc., 30 Conn. App. 505, 509, 620 A.2d 1321 (1993).

#### 1. Meeting of the Minds

Under Connecticut law, n9 "in order for an enforceable contract to exist, the Court must find that the parties' minds had truly met." Fortier, 30 Conn. App. at 510. NHS claims that there was no "meeting of the minds" between NHS and Brookridge regarding the Acknowledgment because the document [*13] itself was ambiguous and because of testimony that suggests the parties had differing interpretations of its meaning. For example, NHS notes that McNiff testified that the Acknowledgment form is "pretty confusing," that the invoices that were purportedly being purchased were not attached to the Acknowledgment, and that Panaccio testified that NHS believed that it was simply verifying that CSI had performed its construction work.

> n9 The parties agree that the applicable law is Connecticut substantive law.

In its ruling of December 4, 2001 on the cross motions for summary judgment, the Court held that certain language of the Acknowledgment was ambiguous. In particular, the Court noted that the wording on the form did not clearly indicate whether Brookridge had already purchased the invoices in question when it asked NHS to execute the Acknowledgment, or whether Brookridge would rely on the Acknowledgment in deciding whether to purchase the invoices. Also, while the Acknowledgment form indicated only one "account" [*14] and one "invoice," the total amount referred to- $ 2,759,024.43- appeared to be a combination of two invoices, which may not have accompanied the Acknowledgment. The Court held that these issues were material in addressing summary judgment because they related both to the issue of consideration and to the amount of NHS's obligation. The Court concluded: "While some of the extrinsic evidence presented by the parties appears to clarify these issues, evidence of the intent of the parties is not undisputed, and thus the Court must reserve its consideration of extrinsic evidence for trial." Brookridge Funding

Corp. v. Northwestern Human Servs., 175 F. Supp. 2d 355, 366 (D. Conn. 2001)

After considering the testimony and other extrinsic evidence of intent, the Court concludes that there was a meeting of the minds of the parties. As to whether Brookridge relied on the Acknowledgment to fund CSI, the Court credits McNiff's testimony that Brookridge decided to provide $ 1,000,000 to CSI on the basis that the Acknowledgment had been executed by NHS with full knowledge of its implications. With regard to Panaccio's testimony that in signing the Acknowledgment he was merely "verifying" [*15] that CSI had performed $ 2.7 million in construction, the Court finds that his testimony is not credible. First, the plain language of the document conflicts with that interpretation. As noted above, the Acknowledgment states, in relevant part, that "the amount to be paid to Brookridge pursuant to the obligations of the Undersigned is $ 2,759,024.43. Such sum is owed absolutely and the Undersigned has no right of counterclaim, contraclaim, setoff or any other right of deduction from such sum." In signing the form in his capacity as CEO of NHS, it was clear to Panaccio that he was both confirming that NHS had an obligation to pay $ 2,759,024.43 to CSI and that he was agreeing that such amounts would now be owed by NHS to Brookridge. Moreover, Panaccio told McNiff several times-both immediately after Panaccio signed the form and months later-that Panaccio understood NHS had an obligation to pay Brookridge. In assessing the contradictory assertions of the parties, the Court credits McNiff, and finds that when Panaccio signed the Acknowledgment on behalf of NHS, his understanding of its essential terms mirrored the understanding of Brookridge. He also had the authority to sign the Acknowledgment [*16] on behalf of NHS. The Court finds that the Executive and Finance Committees and the NHS Board of Directors authorized Panaccio to sign the Acknowledgment understanding the obligations of NHS under the Acknowledgment.

2. Consideration

NHS claims that there is no evidence that NHS received any benefit from signing the Acknowledgment. "Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." Benedetto v. Wanat, 79 Conn. App. 139, 150, 829 A.2d 901 (2003) (citations and internal quotation marks omitted). Brookridge asserts that NHS received a benefit in that CSI received funds from Brookridge to keep the Stadium Project moving forward, while NHS claims that it did not receive a benefit because there is no evidence that the Brookridge funds "ever went to the stadium project." However, even assuming, without deciding, that NHS did not receive a benefit from executing the Acknowledgment, the Court finds that the alternative definition of consideration described above-as "a loss or detriment to the party to whom the promise is made"-was satisfied here. In reliance upon the promise made by NHS, Brookridge [*17] incurred a significant detriment by advancing $ 1 million to CSI. The Acknowledgment itself states that NHS signed it "to induce [Brookridge] to provide financial services to Assignor [CSI]," and McNiff's testimony established that Brookridge proceeded with the transaction on the basis of NHS's promise. n10

n10 The Court previously held that the explicit waiver of defenses in the Acknowledgment would be enforceable if supported by consideration. See Brookridge Funding Corp. v. Northwestern Human Servs., 175 F. Supp. 2d 355, 364 (D. Conn. 2001). Thus, because the Court holds that Brookridge established at trial that the Acknowledgment was supported by consideration, see Section II.A.2., supra, the waiver of defenses is enforceable.

Accordingly, the Court finds in favor of Brookridge on its breach of contract claim. n11

n11 It is not clear whether the facts of this case give rise to an action for account stated. "There must be a pre-existing indebtedness, or there is no account to state." Cooper v. Upton, 60 W. Va. 648, 64 S.E. 523, 527 (W. Va. 1909). Here, there was not a pre-existing indebtedness between Brookridge and CSI that preceded the Acknowledgment and it is not clear whether an account stated can be asserted by a third party. See Zacarino v. Pallotti, 49 Conn. 36, 1881 WL 2136, at *2 (1881) ("An account stated is an agreement between persons who have had previous transactions, fixing the amount due in respect of such transactions and promising payment"). Brookridge has not cited any authority suggesting that a third party may assert an account stated cause of action and has not provided sufficient justification for application of the account stated doctrine to this case. Also, because the Court has found in favor of

[*18]

