UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EXECUTIVE AIRLINES | : | CIVIL ACTION NO. |
| | : | 02-CV-194 (WWE) |
| Plaintiff, | : | |
| VS. | : | |
| | : | |
| ELECTRIC BOAT CORPORATION, | : | |
| | : | |
| Defendant. | : | JULY 18, 2006 |
| | : | |

**MOTION TO PRECLUDE THE TESTIMONY OF PLAINTIFF'S PROPOSED EXPERT**

Defendant Electric Boat Corporation ("Electric Boat") hereby respectfully submits its

Memorandum in Support of its Motion to Preclude the Testimony of Plaintiff's Proposed Expert

Diane S. Steiner.

I.    **INTRODUCTION**

This hearing in damages comes before this Court pursuant to the April 6, 2006 order

granting Electric Boat a retrial as to damages in the above-captioned action.[1]  Plaintiff's claims

against Electric Boat in the underlying case were predicated on a contract between the parties

whereby Plaintiff agreed to provide air charter services to Electric Boat between its facilities

located in Groton, Connecticut and Newport News, Virginia.[2]  Plaintiff commenced services for

---

[1] (*See* Order on Renewed Mot. for J. as a Matter of Law or, in the Alternative, Mot. for a New Trial (Eginton, J.) dated Apr. 6, 2006 ("Order on Motion for Judgment")(attached as Ex. A).

[2] The contract between the parties consisted of three documents: a document entitled "Purchase Order Terms and Conditions" known as GDC 410 (REV. 3/87) (the "Terms and Conditions")(attached as Ex. B); a February 9, 2000 purchase order, number SNL022-096 (the "February Purchase Order"); and a March 14, 2000 purchase order number SNL022-096, along with a "Purchase Order Supp. No. 1" (collectively the "March Purchase Order") (attached as Ex. C) (collectively the "Charter Agreement").

Electric Boat on April 10, 2000, using a BAE Systems Jet Stream 3101, registration number N16EJ (the "Aircraft"). On May 21, 2000, just six weeks after its first flight for Electric Boat, Plaintiff was operating the Aircraft on a charter flight for another customer when the Aircraft crashed, killing all passengers and crew on board. Electric Boat immediately suspended service with the Plaintiff, and on June 7, 2000, terminated the Charter Agreement.

Plaintiff brought suit against Electric Boat claiming that Electric Boat had improperly terminated the Charter Agreement, and seeking damages in the amount of $494,395.00. (*See* Second Am. Compl. first count, ¶ 20; second count, ¶¶ 22-23.) On February 17, 2006, after a four-day jury trial, the jury returned a verdict in favor of Plaintiff in the amount of $472,368.00. Following the verdict, Electric Boat moved for judgment as a matter of law or a new trial, claiming, in part, that Plaintiff was not entitled to an award of liquidated damages under the Charter Agreement. Electric Boat contended that the July 17, 2003 Order (Goettel, J.) granting Electric Boat partial summary judgment barred Plaintiff's claims for liquidated damages and that the jury's actual damage award was against the weight of the evidence. The Court (Eginton, J.) agreed on both fronts, and ordered a new trial as to the damage issue only. (*See* Order on Motion for Judgment.) The Court held that Plaintiff was "entitled only to contract damages, which are generally based on the injured party's expectation interest and should not award him in excess of the sum which compensates him for the loss of his bargain." (*Id.*)

The issue now before this Court concerns the admissibility of the damages testimony of Plaintiff's proposed expert witness, Diane Steiner ("Steiner"). Although Steiner is a certified public accountant, as revealed by her report and subsequent deposition testimony, she has no education, experience or accredited qualification to render an opinion on Plaintiff's economic damages in this case.

More importantly, Steiner's opinion utterly fails to meet the requirements of Fed. R. Evid. 702 and the most basic standards of reliability. Steiner's opinion consists of a six-page report, entitled "Analysis of Economic Losses" ("Steiner Report")(attached as Ex. D) based on the following formula:

> I have calculated the amount of the loss suffered by [Plaintiff] by determining the flights that would have been provided under the contract, had Electric Boat not cancelled the contract prematurely, and then multiplying that number by the fee payable under the contract for each such flight, then subtracting the applicable variable expenses that would otherwise have been incurred by [Plaintiff] had those flights been flown.

