# EXHIBIT D

# Executive Airlines

# V.

# Electric Boat Corporation

# ANALYSIS OF ECONOMIC LOSSES

-------------------------------------------

# EXPERT REPORT OF

# Diane S. Steiner, CPA

# May 31, 2006

## RETENTION AGREEMENT

It was agreed prior to the commencement of this report that I would be paid a flat fee of $3,500 for document review, analysis and preparation of this report; in addition the following fees were agreed to:

1.  Any and all testimony given either in deposition or in court shall be invoiced at $1,500 per day plus traveling expenses.
2.  Any and all travel expenses shall be billed at cost.
3.  Any and all document duplication, binding and other such expenses shall be billed at cost.

## DESCRIPTION OF MATTER

On March 14, 2000 Electric Boat Corporation issued a purchase order no. SNL022-96 to Millennium Aviation Services, Inc. d/b/a Executive Airlines. The purchase order called for Executive Airlines to provide airline service between Groton, CT and Newport News, VA for the employees of Electric Boat Corporation. The term of the contract was for twelve months, beginning on April 17, 2000 and ending April 16, 2001 (See Exhibit A).

## SUMMARY OF CONCLUSIONS

### In my opinion the amount due Executive Airlines is $881,362.43

I have calculated the amount of the loss suffered by Executive Airlines by determining the flights that would have been provided under the contract, had Electric Boat not cancelled the contract prematurely, and then multiplying that number by the fee payable under the contract for each such flight, and then subtracting the applicable variable expenses that would otherwise have been incurred by Executive Airlines had those flights been flown.

### The amount due to Executive Airlines is calculated as follows:

| | | | |
|---|---|---|---|
| Flights that would have been provided | | | 326 |
| Payment per Round Trip Flight | *Average Flight Time* | | $4,553.49 |
| Remaining Fees Due Under the Contract | *4,056 X 326* | | $1,484,437.74 |
| Less Variable Costs: | | | |
| Fuel | 1,323.23 X174.99/HR. | 231,552.02 | |
| Parts Airframe/Eng/Avion | 1,323.23 X134.40/HR. | 177,842.11 | |
| Engine Restoration | 1,323.23 X130.25/HR. | 172,363.94 | |
| Propeller Overhaul | 1,323.23 X  2.74/HR. | 3,625.65 | |
| Landing/Parking Fees | 1,323.23 X 13.37/HR. | 17,691.59 | 603,075.31 |
| Net Amount due Executive Airlines | | | $ 881,362.43 |

*Report*

*Fuel Usage Report*

2

## METHADOLOGY OF CONCLUSION

### 1. Amount Payable per Flight

The amount to be paid by Electric Boat Corporation to Executive Airlines for each round trip (GON-PHF-GON – or - PHF-GON-PHF) is $4553.49 plus $341.51 in federal excise tax for a total of $4,895 per round trip flight as stated in Electric Boat's Purchase Order and Supplement Number SNL 022-096.

### 2. Amounts Actually Paid by Electric Boat to Executive Airlines for Service under the Contract

To come up with the flights actually flown under the Purchase Order I examined the Invoice History Report of Executive Airlines (Exhibit B), Executive Airlines aircraft flight /maintenance logs (Exhibit C) for the three airplanes (16EX, 16EJ, and 404GJ) that provided service under the contract and the Accounts Receivable trial balance report (Exhibit D).

The amounts paid by Electric Boat for services performed by Executive Airlines are as follows:

| DATE | INVOICE NUMBER | FLIGHT NUMBERS | *AMOUNT |
|------|----------------|----------------|---------|
| 4/22/00 | 000162A | 1 – 6 | $30,748.19 |
| 4/29/00 | 000164A | 7 – 13 | 35,627.40 |
| 5/6/00 | 000174 | 14 – 19 | 29,728.75 |
| 5/13/00 | 000184 | 20 – 27 | 41,831.90 |
| 5/20/00 | 000195 | 28 – 34 | 35,580.50 |

Total Amount Paid By Electric Boat for Services Performed      $173,516.74

* Amount includes fuel surcharge.

### 3. Definition of a Month

The contract with Electric Boat ran from April 17, 2000 to April 16, 2001. Therefore I have determined that a contract month begins on the 17th of each month and ends on the 16th of the following month, for twelve consecutive months beginning on April 17th, 2000.

