UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EXECUTIVE  AIRLINES                           : CIVIL  ACTION  NO.
                                              : 02-CV-194  (WWE)
                    Plaintiff,

v s .

ELECTRIC BOAT CORPORATION,

                    Defendant.              JULY 17, 2006

## DEFENDANT'S EXPERT DISCLOSURE

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Defendant Electric Boat

Corporation ("Electric Boat") hereby discloses the following retained expert witness who is

expected to offer expert opinion testimony at trial:

**George   Kosicki**
**Analysis Group, Inc.**
**111 Huntington Avenue, Tenth Floor**
**Boston, MA 02199**

Dr. Kosicki has a Ph.D. in Economics from Cornell University and is currently Vice

President at Analyst Group, Inc., an economics, finance and strategy consulting firm. For

additional information concerning Dr. Kosicki's education, background, training and experience,

please refer to his curriculum vitae, attached as Appendix A to his report in this case.

Dr. Kosicki is expected to offer opinions at trial consistent with his report in this case, a

copy of which is attached hereto as Exhibit A and which is incorporated in its entirety in this

pleading pursuant to Rule 10(c) of the Federal Rules of Civil Procedure as if fully set forth

herein. The bases for his opinions are set forth fully in Exhibit A, and include his education,

knowledge, training and experience in the field of economics and damage calculations; his

review of documents produced by the Plaintiff and Electric Boat, deposition testimony,

information contained in other written discovery materials and pleadings, economic and damage analysis literature and the evidence to be introduced at trial.

Exhibit A contains the following information: (a) a complete statement of all opinions to be expressed by Dr. Kosicki, and the bases and reasons therefore; (b) a list of the data and other information considered by Dr. Kosicki in forming his opinions; (c) a list of exhibits to be used as a summary of or support for Dr. Kosicki's opinions; (d) Dr. Kosicki's qualifications; (e) the compensation to be paid to Dr. Kosicki; and (f) a listing of any of the cases in which Dr. Kosicki has testified at trial or by deposition within the preceding four (4) years.

DEFENDANT,
ELECTRIC BOAT CORPORATION

By _____

Paul D. Williams (ct05244)
Amy T. Maas (ct25561)
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06 103-3499
Tel. (860) 2750100
Fax. (860) 275-0343
E-mail:    pdwilliams@dbh.com
               atmaas@dbh.com

*Its Attorneys*

-2-

## **CERTIFICATION**

THIS IS TO CERTIFY that a copy of the foregoing was mailed this 17th day of July, 2006 via overnight mail, postage prepaid, to:

Leonard Feigenbaum, Esq.
1670 Old County Road
Suite 224
Plainview, NY 11803

Daniel F. Hayes
Biedermann, Hoenig & Ruff
805 Third Avenue
New York, NY 100 17

_____
Amy T. Maas

UNITED  STATES  DISTRICT  COURT
DISTRICT  OF  CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXECUTIVE   AIRLINES,

      Plaintiff,

vs.

ELECTRIC   BOAT   CORPORATION

      Defendant.

:  CIVIL  ACTION  NO.
   3:02-CV-194 (WWE)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# EXPERT  REPORT  OF  GEORGE  KOSICKI, Ph.D.

## INTRODUCTION

1.    My name is George Kosicki, and I am a Vice President at Analysis Group, Inc. ("Analysis Group"), an economics, finance, and strategy consulting firm. I have a Ph.D. in Economics from Cornell University and over 20 years of experience in economic research and teaching.   Prior to joining Analysis Group, I was chair of the Economics Department at the College of the Holy Cross in Worcester, MA, where I spent 15 years on the faculty.   My areas of specialization are applied microeconomics, industrial organization, antitrust, and labor economics.   As an economic consultant, I have worked on a number of antitrust and commercial litigation cases that relate to economic profits and damages. A detailed description of my background and credentials, including a list of my publications, is contained in the attached copy of my curriculum vitae (Appendix A).   I have also included (in Appendix A) a list of the cases in which I have testified during the past four years.

2.   I have been asked by counsel for the defendant, Electric Boat Corporation   ("EB"), to review, assess, and comment on the report "Analysis of Economic Losses" submitted by plaintiffs expert, Ms. Diane Steiner ("Steiner report"). I have also been asked by counsel to make an independent estimate of the lost profit damages incurred by the plaintiff Executive Airlines because of EB's early termination of the March 2000 purchase order agreement (No.   SNL022-96).

3.   My understanding is that the original purchase order contract between the plaintiff and EB was for one year of charter service, with a minimum of 15 round trip flights per month. The gross contract price was fixed at $4,895 per round trip. Service began on April 17, 2000 and was to continue through April 16, 2001. I have been instructed by counsel to use June  7, 2000 as the date of early termination by EB.

4.   This report and the opinions expressed in it are based on my analyses of the information and materials available to me as of this date. I reserve the right to supplement this report in the event that new information becomes available to me.  A complete list of materials I have considered for this particular assignment is included as  Appendix  B.

5.   Analysis Group is being compensated for my work in this case at the rate of $425 per hour.   I was assisted in this report by other professional staff at Analysis Group working under my direction.

## SUMMARY  OF  CONCLUSIONS

6.   As a result of my work in this case, I have come to the following basic conclusions regarding  the  damages  report  prepared  by  Ms. Steiner:

6.1.    Ms. Steiner's damages estimate is seriously flawed and overstates by more than ten times the amount by which the plaintiff was actually damaged.

6.2.    Ms. Steiner totally ignores the fatal crash experienced by Executive Airlines on May 21, 2000 and EB's reaction to it. As a result, her damages calculation erroneously assumes approximately twice the number of flights that EB would have purchased if it had not terminated the   contract.

6.3.    Ms. Steiner's assumptions regarding the cost structure of the plaintiff are fundamentally  incomplete  and  inconsistent  with  basic  economic

principles. She does not consider the fact that some costs which she labels as fixed were also *avoidable* at some point after the contract was terminated (e.g., labor costs and the capital costs associated with the planes themselves). Consequently, she does not allow for any mitigation of the losses experienced by the plaintiff through the elimination of these avoidable costs.

7.  Based on my own independent analysis, I find the lost profit damages to be $83,638, an amount that is more than sufficient to provide the plaintiff a reasonable rate of return on the sales that would have taken place if not for EB's early termination. The rate of return on sales implied by such a damages award (9.4 percent) is more than twice the average rate earned by other airlines operating around the time of the contract.

## EXPECTED REVENUES WITHOUT EARLY TERMINATION

8.  Expected revenues are determined by the contract price and the expected number of flights. I agree with Ms. Steiner's use of a net price of $4553.49 per round trip flight. Executive Airlines invoiced EB at a fixed round trip price of $4,895, which includes $341.5 1 in federal excise tax. This leaves Executive Airlines with a net price of $4,553.49 per round trip flight. I do not agree, however, with Ms. Steiner's assessment of the number of flights that would have occurred absent EB's early termination of the contract.

9.  According to Ms. Steiner's review of Executive Airlines' invoices, EB paid for 30 flights during the first month of service and an additional four flights in the second month.' EB suspended flights during the second month upon learning of the fatal crash experienced by Executive Airlines on May 21, 2000. The contract was terminated by EB in writing on June 7, 2000. In constructing her damages estimate, Ms. Steiner assumes that if EB had not terminated the contract, it would have continued to purchase 30 flights per month. This assumption is inconsistent with the events that occurred after the crash on May 21, 2000 and basic economic principles of consumer behavior.

10. There is a voluminous record from earlier parts of this case indicating that EB executives were deeply concerned about the causes of the crash and its implications for the safety of their employees, particularly because the crash involved a plane that had carried EB personnel just two days before.* Whether

---

[1] See Steiner report, Exhibit B.

[2] See Defendant's Motion for Summary Judgment, October  29, 2004, p. 6.

EB's concerns were justified, of course, is no longer an issue in this case. Instead, the first step in computing lost profit damages is simply to ask what revenues Executive Airlines could have reasonably expected if EB had been forced to comply with the terms of the purchase order contract. Because EB eventually decided to terminate the contract after the crash, it is clear that EB preferred to make alternative arrangements for all of its air travel needs. Consequently, if forced to comply with the terms of the contract, the only logical economic response by EB would have been to allocate as little business as possible to Executive Airlines, specifically 15 flights per month.[3]

## COSTS OF THE ELECTRIC BOAT CONTRACT

11.    The other fundamental flaw in Ms. Steiner analysis is that she divides Executive Airlines' costs into only two categories: those that vary with the amount of time the aircraft is operated (variable costs) and those that do not (fixed cost). She obtained these categorizations from Mr. Bill de Decker, a general aviation industry consultant. Mr. de Decker maintains a database of cost information pertaining to various aircraft, and he offers seminars and financial planning advice to aircraft owners and prospective buyers.[4]

12.    **Avoidable costs.** From an economic perspective, Ms. Steiner's mistake stems from failing to consider the nature of the costs that she treats as fixed. A cost that is fixed from the perspective of adding another flight may still be *avoidable* if no flight service is offered at all. That is, her analysis simply assumes that the assets generating the fixed costs remain deployed in the service of the EB contract, even after the contract no longer exists.[5]

13.    To be clear about Ms. Steiner's conceptual error, suppose that at the time Executive Airlines enters into the EB contract, it hires one additional full-time pilot at an annual salary of $100,000. If the pilot is to be paid regardless of whether a given flight takes place, then the pilot's salary is indeed a fixed cost

---

[3] In an October 31, 2004 affidavit, Mr. Michael Peragine, President of Executive Airlines, testified that he was prepared to subcontract flights to another operator, as was his right under the contract (Peragine affidavit, p. 5). While it is conceivable that under these circumstances EB could have rationally decided to resume its pre-crash purchases, it is likely that in the long-run any subcontractor would have charged Executive Airlines something close to the contract price, leaving Executive Airlines with little profit from such an arrangement.

