# EXHIBIT C

**BIEDERMANN, HOENIG, & RUFF**
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
805 THIRD AVENUE
NEW YORK, NEW YORK 10017
dhayes@bhmr.com

TELEPHONE (212) 697-6555

FACSIMILE (212) 986-3509

July 24, 2006

Hon. Warren W. Eginton, U.S.D.J.
Brien McMahon Federal Building
915 Lafayette Boulevard
Bridgeport, Connecticut 06604

    Re:    Executive Airlines v. Electric Boat (WWE)
             02CV194
             OFN 460.15662

Dear Judge Eginton:

      Several matters have arisen which cause me to write this letter. I had intended to file a formal motion, but since time is pressing, I decided that a letter was called for.

      Your Honor is aware that the trial of this matter as to damages is now scheduled for August 28, 2006, immediately after jury selection. By order of April 6, 2006, the Court scheduled trial for August 15, and also required the parties to file trial memoranda by July 21, 2006, some 25 days before trial. Since then, there have been several adjustments to the trial date, which has been put off by two weeks. I must confess that I thought the filing date for trial memoranda had also been extended, but I now see that it has not been. I was served on July 21, 2006 with the defendant's trial memorandum. Our first request then is for an extension to August 4, 2006 to file the plaintiff's trial memorandum, if the trial date remains August 28.

      However, we must also ask for an extension of the trial date. There is a significant disagreement between the parties' proposed experts about the proper methods to calculate damages in this case which should be resolved not at trial but only after proper preparation and briefing, before trial. If not, the jury will be hopelessly confused.

      Within the last week, defendant has served an extensive report from its expert witness on damages, George Kosicki, Ph.D., and a *Daubert* motion to disallow the testimony of Diane Steiner, CPA, plaintiff's expert witness on damages. Plaintiff is about to serve a report from a second expert on damages, Anthony Ciccidicola, CPA and to move for his substitution as plaintiff's expert; or, alternatively, as a rebuttal expert. In addition, plaintiff plans to bring a *Daubert* motion against Dr. Kosicki. The basis for this motion is plaintiff's belief that his methods of calculating the damages in this case are contrary to Connecticut damage law and thus should not be heard by the jury. Before this motion can be brought, plaintiff must take his deposition. Both parties must know the Court's decisions on the limitations or modifications to expert proof before trial, in order properly to prepare.

Respectfully, there is too much that must be briefed and decided for the trial to go forward in five (5) weeks.

## Background

The Court should know what has transpired in this case in the last few months. To review, this re-trial was ordered when the Court granted in part, on March 31, 2006, defendant's motion, in the alternative, for a new trial after the jury verdict of February 17, 2006 in the sum of $ 472,368. Prior to that decision, Executive's theory on damages was that Electric Boat owed it the minimum contract amount, *i.e.*, the revenue for 15 flights per month for six months, because there was a clause in the contract which permitted Electric Boat to terminate the contract on six (6) months' notice. This is the theory Plaintiff argued to the jury. However, the Court decided on post trial motions that the theory was equivalent to a theory of liquidated damages, and therefore improper as a matter of law..

This theory did not require a detailed review of Executive's books and records to determine the contract's costs and projected profitability. In fact, Executive's books and records were reviewed only superficially during the discovery before the first trial and were not admitted into evidence. Needless to say, Plaintiff had not retained an expert witness to analyze and testify concerning the expenses experienced by Executive, the profits expected from the contract, and the other costs attributable to the breach.

After the Court granted a new trial, plaintiff was ordered to serve an expert's report on damages by June 1, 2006. This required finding a suitable accountant during tax season, locating and sorting out Executive's records after several years of storage, and performing an analysis. Plaintiff reached out to several potential witnesses with forensic experience, but for various reasons, could not in the time allowed find an accountant who was experienced in litigation. Eventually, Mr. Peragine retained a CPA who had done personal tax accounting for him, Diane Steiner, and they began to review the records of Executive. Ms. Steiner is a sole proprietor who works out of her home and her background is mostly in tax accounting for small businesses. Ms. Steiner had only testified once before, in a deposition.