B. Damages for Breach of Contract

The Acknowledgment, as discussed above, recited that NHS agreed to pay $ 2,759,024.43 to Brookridge. However, Brookridge only advanced $ 1,000,000 to CSI. Pursuant to its agreement with CSI, if Brookridge had

received $ 2,759,024.43 from NHS, Brookridge would have forwarded the difference of $ 1,759,024.43-less its factoring fees-to CSI, the maximum permitted under the CSI/Brookridge Agreement. The question for the Court, then, is whether the appropriate measure of damages is the amount stated on the Acknowledgment ($ 2,759,024.43) or the amount that Brookridge was to receive as anticipated by Brookridge and CSI: Brookridge advanced to CSI the maximum under the Brookridge/CSI contract of $ 1,000,000, which was seventy percent of receivables then purchased from CSI of $ 1,428,571.43. NHS's obligation then would be to pay the $ 1,428,571.43 to Brookridge. Brookridge then would take its profit from the $ 428,571.43 difference between the amount previously provided to CSI ($ 1,000,000) and return the balance of the $ 428,571.43 to CSI. n12 The Court finds that the latter is the proper measure. In a breach of contract action "the measure of damages [*19] is that the award should place the injured party in the same position as he would have been in had the contract been fully performed." Zemmel v. SSHC, Inc., 2004 Conn. Super. LEXIS 146, No. CV030102952, 2004 WL 237899, at *1 (Jan. 14, 2004 Conn. Super.) (citing Lar-Rob Bus Corporation v. Fairfield, 170 Conn. 397, 365 A.2d 1086 the plaintiff on its breach of contract claim, the Court will not reach the issue of whether the plaintiff could recover separately on its account stated cause of action.

n12 The complaint in Brookridge v. Contracting Systems, Inc., Civil No. 3:00cv2252(CFD) (D. Conn. filed November 27, 2000) confirms that the amount upon which the $ 1,000,000 was advanced to CSI by Brookridge was $ 1,428,571,43.

The Court need not address Brookridge's alternative argument based on unjust enrichment because it has found an enforceable contract. 397, 404-05, (170 Conn. 397, 365 A.2d 1086 (1976)). For Brookridge to receive over $ 2.7 million in damages would represent an unjustified windfall to Brookridge and would greatly exceed [*20] its expectation under its contract with CSI. Rather, to put Brookridge in the position it would have been in had the contract been performed, the appropriate damages amount is $ 1,428,571.43.

Therefore, the Court finds that the proper damages amount is $ 1,428,571.43, which is the amount Brookridge expected to receive when it entered into the factoring transaction with CSI and even when the Acknowledgment was signed by all the parties. n13

n13 Although it is not clear how much-if any-of the $ 1,428,571.43 should be remitted to CSI after Brookridge deducts its factoring fee and the $ 1,000,000 previously advanced, that matter can be addressed in the companion case of Brookridge v. Contracting Systems, Inc., Civil No. 3:00cv2252(CFD) (D. Conn. filed November 27, 2000).

C. Article Nine

Brookridge also asserts a claim under Article 9 of the Uniform Commercial Code, as adopted in Connecticut. See Conn. Gen. Stat. § 42a-9-101 et seq. Brookridge asserts it is an assignee [*21] entitled to payment of invoices five and six that were purchased from CSI and that NHS is the account debtor on those invoices. Apparently, it claims that the Accounts Receivable Purchase Agreement between CSI and Brookridge (Pl.'s Ex. 18) is the Security Agreement that encompassed the two invoices and that its security interest was perfected by the filing of a UCC-1 Financing Statement with the Pennsylvania Department of State. See Pl.'s Ex. 20.

Article 9 applies to factoring transactions, even when they are subject to full recourse against the debtor/seller of accounts. See 4 James J. White & Robert S. Summers, Uniform Commercial Code § 30-6 (5th ed. 2002); see also Conn. Gen. Stat. § 42a-9-109(a)(3). However, the evidence at trial showed that the amount of invoices five and six actually assigned by CSI to Brookridge was $ 1,428,571, which represented the maximum funding amount of $ 1,000,000 contained in the Brookridge/CSI contract and paid to CSI by Brookridge. Even if Article 9 permits partial assignment of accounts, that amount is less than either invoice five or six. If Brookridge were to recover the amount of invoices five and six [*22] actually assigned to it by CSI, that amount would be the same as the damages found above for the breach of contract count: $ 1,428,571. Accordingly, the Court need not resolve whether Article 9 provides a separate basis for relief. n14

n14 Conn. Gen. Stat. § 42a-9-109(d)(7) provides that Article 9 does not apply to the sale of a single account. The amount transferred to Brookridge was less than either invoice five or six. However, the Court need not resolve this issue, nor the issue of whether the assignment of a portion of an account is subject to Article 9, nor whether the absence of signatures by NHS on invoices five and six is of significance, nor whether one can claim "holder in due course" status on an

amount which is less than the face amount of a transferred account..

D. Prejudgment Interest

Brookridge claims that it is entitled to prejudgment interest pursuant to Conn. Gen. Stat. § 37-3a. n15 "When the court's jurisdiction is based upon diversity, [*23] an award of prejudgment interest is governed by state law." Brandewiede v. Emery Worldwide, 890 F. Supp. 79, 82 (D. Conn. 1994). "Conn.Gen.Stat. § 37-3a provides in relevant part, that 'interest at the rate of ten percent a year, and no more, may be recovered and allowed in civil actions ... as damages for the detention of money after it becomes payable." Id.

> N15 Conn. Gen. Stat. § 37-3a provides, in relevant part, that "interest at the rate of ten per cent a year, and no more, may be recovered an allowed in civil actions . . . as damages for the detention of money after it becomes payable."

The determination of whether prejudgment interest is appropriate pursuant to the statute is within the Court's equitable discretion. See id. ("An award of prejudgment interest pursuant to Section 37-3a is an equitable determination within the discretion of the court."). "Factors for the court to consider when deciding whether to award prejudgment [*24] interest are: 1) whether the detention of money was wrongful under the circumstances; 2) whether the sum recovered was a liquidated amount; and 3) whether the party seeking prejudgment interest diligently presented its claim." Id. While bad faith is a factor that may be considered in determining whether the detention of monies was wrongful, it is not a required element: "Although bad faith is one factor that the court may look at when deciding whether to award interest under § 37-3a, we note that, in the context of the statute, 'wrongful' is not synonymous with bad faith conduct. Rather, wrongful means simply that the act is performed without the legal right to do so." Ferrato v. Webster Bank, 67 Conn. App. 588, 596, 789 A.2d 472 (2002). Moreover, "that this dispute is hotly contested does not impact on the [Court's] determination that the defendant wrongfully detained the money." Republic Ins. Co. v. Pat DiNardo Auto Sales, Inc., 44 Conn. Supp. 207, 220, 678 A.2d 516 (Conn. Super. 1995).

After applying the factors summarized in Brandewiede, the Court chooses not to exercise its discretion to award prejudgment interest pursuant to Conn. Gen. Stat. § 37-3a [*25] . While Brookridge presented its claim on a timely basis (the delay in asserting its claim was because of Panaccio's assurances that NHS was aware of its obligation to pay and planned to honor it), NHS's failure to pay was not "wrongful" as that term is defined in Ferrato. Among the significant factors is that the sum recovered was not a liquidated amount. See Section II.B (discussing damages). Thus, the Court will not award prejudgment interest.