(*See* Steiner Report, p. 2.) Following this formula, Steiner opines that Plaintiff is entitled to $881,362.43 in damages stemming from Electric Boat's termination of the Charter Agreement.

Aside from the fact that Steiner's opinion constitutes nothing more than simple arithmetic – a function well within the ordinary knowledge and experience of lay jurors – Steiner's calculation is the product of information and assumptions that are inherently unreliable and nothing but rank speculation. As such, the Court should preclude Plaintiff's proposed expert testimony pursuant to Federal Rule of Evidence 702.

## I.    ARGUMENT

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." This mandate bestows a gate-keeping function on the district court, and requires the court to admit expert testimony only in circumstances where the proposed testimony is both relevant and reliable. *Id.*; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (applying the holding of *Daubert* to non-scientific expert testimony); *see also* Fed. R. Evid. 702 advisory committee's notes on 2000 amendments. The district court is charged with the responsibility to

"'make certain that an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field.'" *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d

Cir. 2004) (quoting *Kumho Tire Co.*, 526 U.S. 137, 152). Federal Rule of Evidence 702 guides

the district court in this regard:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702. Thus, expert testimony is only properly admitted when the proponent of the

testimony demonstrates reliability through the qualifications of the expert and the trustworthiness

of the information underlying the opinion.


A.      Preclusion is Proper Because Steiner is Not Qualified to Render an Opinion on
        Plaintiff's Damages

Determining whether a particular expert has sufficient specialized knowledge to assist the

jurors in deciding the issues of a case is part and parcel of the Court's "gate-keeping" function

under Federal Rule of Evidence 702. *See Kumho Tire Co.*, 526 U.S. at 156. The reliability

inquiry begins with a determination that the expert is qualified through knowledge or experience

to render an opinion on the matter at issue. *See id.* at 150; *Crowley v. Chait*, 322 F. Supp. 2d

530, 536 (D.N.J. 2004). Expert qualifications are particularly important in cases where the

proposed testimony rests on technical or other specialized knowledge. In the nonscientific

world, theories are most often the subject of experience rather than testing or experimentation.

*Voilas v. M.C.*, 73 F. Supp. 2d 452, 461 (D.N.J. 1999) (quoting Timothy Perrin, *Expert Witness*

-4-

*Testimony: Back to the Future*, 29 U. Rich. L. Rev. 1389, 1457 (1995)).  Thus, cases involving

technical or other specialized knowledge require the district court to focus its reliability inquiry

on the experience of the proposed expert.  *Id.*; *see also Crowley*, 322 F. Supp. 2d at 539 (citing

*Kumho Tire*, 526 U.S. at 152).

Expert testimony should be precluded when the expert lacks training or experience in the

particular area in which the testimony is offered.  *See e.g.*, *Byrne v. Liquid Asphalt Sys.*, 238 F.

Supp. 2d 491, 494 (E.D.N.Y. 2002); *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247, 252

(S.D.N.Y. 1997); *see also Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055 (3d Cir. 1997);

*Crowley*, 322 F. Supp. 2d at 538.  That is not to say a proposed expert need be specifically

qualified in the narrow field from which the disputed issue arises.  However, the proposed expert

must be generally qualified to render an opinion on the question at issue and must have

"specialized knowledge in a field or subject sufficiently broad to allow him to say something

useful to a lay jury, even if that knowledge does not fall squarely within the specific and narrow

confines of the particular issue at hand." *See* Fed. R. Evid. 702; *Kidder, Peabody & Co. v. IAG*

*Int'l Acceptance Group, N.V.*, No. 94 Civ. 4725 (CSH), 1999 U.S. Dist. LEXIS 132, at * 27-28

(S.D.N.Y. Jan. 12, 1999).[3]

In this case, Plaintiff has offered Steiner to establish the amount of Plaintiff's economic

losses stemming from Electric Boat's termination of the Charter Agreement.[4]  Although Steiner

is a certified public accountant, her deposition revealed that she has no education or experience

that qualifies her as an expert in calculating economic damages.  Steiner graduated from

---

[3] Copies of all unreported decisions are attached hereto as Ex. I.