### 4. Remaining Number of Flights

The Purchase Order was cancelled by Electric Boat in the second month of the contract. Based on actual flights flown in the first month of the contract, and the first several days of the second month of the contract, I anticipate that had the contract continued through the end of the purchase order period Executive Airlines would have flown thirty flights per month for a total of 360 flights.

Additional information to support the reasonableness of my estimate is the fact that the Purchase Order, on the top of page three, obligates Executive Airlines to: "be able to meet the current

3

charter schedule outlined below". This schedule calls for Executive Airlines to be able to provide twelve flights per week or 52 flights per month (4 and one third weeks per month times the twelve flights per week) as called for in the Purchase Order.

I have also considered that the purchase order at the bottom of page two calls for a minimum of fifteen round trips per month. Thirty flights per week is less than the average of 33 flights (52 plus divided by 2) which I believe is a reasonable and conservative estimate based on the minimum and maximum flights called for in the Purchase Order.

According to the accounting records of Executive Airlines 34 flights were provided to, and paid for by, Electric Boat Corporation from April 17, 2000 through May 19, 2000. That would leave 326 additional flights to be flown (360 total flights less 34 flights actually flown) under the Purchase Order.

## 5. Excise Taxes Not Due for Canceled Flights and Remaining Fees due Under the Contract

Since the fees due to Executive Airlines are for cancelled flights, said sums are not subject to the federal excise taxes of seven and one half percent. Therefore, the amount due on the remaining 326 flights $4,553.49 per flight. That amount is calculated by taking the $4,895 and deducting the federal excise tax of $341.61, then multiplying that amount by 326 yielding the amount due of **$1,484,437.74.**

Although the purchase order did not include a breakdown of the amount payable as a fee plus excise taxes, I have taken the gross amount payable per flight, as stated in the Purchase Order and netted out the excise taxes, to calculate the remaining fees due under the contract. This exercise places Executive Airlines in the same position it would have been in, if it had collected the gross fee and remitted that portion which would have been payable as excise tax to the government.

## 6. Variable Expenses That Were Considered in My Calculations

Expenses that would only have been incurred by Executive Airlines had there not been a termination of the Purchase Order by Electric Boat Corporation, were subtracted from the remaining amounts that would have been paid to Executive Airlines under the Purchase Order.

The following expenses were considered as variable expenses. These costs were directly variable depending on the number of flights flown:

1. Jet Fuel – Fuel used by the airplane
2. Engine Restoration
3. Parts Airframe/Eng/Avion
4. Propeller Overhaul
5. Landing and Parking Fees.

In determining the variable expenses that would have been incurred by Executive Airlines in performing the remaining 326 flights I relied on an Aircraft Cost Report that was procured from Conklin & de Decker (Exhibit E). In this report Conklin & de Decker identifies the following categories of expenses as variable costs:

4

1. Fuel including additives and Lubricants
2. Maintenance Labor
3. Parts Airplane /Eng/Avionics
4. Engine Restoration
5. Propeller Expenses
6. Landing and Parking Fees
7. Crew Expenses
8. Catering

I have ruled out some of the expenses identified as variable expenses in the report by Conklin & de Decker as follows:

1. Maintenance Labor: Because mechanics working on Executive Airlines airplanes are full time employees and no additional expenses would have been incurred had the Purchase Order not been terminated.
2. Crew Expenses (meals and lodging): As indicated in the Purchase these expenses would have been payable by Electric Boat Corporation and therefore, no expense would have been incurred by Executive Airlines.
3. No food or beverages were specified in the Purchase Order. Therefore, no food or beverage costs (catering costs) would have been incurred by Executive Airlines

## 7. Cost of Fuel

Fuel costs included in this report are as follows:

|  | Price per Gallon |
|---|---|
| Fuel purchased in Farmingdale, NY | $1.37 |
| Fuel purchased at other airports | $1.70 |

*page 6 #4*

The Purchase Order calls for all fuel costs in excess of $1.70 per gallon to be passed on to Electric Boat. Therefore the Executive Airlines fuel cost is capped at $1.70 per gallon for all fuel purchased away from Executive Airlines base of operations in Farmingdale, NY.

Fuel that would have been purchased in Farmingdale, NY is calculated at the wholesale prices paid by Executive Airlines, plus the pumping/storage fees paid to the Fixed Based Operator (FBO), Flightways (see spreadsheet and attached invoices, Exhibit F). The wholesale cost of fuel was calculated by examining the fuel bills for the period April 2000 through April 2001. The pumping and storage fees were determined by a review of Executive Airlines' Lease agreement with the FBO (Exhibit G).