[4] See Steiner deposition, p. 140 and de Decker deposition, p. 22.

[5] For a brief overview of the various categories of economic costs, including the concept of avoidable costs, see Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization,* 3rd edition, Reading, MA: Addison-Wesley, 2000, pp. 28-29. Avoidable costs are sometimes referred to quasi-fixed costs. See Hal R. Varian, *Intermediate Microeconomics,* 5th edition, New York: W.W. Norton, 1999, pp. 353-54.

from the perspective of operating an additional flight. But suppose the pilot is laid off or tired after the EB contract is terminated. The pilot's labor cost is clearly avoidable once there is no longer a need to serve the contract.

14.  Ms. Steiner's analysis fails to take into account that when EB terminated the contract, nothing compelled Executive Airlines to retain the labor, planes, hangar space, and other assets it had acquired to serve the EB contract. These investments that were made to serve the EB account could have been reversed. Planes can be sold or leased, workers dismissed, insurance canceled, hangar space sublet---or these assets can be redeployed to other accounts if the business can be expanded. Ms. Steiner's analysis assumes that these additional assets remained locked in place for close to a full year upon termination of the EB contract.

15.  **Aircraft costs.** One of the most important types of costs handled incorrectly by Ms. Steiner are the costs associated with the additional planes obtained for purposes of serving the EB contract. Because planes are highly mobile assets that can be redeployed, sold, or leased, they must be considered avoidable for purposes of calculating the damages related to the termination of the EB contract.

15.1.  The Department of Justice must regularly make decisions regarding the classification of airline costs when deciding whether to pursue charges of predatory pricing, and in the past the Department has classified airplanes as avoidable costs. In a 1997 speech before the American Bar Association, Roger Fones, former Chief of the Transportation, Energy, and Agriculture Section of the Antitrust Division, explained the economic logic in the following way: "A key issue in any airline predation analysis is the correct treatment of aircraft costs. In the very short run, a carrier's fleet is fixed, and its costs of leasing or owning its aircraft are fixed and unavoidable. On the other hand, aircraft are not like rail lines or electric power lines-they are mobile assets that are reasonably marketable, at least up to a point. Therefore, we treat aircraft costs as avoidable within a relatively short to medium time frame. The time period can be even shorter if a carrier can profitably redeploy aircraft from the route in question to another route."[6]

15.2.  Similarly, economist Alfred Kahn, the former chairman of the Civil Aeronautics Board, pointed out that planes and other airline investments considered to be fixed costs from the perspective of an individual flight are properly treated as variable costs when they are incurred as part of a large incremental increase in service: "The level of incremental cost per

---

[6] Roger W. Fones, "Predation in the Airline Industry." Remarks Before the American Bar Association Forum on Air and Space Law, Seattle, Washington, June 12, 1997.

unit depends, also, on the size of the increment.. . [I]s the incremental unit of sales the provision of regular service between a pair of cities, involving an entire schedule of flights? In this case, still more costs enter into the marginal calculation-airport rentals, ticket offices, the cost of advertising in local newspapers, indeed the cost of the planes themselves, which need not be acquired or can be used in other service. The larger the incremental unit of service under consideration, the more costs become variable."[7]

16. The fact that aircraft costs are ultimately avoidable represents an important opportunity for the mitigation of damages by Executive Airlines. Moreover, because other costs may be tied to the existence of the planes, elimination of the aircraft costs also allows for the elimination of other costs Ms. Steiner considers to be fixed (e.g., pilots and maintenance personnel, hangar space, insurance).

17. In order to incorporate reasonable mitigation by Executive Airlines into my damages estimate, I first convert the one-time capital expenditures on the aircraft into equivalent monthly rental costs, often referred to as the user cost of capital. To do this, I follow a well established methodology that combines information on the aircraft's market value, the depreciation of the market value over time, and the rate of return that could have been earned if the money spent upfront had been put in an alternative investment over time with similar risk.[8] The idea is to estimate the rental cost of the aircraft that would be set in a competitive market by an owner of the same type of aircraft that was actually purchased. This methodology is described in detail in Appendix C.

18. Parts A and B of Exhibit 1 show the various inputs used in the monthly rental cost calculation. Part C of Exhibit 1 shows the resulting monthly rental cost. These are the aircraft costs that I use in computing the total profits earned by Executive Airlines with and without early termination of the EB contract. By spreading the initial investment in the aircraft into an equivalent rental cost over time, I can then eliminate a portion of the aircraft costs and other related costs (e.g., labor, hangar space, insurance) to allow for mitigation of the damages by Executive Airlines.

19. **The adjustment period for eliminating avoidable costs.** While planes are avoidable costs, they are not perfectly liquid assets. Consequently, in my damages analysis I allow for a six month adjustment period before I eliminate the avoidable costs associated with the EB contract. I base this adjustment period on economic

---

[7] Alfred E. Kahn, *The Economics of Regulation,* Cambridge, MA: The MIT press, 1988, p. 75

[8] See Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics,* 6th edition, Upper Saddle River, NJ: Prentice Hall, 2005, pp. 225-227.

research into the relationship between the selling price of used aircraft and the financial condition of the seller, as well as data on inventory turnover by aircraft dealers and brokers.'

19.1.    Any asset can be sold quickly if one lowers the selling price enough. Previous research into the sales of used aircraft indicates that carriers in financial distress sell aircraft at a 14 percent discount to the average market price, provided that the airline industry in general is experiencing depressed conditions."

19.2.    Part C of Exhibit 1 shows that shortly after the date of early termination, the two Jetstream aircraft would have had a combined market value of $1,948,908.[11] Therefore, selling the aircraft immediately at a 14 percent "fire sale" discount is equivalent to absorbing an additional rental cost of approximately $270,000.

19.3.    In order to determine the length of time equivalent to absorbing a one-time reduction in market value of approximately $270,000, I start at the contract termination date and cumulatively add in one month increments the rental cost values from Part C of Exhibit 1. After six months I reach approximately $270,000. This indicates that a 6 month adjustment period is approximately equal to requiring Executive Airlines to sell the aircraft immediately at "fire sale" prices, and is therefore consistent with previous economic research.

19.4.    An average adjustment period of six months is also consistent with data on the sales and inventories reported by aircraft dealers and brokers. In the second quarter of 2000, according to aviation market statistics (AMSTAT) data made available by the National Aircraft Resale Association, 282 turboprop aircraft were sold out of a total supply of 1,115, indicating on average a 33 percent chance of an acceptable offer in

---

[9] Leasing was another option for Executive Airlines to eliminate avoidable aircraft costs. Leasing has grown significantly since the mid-1980s and lessors are active participants in the market for used aircraft. See Allesandro Gavazza, "Leasing and Secondary Markets: Theory and Evidence from Commercial Aircraft," Yale School of Management Working Paper, July 2006, pp. 2-3, available at http://www.som.yale.edu/faculty/ag562/aircraftleasing.pdf.

[10] See Todd C. Pulvino, "Do Asset Fire Sales Exist? An Empirical Investigation of Commercial Aircraft Transactions," *Journal of Finance*, Vol. 53(3), June 1998, pp. 939-978. It is not at all clear that the airline industry was experiencing depressed conditions during 2000. In fact, airline industry stock indexes constructed by Bloomberg, Standard & Poor's, and the American Stock Exchange, are higher at the end of 2000 than around the time of contract termination.

[11] See the market value figure for contract month 3 in column [I] of Exhibit 1, Part C.

that quarter. At that rate of turnover, the probability of at least one acceptable offer after two quarters increases to approximately 56 percent. [12] While the data indicate that in the third and fourth quarters of 2000 inventory turnover did slow, the probability of at least one acceptable offer in a six month period remains about 50 percent.

19.5.    Finally, the empirical evidence in support of a six month adjustment period is consistent with informal anecdotal evidence found in a search of various online appraisal and brokerage companies dealing with used aircraft. For example, Brian M. Jacobson, author of the book "Purchasing & Evaluating Airplanes," states: "In my experience, an airplane that is properly priced will sell within 90 days, while it can take as long as six months or more to sell an airplane that has been overpriced."[13] Similarly, Capital Aircraft Sales advises prospective clients on its website that: "The length of time it takes to sell your aircraft is dependent on a number of factors and can range from a few days to much longer. The average is right around 90-120 days hence the normal Listing Agreement period of 120 days used by most brokers."[14]

20.    As Part A of Exhibit 1 indicates, the aircraft acquired by Mr. Peragine because of the EB contract were not sold until 2003. From an economic perspective, the actual date of sale does not determine the relevant adjustment period. Executive Airlines may have simply retained these assets in the hope of new business that never materialized. There were a number of factors that occurred well after the contract termination date that may have made it difficult for Executive Airlines to find new business-lingering concerns regarding the May 2000 crash, the national recession that occurred during 2001, and of course the events of September 11, 2001.[15]    Regardless of the reasons, however, the fact that Executive Airlines did not eliminate the avoidable costs of the EB contract within a reasonable period of time means that Ms. Steiner's damages estimate is seriously overstated.

---

[12] Probabilities are computed in Excel using the formula for a binomial distribution. Probabilities based on these data understate the true probability of making a sale given that not all sales are made through dealers/brokers. Moreover, actual data on unsold inventory will reflect some sellers who have overpriced their aircraft.

[13] See http://www.aeroappraisers.com/Online%20Evaluation%20Page.htm.