## The Steiner-deDecker Report and Daubert Motion

On June 1, 2006, plaintiff served Ms. Steiner's report on the defendant, with more than 100 pages of documents she relied on. In her report, Ms. Steiner determined a reasonable number of flights which would have been flown during the term of the contract, consistent with the history of flights actually flown, and calculated the profits from those flights by subtracting the variable costs of the flights (fuel, maintenance, etc.) and excise taxes from the gross revenues. Ms. Steiner calculated that over the remaining term of the contract, Executive would have realized a profit of

2

$881,362.[1] She did not mention the non-avoidable fixed costs (aircraft, hangar, pilots' salaries, etc.) because they were "irrelevant" or "a wash" under Connecticut law which allows for their recovery as a separate category of damages. See, *Retepromaca Representaciones Tecnicas Proyectos Y Sistemas, C.A. v. Ensign-Bickford Co.,* 2004 WL 722231 (D.Conn.,2004). Instead of attempting an analysis of Executive's own complex records of aircraft maintenance, in the short time allowed, she reached out to Conklin and de Decker, a company which tracks specific aircraft costs in detail and obtained a report on certain cost items for the Jetstream 31 aircraft for the period in question from Mr. Bill de Decker. His report became an exhibit to hers. Mr. De Decker was deposed by defendant on June 13, 2006.

Ms. Steiner was deposed on June 15, 2006. She testified that she usually charged $100 per hour and had charged Executive the total of $3500 for all her services in this case. She was vigorously cross-examined, and was repeatedly asked for references to corroborate her methodology and her experience in analyzing damages in litigation. She was uncomfortable under questioning and was somewhat inarticulate about her methodology. It became obvious after the deposition that counsel for defendant intended to move against Ms. Steiner because of her inexperience in litigation and her lack of articulation concerning her methodology.

I reviewed the case law and concluded that if defendant succeeded in eliminating Ms. Steiner, with a *Daubert* motion, Executive would have to show that it acted with diligence in retaining a substitute expert when first made aware that she was vulnerable to such a motion. In the exercise of prudence, Plaintiff then located and was able to find and retain an accountant with experience in litigation, Mr. Anthony Ciccodicola, CPA, who began his own review of the company's records, including the maintenance records, and has almost completed a report.

One week ago, on July 18, 2006, Plaintiff was served with an extensive *Daubert* motion against Ms. Steiner, consisting of 185 pages with exhibits. Plaintiff believes that Ms. Steiner is an acceptable expert on damages and should not be disallowed on *Daubert* principles. However, because of his prior experience in litigated matters, Plaintiff intends to move to substitute Mr. Ciccodicola as its main expert and will of course make him available for a deposition. Alternatively, plaintiff will present him as a rebuttal witness.

### The Kosicki Report

On July 17, 2006, defendant served its expert disclosure, a report of 13 pages with an additional 20 pages of exhibits, by an economist, Dr. George Kosicki, Ph.D., past chair of the Department of Economics at Holy Cross. What follows is **only an overview** of plaintiff's problems with this report, which plaintiff intends to deal with more completely in a motion after his

---

[1] This amount may be greater than the amount sought in the original complaint. Defendant has been on notice of this amount since June 1, 2006. However, plaintiff will also move to amend to increase the *ad damnum* to the amount calculated by its expert.

3

deposition. There are dramatic contrasts with Ms. Steiner's report, and we think **with Connecticut damage law**. The different views on how to calculate the damages in this case need to be resolved by the Court after full briefing and before the trial.

Dr. Kosicki arrives at the remarkable conclusion that Executive **would have lost about $650,000 if EB had *not* terminated the contract**, and that Executive actually lost some $83,000 more because of the early termination. [2] This <u>increased loss</u> is what he calculates the damages were to Executive.

Dr. Kosicki's expert report indicates that he charged the defendant $425 per hour. (It is fairly certain that Dr. Kosicki does not work out of his home, like Ms. Steiner). His CV describes Dr. Kosicki's background in part:

> ....specializes in applied microeconomics and has consulted in the areas of antitrust, mergers and acquisitions, labor economics, and pharmacoeconomics. He has also served as an expert witness on liability and damages in cases involving antitrust and labor economics. Dr. Kosicki has worked extensively on issues of cost pass through and damages in indirect purchaser litigation stemming from global price fixing conspiracies. He is experienced in market definition analyses, including those in the pharmaceutical industry, and the estimation of demand elasticities using retail scanner data.....(Appendix A, page 1).