III. Conclusion

Judgment shall enter for the plaintiff, in the amount of $ 1,428,571.43. SO ORDERED this 18th day of August 2004 at Hartford, Connecticut.

/s/ CFD

**CHRISTOPHER F. DRONEY**

**UNITED STATES DISTRICT JUDGE**

LEXSEE 2005 CONN. SUPER. LEXIS 1299

Glenn Duplissie v. Kenneth M. Devino et al.

CV000158151

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF WATERBURY, AT WATERBURY

2005 Conn. Super. LEXIS 1299

May 6, 2005, Decided
May 9, 2005, Filed

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee filed suit against defendants, his former employers, an individual and two of his companies. The employee claimed that the employers breached various oral agreements regarding the compensation the employee was to receive prior to his termination.

**OVERVIEW:** At issue were three oral promises regarding compensation; yearly lump sum payments of $10,000, 10 percent of the profits from projects the employee managed for company two, and a five percent interest in company one. The court awarded damages, holding that 1) the employee met his burden of establishing an enforceable oral agreement regarding the yearly lump sum wages; 2) the statute of limitations in Conn. Gen. Stat. § 52-597 did not apply to the employee's claim; 3) the employee was entitled to damages for breach of that oral contract, with interest of 10 percent, compounded annually on any amounts that had not been paid on the lump sum contract; 4) an award of double damages under Conn. Gen. Stat. § 31-72 was inappropriate; 5) the employee's conversion claim was duplicative of his breach of contract claim; 6) the employee failed to establish fraud; 7) the oral 10 percent profit agreement was enforceable based on part performance, and the employee established a breach of that contract; 8) the statute of limits in Conn. Gen. Stat. § § 52-596 barred one of the claims under the profit agreement; and 9) the five percent interest agreement was too vague in its terms to be enforceable.

**OUTCOME:** The court awarded damages in favor of the employee on the lump sum payment contract with the individual and the 10 percent profit contract with company two. It denied damages with regard to oral agreement to give the employee five percent of company one.

**JUDGES:** Prescott, E., J.

**OPINIONBY:** Prescott , E .

**OPINION:**

MEMORANDUM OF DECISION

This is an action for money damages brought by the plaintiff Glenn Duplissie, against his former employers, Kenneth M. Devino and Building Structures, Inc. ("BSI"). The plaintiff claims that the defendants breached various oral agreements regarding the compensation to be received by the plaintiff prior to the termination of his employment. This action was tried to the Court on December 15, 2004 and December 16, 2004. The parties submitted post-trial briefs and the Court heard oral argument on March 2, 2005. The Court finds for the plaintiff in part, and the defendants in part, as set forth below.

I. FINDINGS OF FACT

The Court finds the following facts. In February 1986, the plaintiff Glenn Duplissie, was hired by the defendant, Kenneth Devino, as a full-time construction manager. Mr. Devino, doing business as Industrial Development Group ("IDG"), built commercial and industrial buildings in and around Waterbury, Connecticut on land owned by himself and others [*2] through various real estate partnerships. Mr. Devino and IDG would then lease the buildings to various tenants.

When Mr. Duplissie began working for Mr. Devino, he received base wages of $ 400 per week, plus additional benefits of paid sick and vacation days and health care insurance. After a short 90-day trial period, Mr. Duplissie's base wages were increased to $ 600 per week. Until the employment relationship ended on August 22, 1997, Mr. Duplissie received periodic increases to his base salary.

A. Oral Agreement for Lump Sum Compensation

Prior to beginning full-time employment with Mr. Devino, Mr. Duplissie owned and operated a small construction business that built custom additions to residential properties and performed other simple carpentry and landscaping services. Mr. Duplissie continued to perform this work in his spare time after he became employed full-time by Mr. Devino.

Sometime in June of 1986, Mr. Devino learned that Mr. Duplissie continued to perform construction work for others. Mr. Devino discussed the matter with Mr. Duplissie and the parties orally agreed that, in exchange for Mr. Duplissie foregoing any additional "moonlighting" activities, Mr. Devino would [*3] pay Mr. Duplissie a lump sum of $ 10,000 each July while Mr. Duplissie remained employed by Mr. Devino. The parties agreed that this payment was to be in addition to Mr. Duplissie's base salary and other benefits. Mr. Devino and Mr. Duplissie also agreed that the plaintiff would have the option of temporarily foregoing receipt of the yearly $ 10,000 payment and, instead, allow it to be held by IDG. Any funds temporarily retained by IDG were to accrue interest at the compounded rate of 10% per annum for the benefit of the plaintiff until such time as he elected to exercise his right to receive the funds.

Pursuant to this agreement Mr. Devino paid the plaintiff the lump sum compensation in 1987, 1988 and 1989. In 1990, the defendant asked the plaintiff pursuant to their oral agreement, to defer receiving the $ 10,000 payment for that year because of the declining real estate market. The plaintiff agreed. The parties reaffirmed their prior agreement that the plaintiff would receive interest for any sums that the plaintiff allowed Mr. Devino to hold back.

In 1991, Mr. Devino paid the plaintiff $ 8,500 pursuant to their oral agreement. Although this payment was made prior to the July [*4] date established by the parties' oral agreement, the Court rejects, as a factual matter, Mr. Devino's claim that these payments were discretionary bonuses that he was not obligated to make. The plaintiff never received the remaining $ 1,500 in lump sum compensation for that year.

In 1992, Mr. Duplissie demanded the payment of the funds, with interest, for which he was entitled from prior years. At this time, Mr. Devino paid Mr. Duplissie $ 8,000 as either partial payment toward this obligation or as part of the $ 10,000 lump sum compensation that the plaintiff was owed for that year. n1 The Court rejects Mr. Devino's assertion that this payment constituted a loan to the plaintiff. n2 The plaintiff never received the additional $ 2,000 owed for 1992.

   n1 This payment was made by a check drawn on an account of Building Structures, Inc. The Court finds that Mr. Devino used his various companies and entities interchangeably to satisfy obligations not necessarily incurred by the entity or person making the payment.

   n2 In fact, Mr. Devino voluntarily withdrew with prejudice a lawsuit he filed against Mr. Duplissie to recover the alleged loan. *See Building Structures, Inc. v. Duplissie*, CV 02-0169161 S (J.D. Waterbury).

[*5]

Mr. Duplissie did not receive any additional lump sum compensation from 1993 until his termination on August 22, 1997.