[4] Although Plaintiff purportedly "disclosed" Steiner as an expert witness by providing counsel for Electric Boat with a copy of the Steiner Report, Plaintiff has yet to provide a formal disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2).

Brooklyn College in 1983 with a Bachelor of Science in Accounting and attended Baruch

College for a Master's Degree in Tax, which she never completed. (Dep. of Diane S. Steiner,

dated June 15, 2006 ("Steiner Dep.") 4:20-24)(attached as Ex. E).  From 1983 through 2000,

Steiner worked at several accounting firms, primarily in the tax and audit functions.[5] (*Id.* 8:10-

13; 11:7-10; 16:10-13; 17:10-12; 18:7-9.)  Since 2000, Steiner's solo accounting practice has

been limited to personal and estate tax work, financial preparation and some financial

consulting.[6] (*Id.* 26:1-27:11.)  Steiner has never been formally designated as an expert witness in

any litigation, has never prepared an expert report on any topic whatsoever, and has never

performed a calculation of lost profits for a business.  (*Id.* 66:13-67:10; 119:16-19.)  In fact,

Steiner's only experience with litigation or calculating damages is rooted in her involvement

with an accounting malpractice case, where she offered an opinion as to damages consisting of

back-owed taxes and time spent on litigation.  (*Id.* 68:6-24.)  For that case, she did not prepare a

formal report and did not testify at trial.  (*Id.* 34:9-17; 67:11-13.)

Accordingly, Steiner's education and experience do not provide the basis for her

proposed qualification to render an opinion on Plaintiff's economic losses in this case.  In fact,

Steiner's experience determining economic damages is limited to her participation in a few

seminars she has attended over the course of her career.  (*Id.* 46:11-47:8.)  Steiner testified that

her training specific to the calculation of economic damages involved a three-hour seminar in

---

[5] Although Steiner testified that she held positions at several accounting firms from 1983-2000, she was unable to identify most of the places she was employed and could not recall the people with whom she worked. (Steiner Dep. 7:7- 22:9.)  Notwithstanding her deficient memory in this regard, Steiner testified that during this period, she did no work related to the calculation of economic damages. (*Id.* at 15:11-18; 22:10-23:25.)

[6] Steiner currently provides personal tax services to Mr. Peragine, the principal of Executive Airlines, and initiated work on this case at the request of Mr. Peragine. (Steiner Dep. 29:21-30:1; 88:15-89:17.)

"damages having to do with real estate work" and a series of 8 to 10 day-long seminars she

attended pursuant to her continuing education responsibilities, which involved some unquantified

amount of training on "business valuation and litigation."[7] (*Id.* 36:6-39:11; 44:15-45:17.)

Because Steiner is simply not qualified to render an expert opinion on Plaintiff's

economic damages, her calculation resembles simple, yet flawed, math more than true

economics:

> I have calculated the amount of the loss suffered by [Plaintiff] by determining the flights that would have been provided under the contract, had Electric Boat not cancelled the contract prematurely, and then multiplying that number by the fee payable under the contract for each such flight, then subtracting the applicable variable expenses that would otherwise have been incurred by [Plaintiff] had those flights been flown.

(*See* Steiner Report, p. 2.) Steiner testified that this opinion was based on her twenty years of

experience "look[ing] at businesses" and without the aid of any authoritative works. (*Id.* 118:11-

19.) However, Steiner's general experience in audit and tax work simply does not represent the

kind of "knowledge, skill, experience, training, or education" required by Federal Rule of

Evidence 702 to permit her testimony as to Plaintiff's economic losses in this case. In addition

to being unfamiliar with the airline industry (*id.* 140:17-22), her education and accounting

experience is limited to academic fields that do not bear on the issue for which Plaintiff offers

Steiner's testimony.