For the purposes of calculating fuel costs, I assumed that approximately one half of the fuel that would have been used would have been purchased at the Republic Airport in Farmingdale, NY. I then averaged the cost per gallon of fuel purchased in Farmingdale and the cost per gallon of fuel purchased elsewhere and arrived at an average fuel cost of $1.535 per gallon.

The Conklin & de Decker Report (Exhibit E) indicates that Jetstream Airplane uses 114 gallons per hour. That number times the average fuel cost of $1.535 per gallon equals $174.99 in fuel cost per hour.

5

## 8. Average Flight Time per Trip

In order to determine how many flight hours would have been flown to complete the reaming 326 trips. I was provided with Flight/Maintenance Logs which detailed the flying times on the all of the flights provided by Executive Airlines for Electric Boat. To do this I analyzed the flight logs for the trips flown by Executive Airlines for Electric Boat. I was also provided with a spread sheet detailing those flights on the Flight/Maintenance Logs that were specific to Electric Boat (See spreadsheet, Exhibit H and Fight/Maintenance Logs, Exhibit C).

In analyzing the aforementioned Flight/Maintenance Logs and spreadsheet together with the Invoice History Report (Exhibit B) I determined the following:

Thirty four flights were billed to Electric Boat. Eight flights were farmed out and one flight was not billed, although it was recorded on the Flight/Maintenance Logs. Consequently twenty seven flights were used in calculating the average flight times (see spreadsheet, Exhibit I).

The total number of hours flown, including repositioning legs, as shown in the spreadsheet is 109.60. Dividing that number by 27 trips produces the time to complete one rotation, which is 4.059 hours.

## 9. The Hours Required to Complete the Remaining Trips

The remaining flight hours that would have been required to complete the remaining trips are calculated by taking the average flight time (4.059) times the remaining number of trips (326). Therefore, the flight hours that would have been flown are 1323.23 hrs.

## 10. Calculation of Total Variable Costs

Fuel usage was calculated by taking the cost of fuel used on the Jetstream of $174.99 per hour and multiplying this number by the remaining flight hours that would have been flown.

For the calculation of the other variable costs I relied on the information provided in the Conklin & de Decker Aircraft Cost Report. Those costs per hour were multiplied by the remaining flight hours (1,323.23) to calculate the Total Cost(s) shown below.

|  | PER FLIGHT HOUR | TOTAL COST |
|---|---|---|
| Fuel | $174.99 | $231,552.02 |
| Parts Airframe/Eng/Avion | 134.40 | 177,842.11 |
| Engine Restoration | 130.26 | 172,363.94 |
| Propeller Overhaul | 2.74 | 3,625.65 |
| Landing/Parking Fees | 13.37 | 17,691.59 |

6

Curriculum Vitae of Expert Witness:

**Diane S. Steiner**
**1 Rita Street**
**Syosset, NY 11791**
**(516) 496-9335**

E-mail DSSCPA@MSN.COM

**Professional Certification**

CPA State of New York 1987

**Education:**

BA Accounting, Brooklyn College 1983

**Professional Experience:**

Worked for several Regional firms for more than ten years before starting own practice in 1993. Have spoken before professional audiences including the FAE's State and Local Tax Conference and Annual Computer and Accounting Show. Twenty year member of the NYSSCPAS. Currently serving on the NYSSCPA'S State and Local Tax Committees and its committee on Relations with the IRS. In addition serves on the NYSSCPA's Nassau Chapters Professional Practice and Health Care Committee. Previously has served on the NYSSCPA's Estate Planning and Litigation Support Committees. Have had several articles on tax planning published on the Queens Bar Association Journal. Practice includes small businesses and professional practices. Regularly works with high net worth individuals doing business and individual tax planning, valuations and practice consulting.

Recently contributed financial and corporate analysis for application of Empire Airways to conduct scheduled passenger operations as commuter air carrier under 49 U.S.C. 41738

**Prior Testimony**

None

**Continuing Professional Education:**

Continuing professional education includes graduate level study in taxation and business at Baruch College and a Certificate in Educational Achievement from the American Institute of Certified Public Accountants in Business Valuation.

**Other affiliations:**

Diane serves on the Business Advisory Committee of the Long Island Ronald Mc Donald House.