[14] See http://www.capital-aircraft.com/Selecting%2a%20Broker.htm. Capital Aircraft Sales appears to deal primarily in general aviation aircraft. Aircraft Shopper Online, which was founded in 1995 and lists aircraft such as the Jetstream 3 1, contains numerous testimonials from customers selling planes in less than six months. See http://www.aso.com/i.aso3/staticcontent.jsp?which=asoinfo/testimnl&iaso3sid=1.

[15] The 2001 recession in the U.S. began in March 2001 and continued until November 2001. See Robert Hall et al., "The NBER's Business-Cycle Dating Procedure," October 21, 2003, p. 1, available at http://www.nber.org/cycles/recessions.pdf.

## LOST PROFIT DAMAGES FROM EARLY TERMINATION

21.    **Overview.** In this section I describe the methodology I use to compute lost profit damages. I first estimate Executive Airlines' profits without early termination by EB. Then, I estimate Executive Airlines profit with early termination, but with the elimination of avoidable costs after the six month adjustment period described above.    Damages are then simply Executive Airline's profits *without* early termination minus the profits earned *with* early termination, assuming reasonable mitigation of damages by Executive Airlines in the latter scenario.

22.    The first step in constructing these scenarios was described earlier in connection with the expected revenues of the EB contract after the May 2000 crash. When estimating Executive Airlines' profits without early termination, I use the minimum of 15 flights per month specified in the contract for all months after the first month. The second step is to classify properly Executive Airlines' costs and identify the fixed but avoidable costs ignored by Ms. Steiner.

23.    **Classification of plaintiff costs.**    According to Mr. Peragine, the EB contract represented a significant increase in business, and as a result he undertook a number of activities to begin to fulfill that contract, including the acquisition of additional aircraft, leasing additional hangar space, and adding flight crew and maintenance personnel. As discussed previously, Exhibit 1 shows the capital costs associated with the aircraft acquired because of the EB contract.

24.    In Exhibit 2, I summarize the plaintiffs filings regarding other contract costs.[16]

   24.1.    Ms. Steiner computes a cost per flight of $1,850 using information provided by Mr. de Decker. Mr. de Decker provided Ms. Steiner with one of his standard cost reports for the Jetstream aircraft, with the exception of fuel and labor cost figures, which were provided by Ms. Steiner and/or Mr. Peragine.[17]

---

[16] I subsequently use these plaintiff-provided costs in my damages calculations, but this should not be taken as an endorsement of the accuracy of these costs. My work in this matter is ongoing and I reserve the right to modify these inputs to my analysis should further study reveal them to be incorrect.

[17] See de Decker deposition, pp. 42, 71-72. Mr. de Decker was not provided any supporting documentation for these fuel and labor cost figures. In addition, Ms. Steiner indicates that eight of the flights purchased by EB in the first month were subcontracted to another airline, but she did not obtain the costs charged by the subcontractor to Executive Airlines (Steiner report, p. 6; Steiner deposition, p. 137). If the subcontractor has a similar cost structure to Executive Airlines and adds a profit margin to its costs, the profit earned by Executive Airlines on those flights would be reduced. If Executive Airlines maintained this practice of subcontracting flights throughout the contract period, Ms. Steiner's damages estimate would be overstated.

24.2.    Mr. Peragine provided estimates of additional contract costs in earlier interrogatory responses and in documents prepared for earlier parts of the case. Ms. Steiner treats all of these costs as fixed. In most cases, I agree that these costs will not vary with the number of flights." As described earlier, however, it is important to assess whether any of these fixed costs are avoidable. Consequently, in Exhibit 2 I separate the costs identified in earlier plaintiff submissions into those that are not recoverable (sunk costs) and those that are recoverable (avoidable costs)."

25.    Exhibit 3 pulls together the various elements of the damages analysis described above and shows how I arrive at my damages estimate.

25.1.    Part A shows Executive Airlines' profits without early termination of the contract. In this scenario, EB is considered to be a rational consumer and purchases as few flights as possible without violating the contract after the crash experienced by Executive Airlines in May 2000.[20] Given the fixed costs that occur throughout the length of the contract, I estimate that Executive Airlines would experience a loss on the contract of $650,663.[21]

25.2.    Part B shows Executive Airlines' profits with early termination of the contract on June 7, 2000. As discussed earlier, I allow for a six month adjustment period for the elimination of avoidable fixed costs. Consequently, I allow Executive Airlines to continue to absorb the avoidable fixed costs of the EB contract through December 7, 2000, at

---

[18] Mr. Peragine testified that some pilots were paid by the day, and so these labor costs would vary with the number of flights (Peragine deposition, volume 2, p. 296).

[19] I did not include in this summary the additional maintenance costs, loss of fuel discount, or financing costs claimed by Mr. Peragine (see response to defendant's first set of interrogatories, November 6, 2002, p. 2). Ms. Steiner's variable cost estimate supposedly incorporates fuel and ongoing maintenance costs. Financing costs are captured by my equivalent rental cost estimates in Exhibit 1.

[20] My understanding is that EB also had the right to terminate the contract without penalty after giving six months advance notice of termination.    If I were to allow EB to give advance notice on 6/07/00, there would be no sales in Part A of Exhibit 3 after 12/07/00. My damages estimate would be approximately the same or lower after allowing for a reasonable adjustment period for the elimination of avoidable costs after flight operations end.

[21] Provided the various operating cost and purchase/sale documents produced by the plaintiff are correct, Executive Airlines would have incurred an economic loss during the first year of the contract until the number of flights reached approximately 36 per month. The contract required Executive Airlines to have the capacity to handle 12 round trip flights per week or approximately 52 flights per month. See Purchase Order SNL022-096 Supplement 001, p. 3 (Exhibit A to the Steiner report).

which point I eliminate all avoidable costs.[22]   In this scenario, as expected, Executive Airlines does worse, incurring a greater loss of $734,301.

25.3.       Part C summarizes the lost profit damages. In each of the prior scenarios Executive Airlines experiences a loss, but the loss is smaller without early termination of the contract. Damages in this case represent the reduction in Executive Airlines' loss. Consequently, damages equal $83,638. This is less than one-tenth of the amount claimed by Ms. Steiner.

## PROFITS IN THE AIRLINE INDUSTRY

26.     As a check on the reasonableness of my damages estimate, I compute the rate of return on sales associated with the damages estimate. As shown in Part C of Exhibit 3, my estimated damages of $83,638 represent a 9.4 percent return on the sales that would have occurred absent the early termination.   In contrast, Ms. Steiner's damages estimate of $88 1,362 represents a 99.3 percent return on sales.

27.     The rate of return on sales associated with my damages estimate is generally consistent with the operating profit margins earned by the airline industry over time, and Executive Airlines in particular.

27.1.       When asked about the gross profit margin for Jetstream aircraft operated by Executive Airlines, Mr. James B. Ahlfeld, a former accountant at Executive Airlines, could not recall an exact figure, but he testified that "from my experience in the business in some of the airlines I have worked for, if you could get to the bottom line and be at five percent of revenue, you were doing pretty good."[23]

27.2.       When Mr. Ahlfeld was asked whether he ever calculated a gross margin for Executive Airlines on its [Jetstream] 3 100 aircraft that was materially better than five percent of revenue, he replied:  "I don't think materially better. I might have calculated some numbers that could have been in the range of eight percent, but I would be very surprised."[24]

---

[22] Sunk cost investments for certification and training are accounted for in the first contract month in both Parts A and B of Exhibit 3. Because the sunk costs appear in both parts, they do not affect total damages.

[23] See Ahlfeld deposition, p. 53.

[24] See Ahlfeld deposition, p. 54.

28.   For additional perspective on operating profit margins during the period in question, I computed the operating profit margins for the airline industry using data compiled by the Department of Transportation's Bureau of Transportation Statistics (BTS).

29.   Exhibit 4 lists the operating profits, revenues, and operating profit margins for all airlines in the BTS data operating continuously from the third quarter of 1999 through the second quarter of 200 1 .[25] The period analyzed begins with the quarter during which the contract was being negotiated and extends through the full term of the contract. The time period does not include the severe downturn in the airline industry caused by the events of September 11, 2001. By focusing on airlines in continuous operation, I overstate the margin for the industry as a whole, which includes a number of failing firms with abnormally low margins.

30.   Exhibit 4 shows a wide variation in the operating margins experienced by individual airlines. In Exhibit 4 the airlines are ranked from smallest to largest in term of total revenue over the period.  In general, airlines with higher revenues had higher margins.  For this group of airlines as a whole, the profit margin is 3.8 percent over the period, with a median margin of only 1.0 percent. Note that the list of airlines includes Trans States Airlines (margin = 1.2 percent), a company that also flew the Jetstream aircraft used by Executive Airlines.[26]

31.   The distribution of airline industry margins is summarized by the histogram shown in Exhibit 5. The histogram shows that a profit to sales ratio of 9.4 percent is located well into the upper end of the distribution of returns. This additional perspective on airline industry profitability confirms that a damages award of $83,638 would be more than reasonable.

32.   In contrast, Ms. Steiner's damages estimate of $881,362 represents a 99.3 percent return on the sales that would have occurred absent the early termination by EB. This extreme upward bias in her damages estimate results from: (1) her failure to account for the effect of the May 2000 crash on the number of flights EB was willing to purchase; and (2) her failure to allow for any mitigation of damages through the elimination of avoidable costs.   There is simply no economic justification for such a large overstatement of Executive Airlines' lost profits.

---

[25] Operating profits reported by the BTS are net of general and administrative expenses and depreciation, but not interest and taxes.

[26] See de Decker deposition, pp. 67-68.