Dr. Kosicki substantially decreases the revenues expected under the contract and substantially increases the costs attributable to the contract and concludes that,

> "[without early termination since] EB also had the right to terminate the contract without penalty after giving six months advance notice of termination... Given the fixed costs that occur throughout the length of the contract, I estimate that Executive Airlines would experience a loss on the contract of $650,663. " (Kosicki Report at page 10)....

> 25.2...profits with early termination of the contract on June 7, 2000. ....I allow for a six month adjustment period for the elimination of avoidable fixed costs..... through December 7, 2000, at which point I eliminate all avoidable costs....a greater loss of $734,301." (Kosicki Report at page 11).

Dr. Kosicki decreases the damages for Executive in these improper ways: first, because of the accident he estimates that a much lower number of flights would have been flown, than does Ms. Steiner, who extrapolates from the history of the five weeks of flights which were actually flown

---

[2] "Part C summarizes the lost profit damages. In each of the prior scenarios Executive Airlines experiences a loss, but the loss is smaller without early termination of the contract. Damages in this case represent the reduction in Executive Airlines' loss. Consequently, damages equal $83,638.(Kosicki Report at para. 25.3. )"

4

before termination; second, he *creates an expense for aircraft rental* [3] (although the aircraft were not rented) and then assesses a very high charge for aircraft rental and other fixed costs against the revenues of the contract, because he assumes as a factual matter that they were avoidable; he does not allow for recovery of avoidable fixed costs as Connecticut law permits, as a separate head of damages; and, he assumes that Electric Boat could have given six months notice after the crash, and used only the minimum number of flights, 15 per month, during the six months, although this was what Electric Boat in fact **did not do** and why the jury found them liable.

The Court determined that the "notice clause" of the contract was **not** a meeting of the minds on the extent of damages. However, Dr. Kosicki is using as a shield what the Court has disallowed to the plaintiff as a sword: that the Defendant owed Plaintiff for a minimum of 15 flights per month for 6 months; and he has assessed against those limited revenues large fixed costs on the theory they were avoidable, to diminish the net result to Executive.

Lost profits should be calculated from the viewpoint of contract formation without reference to improper termination: what would the profits have been over the year's term, if Electric Boat had not terminated, which were lost to Executive by the termination; and what other consequential damages did Executive suffer which it was unable to mitigate ?

The jury determined that the early termination after the accident was improper. Defendant put the excuse or justification of the accident to the first jury which rejected it and found for the plaintiff. To allow the new jury to consider the accident as a *bona fide* reason to decrease the number of projected flights would allow that finding to be disregarded.

Dr. Kosicki's report clearly demonstrates that he improperly relied on many hearsay documents, including web pages, of which he had no prior knowledge, to establish facts concerning the "avoidability" of "airline" fixed costs.

Executive needs to take his deposition, obtain his detailed explanations of his methods, and have these issues resolved by the Court, before he is allowed to testify to a jury. His opinion contains many esoteric references that must be researched before his deposition. [4] Additionally, we

---

[3] "METHODOLOGY FOR CALCULATING THE MONTHLY AIRCRAFT RENTAL COST....used to convert one-time capital expenditures to an equivalent monthly rental cost ....The equivalent monthly rental cost ® is computed by multiplying the market value of the aircraft (V') at the beginning of the month by the sum of the economic depreciation rate (D) and the rate of return (0 that could have been earned by the owner had the money been invested in an alternative investment with similar risk. That is, $R = V(D+I)$ (Kosicki Report at Appendix C, page 1).

[4] Some of Dr. Gosicki's footnoted references to his sources follow:

"5 For a brief overview of the various categories of economic costs, including the concept of avoidable

5

were just served with a notice of deposition under Rule 30(b)(6) and a demand for production of documents.