B. Oral Agreement for 10% Commission on Profits from Building Structures, Inc.

Beginning sometime in 1989, the real estate market in the Greater Waterbury area suffered a significant downturn and Mr. Devino's business was negatively impacted. As a result, Mr. Devino formed an entity called Building Structures, Inc. The purpose of BSI was to provide construction services for properties that were *not* owned by Mr. Devino or any of his related partnerships or entities. Mr. Devino assigned Mr. Duplissie to be the construction manager for any building projects that BSI performed. n3

   n3 Although Mr. Duplissie spent a substantial amount of his time during this period working for BSI, he continued to be paid from the payroll of IDG and/or other related Devino entities, such as Devino Fuels. Mr. Devino often allocated payroll expenses for various employees to the financial books of his various entities with little regard for the amount of time the employee spent working for that entity. *See also* footnote 1.

[*6]

In 1991, Mr. Duplissie and BSI, through Mr. Devino, entered into a separate oral agreement that BSI would pay the plaintiff a commission for each of the

construction projects that BSI performed while Mr. Duplissie was employed by BSI, The defendants agree that Mr. Devino made this promise. Specifically, the parties agreed that Mr. Duplissie would receive 10% of the profit BSI made on these jobs. This commission, if any, was to be paid in addition to the wages and benefits that Mr. Duplissie received from IDG, and in addition to the annual July lump sum payment of $ 10,000. The parties explicitly agreed, or at least implicitly understood, that the amount of profit would be determined by subtracting the job costs from the contract price for each BSI job.

BSI completed four construction jobs during the plaintiff's employment. The parties agree that the plaintiff was in fact paid a commission for two of these jobs, the so-called Edison Chemical n4 and Capital Light projects. The other two projects are discussed seriatim.

> n4 In this instance, BSI paid the plaintiff the entire profit from the project because Mr. Devino did not believe, prior to its inception, that the project would yield any profit.

[*7]

1. Petro Automation Project

In 1992, pursuant to a written agreement, BSI contacted with Michael and Patricia Petro to construct a 7,500 square foot building on land located in Watertown, Connecticut. The total contract price for the project was $ 333,450. The total job costs for this project were $ 266,110.11, thereby giving BSI a profit of $ 67,340.

In light of this profit, Mr. Duplissie was entitled to receive from BSI $ 6,734 pursuant to the 10% commission agreement. BSI did not pay Mr. Duplissie the commission for this job. n5

> n5 The Court reaches this conclusion in light of (1) Mr. Duplissie's testimony that he was never paid and (2) Mr. Devino's testimony that he could not find the cancelled check demonstrating payment to the plaintiff.

2. New England Country Bakers Project

In 1994, BSI entered into a contract with David Spivak to construct a building in Watertown for Mr. Spivak's business, New England Country Bakers. The total contract price, including any supplemental agreements (so-called "change [*8] orders"), for this project was $ 715,716. The total job costs for this project were $ 497,094, thereby resulting in a profit to BSI of $ 218,622. Consequently, Mr. Duplissie was entitled to receive $ 21,862 as a commission for this project.

Mr. Duplissie never received any commission payment for this project. Although Mr. Devino originally asserted that he had paid the plaintiff, in cash, the defendants subsequently withdrew that testimony. In addition, there is no record of this transaction, and Mr. Duplissie was never issued by Mr. Devino, BSI or IDG an I.R.S. 1099 supplemental income tax form as would have been required by federal tax law. There is also simply no reason to believe that a sophisticated business man such as Mr. Devino would fail to document such a large payment made for the purpose of satisfying a liability of his company if the payment had in fact been made.

C. Devino's Agreement to Convey 5% of IDG to Duplissie

In 1989, at the time IDG began to suffer the ill effects of the downturn of the real estate market, Mr. Duplissie discussed the issue of his job security with Mr. Devino. At that time, Mr. Devino told the plaintiff that he would receive a 5% interest in [*9] "IDG," as an additional benefit of his employment at the time he retired from, or ended his employment with, Mr. Devino. The plaintiff concedes that the parties did not discuss whether the 5% interest related to the total value of all of the assets "held" by IDO or whether it related to the equity value of such holdings.

Although Mr. Duplissie subjectively believed that Mr. Devino had promised him an interest in IDG, there is insufficient evidence for the Court to find what the parties understood regarding how that interest would be measured. For example, it is entirely unclear whether Mr. Devino had promised him 5% of the net value of the company, that is, the value of the assets of IDG minus any outstanding liabilities such as mortgages on real property, or whether Mr. Duplissie was entitled to 5% of the gross assets of IDG. There is also no credible evidence that there was any meeting of the minds between the parties as to what point in time the value of the interest would be calculated, that is, at the time this promise was made, or at the time Mr. Duplissie left Mr. Devino's employment.

Moreover, the Court finds that the plaintiff could not have reasonably understood that the [*10] defendant was entering into a legally enforceable agreement to convey 5% of IDG to him. Any reliance on this alleged promise was not justifiably reasonable. The plaintiff understood that IDG was simply a trade name for a number of a series of real estate partnerships that in turn held a number of industrial and commercial properties in the Waterbury area. The plaintiff also understood that other people, including Mr. Devino's brother, may have held an interest in one or more of real estate partnerships.

Finally, there is little or no evidence in this record from which the Court could even begin to approximate or determine the value of 5% of IDG, at either the time the parties discussed the transfer or at the time the parties' employment relationship ended.

Additional facts are set forth below when necessary.

## II. LEGAL CONCLUSIONS

### A. Oral Agreement for Lump Sum Compensation

The first four counts of the plaintiff's complaint seek money damages from Kenneth Devino related to the defendant's breach of an oral agreement to pay the plaintiff a yearly lump sum of $ 10,000 per year in addition to his other wages.

Specifically, the First Count seeks double damages and attorneys fees for [*11] the defendant Devino's alleged violation of Conn. Gen. Stat. § 31-72, which provides in relevant part: "When an employer fails to pay an employee wages in accordance with the provisions of Section 31-71a to 31-71I, inclusive, such employee . . . may recover, in a civil action, twice the full amount of such wages with costs and reasonable attorneys fees as may be allowed by the court . . ." The Second Count alleges breach of contract. The Third Count alleges a common-law conversion. The Fourth Count alleges the tort of fraudulent misrepresentation.