For these reasons, this Court should preclude Plaintiff's proposed expert testimony on the

ground that Steiner lacks qualification to render an expert opinion in this case pursuant to

Federal Rule of Evidence 702.

---

[7] Steiner also noted she sat for an exam known as the "certified valuation analyst" exam, but never received the certification due to her failure to complete the accompanying continuing education requirements. This certification does not appear on her curriculum vitae. (Steiner Dep. 41:5-43:21.)

B.     <u>Preclusion is Proper Because Steiner's Method is Not Reliable</u>

Perhaps more importantly, Steiner's method lacks the reliability required by Federal Rule

of Evidence 702.  The *Daubert* Court posited four factors to aid in the determination of whether

an expert's reasoning or methodology is reliable:

> (1) whether the theory or technique relied on has been tested; (2) whether the theory or
> technique has been subjected to peer review and publication; (3) whether there is a
> known or potential rate of error…; and (4) whether the theory or method has been
> generally accepted by the [specialized] community.

*Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45, 48 (E.D.N.Y. 1999) (citing *Daubert*, 509 U.S. at

593-94); *see also Total Containment, Inc. v. Dayco Prods., Inc.*, No. 1997-cv-6013, 2001 U.S.

Dist. LEXIS 15838, at *22-23 (E.D. Pa. Sept. 6, 2001).  Although the *Daubert* factors neither

necessarily nor exclusively apply to all experts or in every case, the Supreme Court has

recognized that these questions "can help to evaluate the reliability even of experience-based

testimony."  *Kumho Tire Co.*, 526 U.S. at 142, 151.  In this case, the *Daubert* factors weigh

against the admissibility of Plaintiff's proposed expert testimony because Steiner failed to

identify any authority for her method and because her method is premised on unverified

information.

As an initial matter, Steiner was unable to identify a single authoritative article or text

that would calculate Plaintiff's damages in the same manner she employed in this case.  (Steiner

Dep. 57:12-59:4; 70:9-70:13.)  Steiner's failure to identify any authority for her opinion

forecloses inquiry into three of the four *Daubert* questions:  (1) whether the method she

employed has been relied on or tested by others in her field, (2) whether her method has been

subjected to peer review and publication, and (3) whether her method has been generally

accepted by the accounting community.  There is simply no evidence in the record to support the

contention that Steiner's method has been written about, relied on, tested or generally accepted

by the accounting or economic communities as a proper method for determining economic losses. Moreover, there is no evidence in the record to establish that the method Steiner used was properly applied to the facts of this case. Indeed, Steiner admitted that she prepared her report with no aid from any other professional, and that she did not have her conclusions reviewed by any other accountants or economists. (*Id.* 69:17-70:13.)

The final *Daubert* factor, which considers the known or potential rate of error, also weighs in favor of excluding Plaintiff's proposed expert testimony. Federal courts recognize that a methodology which employs unsupported and untested assumptions contains an "infinite" margin of error, and that an expert opinion should be precluded when the methodology employs unreliable or unverified information. *See, e.g., Total Containment, Inc.,* 2001 U.S. Dist. LEXIS 15838, at *22-23; *see also GE Co. v. Joiner*, 522 U.S. 136 (1997); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000). Accordingly, *Daubert* and its progeny require an expert to investigate the accuracy of the information used to render an opinion, particularly when that information is obtained directly from the client. *See Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95 Civ. 8136 (RCC), 2001 U.S. Dist. LEXIS 20737, at *12 (S.D.N.Y. Dec. 13, 2001)(excluding expert testimony because the expert relied on statements made by a client rather than the expert's own independent evaluation of records); *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904 (S.D.N.Y. 1985), aff'd, 801 F.2d 38 (2d Cir. 1986).

Here, Steiner employs several unsupported conclusions as the factual basis for her calculation of Plaintiff's variable expenses, and thus, her ultimate damage opinion.[8] These conclusions are based exclusively on two sources of information: (1) generic operating cost information generated by Conklin & deDecker ("deDecker Report) (attached as Ex. F), and (2) information obtained directly from Mr. Peragine, Plaintiff's principal and sole owner.