July 17, 2006

George Kosicki

**List of Appendixes and Exhibits**

<u>Appendixes</u>

Appendix A: CV of George Kosicki (Includes Testimony in the Last Four Years)

Appendix B: Documents Considered

Appendix C: Methodology for Calculating the Monthly Aircraft Rental Cost

<u>Exhibits</u>

Exhibit 1: Monthly Rental Cost for Jetstream Aircraft

Exhibit 2: Plaintiff Estimates of Costs Associated with EB Contract

Exhibit 3: Damages from Early Termination of EB Contract

Exhibit 4: Operating Profit Margins by Airline: 1999 Q3 – 2001 Q2

Exhibit 5: Distribution of Airline Profit Margins: 1999 Q3 – 2001 Q2

APPENDIX  A


# GEORGE  KOSICKI,  Ph.D.
## Vice  President

Phone:  (617)  4258162

Fax: (617) 425-8001

gkosicki@analysisgroup.com

111 Huntington Avenue

Tenth Floor

Boston,  MA  02199

Dr. Kosicki specializes in applied microeconomics and has consulted in the areas of antitrust, mergers and acquisitions, labor economics, and pharmacoeconomics. He has also served as an expert witness on liability and damages in cases involving antitrust and labor economics. Dr. Kosicki has worked extensively on issues of cost pass through and damages in indirect purchaser litigation stemming from global price fixing conspiracies. He is experienced in market definition analyses, including those in the pharmaceutical industry, and the estimation of demand elasticities using retail scanner data. Dr. Kosicki worked with Analysis Group academic affiliate Robert S. Pindyck on behalf of P&O Princess Cruises plc during the Federal Trade Commission's review of Princess Cruises' merger with Carnival. For a proposed merger in the telecommunications industry, he analyzed competition and pricing for international long distance service. Dr. Kosicki's research in pharmacoeconomics has focused on measuring the cost-effectiveness of treatment for cancer patients.

Prior to joining Analysis Group, Dr. Kosicki served as Chair of the Economics Department at the College of the Holy Cross, where he spent 15 years on the faculty teaching principles of economics, microeconomic theory, industrial organization, and labor economics. He also wrote the book *Labor Market Problems and Applications* to accompany the best selling labor economics textbook *Modern Labor Economics* by Ehrenberg and Smith. Dr. Kosicki's research has been published in several peer-reviewed journals, including *Southern Economic Journal* and *Journal of Economic Education.*


## EDUCATION

Ph.D. in Economics, Cornell University, 1985

M.A. in Economics, Come11 University, 1984

B.A. in Economics, John Carroll University, 1981


## SELECTED  CASEWORK

.   **Non Participating Manufacturer (NPM) Adjustment Proceeding Under the Tobacco Master Settlement Agreement Between the Settling States and the Participating Manufacturers**
    *Arbitration Proceeding Before Professor Daniel McFadden and the* **Brattle** *Group*
    On behalf of the Settling States, supported Professors Robert Pindyck and Jonathan Gruber in an analysis of whether the disadvantages of the 1998 Master Settlement Agreement were a "significant factor" contributing to the Market Share Loss of the Participating Manufacturers in 2003. The NPM Adjustment Proceeding pertained to a potential adjustment in settlement payments totaling approximately one billion dollars.

- **HDC Medical, Inc. v. Minntech Corporation**
  *United States District Court, District of Minnesota, File No. 04-CV-143 ADM/AJB*
  Expert report and deposition testimony in rebuttal of plaintiffs claim of attempted monopolization and anticompetitive tying; report addressed market definition, liability, and damages issues pertaining to defendant's sales of kidney dialysis reprocessing equipment and supplies. Judge approved defendant's motion for summary judgment, citing expert report.

- **Agri-King, Inc., et al. v. Akzo Nobel, Inc., et al.**
  *State of Minnesota, District Court, County of Ramsey, Second Judicial District*
  **Pratt Feeders, LLC, et al. v. F. Hoffman-La Roche, Ltd., et al.**
  **Steven L. Cox, et al. v. Aventis Animal Nutrition, Inc., et al.**
  *District Court of Wyandotte County Kansas*
  Analyzed damages claims by indirect purchasers of vitamin-containing animal feed products that were artificially inflated in price.

- **Remeron Antitrust Litigation**
  *United States District Court, District of New Jersey*
  Supported Professor Janusz Ordover in an analysis of market definition for antidepressant drugs.

- **Northland Cranberries v. Ocean Spray Cooperative**
  *United States District Court, District of Massachusetts*
  Supported Professor Robert Pindyck in an analysis related to allegations of monopolization and unfair competition pertaining to sales of cranberries, concentrate, and retail juice products.

- **Verizon New England, Inc. v. D.W. White Construction Company, et al.**
  *Commonwealth of Massachusetts (Suffolk County), Superior Court C.A. No. 00-0723-G*
  Deposition testimony (March 14, 2003) evaluated the wage rate and total labor costs billed by Verizon New England in its attempt to recover damages from D.W. White and others for an excavation accident.

- **Kellogg Company v. BASF AG, et al.**
  *United States District Court, District of Columbia*
  Supported Professor Robert Pindyck in an analysis of the lost profits incurred by an indirect purchaser of an input that was artificially inflated in price.

- **P&O Princess Cruises plc**
  *Before the Federal Trade Commission*
  Supported Professor Robert Pindyck in an analysis of the economic effects of a proposed merger in the cruise industry.

- **EF Institute for Cultural Exchange, et al. v. Explorica, Inc., et al.**
  *United States District Court, District of Massachusetts, C.A. No. 01-10645MEL*
  Expert affidavit addressed the economic effect that the electronic collection of publicly available price information by a competitor has on market competition.

Page 2

- **WorldCorn-Sprint Merger**

  *Before the Antitrust Division of the U.S. Department of Justice*
  Analysis of the market power implications of the proposed merger; potential unilateral price increases were predicted through market simulations within a differentiated products framework.

## PRIOR RESEARCH EXPERIENCE

Dr. Kosicki has conducted several empirical studies of the effects of community consumption standards on individual decisions to work and save. These studies utilized large micro data sets, including the Consumer Expenditure Survey, the Current Population Survey, and the National Longitudinal Survey.

## PUBLICATIONS

### Refereed Journals

"Economics of Cost Pass Through and Damages in Indirect Purchaser Antitrust Cases" (with Miles Cahill), *The Antitrust Bulletin,* forthcoming, Fall 2006.

"Cost-Minimization Analysis of Once-Weekly Versus Thrice-Weekly Epoetin Alfa for Chemotherapy-Related Anemia" (with Pierre Y. Cremieux, John M. Fastenau, Catherine T. Piech, A. Mark Fendrick), *Journal of Managed Care Pharmacy,* November/December 2004, 531-537.

"Exploring Economic Models Using Excel" (with Miles Cahill), *Southern Economic Journal,* January 2000, 770-792.

"Interpersonal Comparisons and Labor Supply: An Empirical Analysis," *The American Economist,* Spring 1993, 20-34.

"Linking the Production Possibilities Curve, the Supply Curve, and the Competitive *Norm," Journal of Economic Education,* Fall 1991, 307-3 11.

"Income Redistribution and Aggregate Consumption: Implications of the Relative Income Hypothesis," *The American Economist,* Spring 1990, 40-44.

"A Note about Savings as a Nonpositional Good," *Eastern Economic Journal,* July-September 1988, 271-276.

"A Test of the Relative Income Hypothesis," *Southern Economic Journal,* October 1987, 422-434.

"The Relative Income Hypothesis: A Review of the Cross Section Evidence," *Quarterly Journal of Business and Economics,* Autumn 1987, 65-80.

### Books

*Student Learning Guide: Labor Market Problems and Applications* to accompany Ehrenberg and Smith *Modern Labor Economics,* 6th edition. Reading, MA: Addison Wesley, 1997. (5th edition published in 1994 by Harper Collins.)

**Other    Articles**

"A Framework for Developing Spreadsheet Applications in Economics" (with Miles Cahill), *Social Science Computer Review,* Summer 2001, 186-200 (invited article).

"Using Spreadsheets to Explore Neoclassical Assumptions in a New Keynesian Model" (with Miles Cahill), *Computers in Higher Education Economics Review,* Volume 14, No. 2, 2000.

"Antitrust Policy" and "The Relative Income Hypothesis" in *Survey of Social Science: Economics,* edited by Frank N. Magill, Pasadena: Salem Press, 1991, 55-61 and 1980-1985 (subsequently published as *International Encyclopedia of Economics,* Fitzroy Dearborn Publishers, 1997).

"The Temporary Workforce: An Economic Appraisal," *The Margin,* September/October 1990, 27.

**Book Reviews**

*The Antitrust Revolution,* edited by John E. Kwoka, Jr. and Lawrence J. White, *The American Economist,* Spring 199 1.

*The New Unionism: Employee Involvement in the Changing Corporation* by Charles C. Heckscher, *Southern Economic Journal,* October 1989.

*Deindustrialization and Plant Closure,* edited by Paul D. Staudohar and Holly E. Brown, *Southern Economic Journal,* April 1988.

*The New Industrial Organization* by Alexis Jacquemin, *The American Economist,* Fall 1987.

**OTHER PROFESSIONAL ACTIVITIES**

Referee for the *Journal of Economic Behavior and Organization, Journal of Economic Education, Quarterly Review of Economics and Business, The American Economist, Defence and Peace Economics*

Textbook reviewer for Harper Collins, McGraw Hill, Oxford University Press

Member of the American Economic Association, associate member of the American Bar Association

**TESTIMONY IN THE LAST FOUR YEARS**

.    **Verizon New England, Inc. v. D.W. White Construction Company et al.**
     *Commonwealth of Massachusetts (Suffolk County), Superior Court C.A. No. 00-0723-G*
     Deposed March 14, 2003.