---

costs, see Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization,* 3rd edition, Reading, MA: Addison-Wesley, 2000, pp. 28-29. Avoidable costs are sometimes referred to quasi-fixed costs. See Hal R. Varian, *Intermediate Microeconomics,* 5th edition, New York: W.W. Norton, 1999, pp. 353-54. **(Page 4)**

' Roger W. Fones, "Predation in the Airline Industry." Remarks Before the American Bar Association Forum on Air and Space Law, Seattle, Washington, June 12, 1997.

7 Alfred E. Kahn, *The Economics o f Regulation,* Cambridge, MA: The MIT press, 1988, p. 75
' See Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics,* 6th edition, Upper Saddle River, NJ: Prentice Hall, 2005, pp. 225-227.

9 Leasing was another option for Executive Airlines to eliminate avoidable aircraft costs. Leasing has grown significantly since the mid-1980s and lessors are active participants in the market for used aircraft. See Allesandro Gavazza, "Leasing and Secondary Markets: Theory and Evidence from Commercial Aircraft," Yale School of Management Working Paper, July 2006, pp. 2-3, available at http://www.som.yale.edu/faculty/ag562/aircraftleasing.pdf .

10 See Todd C. Pulvino, "Do Asset Fire Sales Exist? An Empirical Investigation of Commercial Aircraft Transactions," *Journal* ofFinance, Vol. 53(3), June 1998, pp. 939-978. It is not at all clear that the airline industry was experiencing depressed conditions during 2000. In fact, airline industry stock indexes constructed by Bloomberg, Standard & Poor's, and the American Stock Exchange, are higher at the end of 2000 than around the time of contract termination.

12 Probabilities are computed in Excel using the formula for a binomial distribution. Probabilities based on these data understate the true probability of making a sale given that not all sales are made through dealers/brokers. Moreover, actual data on unsold inventory will reflect some sellers who have overpriced their aircraft.

13 See http://www.aeroappraisers.com/Online%20Evaluation%2OPage.htm.

14 See http://www.capital-aircraft.com/Selecting%2Oa%20Broker.htm. Capital Aircraft Sales appears to deal primarily in general aviation aircraft. Aircraft Shopper Online, which was founded in 1995 and lists aircraft such as the Jetstream 3 1, contains numerous testimonials from customers selling planes in less than six months. See http://www.aso.com/i.aso3/staticcontent.jsp?which=asoinfo/testimnl&iaso3sid=1 .

15 The 2001 recession in the U.S. began in March 2001 and continued until November 2001. See Robert Hall et al., "The NBER's Business-Cycle Dating Procedure," October 21, 2003, p. 1, available at http://www.nber.org/cycles/recessions.pdf.   "

6

In summary, there are a number of steps which need to be taken and issues resolved and clarified before trial, in order to forestall jury confusion and to ensure that the jury receives appropriate evidence and opinions and renders a just verdict. Some of these are:

- Briefing the opposition to Electric Boat's *Daubert* motion;
- Submission of the Ciccodicola Report;
- Deposition of Dr. Kosicki;
- Deposition of Mr. Peragine (under FRCP 30(b)(6));
- Response to Electric Boat's document demand;
- Preparation and submission of a motion to substitute Mr. Ciccodicola;
- Deposition of Mr. Ciccodicola;
- Preparation and submission of a *Daubert* motion relating to Dr. Kosicki;
- Resolution of *Daubert* motions by the court; and,
- Trial preparation based on court rulings.

The need for clarification and resolution of these issues before the experts testify to a lay jury, in our view, requires and justifies a three month extension of the trial date, which we respectfully ask the Court to grant.

Respectfully submitted,

*[signature]*

Daniel F. Hayes (ctphv0207)

DFH/jih

Enclosures (Steiner report and Kosicki report in pdf format sent as attachments to forwarded emails to Talbot Wells, Esq.)

cc :
    By Federal Express
    (wout attachments)
    Hon. Holly B. Fitzsimmons, U.S.M.J.
    Brien McMahon Federal Building
    915 Lafayette Boulevard
    Bridgeport, Connecticut 06604

(wout attachments by email)
Paul D. Williams, Esq.
pdwilliams@dbh.com
Amy T. Maas, Esq.
atmaas@dbh.com
**Day, Berry & Howard LLP**
CityPlace I
Hartford, Connecticut 06103-3499
Attorneys for Defendant, Electric Boat Corporation