As an initial matter, for the plaintiff to prevail on any of the first four counts, he must establish by a preponderance of the evidence that he and the defendant entered into an enforceable oral agreement to pay the plaintiff, in addition to his standard wages, a yearly lump sum of $ 10,000 per year, plus 10% per annum interest on any amount the plaintiff elected to defer receiving until later years. "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Rosato v. Mascardo*, 82 Conn. App. 396, 411, 844 A.2d 893 (2004). [*12]

"To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. If the minds of the parties have not truly met no enforceable contract exists. An agreement must be definite and certain as to its terms and requirements. So long as any essential matters are left open for further consideration, the contract is not complete . . . A contract requires a clear and definite promise. *See Suffield Development Associates Ltd. Partnership v. Society for Savings*, . . . 243 Conn. [832,] 843, [708 A.2d 1361 (1998)]." *Geary v. Wentworth Laboratories, Inc.*, 60 Conn. App. 622, 628, 760 A.2d 969 (2000).

"A court may, however, enforce an agreement 'if the missing terms can be ascertained, either from the express terms or by fair implication.' *Presidential Capital Corp. v. Reale*, 231 Conn. 500, 507-08, 652 A.2d 489 (1994). Thus, an agreement, previously unenforceable because of its indefiniteness, [*13] may become binding if the promise on one side of the agreement is made definite by its complete or partial performance. *See Augeri v. C.F. Wooding Co.*, 173 Conn. 426, 430, 378 A.2d 538 (1977)." *Geary v. Wentworth Laboratories*, 60 Conn. App. 622, 627-28, 760 A.2d 969 (2000).

In this case, the plaintiff has met his burden of establishing that the plaintiff and the defendant entered into an enforceable oral agreement regarding yearly lump sum wages that were to be paid to the plaintiff by the defendant in addition to his regular wages and benefits. Based upon the facts found above, the Court concludes that the defendant expressly promised this benefit to the plaintiff, the promise was supported by adequate consideration, the promise was accepted by the plaintiff and the terms and requirements are sufficiently clear. This conclusion is bolstered by the Court's finding that the oral agreement was performed for several years.

### 1. Defendant's Statute of Limitations Defense

The defendant, Kenneth Devino, asserts that recovery on the first four counts of the plaintiff's complaint is barred by the two-year statute of limitation contained in Conn. Gen. Stat. § 52-597 [*14] , which provides in relevant part: "No action for the payment of remuneration for employment payable periodically shall be brought within two years after the right of action accrues. Specifically, the defendant argues the right of action accrued August 22, 1997, when the plaintiff was discharged from employment and thus the action should have been filed on or before August 22, 1999. The plaintiff brought this action on March 1, 2000, the date the defendants, Kenneth Devino and BSI, were served.

The Court rejects the defendant Devino's statute of limitations claim as to the first four counts of the plaintiff's complaint. The two-year statute of limitation contained in § 52-597 only applies to remuneration for employment "payable periodically." Although the term "periodically" is not defined by statute, the manifest purpose of the provision is to cover employment wages that are payable on recurring, fixed intervals. *See, e.g., Mace v. Conde Nast Publications, Inc.*, 155 Conn. 680, 683-84, 237 A.2d 360 (1967) (holding that lump sum severance payment, unlike weekly or monthly wages, do not constitute remuneration payable periodically). Indeed, Mr. Devino himself in [*15] his post-trial brief recognizes that the term "periodical" is generally defined as "recur-

ring at fixed intervals; to be made or done, or to happen, at successive periods separated by determined intervals of time, as periodic payments of interest on a bond." BLACK'S LAW DICTIONARY, 4th Ed.

Under the particular--and perhaps unique--circumstances of this case, the agreement to pay yearly lump sum compensation to the plaintiff does not fall within the statute. Although the plaintiff had the right to receive the $ 10,000 on a periodic and fixed basis, i.e., yearly, he also had the right to defer receiving the compensation for an undetermined period of time during which any amount not received would accrue interest at the rate of 10% per annum. In fact, the plaintiff exercised this right on at least one occasion. (A decision that arguably benefited both the plaintiff and the defendant.) Consequently, because the remuneration was not necessarily "payable periodically" the two-year statute of limitations contained in § 52-596 does not apply. n6

n6 The defendant's reliance on § 52-596 is also belied by his own argument that the plaintiff's action accrued on August 22, 1997 when the plaintiff was discharged from employment. The test for determining when an action accrues "is to establish the time when the plaintiff first could have successfully maintained an action." *Engelman v. Connecticut General Life Ins. Co.*, 240 Conn. 287, 294 n.7, 690 A.2d 882 (1997). If the amount was payable periodically and the statute applied, as the defendant argues, the action would have had to accrue much earlier than August 22, 1997. Under the defendant's theory, for example, an action to recover the 1992 annual payment should have been brought on or before July 1, 1994, not on August 22, 1997, the date he admits it accrued.

[*16]

2. Breach of contract--Second Count

Because the Court concludes (1) that an enforceable, oral agreement for lump sum compensation agreement existed, and (2) the plaintiff's right to recovery is not barred by the two-year statute of limitation contained in § 52-597, the plaintiff is entitled to damages for the defendant's breach of that contract. In awarding damages, pursuant to Count Two of the complaint, "[it] is axiomatic that the sum of damages awarded as compensation in a breach of contract action should place the injured party in the same position as he would have been in had the contract been performed." *Argentinis v. Gould*, 219 Conn. 151, 157, 592 A.2d 378 (1991).

In the present case, based upon the factual finding set forth above, the plaintiff did not receive the yearly lump sum compensation to which he was entitled for the calendar year 1990. In 1991, the plaintiff did not receive $ 1,500 of the lump sum compensation to which he was entitled for that year. In 1992, the plaintiff did not receive $ 2,000 of the lump sum compensation to which he is entitled for that year. The plaintiff did not receive any lump sum compensation for the calendar years 1993, [*17] 1994, 1995, 1996, and 1997.

Consequently, the plaintiff is entitled to recover those sums, plus the 10% interest, compounded annually, until the contract was breached. The court finds that, although the plaintiff made periodic demands for payments of these sums during his employment, the parties had not specifically agreed when any deferred amounts must be paid to the plaintiff. A reasonable inference is that any deferred amounts (or amount otherwise not received) must be paid no later than the date the employment relationship was terminated.