With respect to the deDecker Report, Steiner testified that she used the deDecker's figures as the basis for her calculation of Plaintiff's variable expenses after being told by another aircraft operator that Conklin & deDecker were the "authority" in the field. (Steiner Dep. 64:6-64:17.) The deDecker Report sets forth, in the most generic terms, operating cost information and variable expenses for the type of Jet Stream aircraft operated by Plaintiff under the Charter Agreement.[9] (*See* Dep. of William deDecker, dated June 13, 2006 ("deDecker Dep.") 41:3-11; 42:5-43:3; 48:23-49:3)(attached as Ex. G). However, Steiner testified that she was unfamiliar with Conklin & deDecker prior to her engagement in this matter and engaged in no comparative cost analysis to confirm the accuracy of deDecker's generic figures as applied to Plaintiff's

---

[8] Variable expenses are costs that change in relationship to the usage of the business, as opposed to fixed expenses that do not vary depending on business output. (Steiner Dep. 146:22-147:1.) Under Steiner's method, variable expenses are deducted from the remaining gross income Plaintiff would have received under the Charter Agreement in order to arrive at her final damage conclusion, while fixed expenses are not. (*See* Steiner Report, pp. 2, 4-5.) Under this formula, lower variable expenses equal a higher damage calculation.

[9] Plaintiff has also disclosed Mr. deDecker as an expert witness. Mr. deDecker's proposed opinion is limited to a recitation of generic cost information for the type of Jet Stream aircraft operated by Plaintiff under the Charter Agreement. Mr. deDecker does not opine as to the ultimate amount of Plaintiff's economic losses and does not attempt to evaluate the actual operating costs of Plaintiff's business. (*See* deDecker Report.) In fact, Mr. deDecker had no information specific to Plaintiff's business at the time he prepared the deDecker Report. (deDecker Dep. 41:8-11.) Accordingly, the deDecker Report is relevant to this matter *only* because Steiner relied in part on the deDecker Report in formulating her opinion as to Plaintiff's damages. As such, if the Court excludes Steiner's proposed expert testimony, the deDecker Report and Mr. deDecker's proposed testimony become irrelevant and must also be excluded pursuant to Federal Rule of Evidence 702.

business.  (Steiner Dep. 48:21-49:1; 106:16-18.)  Notwithstanding, Steiner relied on the

deDecker Report rather than reviewing documents concerning Plaintiff's actual costs "[b]ecause

the recalculating of those numbers would have been prohibitive, and I probably would have

come up in the same or similar place as I would have using the deDecker Report."  (*Id.* 168:24-

169:8.)

Steiner also testified that she relied heavily on information provided by Mr. Peragine in

calculating Plaintiff's variable costs.  Although Conklin & deDecker consider aircraft

maintenance labor a variable cost, Steiner unilaterally chose to treat Plaintiff's maintenance labor

as a fixed expense.  (*Id.* 167:3-25.)  Likewise, Steiner admitted that per diem based labor,

whether for maintenance, crew or otherwise, is generally considered a variable cost.  (*Id.* 150:16-

19.)  However, Steiner chose to treat Plaintiff's entire payroll as a fixed cost based on a

conversation she had with Mr. Peragine.  (*Id.* 154:19-155:2.)  Steiner admitted that she relied

exclusively on Mr. Peragine's representation and "had no idea" whether Plaintiff employed crew

or maintenance personnel on a per diem basis.[10]  (*Id.* at 154:1-5.)

Steiner further admitted that she prepared the Flight Time Schedule, Exhibit H to the

Steiner Report, with Mr. Peragine *jointly*.  (*Id.* at 161:7-18.)  Steiner relied on Exhibit H to

calculate the per-hour variable costs associated with flying Plaintiff's Jet Stream aircraft,

including fuel, parts/airframe engineering, engine restoration, propeller overhaul and

landing/parking fees.  (*See* Steiner Report, p. 6; *see also* Exhibit H to Steiner Report, attached as

Ex. J.)  Ultimately, however, Steiner testified that she had no idea or reason to know whether the

---

[10] In treating labor as a fixed cost, Steiner also failed to consider whether Plaintiff
replaced the crew that was killed in the May 21, 2000 crash. In fact, Steiner had no idea whether
the deceased crew had been replaced.  (Steiner Dep. 145:4-8.)

flight time information provided by Mr. Peragine was accurate.[11] (Steiner Dep. 164:9-164:14.)