.    **HDC Medical, Inc. v. Minntech Corporation**
     *United States District Court, District of Minnesota, File No. 04-CV-143 ADM/AJB*
     Deposed August 26, 2005.

**Appendix B**

**Documents    Considered**

**Court   Filings**

Affidavit of Michael S. Peragine, Docket #02-CV-194 (JCH), October 3 1, 2004.

"Defendant Electric Boat Corporation's Answer, Affirmative Defenses, and Counterclaim in Response to Plaintiffs Second Amended Complaint Dated June 14, 2004," Civil Action No. 02-CV-194 (JCH), October 8, 2004.

"Defendant's Motion for Summary Judgment," Civil Action No. 02-CV-194 (JCH), October 29, 2004.

"Disclosure Pursuant to Rule 26, Fed. R. Civ. Proc.," 02-CV-194 (GLG), July 12, 2002.

"Exhibits on Plaintiffs Motion for Summary Judgment," Civil Action No. 02-CV-194 (JCH), November 7, 2004.

Expert Report of Diane S. Steiner, CPA, May 3 1, 2006, including Exhibits.

"Local Rule 56(A)1 Statement," Civil Action No. 02-CV-194 (JCH), October 29, 2004.

"Plaintiff, Answering Defendant's First Set of Interrogatories," Civil Action No. 02-CV-194 (GLG), November 6, 2002.

"Plaintiff Executive Airlines' Memorandum of Law on its Motion for Summary Judgment," Civil Action No. 02-CV-194 (JCH), November 7, 2004.

"Second Amended Complaint," Docket #02-CV-194 (JCH), June 14, 2004.

Summary Judgment Decision of Judge Gerard L. Goettel, No. 3:02CV0194 (GLG), July 17, 2003.

**Depositions**

Deposition of James B. Ahlfeld, Civil Action No. 02-CV-194 (GLG), May 20, 2004 (including Exhibits).

Deposition of Bill de Decker, 3:02-CV-194 (WWE), June 13, 2006 (including Exhibits).

Deposition of Michael Peragine, Volume 1, Docket No. 02-CV-194 (GLG), December 16, 2003 (including Exhibits).

Deposition of Michael Peragine, Volume 2, Docket No. 20-CV-194 (GLG), March 20, 2004 (including Exhibits).

Deposition of Diane S. Steiner, CPA, Civil Action No. 3:02-CV-194 (WWE), June 15, 2006 (including Exhibits).

**Economic Methodology and Research**

Alfred E. Kahn, *The Economics of Regulation,* Cambridge, MA: The MIT Press, 1988, p. 75.

Dennis W. Carlton, & Jeffrey M. Perloff, *Modern Industrial Organization,* 3rd Edition, Reading, MA: Addison-Wesley, 2000, pp. 28-29.

Hal R. Varian, *Intermediate Microeconomics,* 5th Edition, New York: W.W. Norton, 1999, pp. 353-354.

Robert Hall, et al., "The NBER's Business Cycle Dating Procedure," October 21, 2003, p. 1. Available at: http://www.nber.org/cycles/recessions.pdf.

Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics,* 6th Edition, Upper Saddle River, NJ: Prentice Hall, **2005,** pp. 225-227.

Roger W. Fones, "Predation in the Airline Industry." Remarks Before the American Bar Association Forum on Air & Space Law, Seattle, Washington, June 12, 1997. Available at http://www.usdoj.gov/atr/public/speeches/1188.pdf.

Todd Pulvino, "Do Asset Fire Sales Exist? An Empirical Investigation of Commercial Aircraft Transactions," The *Journal of Finance,* June 1998, Vol. 53, No. 3: pp. 939-978.

### Industry Background

Air Transport Association – Annual Reports: 2000, 2001, 2002. Available at: http://www.airlines.org/econ/d.aspx?nid=8156.

"Aircraft Shopper Online" webpages (company overview, BAe Jetstream 3 1 ad, testimonials). Available at: http://www.aso.com/.

Allesandro Gavazza, "Leasing and Secondary Markets: Theory and Evidence from Commercial Aircraft," Yale School of Management Working Paper, July 2006. Available at: http://www.som.yale.edu/faculty/ag562/aircraftleasing.pdf.

Description of used aircraft sales by Brian M. Jacobson. Available at: http://www.aeroappraisers.com/Online%20Evaluation%20Page.htm.

"Selecting a Broker" webpage. Available at:http://www.capital-aircraft.com/Selecting%20a%20Broker.htm.

Thomas W. Gilligan, "Lemons and Leases in the Used Business Aircraft Market," *Journal of Political Economy,* Vol. 1 12, No. 5, October 2004, pp. 1157-l 180.

### Data

Airline industry stock price indexes (from Bloomberg).

AMSTAT, "Market Statistics for Retail Sales, Number of Aircraft for Sale by Quarter 2000-2005." Available through National Aircraft Resale Association, Available at: http://www.nara-dealers.com/resourcelib/mkttrends/NARAmktstat063005.pdf.

Bureau of Transportation Statistics, Air Carrier Financial Reports Schedule: P-1 1 and P-1 2. Available at: http://www.transtats.bts.gov/databases.asp?Mode_ID=1&Mode_Desc=Aviation&Subject_ID2=0

*Cost of Capital 2000 Yearbook,* Chicago: Ibbotson Associates, 2000: pp. n-m; 1-48; 4-l 1.

## APPENDIX C

## METHODOLOGY FOR CALCULATING THE MONTHLY AIRCRAFT RENTAL COST

This Appendix describes the economic methodology used to convert one-time capital expenditures to an equivalent monthly rental cost (often referred to as the user cost of capital).'

The equivalent monthly rental cost ($R$) is computed by multiplying the market value of the aircraft ($V$) at the beginning of the month by the sum of the economic depreciation rate ($D$) and the rate of return ($I$) that could have been earned by the owner had the money been invested in an alternative investment with similar risk. That is,

$$R = V(D + I).$$

 Exhibit 1 shows the rental cost calculation pertaining to the two Jetstream aircraft acquired by Mr. Michael Peragine, President of Executive Airlines, for purposes of serving the EB account.[2] Part A of Exhibit 1 shows the calculation of the average monthly economic depreciation based on the purchase and sales records of the two aircraft. These aircraft were purchased slightly before the starting date of the EB contract, and at the time of purchase had a combined market value of $2,059,312.

An estimate of the rate of return on investments with similar risk ($I$) is given by the weighted average cost of capital (WACC) associated with all airline industry investments in 2000. In this case, I convert the annual WACC of 13.51 percent reported

---

[1] See Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics,* 6th edition, Upper Saddle River, NJ: Prentice Hall, 2005, pp. 225-227.

[2] According to Executive Airlines' flight/maintenance logs (Steiner report, Exhibit C), three aircraft were actually used for the EB account (N16EJ, N16EX, and N404GJ). Because no information was provided on the N16EJ or N16EX aircraft, I use the information on the N404GJ and N16EN. Mr. Peragine testified that the N16EN aircraft would have been used on EB flights, but was in the process of being renovated when the contract began. He indicated that the renovation "may have been 80 or 90 percent completed" (Peragine deposition, vol. 2, pp. 246-47). **No** documentation was submitted on the cost of this renovation. The final sales price of the N16EN aircraft should reflect the renovation, however, so my economic depreciation rate may be understated. Similarly the document titled "March 31, 2001 Snap-Shot of Aircraft Values & Operating Losses" prepared by Mr. Peragine implies a faster depreciation rate than I compute. Because the aircraft rental cost becomes avoidable at some point, however, using such a higher economic depreciation rate would only serve to reduce my damages estimate.

by Ibbotson Associates into a monthly WACC of 1.06 percent.[3] This is shown in Part B of Exhibit 1.

In Part C of Exhibit 1, I combine the economic depreciation and WACC estimates into an estimate of the monthly rental cost. In the first month, the combined aircraft market value at the beginning of month ($1,999,831) is multiplied by the sum of the economic depreciation rate and the WACC, which I refer to as the equivalent rental rate (2.34 percent). This multiplication yields a monthly rental cost of $46,882 for the two Jetstream aircraft. At the beginning of the second month, the first month's market value is depreciated by 1.28 percent, and then that market value is multiplied by the rental rate of 2.34 percent to yield a rental cost in the second month of $46,280. The same procedure is followed for subsequent months and the rental cost values are shown in Part C of Exhibit 1.



---

[3] See Ibbotson Associates, *Cost of Capital 2000 Yearbook,* Chicago: lbbotson Associates, 2000, p. 4-11.