Consequently, the Court concludes that the plaintiff is entitled to the 10% interest, compounded annually, on any deferred or unpaid amounts up to August 22, 1997, when his employment was terminated. The Court calculates this amount to be $ 86,416.53. n7

n7 The plaintiff did not offer any evidence that the parties agreed as to precisely how the compounded interest would be calculated. In the absence of such evidence, the Court has calculated, separately, compounded interest for each annual $ 10,000 payment, or portion thereof, that was not paid to plaintiff from July 1st of the respective year until July 1st of 1997. For example, for the $ 10,000 lump sum compensation due to the plaintiff on July 1, 1990, the court awarded $ 9,487.17 in compounded interest for the period July 1, 1990 to July 1, 1997. For the $ 1,500 of unpaid annual lump sum compensation due to the plaintiff on July 1, 1991, the court awarded $ 1,157.34 for the period July 1, 1991 to July 1, 1997. The Court then made a similar calculation for each remaining year (1992-97) and then added the total amount of applicable principal and compounded interest for each of these years and thereby reached the figure of $ 86,416.53 total amount. This manner of calculation inures to the benefit of the defendant because it does not aggregate the total amount of unpaid principal and compounded interest each year, thereby reducing, somewhat, the total amount each year that was subjected to compounding. Additionally, because the defendant made some of these pay-

ments prior to July 1st in the year in which they were due, the Court, in equity, and to simplify the necessary computations, has not awarded any interest for the period July 1, 1997 to August 22, 1997.

[*18]

3. Civil wage claim--First Count

As noted above, the First Count of the plaintiff's complaint seeks double damages and attorneys fees for the defendant's alleged violation of Conn. Gen. Stat. § 31-72. The Court declines to award damages on this count.

The case law is clear that an award for double damages and attorneys fees pursuant to § 31-72 is inappropriate in the absence of a finding of "bad faith, arbitrariness or unreasonableness." *Sansone v. Clifford*, 219 Conn. 217, 229, 592 A.2d 931 (1991). Based upon this record, the Court is not persuaded that the defendant's conduct rose to the level of bad faith, arbitrariness or unreasonableness required by the statute. The defendant for several years did in fact pay the plaintiff according to their oral agreement and only began to breach the agreement when he and his business were negatively impacted by downturn of the real estate business. An award of double damages in this case would not just compensate the plaintiff for his losses but would also serve to punish the defendant. *See Crowther v. Gerber Garment Technology, Inc.*, 8 Conn. App. 254, 266, 513 A.2d 144 (1986). The [*19] Court does not credit any testimony in this record that would justify such a sanction.

4. Conversion--Third Count

In the Third Count, the plaintiff alleges that the defendant's failure to pay him the annual lump sum compensation constitutes a conversion. Although the Court finds that the plaintiff has established the elements of a conversion; *see, e.g., Epstein v. Automatic Enterprises*, 6 Conn. App. 484, 488, 506 A.2d 158 (1986); it declines to award recovery on this count because any damages awarded pursuant to this count would be duplicative of the plaintiff's recovery on his breach of contract claim.

5. Fraudulent Misrepresentation--Fourth Count

Finally, the plaintiff in the Fourth Count of his complaint alleges the tort of fraudulent misrepresentation. Specifically, the plaintiff alleges that the defendant requested in 1990 that the plaintiff defer receipt of the annual $ 10,000 lump sum compensation. The plaintiff asserts that the defendant fraudulently misrepresented his intention to repay the plaintiff, with interest, any compensation once the real estate market recovered from its recession. The Court finds for the defendant on the Fourth Count.

"It is [*20] well settled that the essential elements of fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Leonard v. Commissioner of Revenue Services*, 264 Conn. 286, 296, 823 A.2d 1184 (2003) (internal quotation marks omitted). "All of these ingredients must be found to exist; and the absence of any one of them is fatal to a recovery . . . Additionally, the party asserting such a cause of action must prove the existence of the first three of [the] elements by a higher standard than the usual preponderance of the evidence, which higher standard [is] described as clear and satisfactory or clear, precise and unequivocal." *Harold Cohn & Co. v. Harco International*, 72 Conn. App. 43, 51, 804 A.2d 218, cert. denied, 262 Conn. 903, 810 A.2d 269 (2002) (internal quotation marks omitted). "Generally, misrepresentations must relate to an existing or past fact. A promise to do something in the future is not actionable unless the promise [*21] is coupled with a present intention not to fulfill the promise." *New Horizon Financial Services, LLC v. First Financial Equities, Inc.*, 175 F. Supp. 2d 348, 352-53 (D.Conn. 2001) (internal quotation marks omitted). "An assurance, wholly promissory in its nature, cannot be the basis of an action for fraud . . . It could not be held fraudulent unless the [individual], when he made it, knew or had reason to believe that the corporation would not assume the obligation or gave the assurance recklessly or without belief that it would do so." *Lowe v. Kohn*, 128 Conn. 45, 51, 20 A.2d 407 (1941) (citation omitted; internal quotation marks omitted).

The plaintiff has not met this high standard. The Court finds no credible evidence that Mr. Devino had the present intention that he would not make the agreed-upon payments to the plaintiff once the business climate improved. Accordingly, the plaintiff's claim fails.

B. Oral Agreement for 10% Commission on Profits from Building Structures, Inc. Projects

Counts Nine and Eleven of the plaintiff's complaint seek money damages for the BSI's breach of an oral promise to pay to the plaintiff a 10% commission on all [*22] profits BSI earned on BSI construction projects. n8 Specifically, the Ninth Count alleges a breach of contract. The Eleventh Count seeks recovery under the doctrine of unjust enrichment.

---

n8 The Tenth Count, seeking recovery under the doctrine of quantum meruit, and the Twelfth Count asserting a civil wage claim pursuant to Conn. Gen. Stat. § 31-72, were previously stricken by the Court, Holzberg, J.

Case 3:02-cv-00194-WWE    Document 169-4    Filed 03/22/2006    Page 15 of 18

Page 7
2005 Conn. Super. LEXIS 1299, *

As noted above, the Court finds that the defendant did in fact pay the agreed upon commission to the plaintiff for two of the four jobs, but did not pay the plaintiff any commission for the Petro and New England County Baker projects. n9 The dispositive issue for the Court is whether this oral agreement is enforceable under the facts of this case.

> n9 The defendant BSI asserted in its amended special defenses, dated June 17, 2002, the special defense of payment. The plaintiff concedes that he was paid for two of the BSI projects, the Edison Coatings and Capitol Light jobs. The defendant withdrew his testimony that he paid the plaintiff for the New England Country Bakers job. Consequently, the defense of payment applies only to the Petro project, which the Court rejects on the basis of the facts found above.

[*23]

BSI concedes that such a promise was made. Instead, it argues that the promise is unenforceable because there was no agreement as to how the profit from each job should be measured. The Court rejects this argument both factually and legally. First, the Court finds that the plaintiff and the defendant, at the time the promise was made, either explicitly or implicitly understood and agreed regarding how the profit was to be measured: The amount of profit would be determined by subtracting the job costs from the contract price for each BSI job. Consequently, there was a sufficient meeting of the minds to render the contract enforceable. See *Suffield Development*, 243 Conn. at 843 (a contract requires the parties to have a mutual understanding of terms that are definite and certain).