In short, Steiner's calculation of Plaintiff's variable expenses is based on information that she did

not independently verify, and the accuracy of which she cannot confirm.[12]  Accordingly, the

potential rate of error in Steiner's opinion is "infinite" and the final *Daubert* factor weighs in

favor of excluding Steiner's proposed expert testimony.

For these reasons, the Court should preclude Plaintiff's proposed expert testimony on the

grounds that Steiner's opinion does not meet the reliability standards of Federal Rule of

Evidence 702.

C.    In the Alternative, Steiner's Testimony Must Be Limited to Her Calculation of
       Plaintiff's Damages Based on Fifteen Flights Per Month for Six Months

As a matter of law, the Charter Agreement limits the scope of Plaintiff's damages in this

case to the reasonable costs and profits associated with Plaintiff providing Electric Boat with

fifteen flights per month for a period of six months.  While a clearer case demonstrating the

_____

[11] To be sure, Steiner reviewed certain of Plaintiff's account receivable reports, flight
reports, payroll documents and financial statements.  (Steiner Dep. 51:8-14; 52:20-25.)
However, these documents were gathered from the garage of Mr. Peragine's Syosset, New York
office, which Steiner accessed with a garage door opener provided by Mr. Peragine. (*Id.* at
95:21-96:5.)  Steiner also testified that the flight reports for one of Plaintiff's Jetstream aircrafts
was missing from the garage, and were ultimately "found" by Mr. Peragine in the basement of
his office building.  (*Id.* 97:24-99:5.)

[12] Steiner also premised her damage opinion on speculative assumptions not grounded in
the facts of this case.  Although Steiner is not qualified to render an expert opinion on airline
usage rates, she based her damage opinion on the assumption that Electric Boat would pay
Plaintiff for 30 flights per month over the remaining duration of the Charter Agreement.  (Steiner
Report, p. 3.)  This assumption ignored the effect that Plaintiff's May 21, 2000 fatal crash may
have on usage (Steiner Dep. 134:6-136:5; 135:2-5; 139:11-15), and ignored the terms of the
Charter Agreement which permitted Electric Boat to terminate Plaintiff's services for any reason
without penalty upon six (6) months written notice to Plaintiff (*id.* 122:6-123:6), and required
only that Electric Boat purchase 15 roundtrip flights from Plaintiff per month. (*Id.* 126:2-10; *see
also infra* Section C.)  Steiner was instructed not to consider the six-month termination provision
by Plaintiff's counsel. (*Id.* 122:6-11.)

unreliability or irrelevance of a proffered expert's opinion is hard to imagine, if this Court is

inclined to allow Steiner to testify at all, it must limit her testimony to a calculation of Plaintiff's

damages within the parameters set forth by the Charter Agreement.

The Charter Agreement contained two early termination provisions.  Section 2(A) of the

March Purchase Order provided Electric Boat a general right to terminate the Charter Agreement

without penalty upon six (6) months written notice to Plaintiff.  Section 2(B) provided Electric

Boat the right to terminate the Charter Agreement without penalty upon ten (10) days written

notice to Plaintiff if the termination was based on Plaintiff's default.  (*See* Purchase Order Supp.

No. 1, § 2(A), (B).)

On July 17, 2003, the Court (Goettel, J.) issued a ruling on Electric Boat's Motion for

Summary Judgment affirming, as a matter of law, Electric Boat's right to terminate the Charter

Agreement pursuant to Section 2(A).  *See Exec. Airlines v. Elec. Boat Corp.*, 271 F. Supp. 2d

392, 394 (D. Conn. 2003) (attached as Ex. H).  The Court held that the Charter Agreement

granted Electric Boat the right to terminate charter services regardless of the reason for

termination, as follows:

> "The [Charter] Agreement specifically allowed for termination for convenience.
> Electric Boat did not breach the Agreement by invoking its right of early termination.
> However, that does not absolve Electric Boat from the consequences associated
> therewith, which is the more difficult issue in this case."