Exhibit 1

Monthly Rental Cost for Jetstream Aircraft

[A]  Economic Depreciation of Jetstream Aircraft

| | [1] | [2] | [3] | [4] | [5] | | [6] | [7] | [8] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Transaction | Prices | | Economic Depreciation | |
| Aircaft Tail No. | Date of Purchase | Date of Sale | Total No. of Months Owned | No. of Months Owned before Contract Start | Purchase | | Sale | Monthly | Annual |
| N404GJ | 12/21/99 | 10/01/03 | 45.4 | 3.9 | $ 1,295,000 | $ | 775,000 | 1.12% | 14.36% |
| N16EN | 03/30/00 | 08/11/03 | 40.4 | 0.6 | $ 764,312 | $ | 425,000 | 1.44% | 18.73% |
| N16EX | n/a | n/a | da | n/a | n/a | | n/a | n/a | n/a |
| N16EJ* | n/a | n/a | n/a | n/a | n/a | | n/a | n/a | n/a |
| Total | | | | | $ 2,059,312 | $ | 1,200,000 | | |
| Average | | | | 2.3 | | | | 1.28% | 16.54% |

[B]  Weighted Average Cost of Capital  (WACC)

| [1] | [2] |
|---|---|
| Annual | Monthly |
| 13.51% | 1.06% |

[C]  Calculation of Monthly Rental Cost

| | | | [1] | [2] | [3] | [4] | [5] | |
|---|---|---|---|---|---|---|---|---|
| Contract Month | Begin Date | End Date | Aircraft Market Value | Economic Depreciation | WACC | Rental Rate | Aircraft Rental | Cost |
| 1 | 04/17/00 | 05/16/00 | $ 1,999,881 | 1.28% | 1.06% | 2.34% | $ | 46,882 |
| 2 | 05/17/00 | 06/16/00 | $ 1,974,230 | 1.28% | 1.06% | 2.34% | $ | 46,280 |
| 3 | 06/17/00 | 07/16/00 | $ 1,948,908 | 1.28% | 1.06% | 2.34% | $ | 45,687 |
| 4 | 07/17/00 | 08/16/00 | $ 1,923,911 | 1.28% | 1.06% | 2.34% | $ | 45,101 |
| 5 | 08/17/00 | 09/16/00 | $ 1,899,235 | 1.28% | 1.06% | 2.34% | $ | 44,522 |
| 6 | 09/17/00 | 10/16/00 | $ 1,874,875 | 1.28% | 1.06% | 2.34% | $ | 43,951 |
| 7 | 10/17/00 | 11/16/00 | $ 1,850,827 | 1.28% | 1.06% | 2.34% | $ | 43,387 |
| 8 | 11/17/00 | 12/16/00 | $ 1,827,088 | 1.28% | 1.06% | 2.34% | $ | 42,831 |
| 9 | 12/17/00 | 01/16/01 | $ 1,803,654 | 1.28% | 1.06% | 2.34% | $ | 42,282 |
| 10 | 01/17/01 | 02/16/01 | $ 1,780,520 | 1.28% | 1.06% | 2.34% | $ | 41,739 |
| 11 | 02/17/01 | 03/16/01 | $ 1,757,682 | 1.28% | 1.06% | 2.34% | $ | 41,204 |
| 12 | 03/17/01 | 04/16/01 | $ 1,735,138 | 1.28% | 1.06% | 2.34% | $ | 40,675 |

Notes and Sources:

*    Aircraft crashed May 21, 2000.

[A1]  Deposition of Michael S. Peragine, Vol. 2, March 20, 2004, Exhibit 1, pp. 3-26.

[A2]  Deposition of Michael S. Peragine, Vol. 2, March 20, 2004, Exhibit 1, pp. 27-39.

[A3]  = ([A2] - [A1] + 1) x (12/365).

[A4]  = (04/17/00 - [A1] + 1) x (12/365).

[A5]  Deposition of Michael S. Peragine, Vol. 2, March 20, 2004, Exhibit 1, pp. 3-26.

[A6]  Deposition of Michael S. Peragine, Vol. 2, March 20, 2004, Exhibit 1, pp. 27-39.

[A7]  = 1 - ([A6]/[A5])$^{1/[A3]}$.

[A8]  = (1 + [A7])$^{12}$ - 1.

[B1]  Ibbotson Associates, *Cost of Capital 2000 Yearbook*, composite WACC for airline industry (SIC 4512), p. 4-11.

[B2]  = (1 + [B1])$^{1/12}$ - 1.

[C]   See, for example, Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 6th edition,
      Upper Saddle River, NJ: Prentice Hall, 2005, pp. 225-227.

[C1]  = Total market value from previous month x (1 - economic depreciation rate).
      Market value at start of contract equals total purchase price depreciated by average number of months
      aircraft were owned prior to the start of the contract.  Market values are shown as of the beginning of the month.

[C2]  = Average of [A7].

[C3]  = [B2].

[C4]  = [C2] + [C3].

[C5]  = [C1] x [C4].

**Exhibit 2**

**Plaintiff Estimates of Costs Associated with EB Contract**

| | Per Flight Costs | | | | | Source |
|---|---|---|---|---|---|---|
| [A] | No. of Flights without early termination | | 326 | | | [1] |
| [B] | Cost of operating additional flights | $ | 603,075 | | | [1] |
| [C] | Variable costs per flight | $ | 1,850 | | | [C] = [B]/[A] |

**Other Costs Associated with EB Contract**

| | | | Annual | | Monthly | Source |
|---|---|---|---|---|---|---|
| [D] | *Sunk Costs* | | | | | |
| | Moving costs & signage | $ | 1,827 | | | [2] |
| | Telephone installation at new location | $ | 6,690 | | | [2] |
| | Additional pilot/maintenance training | $ | 64,125 | | | [2] |
| | Aircraft certification & equip. list development | $ | 4,600 | | | [2] |
| | Contract prep expenses | $ | 3,600 | | | [2] |
| | Jetstream N404GJ certification | $ | 25,000 | | | [3] |
| | Jetstream N16FN certification | $ | 65,000 | | | [3] |
| | Total | $ | 170,842 | | | |
| | | | | | | |
| [E] | *Avoidable Costs* | | | | | |
| | Additional utility charges at new location | $ | 5,475 | $ | 456 | [2] |
| | Expanded facilities (hangar, ramp & office space) | $ | 120,000 | $ | 10,000 | [3] |
| | Increase in crew & maintenance personnel | $ | 245,000 | $ | 20,417 | [3] |
| | Additional insurance | $ | 112,000 | $ | 9,333 | [3] |
| | Total | $ | 482,475 | $ | 40,206 | |

Notes and Sources:

[1] Steiner report, May 31, 2006.

[2] March 31, 2001 Snap-Shot of Aircraft Value & Operating Losses.

[3] Plaintiff, Answering Defendant's First Set of Interrogatories, Nov. 6, 2002.

[D] Sunk costs are costs that are not recoverable.

[E] Avoidable costs do not vary with the number of flights, but can be eliminated
if no service is provided.

**Exhibit 3**
**Damages from Early Termination of EB Contract**

**[A]  Profits without Early Termination**

| Contract Month | Begin Date | End Date | Price | [1] No. of Flights | [2] Revenue | [3] Flight Costs (Steiner) | [4][5] Aircraft Rental Costs | [6] Other Avoidable Costs (Labor & Ins.) | [7] Sunk Costs (Certification & Training) | [8] Total Costs | [9] Profit (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 04/17/00 | 05/16/00 | $ 4,553 | 30 | $ 136,605 | $ 55,498 | $ 46,882 | $ 40,206 | $ 170,842 | $ 313,428 | $ (176,823) |
| 2 | 05/17/00 | 06/16/00 | $ 4,553 | 15 | $ 68,302 | $ 27,749 | $ 46,280 | $ 40,206 | $ • | $ 114,235 | $ (45,933) |
| 3 | 06/17/00 | 07/16/00 | $ 4,553 | 15 | $ 68,302 | $ 27,749 | $ 45,687 | $ 40,206 | $ • | $ 113,642 | $ (45,339) |
| 4 | 07/17/00 | 08/16/00 | $ 4,553 | 15 | $ 68,302 | $ 27,749 | $ 45,101 | $ 40,206 | $ • | $ 113,056 | $ (44,753) |
| 5 | 08/17/00 | 09/16/00 | $ 4,553 | 15 | $ 68,302 | $ 27,749 | $ 44,522 | $ 40,206 | $ • | $ 112,477 | $ (44,175) |
| 6 | 09/17/00 | 10/16/00 | $ 4,553 | 15 | $ 68,302 | $ 27,749 | $ 43,951 | $ 40,206 | $ • | $ 111,906 | $ (43,604) |
| 7 | 10/17/00 | 11/16/00 | $ 4,553 | 15 | $ 68,302 | $ 27,749 | $ 43,387 | $ 40,206 | $ • | $ 111,343 | $ (43,040) |
| 8 | 11/17/00 | 12/16/00 | $ 4,553 | 15 | $ 68,302 | $ 27,749 | $ 42,831 | $ 40,206 | $ • | $ 110,786 | $ (42,484) |
| 9 | 12/17/00 | 01/16/01 | $ 4,553 | 15 | $ 68,302 | $ 27,749 | $ 42,282 | $ 40,206 | $ • | $ 110,237 | $ (41,934) |
| 10 | 01/17/01 | 02/16/01 | $ 4,553 | 15 | $ 68,302 | $ 27,749 | $ 41,739 | $ 40,206 | $ • | $ 109,694 | $ (41,392) |
| 11 | 02/17/01 | 03/16/01 | $ 4,553 | 15 | $ 68,302 | $ 27,749 | $ 41,204 | $ 40,206 | $ • | $ 109,159 | $ (40,857) |
| 12 | 03/17/01 | 04/16/01 | $ 4,553 | 15 | $ 68,302 | $ 27,749 | $ 40,675 | $ 40,206 | $ • | $ 108,631 | $ (40,328) |
| **Total** | | | | 195 | $ 887,931 | $ 360,735 | $ 524,542 | $ 482,475 | $ 170,842 | $ 1,538,594 | $ (650,663) |