In fact, BSI, through Mr. Devino, demonstrated that it understood how to measure the profit from each job when it paid the plaintiff the 10% commission due on the Capitol Light project. n10 Mr. Devino also clearly testified that "I paid him ten percent commission for all of the jobs, except for Capitol Light and Edison Chemical." In response to questioning by the Court, he conceded that profits [*24] mean "the total contract price, what you [BSI] received from doing the job from the third party, minus any contract costs that your company . . . incurred in completing the job. Obviously, BSI and Mr. Devino did in fact have an understanding as to how to calculate the project for each job and that understanding was shared by the plaintiff.

> n10 The fact that BSI chose not to calculate the job costs for the BSI by including the value of the plaintiff's time as foreman, or other expenses for office staff and overhead does not, as the defendant asserts, compel a conclusion that the parties lacked a mutual understanding of how the profit for each job was to be measured. Although BSI might have been justified in calculating the overall profits from each job to be lower, its failure to do so does not alter the fundamental understanding of the agreement.

Second, even if the parties had not initially reached a mutual understanding as to how the profit was to be measured, an agreement, "previously unenforceable because [*25] of its indefiniteness, may become binding if the promise on one side of the agreement is made definite by its complete or partial performance." *Geary v. Wentworth Laboratories*, 60 Conn. App. at 628. In this case, the evidence established that the plaintiff completed performance on four projects for BSI and BSI partially performed its obligation by paying the plaintiff commission on two of the jobs. n11 The defendant's partial performance and payment of these commissions would have made the terms of the oral agreement sufficiently definite to render its terms enforceable.

> n11 The defendant argues that the amount of profit was left to his sole discretion, which is evidenced by the fact he paid the plaintiff more than the 10% commission he promised to the plaintiff for the Edison Chemical and Capitol Light jobs. Based on the plaintiff's testimony, which the Court credits, the plaintiff in fact was not paid more than the 10% commission for the Capitol Light project. The profit from that job was $ 30,000, and the plaintiff received $ 3,000.

[*26]

In sum, the Court finds that: (1) the parties orally agreed that the plaintiff would receive a 10% commission on the profits of any BSI job in exchange for the plaintiff's work on those projects; (2) the agreement was sufficiently definite as to its terms as to be enforceable; and (3) BSI breached this agreement with respect to the Petro and New England Country Bakers projects. Consequently, the Court concluded that the plaintiff has proven the elements of breach of contract as alleged in Count Nine of his Complaint.

The Court next turns to the plaintiff's unjust enrichment claim. "Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, *and no remedy is avail-*

*able by an action on the contract."* Meaney v. Connecticut Hospital Assn., 250 Conn. 500, 511, 735 A.2d 813 (1999) (emphasis added). Because the Court finds that a valid, enforceable oral contract existed between the parties, it is not necessary to address the plaintiff's unjust enrichment claim.

1. Building Structures, Inc.'s Statute of Limitations Defenses

BSI asserts that the plaintiff's right to recover any commission due to the [*27] plaintiff is barred by the two-year statute of limitation contained in Conn. Gen. Stat. § 52-596, or the six-year statute of limitations contained in Conn. Gen. Stat. § 52-576. The following additional facts are relevant to this claim.

The defendant and the plaintiff orally agreed that the plaintiff would receive, as a commission, 10% of the profits from any and all BSI projects that were completed. Although the timing of the commission payments were not explicitly discussed by the parties, the Court infers from the actions of the parties with respect to the Capital Light and Edison Chemical projects that any commission was to be paid at the completion of the project.

The Petro Automation project was completed on or about December 1, 1993. The New England Country Bakers project was completed on or about May 1, 1995. This action was brought on March 1, 2000, the date the defendant BSI was served.

The defendant first asserts that recovery of any commission earned on these projects is barred by Conn. Gen. Stat. § 52-596, which, as discussed above, provides that an action for the payment of remuneration for [*28] employment payable periodically shall be brought within two years after the right of action accrues. The Court concludes that § 52-596 is not applicable to the claim for the commission earned by Mr. Duplissie because such compensation was not "payable periodically" within the meaning of that statute. These commission payments were not payable to the plaintiff on fixed intervals. In fact, the plaintiff was not entitled to any compensation until and unless, if ever, the BSI projects were completed and earned a profit. *Cf. Mace*, 155 Conn. at 683-84.

Consequently, the Court concludes that the plaintiff's right to recover any commission due to him is governed by the six-year statute of limitations contained in Conn. Gen. Stat. § 52-576. This action was brought more than six years after the completion of the Petro Automation project. The plaintiff appears to assert that the statute of limitations was tolled because of the "unequal relationship" between the parties and the likelihood that he would lose his job if he brought suit against his employer. The plaintiff does not cite to any authority, nor could the Court find any, holding that a statute [*29] of limitation governing an action between employer and employee is tolled until the employment relationship ends. Consequently, Counts Nine and Eleven of the plaintiff's complaint are barred to the extent they seek to recover the commission due to the plaintiff from the Petro Automation project. n12

n12 The statute of limitations applies to both the breach of contract count and the unjust enrichment count. "Where a party seeks equitable relief pursuant to a cause of action that would allow that party to seek legal relief concurrent legal and equitable jurisdiction exists, and the statute of limitations that would be applicable to bar the legal claim also applies to bar the equitable claim." *Dowling v. Finley Associates*, 49 Conn. App. 330, 335, 714 A.2d 694 (1998), *rev'd on other grounds*, 248 Conn. 364, 727 A.2d 1245 (1999). Consequently, even if the plaintiff had established a prima facie case for unjust enrichment for the Petro project, recovery would still be barred in this case.

[*30]
The Ninth and Eleventh Count are not barred to the extent that they seek recovery for the commission due for the New England Country Bakers project. This action was brought within six years from May 1, 1995, the date of the completion of that project.

2. Damages

The plaintiff was entitled to receive a 10% commission on the profits from the New England Country Bakers project. Consequently, because the total profit from this job was $ 218,622, the plaintiff is entitled to recover $ 21,862.

C. Oral Agreement to Convey 5% of IDG to Duplissie

The plaintiff next seeks damages against Mr. Devino for his alleged breach of an oral promise to convey a 5% equity interest in IDG. Specifically, the Fifth Count alleges that the defendant's failure to pay violates Conn. Gen. Stat. § 31-72, for which he seeks double damages and attorneys fees pursuant to that statute. The Sixth Count alleges breach of contract, and the Seventh Count alleges the tort of fraudulent misrepresentation. n13

n13 The Eighth Count, seeking quantum meruit recovery, was previously stricken by the Court.