*Id.* at 397 (footnote omitted).  The "more difficult issue in this case" was determining whether

Electric Boat actually terminated the Charter Agreement for convenience, and if so, the

Plaintiff's damages associated with that termination.

The Court found that language of the Charter Agreement was clear and unambiguous

"with respect to the consequences of termination" and therefore "the determination of what the

parties intended by their contractual commitments [was] a question of law for the Court to

decide." *Id.* at 399 (internal quotation marks and citation omitted). Assuming, for purposes of

the motion, that Electric Boat in fact terminated the Charter Agreement for convenience, the

Court held that Section 14 of the Terms and Conditions ("Section 14") was a "formula for the

calculation of damages in the event of termination by Electric Boat for convenience."[13] *Id.* at

398. Section 14 provides as follows:

> If this order is terminated, in whole or in part, for Buyer's convenience, Seller shall be
> paid an amount, to be mutually agreed upon which shall be adequate to cover the
> reasonable cost of Seller's actual performance of work under this order to the effective
> date of termination, plus a reasonable profit thereon provided that no amount shall be
> paid to Seller for (i) any anticipatory profits related to work under this order not yet
> performed, or (ii) costs incurred due to Seller's failure to terminate work as ordered on
> the effective date of termination.

*Id.* at 396. The Court also determined that the Charter Agreement must be read to give effect to

Section 2(A) of the March Purchase Order in conjunction with Section 14:

> Under § 2 of Purchase Order Supplement No. 1 of the March Purchase Order, Executive
> Airlines was required to give six-months' notice of its intent to terminate for convenience
> in order to be able to do so without penalty. Under § 14 of the Terms and Conditions, if
> the Agreement were terminated for convenience, Executive Airlines would be entitled to
> receive a sum of money 'to be mutually agreed upon…adequate to cover the reasonable
> costs of [Seller's] actual performance of work under this order to the effective date of
> termination, plus a reasonable profit thereon….", subject to additional limitations. The
> Agreement must be read so as to give effect to both of these provisions.

*Id.* at 397 (quoting Section 14).

As a matter of law, therefore, the Court determined that Plaintiff's damages stemming

from termination for convenience are limited to the reasonable cost of Plaintiff's actual

performance under the Charter Agreement plus a reasonable profit thereon *from the effective*

---

[13] The jury in the underlying trial determined that Section 14 did not apply to
terminations for convenience under the Charter Agreement. However, this Court and the newly-
empanelled jury are not bound by the damage findings made by the jury in the underlying
proceeding. *See, e.g., DeWitt v. N. Y. State Hous. Fin. Agency*, No. 97 Civ. 4651 (SAS), 1999
U.S. Dist. LEXIS 13057, at *13 n.6 (S.D.N.Y. Aug. 24, 1999)("On retrial of this case, the new
jury would not bound by any findings of the previous jury…").

*date of the Charter Agreement through the date that Electric Boat's termination for convenience*

*was legally effective under Section 2(A).* In other words, Plaintiff is entitled to be paid for

services rendered from April 17, 2000, the date the Charter Agreement began, through December

7, 2000, the date on which Plaintiff had six months notice of Electric Boat's termination.[14]

Electric Boat has paid in full for each charter service Plaintiff actually provided under the

Charter Agreement. *See Exec. Airlines*, 271 F. Supp. 2d at 395. Accordingly, Plaintiff's

damages in this case are limited to "reasonable cost of…actual performance…plus a reasonable

profit" for the six month period following the date of termination. *Id.* at 396.