**[B]  Profits with Early Termination & Mitigation**

| | |
|---|---|
| [Ba] Contract Initiation Date | 04/17/00 |
| [Bb] Contract Termination Date | 06/07/00 |
| [Bc] Adjustment/Mitigation Period (Months) | 6 |
| [Bd] End of Avoidable Costs | 12/07/00 |

| Contract Month | Begin Date | End Date | Price | [1] No. of Flights | [2] Revenue | [3] Flight Costs (Steiner) | [4][5] Aircraft Rental Costs | [6] Other Avoidable Costs (Labor & Ins.) | [7] Sunk Costs (Certification & Training) | [8] Total Costs | [9] Profit (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 04/17/00 | 05/16/00 | $ 4,553 | 30 | $ 136,605 | $ 55,498 | $ 46,882 | $ 40,206 | $ 170,842 | $ 313,428 | $ (176,823) |
| 2 | 05/17/00 | 06/16/00 | $ 4,553 | 4 | $ 18,214 | $ 7,400 | $ 46,280 | $ 40,206 | $ • | $ 93,886 | $ (75,672) |
| 3 | 06/17/00 | 07/16/00 | $ 4,553 | 0 | $ • | $ • | $ 45,687 | $ 40,206 | $ • | $ 85,893 | $ (85,893) |
| 4 | 07/17/00 | 08/16/00 | $ 4,553 | 0 | $ • | $ • | $ 45,101 | $ 40,206 | $ • | $ 85,307 | $ (85,307) |
| 5 | 08/17/00 | 09/16/00 a | $ 4,553 | 0 | $ • | $ • | $ 44,522 | $ 40,206 | $ • | $ 84,728 | $ (84,728) |
| 6 | 09/17/00 | 10/16/00 | $ 4,553 | 0 | $ • | $ • | $ 43,951 | $ 40,206 | $ • | $ 84,157 | $ (84,157) |
| 7 | 10/17/00 | 11/16/00 | $ 4,553 | 0 | $ • | $ • | $ 43,387 | $ 40,206 | $ • | $ 83,594 | $ (83,594) |
| 8 | 11/17/00 | 12/16/00 | $ 4,553 | 0 | $ • | $ • | $ 29,982 | $ 28,144 | $ • | $ 58,126 | $ (58,126) |
| 9 | 12/17/00 | 01/16/01 | $ 4,553 | 0 | $ • | $ • | $ • | $ • | $ - | $ - | $ • |
| 10 | 01/17/01 | 02/16/01 | $ 4,553 | 0 | $ • | $ • | $ - | $ • | $ • | $ - | $ • |
| 11 | 02/17/01 | 03/16/01 | $ 4,553 | 0 | $ • | $ • | $ - | $ • | $ • | $ - | $ • |
| 12 | 03/17/01 | 04/16/01 | $ 4,553 | 0 | $ • | $ • | $ - | $ • | $ - | $ - | $ • |
| **Total** | | | | 34 | $ 154,819 | $ 62,897 | $ 345,792 | $ 309,588 | $ 170,842 | $ 889,120 | $ (734,301) |

**[C]  Damages Summary**

| | | |
|---|---|---|
| [C1] | Profit (Loss) without Early Termination | $ (650,663) |
| [C2] | Profit (Loss) with Early Termination & Mitigation | $ (734,301) |
| [C3] | Lost Profit Damages from Early Termination | $ 83,638 |
| [C4] | Damages as % of Sales without Early Termination | 9.4% |

Notes and Sources:

[A1]   = Price per round trip flight net of excise tax; Steiner report.
[A2]   = Actual flights used by EB in month 1 (Steiner report, Exhibit B); minimum number of flights specified by contract thereafter.
[A3]   = [A1] x [A2].
[A4]   = [C] from Exhibit 2 (Variable costs per flight from Steiner report) x [A2].
[A5]   = [C5] from Exhibit 1.
[A6]   = Total monthly avoidable costs from Exhibit 2.
[A7]   = Total sunk costs from Exhibit 2.
[A8]   = [A4] + [A5] + [A6] + [A7].
[A9]   = [A3] - [A8].  Negative values (i.e., losses) shown in parentheses.
[Ba]   = Start date of EB charter contract; Steiner report, Exhibit A.
[Bb]   = Date of early termination as instructed by counsel.
[Bc]   = Period of time within which aircraft and other assets could be sold, leased, or redeployed to other accounts.
[Bd]   = [Bb] + [Bc].
[B1]   = Price per round trip flight net of excise tax; Steiner report.
[B2]   = Actual flights used by EB in months 1 & 2 (Steiner report, Exhibit B);  0 thereafter.
[B3]   = [B1] x [B2].
[B4]   = [C] from Exhibit 2 (Variable costs per flight from Steiner report) x [B2].
[B5]   = [A5] x (Number of days in contract month prior to [Bd] / Number of days in contract month).
[B6]   = [A6] x (Number of days in contract month prior to [Bd] / Number of days in contract month).
[B7]   = Total sunk costs from Exhibit 2.
[B8]   = [B4] + [B5] + [B6] + [B7].
[B9]   = [B3] - [B8].  Negative values (i.e., losses) shown in parentheses.
[C1]   = Total [A9].
[C2]   = Total [B9].
[C3]   = [C1] - [C2].
[C4]   = [C3]/Total [A3].

Exhibit 4
**Operating Profit Margins by Airline**
1999 Q3 - 2001 Q2

| Airline (Sorted by Revenue) | Qtr. Begin End | Profit (thousands) 1999 Q3 2000 Q2 | Profit (thousands) 2000 Q3 2001 Q2 | Total | Revenue (thousands) 1999 Q3 2000 Q2 | Revenue (thousands) 2000 Q3 2001 Q2 | Total | Profit as % of Revenue 1999 Q3 2000 Q2 | Profit as % of Revenue 2000 Q3 2001 Q2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Gulf And Caribbean Cargo | | (62) | 0.1 | (62) | 628 | 561 | 1,189 | -9.8% | 0.0% | -5.2% |
| Trans-Air-Link Corporation | | (349) | (359) | (708) | 876 | 763 | 1,639 | -39.8% | -47.0% | -43.2% |
| Sierra Pacific Airlines | | 568 | 832 | 1,400 | 6,549 | 7,488 | 14,038 | 8.7% | 11.1% | 10.0% |
| Asia Pacific | | (402) | (11) | (413) | 7,692 | 11,480 | 19,172 | -5.2% | -0.1% | -2.2% |
| Allegiant Air | | (5,303) | (5,010) | (10,314) | 11,618 | 9,938 | 21,556 | -45.6% | -50.4% | -47.8% |
| Custom Air Transport | | (4,409) | (4,618) | (9,028) | 18,596 | 4,519 | 23,114 | -23.7% | -102.2% | -39.1% |
| Southeast Airlines | | 392 | (279) | 113 | 9,888 | 18,496 | 28,385 | 4.0% | -1.5% | 0.4% |
| Sunworld Int'l Airlines | | 652 | (2,931) | (2,280) | 17,461 | 16,709 | 34,170 | 3.7% | -17.5% | -6.7% |
| Zantop International | | 5,014 | (3,463) | 1,551 | 25,230 | 12,064 | 37,294 | 19.9% | -28.7% | 4.2% |
| Tatonduk Flying Service | | 2,562 | 1,364 | 3,926 | 21,729 | 23,493 | 45,222 | 11.8% | 5.8% | 8.7% |
| Express.Net Airlines | | (2,255) | (953) | (3,208) | 8,805 | 42,921 | 51,727 | -25.6% | -2.2% | -6.2% |
| Casino Express | | (3,779) | (5,678) | (9,456) | 27,949 | 29,174 | 57,122 | -13.5% | -19.5% | -16.6% |
| Pan American Airways Corp | | (12,285) | (22,294) | (34,580) | 16,784 | 43,190 | 59,974 | -73.2% | -51.6% | -57.7% |
| Northern Air Cargo Inc. | | (3,935) | 534 | (3,401) | 37,173 | 40,818 | 77,990 | -10.6% | 1.3% | -4.4% |
| Tradewinds Airlines | | 1,209 | 1,081 | 2,290 | 26,374 | 55,481 | 81,855 | 4.6% | 1.9% | 2.8% |
| Capital Cargo International | | 1,836 | (7,629) | (5,793) | 37,304 | 46,517 | 83,821 | 4.9% | -16.4% | -6.9% |
| Florida West Airlines Inc. | | (867) | (750) | (1,616) | 38,721 | 48,941 | 87,662 | -2.2% | -1.5% | -1.8% |
| Transmeridian Airlines | | 933 | (5,457) | (4,524) | 58,939 | 36,679 | 95,618 | 1.6% | -14.9% | -4.7% |
| Lynden Air Cargo Airlines | | 6,765 | 6,847 | 13,612 | 49,173 | 47,644 | 96,817 | 13.8% | 14.4% | 14.1% |
| Falcon Air Express | | (6,614) | 2,396 | (4,218) | 53,399 | 44,386 | 97,785 | -12.4% | 5.4% | -4.3% |
| Omni Air Express | | 4,575 | 8,017 | 12,592 | 65,666 | 91,388 | 157,054 | 7.0% | 8.8% | 8.0% |
| North American Airlines | | (423) | 2,505 | 2,081 | 73,589 | 89,999 | 163,588 | -0.6% | 2.8% | 1.3% |
| Amerijet International | | (2,163) | (13,371) | (15,534) | 105,231 | 85,911 | 191,142 | -2.1% | -15.6% | -8.1% |
| Miami Air International | | (1,709) | 461 | (1,248) | 94,771 | 122,993 | 217,765 | -1.8% | 0.4% | -0.6% |
| Express One Int'l Inc. | | 5,928 | 2,564 | 8,492 | 119,187 | 111,238 | 230,425 | 5.0% | 2.3% | 3.7% |
| Vanguard Airlines Inc. | | (17,143) | (29,948) | (47,091) | 132,668 | 122,821 | 255,489 | -12.9% | -24.4% | -18.4% |
| Centurion Cargo Inc. | | (26,232) | (23,603) | (49,835) | 146,665 | 112,916 | 259,581 | -17.9% | -20.9% | -19.2% |
| Arrow Air Inc. | | 17,377 | (80,223) | (62,847) | 95,013 | 175,536 | 270,549 | 18.3% | -45.7% | -23.2% |
| Champion Air | | 14,490 | 18,876 | 33,367 | 127,004 | 160,600 | 287,605 | 11.4% | 11.8% | 11.6% |
| Gemini Air Cargo Airways | | 3,365 | 6,332 | 9,697 | 134,824 | 192,632 | 327,456 | 2.5% | 3.3% | 3.0% |
| Executive Airlines* | | 11,064 | 9,174 | 20,238 | 171,753 | 185,369 | 357,123 | 6.4% | 4.9% | 5.7% |
| Trans States Airlines* | | (1,786) | 6,677 | 4,891 | 219,304 | 189,808 | 409,112 | -0.8% | 3.5% | 1.2% |
| Ryan International Airlines | | 2,763 | 3,268 | 6,031 | 205,183 | 232,533 | 437,716 | 1.3% | 1.4% | 1.4% |
| National Airlines | | (36,028) | (45,702) | (81,731) | 168,864 | 301,672 | 470,536 | -21.3% | -15.1% | -17.4% |
| Kitty Hawk Aircargo | | 8,899 | 5,149 | 14,048 | 303,347 | 210,629 | 513,975 | 2.9% | 2.4% | 2.7% |
| Sun Country Airlines d/b/a Mn Airlines | | (29,433) | (43,202) | (72,635) | 269,030 | 274,165 | 543,194 | -10.9% | -15.8% | -13.4% |
| World Airways Inc. | | (8,449) | (11,557) | (20,006) | 256,006 | 289,556 | 545,562 | -3.3% | -4.0% | -3.7% |
| Pace Airlines | | 4,151 | 251,463 | 255,613 | 177,214 | 370,147 | 547,361 | 2.3% | 67.9% | 46.7% |
| Aloha Airlines Inc. | | (10,194) | (8,815) | (19,008) | 253,257 | 298,561 | 551,817 | -4.0% | -3.0% | -3.4% |
| Midway Airlines Inc. | | (6,154) | (29,222) | (35,376) | 241,694 | 312,124 | 553,818 | -25% | -9.4% | -6.4% |
| Evergreen Int'l Inc. | | 24,427 | 26,966 | 51,393 | 320,383 | 277,503 | 597,885 | 7.6% | 9.7% | 8.6% |