[*31]

The plaintiff has failed to meet his burden of proof on these counts. Although the Court concludes that Mr. Devino stated that he would give the plaintiff 5% of IDG when the plaintiff retired or otherwise left his employ, it is inconceivable to this Court that either the plaintiff or the defendant believed that the parties were entering into an enforceable oral contract. First, as noted above, a contract "must be definite and certain as to its terms and requirements. So long as any essential matters are left open for further consideration, the contract is not complete . . . A contract requires a clear and definite promise. See Suffield Development Associates Ltd. Partnership v. Society for Savings, 243 Conn. [832,] 843, [708 A.2d 1361 (1998)]." Geary v. Wentworth Laboratories, Inc., 60 Conn. App. 622, 628, 760 A.2d 969 (2000).

In this case, based upon the facts found above, significant terms of the alleged contract were not discussed at all and/or were left undefined. Moreover, the Court cannot reasonably imply these terms from the promise itself. Nor can the Court find any partial performance by the defendant that would shed any light on these [*32] missing terms. Under these circumstances, the promise by the defendant is so incomplete as to render it unenforceable. Accordingly, the plaintiff cannot recover on Count Five or Count Six of his complaint, both of which require an enforceable agreement.

The plaintiff also cannot recover on his fraudulent misrepresentation theory. Among other things, an action for fraud requires "justifiable reliance" on the promise by the party seeking recovery. See, e.g., Visconti v. Pepper Partners LTD Partnership, 77 Conn. App. 675, 682-83, 825 A.2d 210 (2003). In this case, the plaintiff could not have justifiably relied upon the defendant's promise in light of its vague nature. Moreover, any reliance on a oral agreement to convey such a potentially significant interest of the defendant, without requiring that (1) the key terms be better defined, (2) it be reduced to writing, (3) or without first ascertaining whether the agreement of other parties such as the defendant's brother, would be required, is simply unjustified and unreasonable. Similarly, the Court is not convinced that the plaintiff would have left his job or sought other employment in the absence of the defendant's [*33] promise.

Finally, to be entitled to recover on any of these theories, the plaintiff must establish damages for the breach of a contract or a fraudulent misrepresentation. "It is axiomatic that the burden of proving damages is on the party claiming them . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty . . ." Lawson v. Whitey's Frame Shop, 241 Conn. 678, 689-90, 697 A.2d 1137 (1997) (citation omitted; internal quotation marks omitted). There is little or no evidence in this record that would allow the Court to estimate, with any degree of reasonable certainty, the plaintiff's damages even if the Court found a valid, enforceable promise to convey "5% of IDG" to the plaintiff.

D. Plaintiff's Entitlement to Prejudgment Interest

The Court now turns to whether the plaintiff is entitled to prejudgment interest for the defendant's breach of his agreement to pay the plaintiff annual lump sum compensation and to a 10% commission on the profits [*34] from the New England Country Bakers project. "The allowance of prejudgment interest under Conn. Gen. Stat. § 37-3a is a matter within the discretion of the trial court. Metcalfe v. Talarski, 213 Conn. 145, 160, 567 A.2d 1148 (1989); Solomon v. Hall-Brooke Foundation, Inc., 30 Conn. App. 136, 146-47, 619 A.2d 866 (1993); Alderman v. RPM of New Haven, Inc., 20 Conn. App. 566, 569-70, 568 A.2d 1068 (1990). This allowance turns on whether the detention of the money is or is not wrongful under the circumstances. (Internal quotation marks omitted.) Lawrence v. New Hampshire Ins. Co., 29 Conn. App. 484, 498, 616 A.2d 806, cert. denied, 224 Conn. 923, 618 A.2d 528 (1992); Solomon v. Hall-Brooke Foundation, Inc., supra, 146. If the trial court determines that one party has wrongfully detained funds, it must next determine the date the wrongful detention began. Where the claim rests on a breach of contract, statutory interest accrues from the date the contract was breached. See West Haven Sound Development Corp. v. West Haven, 207 Conn. 308, 322-23, 541 A.2d 858 (1988); [*35] Harris Calorific Sales Co. v. Manifold Systems, Inc., 18 Conn. App. 559, 566, 559 A.2d 241 (1989)." Patron v. Konover, 35 Conn. App. 504, 517, 646 A.2d 901, cert. denied, 231 Conn. 929, 648 A.2d 879 (1994). n14

n14 Because the amount of damages can reasonably be determined by the terms of the parties or the oral contract itself, this case does not fall within the category of breach of contract cases in which § 37-3a does not apply. See, e.g., Foley v. Huntington Company, 42 Conn. App. 712, 739-43, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996).

In this case, the Court concludes, with respect to the lump sum compensation agreement, that the defendant Devino has wrongfully detained funds due and owing to the plaintiff no later than August 22, 1997, the date the plaintiff was discharged from employment. Therefore,

the Court awards statutory interest at the rate of 5% per year, from August 22, 1997 up to the date [*36] of judgment. n15 *See Paulus v. Lasala*, 56 Conn. App. 139, 742 A.2d 379 (1999) (prejudgment interest, if awarded, runs to the date of judgment); *Sears Roebuck & Co. v. Board of Tax Review*, 241 Conn. 749, 765-66, 699 A.2d 81 (1997) (trial court has discretion to set amount of interest up to the statutory maximum). This amount is $ 33,270.16.

> n15 The Court has broad discretion, pursuant to § 37-3a, to award prejudgment interest up to the statutory maximum of 10%. *Sears, Roebuck & Co. v. Board of Tax Review*, 241 Conn. 749, 766, 699 A.2d 81 (1997). Neither party exercised the right to offer any evidence regarding available interest rates during the relevant period.

The Court also concludes that the plaintiff is entitled to prejudgment statutory interest regarding the New England Country Bakers project. The Court finds that the plaintiff was entitled to receive his 10% commission on that project on or about May 1, 1995, the date that project was completed. The defendant [*37] wrongfully detained funds belonging to the plaintiff after that date. Consequently, he is entitled to prejudgment interest in the amount of $ 10,952.86

CONCLUSION

For the reasons set forth above, the plaintiff is entitled to damages against the defendant, Kenneth Devino, in the amount of $ 86,416.53, plus prejudgment interest in the amount of $ 33,270.16, for total damages in the amount of $ 119,686.69.

The plaintiff is also entitled to damages against the defendant, Building Structures, Inc., in the amount of $ 21,682, plus prejudgment interest in the amount of $ 10,952.86, for total damages in the amount of $ 32,636.86.

Judgment shall enter accordingly.

Prescott, J.