Likewise, Plaintiff's "reasonable cost of…actual performance…plus a reasonable profit"

must be calculated in accordance with other applicable provisions of the Charter Agreement. *Id.*

at 398 ("The Agreement must be read so as to give effect to both of these provisions.")(citing

*Dainty Rubbish Serv., Inc. v. Beacon Hill Ass'n,* 32 Conn. App. 530, 534, 630 A.2d 115 (1993)

("holding that the rules of contract construction require giving effect to all of the provisions of a

contract, construing it as a whole, and reconciling its clauses"); *Wheelabrator Envtl. Sys., Inc. v.*

*Galante*, 136 F. Supp. 2d 21, 36 (D. Conn. 2001) (holding that "'[a] contract should be

interpreted in a way that ascribes meaning, if possible, to all of its terms…'")(citation omitted)).

The Charter Agreement "itinerary" called for a minimum of 15 roundtrip flights per

month, and the overall price per flight was based "on a minimum monthly billing of fifteen (15)

R/Ts per month." (*See* Purchase Order Supp. No. 1, pp. 2-3.) Thus, the Charter Agreement

required only that Electric Boat pay Plaintiff for 15 roundtrip flights per month. Because

Plaintiff did not provide any services to Electric Boat under the Charter Agreement after the date

Electric Boat notified Plaintiff of termination, at most, Plaintiff's "reasonable cost of…actual

---

[14] Electric Boat notified Plaintiff of termination by letter dated June 7, 2000. *See Exec. Airlines v. Elec. Boat Corp.*, 271 F. Supp. 2d 392, at 394-95 (D.Conn. 2003).

performance…plus a reasonable profit" is limited to the costs and profits associated with the minimum of 15 roundtrip flights per month.

For these reasons, Plaintiff's damages stemming from Electric Boat's termination of the Charter Agreement are limited to the "reasonable cost of…actual performance…plus a reasonable profit" associated with 15 flights per month for a period of six months, as a matter of law.[15] To the extent the Court permits Steiner to offer an expert opinion in this matter, Electric Boat respectfully requests the Court limit that testimony to her calculation of Plaintiff's damages based on these parameters.

## III.    CONCLUSION

For all the foregoing reasons, Electric Boat respectfully requests that the Court preclude Plaintiff's proposed expert testimony in its entirety. In the alternative, Electric Boat respectfully requests that the Court limit Plaintiff's proposed expert testimony to a conclusion of damages based on a frequency of 15 flights per month for a period of six months.

---

[15] Even if this Court determines that the Plaintiff's damages are not limited to the "reasonable cost of…actual performance…plus a reasonable profit" as set forth in Section 14, Plaintiff's damages must be limited to contract damages based on 15 flights per month for six months. The Charter Agreement must be read to give effect to each provision agreed upon by the parties. *See Exec.e Airlines*, 271 F. Supp. 2d 397; *Wheelabrator Envtl. Sys., Inc. v. Galante*, 136 F. Supp. 2d 21, 36 (D. Conn. 2001). To ignore the six month termination provision and the 15 flight monthly minimum would be, in effect, to ignore the parties' agreed-upon contract terms and improperly render Electric Boat liable for damages it could not foresee in this case. *L. F. Pace & Sons, Inc. v. Travelers Indem. Co.*, 9 Conn. App. 30, 40 (1986)("'Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.'")(quoting 3 Restatement (Second), Contracts § 351 (1)). Steiner testified that limited in this manner, her opinion as to the value of Plaintiff's damages would be under $200,000.00. (Steiner Dep. 179:21-180:4.)

DEFENDANT ELECTRIC BOAT
CORPORATION


By: _____
     Paul D. Williams (ct05244)
     Amy T. Maas (ct25561)
     Day, Berry & Howard LLP
     CityPlace I
     Hartford, Connecticut 06103-3499
     Tel. (860) 275-0100
     Fax. (860) 275-0343
     E-mail:  pdwilliams@dbh.com
             atmaas@dbh.com

     *Its Attorneys*


## **CERTIFICATION**

     THIS IS TO CERTIFY that a copy of the foregoing was mailed this 18th of July, 2006 via overnight mail, postage prepaid, to:

Leonard Feigenbaum, Esq.            Daniel F. Hayes, Esq.
1670 Old County Road               Biedermann, Hoenig & Ruff
Suite 224                         805 Third Avenue
Plainview, NY  11803              New York, NY 10017


     _____
     Amy T. Maas