| Airline (Sorted by Revenue) | Qtr. Begin End | Profit (thousands) 1999 Q3 2000 Q2 | 2000 Q3 2001 Q2 | Total | Revenue (thousands) 1999 Q3 2000 Q2 | 2000 Q3 2001 Q2 | Total | Profit as % of Revenue 1999 Q3 2000 Q2 | 2000 Q3 2001 Q2 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Air Transport International | | $ 9.152 | $ 710 | $ 9,862 | $ 300.660 | $ 299,622 | $ 600,282 | 3.0% | 0.2% | 1.6% |
| Spirit Air Lines | | $ (10,879) | $ 10,232 | $ (648) | $ 271,948 | $ 356,542 | $ 628,490 | -4.0% | 2.9% | -0.1% |
| Polar Air Cargo Airways | | $ (7,614) | $ (40,486) | $ (48,100) | $ 342,887 | $ 368.741 | $ 711,628 | -2.2% | -11.0% | -6.8% |
| Air Wisconsin Airlines Corp | | $ 10,748 | $ 8,570 | $ 19,318 | $ 323,135 | $ 396.695 | $ 719,830 | 3.3% | 2.2% | 2.7% |
| Frontier Airlines Inc. | | $ 53,263 | $ 66,654 | $ 119,917 | $ 364,743 | $ 483,384 | $ 848,127 | 14.6% | 13.8% | 14.1% |
| Midwest Airline, Inc. | | $ 40,607 | $ (5,510) | $ 35,096 | $ 414,976 | $ 440,987 | $ 855,963 | 9.8% | -1.2% | 4.1% |
| Mesaba Airlines | | $ 44,583 | $ 24,413 | $ 68,995 | $ 414,210 | $ 447,202 | $ 861,412 | 10.8% | 5.5% | 8.0% |
| Horizon Air | | $ 15,762 | $ (26,206) | $ (10,444) | $ 43 1,984 | $ 445,291 | $ 877,275 | 3.6% | -5.9% | -1.2% |
| Continental Micronesia | | $ 39,806 | $ 86,771 | $ 126,577 | $ 514,079 | $ 508,971 | $ 1,023,050 | 7.7% | 17.0% | 12.4% |
| Hawaiian Airlines Inc. | | $ (43,397) | $ (15,288) | $ (58,685) | $ 547,136 | $ 620,714 | $ 1,167,851 | -7.9% | -2.5% | -5.0% |
| Atlantic Southeast Airlines | | $ 141,723 | $ 72.540 | $ 214,263 | $ 562,926 | $ 651,379 | $ 1,214,305 | 25.2% | 11.1% | 17.6% |
| AirTran Airways Corporation | | $ 88,752 | $ 96,187 | $ 184,939 | $ 556,757 | $ 710,423 | $ 1,267,181 | 15.9% | 13.5% | 14.6% |
| Atlas Air Inc. | | $ 206,230 | $ 74,580 | $ 280,810 | $ 713,747 | $ 761,620 | $ 1,475,367 | 28.9% | 9.8% | 19.0% |
| Emery Worldwide Airlines | | $ (1,236) | $ 15,223 | $ 13,988 | $ 902,263 | $ 754,064 | $ 1,656,327 | -0.1% | 2.0% | 0.8% |
| ATA Airlines d/b/a ATA | | $ 58,743 | $ 9,435 | $ 68,178 | $ 1,096,488 | $ 1,22 1,905 | $ 2,318,393 | 5.4% | 0.8% | 2.9% |
| American Eagle Airlines Inc. | | $ 66,233 | $ (51,992) | $ 14.24 1 | $ 1,135,165 | $ 1,343,339 | $ 2,478,504 | 5.8% | -3.9% | 0.6% |
| Astar Air Cargo Inc. | | $ (2,311) | $ (152,361) | $ ( 154,672) | $ 1,453,813 | $ 1,509,242 | $ 2,963.054 | -0.2% | -10.1% | -5.2% |
| Alaska Airlines Inc. | | $ 88,226 | $ (26,165) | $ 62,061 | $ 1,729,640 | $ 1,813,601 | $ 3,543,241 | 5.1% | -1.4% | 1.8% |
| America West Airlines Inc | | $ 136,082 | $ (154,967) | $ (18,885) | $ 2,254,959 | $ 2,308,399 | $ 4,563,358 | 6.0% | -6.7% | -0.4% |
| United Parcel Service | | $ 106,154 | $ 148,040 | $ 254,194 | $ 2,343,668 | $ 2,712,743 | $ 5,056,411 | 4.5% | 5.5% | 5.0% |
| Trans World Airways LLC | | $ (412,070) | $ (282,088) | $ (694,158) | $ 3,442,050 | $ 3,353,811 | $ 6,795,862 | -12.0% | -8.4% | -10.2% |
| Southwest Airlines Co. | | $ 831,045 | $ 1,051,324 | $ 1,882,369 | $ 5,142,966 | $ 5,928,700 | $ 11,071,666 | 16.2% | 17.7% | 17.0% |
| Continental Air Lines Inc. | | $ 408,181 | $ 501,847 | $ 910,028 | $ 8,557,377 | $ 9,173,481 | $ 17,730,858 | 4.8% | 5.5% | 5.1% |
| US Airways Inc. | | $ (132,502) | $ (233,111) | $ (365,613) | $ 8,630,188 | $ 9,442,292 | $ 18,072,480 | -1.5% | -2.5% | -2.0% |
| Northwest Airlines Inc. | | $ 773,826 | $ 119,914 | $ 893,740 | $ 10,466,069 | $ 10,856,743 | $ 21,322,812 | 7.4% | 1.1% | 4.2% |
| Delta Air Lines Inc. | | $ 1,614,916 | $ 505,220 | $ 2,120,136 | $ 14,983,624 | $ 15,031,895 | $ 30,015,519 | 10.8% | 3.4% | 7.1% |
| Federal Express Corporation | | $ 947,530 | $ 785,014 | $ 1,732,544 | $ 15,196,781 | $ 15,424,893 | $ 30,62 1,674 | 6.2% | 5.1% | 5.7% |
| American Airlines Inc. | | $ 1,281,292 | $ (89,449) | $ 1,191,843 | $ 17,200,147 | $ 18,085,651 | $ 35,285,798 | 7.4% | -0.5% | 3.4% |
| United Air Lines Inc. | | $ 1,727,804 | $ (980,807) | $ 746,997 | $ 18,917,694 | $ 18,766,266 | $ 37,683,960 | 9.1% | -5.2% | 2.0% |
| **Total** | | $ 8,017,648 | $ 1,527,671 | $ 9,545,318 | $ 123,367,623 | $ 128,967,957 | $ 252,335,580 | 6.5% | 1.2% | 3.8% |
| **Median** | | | | | | | | 3.2% | 0.1% | 1.0% |

**Notes:**

\* These data do not pertain to the plaintiff in this case; this airline is a Puerto Rico-based affiliate of American Eagle.

Only those airlines reporting non-zero revenue in each period are included.

Operating profit reported is net of accounting depreciation, but not interest and taxes.

Source:

Bureau of Transportation Statistics, Air Carrier Financial Reports Schedule: P-1 1 and P-12.

Available at http://www.transtats.bts.gov/databases.asp?Mode_ID=1&Mode_Desc=Aviation&Subject_ID2=0

**Exhibit 5**
**Distribution of Airline Profit Margins**
**1999 Q3 - 2001 Q2**



Source: Bureau of Transportation Statistics, Air Carrier Financial Reports Schedule: P-l 1 and P-12.