EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EXECUTIVE AIRLINES         :   CIVIL ACTION NO. 3:02cv194 (JCH)
                        :
             Plaintiff,       :
v.                            :
                        :
ELECTRIC BOAT CORPORATION     :
                        :
            Defendant.     :   APRIL 30, 2007

## AFFIDAVIT OF JAMES H. ROTONDO

I, James H. Rotondo, having duly been sworn, do hereby depose and state that:

1.      I am over 18 years of age and make this affidavit based on personal knowledge.

2.      I am a member of the firm Day Pitney LLP and represent the defendant Electric Boat Corporation in connection with this action.

3.      In the fall of 2006, I inquired of plaintiff's counsel, Daniel Hayes, whether the plaintiff planned to call Ms. Diane Steiner as an expert witness at trial in light of the fact that the Court had allowed the plaintiff to disclose Mr. Anthony Ciccodicola as an expert. Mr. Hayes indicated that the plaintiff would withdraw Ms. Steiner as an expert witness if Electric Boat would agree not to move to preclude or otherwise challenge *in limine* Mr. Ciccodicola's testimony. I then inquired, if Electric Boat were to agree to this arrangement, whether the plaintiff would agree not to move to preclude or otherwise challenge *in limine* the testimony of Electric Boat's expert witness, Dr. George Kosicki.. Mr. Hayes said that the plaintiff would be willing to agree to such an arrangement. I then told him that I would need to discuss this arrangement with Electric Boat and would get back to him.

4.      Shortly after completing the deposition of Mr. Ciccodicola, I initially indicated to Mr. Hayes that Electric Boat planned to challenge the admissibility of Mr. Ciccodicola's testimony.

5.      On February 15, 2007, Mr. Hayes and I received an e-mail inquiry from the Clerk of the Court, Ms. Talbot Welles, regarding whether the plaintiff would still be calling Ms. Steiner as an expert witness.  A true and accurate copy of the February 15, 2007 e-mail from Ms. Welles is attached herewith as Exhibit 1.

6.      After receiving Ms. Welles' e-mail, Mr. Hayes and I spoke regarding experts in this case.  Mr. Hayes and I also exchanged a number of e-mails with each other and with Ms. Welles indicating that it would be necessary to go forward with Electric Boat's pending motion to preclude the expert testimony of Ms. Steiner, but that the motion could be delayed until after Dr. Kosicki served a supplemental report and was deposed.  A true and accurate copy of the February 27, 2007 e-mail communications between Mr. Hayes and me and Ms. Welles concerning expert witnesses and the scheduling of <u>Daubert</u> hearings for the first week in April are attached herewith as Exhibit 2.

7.      Between February 27, 2007 and March 2, 2007, Mr. Hayes and I spoke on a number of occasions regarding expert witnesses in this case.  We agreed that neither party would move the preclude the opposing expert's testimony either by a <u>Daubert</u> motion or other *in limine* challenge , and therefore it would not be necessary for the Court to set aside time during the first week of April for a hearing on any such motions.  A true and accurate copy of my e-mail dated March 2, 2007 to Ms. Welles, with a copy to Mr. Hayes, confirming this agreement is attached herewith as Exhibit 3.  Mr. Hayes expressed no objection to the agreement as relayed to Ms.

Welles in Exhibit 3 and has never indicated that Exhibit 3 did not accurately reflect the agreement of the parties on this issue.

8.     After March 2, Mr. Hayes continued to indicate that he wanted to take the deposition of Dr.. Kosicki, which was scheduled for March 23, 2007 in Boston, Massachusetts.

9.     Accordingly, Electric Boat provided Mr. Hayes with Dr. Kosicki's entire file in anticipation of Dr. Kosicki's deposition.  In fact, most of Dr. Kosicki's file was provided to Mr. Hayes before Mr. Hayes even issued his notice of deposition dated March 20, 2007, a true and accurate copy of which is attached herewith as Exhibit 4.

10.     Mr. Hayes cancelled the deposition of Dr. Kosicki on March 21, 2007.   There was no negotiation regarding the cancellation of that deposition.  Mr. Hayes simply indicated that he would not be proceeding with the deposition.

11.     Contrary to the representation on page 1 of plaintiff's April 23, 2007 trial memorandum and in support of motion in limine, there was no agreement between Executive Airlines and Electric Boat to waive Dr. Kosicki's deposition in return for Electric Boat not pursuing Daubert motions.  In fact, that subject was never discussed.  Instead, the agreement was, as represented in Exhibit 3 that "neither party will be filing Daubert or other in limine motions seeking to exclude the testimony of experts . . .."

12.     A true and accurate copy of Dr. Kosicki's initial report dated July 17, 2006 is attached as Exhibit 5.

13.     A true and accurate copy of Dr. Kosicki's supplemental report dated March 12, 2007 is attached as Exhibit 6.

James H. Rotondo

Subscribed and sworn to before me this __30th__ day of April, 2007.

Commissioner of the Superior Court

# EXHIBIT 1

## Rotondo, James H.

**From:** Talbot_Welles@ctd.uscourts.gov

**Sent:** Thursday, February 15, 2007 4:12 PM

**To:** dhayes@bhmr.com; Rotondo, James H.; Maas, Amy T.

Hello attorneys,

Let me know in the near future whether Diane Steiner is still planned to be a witness in the Electric Boat case. If so, Dan can tell me when he can respond to the motion to preclude. If not, we can dispose of the motion to preclude as moot.

If you should need the Court's assistance with anything, Judge Eginton will be around since we are not going to Tucson or New Mexico this February/March.

Enjoy your weekend.

Talbot

# EXHIBIT 2

## Rotondo, James H.

| | |
|---|---|
| **From:** | Rotondo, James H. |
| **Sent:** | Tuesday, February 27, 2007 4:37 PM |
| **To:** | 'Talbot_Welles@ctd.uscourts.gov'; Daniel F. Hayes |
| **Cc:** | Maas, Amy T. |
| **Subject:** | RE: FW: Executive Airlines v. Electric Boat, 02 CV 194 (WWE), OFN 460.15662 |

Talbot and Dan,

We could do a hearing the first week in April.

Jim

-----Original Message-----
**From:** Talbot_Welles@ctd.uscourts.gov [mailto:Talbot_Welles@ctd.uscourts.gov]
**Sent:** Tuesday, February 27, 2007 4:31 PM
**To:** Daniel F. Hayes
**Cc:** Maas, Amy T.; Rotondo, James H.
**Subject:** Re: FW: Executive Airlines v. Electric Boat, 02 CV 194 (WWE), OFN 460.15662

Thank you for the e-mail missives.  Fortunately or unfortunately for me, Dr. Kosicki is not mine and probably will never be mine.  Can you all do the Daubert hearing the first week of April?

Talbot

| | | |
|---|---|---|
| **"Daniel F. Hayes" <dhayes@bhmr.com>** | To | "Talbot Welles <talbot_welles@ctd.uscourts.gov> |
| | | "Amy T. Maas" <atmaas@dbh.com>, "James Rotondo" |
| 02/27/2007 04:15 PM | cc | <jhrotondo@daypitney.com> |
| | Subject | FW: Executive Airlines v. Electric Boat, 02 CV 194 (WWE), OFN 460.15 |

Hi, Talbot.
I've discussed your request concerning the Daubert motion against Diane
Steiner with Jim Rotondo and he has approved my sending you the following
request.  He also wanted to point out his unavailability from April 13 until
April 28 (see email exchange below).

At this time Diane Steiner remains an expert witness for the plaintiff.  Jim
and I have agreed that the motion to disqualify her on Daubert principles
should be adjourned until after  his expert - Dr. Kosicki - serves a report
in response to Anthony Ciccodicola's opinions and is himself deposed.  We
have a tentative date of March 13 at Boston for his deposition.  At that
time Jim will probably bring a Daubert motion against Mr. Ciccodicola and I
will decide whether to do so against your Dr. Kosicki.

Hope this is responsive.

Regards,

Dan Hayes

4/24/2007

Daniel F. Hayes

BIEDERMANN, HOENIG, & RUFF, PC
ATTORNEYS AT LAW
805 Third Avenue
18th Floor
NEW YORK, NEW YORK 10022

TELEPHONE (212) 697-6555
FACSIMILE (212) 986-3509

http://lawbhr.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL
OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION
THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE
UNDER APPLICABLE LAW.  IF THE READER OF THIS MESSAGE IS NOT THE
INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR
DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY
NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS
COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS
COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE,
AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA
THE UNITED STATES POSTAL SERVICE.  THANK YOU.

If this transmission is incomplete, please contact us.

-----Original Message-----
From: Rotondo, James H. [mailto:jhrotondo@daypitney.com]
Sent: Tuesday, February 27, 2007 3:33 PM
To: Daniel F. Hayes
Cc: Maas, Amy T.
Subject: RE: Executive Airlines v. Electric Boat, 02 CV 194 (WWE), OFN
460.15662

Dan,

        That is accurate.  The only concern that I would like expressed
to the court relates to scheduling. I will be out of the office for most
of the two weeks from April 13 until April 28.  I will prepared to file
the motion to preclude Mr. Ciccodicola shortly after the conclusion of
Mr. Kosicki's deposition.  I am hoping that we can schedule his
deposition in the first two weeks in March.  I will know by the end of
this week when Mr. Kosicki's supplemental report will be available and
should have some proposed dates for his deposition.  Please let me know
whether you would prefer to take his deposition in our offices in Boston
or Hartford.  We will make arrangements to get you his file in advance
of the deposition.

Jim

-----Original Message-----
From: Daniel F. Hayes [mailto:dhayes@bhmr.com]
Sent: Tuesday, February 27, 2007 2:15 PM
To: Rotondo, James H.
Subject: FW: Executive Airlines v. Electric Boat, 02 CV 194 (WWE), OFN
460.15662

Jim, I sent this to your old email address this morning.

-----Original Message-----
From: Daniel F. Hayes [mailto:dhayes@bhmr.com]
Sent: Tuesday, February 27, 2007 9:48 AM
To: jhrotondo@dbh.com
Subject: Executive Airlines v. Electric Boat, 02 CV 194 (WWE), OFN
460.15662

Jim, as discussed, I plan on telling Talbot Welles, J. Eginton's
chambers,
that at this time Diane Steiner remains an expert witness for the

plaintiff,
but that you and I have agreed that the motion to disqualify her on Daubert
principles should be adjourned until after  your expert - Dr. Kosicki -
serves a report in response to Anthony Ciccodicola's opinions and is himself
deposed.  At that time you will probably bring a Daubert motion against Mr.
Ciccodicola and I will decide whether to do so against your Dr. Kosicki.

If this is a correct statement of our agreement, please let me know.

Thanks.

Dan Hayes

Daniel F. Hayes

BIEDERMANN, HOENIG, & RUFF, PC
ATTORNEYS AT LAW
805 Third Avenue
18th Floor
NEW YORK, NEW YORK 10022

TELEPHONE (212) 697-6555
FACSIMILE (212)  986-3509

http://lawbhr.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL
OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION
THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE
UNDER APPLICABLE LAW.  IF THE READER OF THIS MESSAGE IS NOT THE
INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR
DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY
NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS
COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS
COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE,
AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA
THE UNITED STATES POSTAL SERVICE.  THANK YOU.

If this transmission is incomplete, please contact us.

# EXHIBIT 3

## Rotondo, James H.

| | |
|---|---|
| **From:** | Rotondo, James H. |
| **Sent:** | Friday, March 02, 2007 5:19 PM |
| **To:** | 'Talbot_Welles@ctd.uscourts.gov'; Daniel F. Hayes |
| **Cc:** | Maas, Amy T. |
| **Subject:** | RE: FW: Executive Airlines v. Electric Boat, 02 CV 194 (WWE), OFN 460.15662 |

Talbot,

   Dan Hayes and I have spoken and agreed that neither party will be filing <u>Daubert</u> or other in limine motions seeking tp exclude the testimony of experts, and therefore it will not be necessary for the court to set aside time during the first week of April for a hearing on any such motions.  Mr. Hayes also indicated that he will not be calling Ms. Steiner to testify, and therefore the court will not need to rule on Electric Boat's motion to exclude Ms. Steiner.

   Is there a date by which the court would like the parties to submit their joint pretrial memorandum?  If so, is the format the same as the previous memorandum?  Thanks.


James H. Rotondo, Esq.
Day Pitney LLP
CityPlace I | 185 Asylum Street | Hartford CT 06103-3499
| *t* (860) 275 0197 | *f* (860) 275-0343 | *c* (860) 833 7561
JHRotondo@DayPitney.com      www.DayPitney.com

        -----Original Message-----
        **From:** Talbot_Welles@ctd.uscourts.gov [mailto:Talbot_Welles@ctd.uscourts.gov]
        **Sent:** Wednesday, February 28, 2007 10:33 AM
        **To:** Daniel F. Hayes
        **Cc:** Maas, Amy T.; Rotondo, James H.
        **Subject:** RE: FW: Executive Airlines v. Electric Boat, 02 CV 194 (WWE), OFN 460.15662


        Hello,

        Could you please check with your experts to see what day they can come in for the Daubert hearing during that first week of April.  Also, all briefing will need to be completed prior to the hearing, of course.

        Thank you.

        Stay well,

        Talbot

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| EXECUTIVE AIRLINES, | : | CIVIL NO.: 3:02 CV 194(WWE) : |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | ——— |
| | : | |
| ELECTRIC BOAT Corp., | : | |
| | : | |
| | : | |
| Defendant | : | March 20, 2007 |

**PLAINTIFF'S NOTICE OF DEPOSITION AND REQUEST FOR THE PRODUCTION**
**OF**
**DOCUMENTS**

To:    George Kosicki
c/o James Rotondo, Esq.
Day Pitney LLP
CityPlace I
Hartford, CT 06103-3499

**PLEASE TAKE NOTICE** that pursuant to Rules 30 and 45 of the Federal Rules of Civil Procedure, the plaintiff will take the deposition of GEORGE KOSICKI before Anthony Kaczynski, Kaczynski Reporting or other competent authority authorized to administer oaths at the law offices of Day Pitney LLP , One International Place, Boston, Massachusetts, commencing on the 23rd day of March, 2007, at ten o'clock in the morning and continuing day to day until completed. You are invited to attend and cross-examine.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Federal Rules of Civil Procedure 30(b)(5) and 34, Executive Airlines hereby requests that the deponent produce documents as set forth in Schedule A, attached hereto. The deponent's production, unless otherwise agreed upon by counsel, is to be made by electronic means or overnight mail at the offices of the undersigned prior to Thursday, March 22, 2007 and supplemented as additional or new information is subsequently discovered.

1 . A current, up-to-date Curriculum Vitae;

2. All documents constituting the deponent's entire file on this matter;

3. Any correspondence or notes outlining the specific scope of the deponent's assignment;

4. Any correspondence or notes documenting the fee or compensation agreement including all records showing time expended on the file to the date of the deposition; all out-of-pocket expenses, and copies of all bills rendered to the date of the deposition;

5. All reports given to the plaintiffs attorney;

6. All materials received, supplied or reviewed in forming the opinion or the conclusion including, but not limited to protocols, scoring sheets, interview notes, test data, videotapes, and audiotapes.

7. All material that the deponent consulted or used in forming his opinion or the conclusion;

8 . All notes made in connection with the case;

9. All writings, including correspondence to and from the plaintiff and/or the plaintiffs attorney;

10. All computations made by the deponent;

11. A listing of all cases in which the deponent has served as a consultant and/or expert; and

12. A listing of all cases in which the deponent has testified, either by deposition or trial.

Dated: New York, New York
      March 20, 2007

                    Yours, etc.,

                    Plaintiff Executive Airlines

                    By_____

                    Daniel F. Hayes (phv0207)
                    Biedermann, Hoenig & Ruff, P.C.
                    805 Third Avenue, 18th Floor
                    New York, New York  10016
                    (212) 697-6555 Telephone
                    (212) 986-3509 Facsimile
                    dhayes@bhmr.com

To:

James H. Rotondo,  Esq. (Ct05713)
jhrotondo@dbh.com
Amy T. Maas, Esq. (Ct25561)
atmaas@dbh.com
Day Pitney LLP
Attorneys for Defendant Electric Boat Corporation
CityPlace I
Hartford, CT 06103-3499
(860) 275-0100 (phone)
(860) 275-0343 (fax)

<u>CERTIFICATION</u>

This is to certify that a copy of the foregoing was emailed and mailed, postage prepaid, on March 20, 2007, to:

James H. Rotondo, Esq.
jhrotondo@dbh.com
Amy T. Maas, Esq.
atmaas@dbh.com
Day Pitney LLP
CityPlace I
Hartford, CT 06103-3499

By_____

Daniel F. Hayes (phv0207)

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
EXECUTIVE AIRLINES,
                                          :    CIVIL ACTION NO.
     Plaintiff,                          3:02-CV-194 (WWE)
                                          :
vs.
                                          :
ELECTRIC BOAT CORPORATION
                                          :
     Defendant.
                                          :

                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x


# EXPERT REPORT OF GEORGE KOSICKI, Ph.D.

## INTRODUCTION

1.    My name is George Kosicki, and I am a Vice President at Analysis Group, Inc. ("Analysis Group"), an economics, finance, and strategy consulting firm. I have a Ph.D. in Economics from Cornell University and over 20 years of experience in economic research and teaching. Prior to joining Analysis Group, I was chair of the Economics Department at the College of the Holy Cross in Worcester, MA, where I spent 15 years on the faculty. My areas of specialization are applied microeconomics, industrial organization, antitrust, and labor economics. As an economic consultant, I have worked on a number of antitrust and commercial litigation cases that relate to economic profits and damages. A detailed description of my background and credentials, including a list of my publications, is contained in the attached copy of my curriculum vitae (Appendix A). I have also included (in Appendix A) a list of the cases in which I have testified during the past four years.

2.  I have been asked by counsel for the defendant, Electric Boat Corporation ("EB"), to review, assess, and comment on the report "Analysis of Economic Losses" submitted by plaintiff's expert, Ms. Diane Steiner ("Steiner report"). I have also been asked by counsel to make an independent estimate of the lost profit damages incurred by the plaintiff Executive Airlines because of EB's early termination of the March 2000 purchase order agreement (No. SNL022-96).

3.  My understanding is that the original purchase order contract between the plaintiff and EB was for one year of charter service, with a minimum of 15 round trip flights per month. The gross contract price was fixed at $4,895 per round trip. Service began on April 17, 2000 and was to continue through April 16, 2001. I have been instructed by counsel to use June 7, 2000 as the date of early termination by EB.

4.  This report and the opinions expressed in it are based on my analyses of the information and materials available to me as of this date. I reserve the right to supplement this report in the event that new information becomes available to me. A complete list of materials I have considered for this particular assignment is included as Appendix B.

5.  Analysis Group is being compensated for my work in this case at the rate of $425 per hour. I was assisted in this report by other professional staff at Analysis Group working under my direction.

## SUMMARY OF CONCLUSIONS

6.  As a result of my work in this case, I have come to the following basic conclusions regarding the damages report prepared by Ms. Steiner:

    6.1.  Ms. Steiner's damages estimate is seriously flawed and overstates by more than ten times the amount by which the plaintiff was actually damaged.

    6.2.  Ms. Steiner totally ignores the fatal crash experienced by Executive Airlines on May 21, 2000 and EB's reaction to it. As a result, her damages calculation erroneously assumes approximately twice the number of flights that EB would have purchased if it had not terminated the contract.

    6.3.  Ms. Steiner's assumptions regarding the cost structure of the plaintiff are fundamentally incomplete and inconsistent with basic economic

principles. She does not consider the fact that some costs which she labels as fixed were also *avoidable* at some point after the contract was terminated (e.g., labor costs and the capital costs associated with the planes themselves). Consequently, she does not allow for any mitigation of the losses experienced by the plaintiff through the elimination of these avoidable costs.

7.   Based on my own independent analysis, I find the lost profit damages to be $83,638, an amount that is more than sufficient to provide the plaintiff a reasonable rate of return on the sales that would have taken place if not for EB's early termination. The rate of return on sales implied by such a damages award (9.4 percent) is more than twice the average rate earned by other airlines operating around the time of the contract.

## EXPECTED REVENUES WITHOUT EARLY TERMINATION

8.   Expected revenues are determined by the contract price and the expected number of flights. I agree with Ms. Steiner's use of a net price of $4,553.49 per round trip flight. Executive Airlines invoiced EB at a fixed round trip price of $4,895, which includes $341.51 in federal excise tax. This leaves Executive Airlines with a net price of $4,553.49 per round trip flight. I do not agree, however, with Ms. Steiner's assessment of the number of flights that would have occurred absent EB's early termination of the contract.

9.   According to Ms. Steiner's review of Executive Airlines' invoices, EB paid for 30 flights during the first month of service and an additional four flights in the second month.[1] EB suspended flights during the second month upon learning of the fatal crash experienced by Executive Airlines on May 21, 2000. The contract was terminated by EB in writing on June 7, 2000. In constructing her damages estimate, Ms. Steiner assumes that if EB had not terminated the contract, it would have continued to purchase 30 flights per month. This assumption is inconsistent with the events that occurred after the crash on May 21, 2000 and basic economic principles of consumer behavior.

10.  There is a voluminous record from earlier parts of this case indicating that EB executives were deeply concerned about the causes of the crash and its implications for the safety of their employees, particularly because the crash involved a plane that had carried EB personnel just two days before.[2] Whether

---

[1] See Steiner report, Exhibit B.

[2] See Defendant's Motion for Summary Judgment, October 29, 2004, p. 6.

Page 3

EB's concerns were justified, of course, is no longer an issue in this case. Instead, the first step in computing lost profit damages is simply to ask what revenues Executive Airlines could have reasonably expected if EB had been forced to comply with the terms of the purchase order contract. Because EB eventually decided to terminate the contract after the crash, it is clear that EB preferred to make alternative arrangements for all of its air travel needs. Consequently, if forced to comply with the terms of the contract, the only logical economic response by EB would have been to allocate as little business as possible to Executive Airlines, specifically 15 flights per month.[3]

## COSTS OF THE ELECTRIC BOAT CONTRACT

11.    The other fundamental flaw in Ms. Steiner analysis is that she divides Executive Airlines' costs into only two categories: those that vary with the amount of time the aircraft is operated (variable costs) and those that do not (fixed cost). She obtained these categorizations from Mr. Bill de Decker, a general aviation industry consultant. Mr. de Decker maintains a database of cost information pertaining to various aircraft, and he offers seminars and financial planning advice to aircraft owners and prospective buyers.[4]

12.    **Avoidable costs.** From an economic perspective, Ms. Steiner's mistake stems from failing to consider the nature of the costs that she treats as fixed. A cost that is fixed from the perspective of adding another flight may still be *avoidable* if no flight service is offered at all. That is, her analysis simply assumes that the assets generating the fixed costs remain deployed in the service of the EB contract, even after the contract no longer exists.[5]

13.    To be clear about Ms. Steiner's conceptual error, suppose that at the time Executive Airlines enters into the EB contract, it hires one additional full-time pilot at an annual salary of $100,000. If the pilot is to be paid regardless of whether a given flight takes place, then the pilot's salary is indeed a fixed cost

---

[3] In an October 31, 2004 affidavit, Mr. Michael Peragine, President of Executive Airlines, testified that he was prepared to subcontract flights to another operator, as was his right under the contract (Peragine affidavit, p. 5). While it is conceivable that under these circumstances EB could have rationally decided to resume its pre-crash purchases, it is likely that in the long-run any subcontractor would have charged Executive Airlines something close to the contract price, leaving Executive Airlines with little profit from such an arrangement.

[4] See Steiner deposition, p. 140 and de Decker deposition, p. 22.

[5] For a brief overview of the various categories of economic costs, including the concept of avoidable costs, see Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 3rd edition, Reading, MA: Addison-Wesley, 2000, pp. 28-29. Avoidable costs are sometimes referred to quasi-fixed costs. See Hal R. Varian, *Intermediate Microeconomics*, 5th edition, New York: W.W. Norton, 1999, pp. 353-54.

from the perspective of operating an additional flight. But suppose the pilot is laid off or fired after the EB contract is terminated. The pilot's labor cost is clearly avoidable once there is no longer a need to serve the contract.

14.  Ms. Steiner's analysis fails to take into account that when EB terminated the contract, nothing compelled Executive Airlines to retain the labor, planes, hangar space, and other assets it had acquired to serve the EB contract. These investments that were made to serve the EB account could have been reversed. Planes can be sold or leased, workers dismissed, insurance canceled, hangar space sublet—or these assets can be redeployed to other accounts if the business can be expanded. Ms. Steiner's analysis assumes that these additional assets remained locked in place for close to a full year upon termination of the EB contract.

15.  **Aircraft costs.** One of the most important types of costs handled incorrectly by Ms. Steiner are the costs associated with the additional planes obtained for purposes of serving the EB contract. Because planes are highly mobile assets that can be redeployed, sold, or leased, they must be considered avoidable for purposes of calculating the damages related to the termination of the EB contract.

  15.1.  The Department of Justice must regularly make decisions regarding the classification of airline costs when deciding whether to pursue charges of predatory pricing, and in the past the Department has classified airplanes as avoidable costs. In a 1997 speech before the American Bar Association, Roger Fones, former Chief of the Transportation, Energy, and Agriculture Section of the Antitrust Division, explained the economic logic in the following way: "A key issue in any airline predation analysis is the correct treatment of aircraft costs. In the very short run, a carrier's fleet is fixed, and its costs of leasing or owning its aircraft are fixed and unavoidable. On the other hand, aircraft are not like rail lines or electric power lines—they are mobile assets that are reasonably marketable, at least up to a point. Therefore, we treat aircraft costs as avoidable within a relatively short to medium time frame. The time period can be even shorter if a carrier can profitably redeploy aircraft from the route in question to another route."[6]

  15.2.  Similarly, economist Alfred Kahn, the former chairman of the Civil Aeronautics Board, pointed out that planes and other airline investments considered to be fixed costs from the perspective of an individual flight are properly treated as variable costs when they are incurred as part of a large incremental increase in service: "The level of incremental cost per

---

[6] Roger W. Fones, "Predation in the Airline Industry," Remarks Before the American Bar Association Forum on Air and Space Law, Seattle, Washington, June 12, 1997.

unit depends, also, on the size of the increment...[I]s the incremental unit of sales the provision of regular service between a pair of cities, involving an entire schedule of flights? In this case, still more costs enter into the marginal calculation—airport rentals, ticket offices, the cost of advertising in local newspapers, indeed the cost of the planes themselves, which need not be acquired or can be used in other service. The larger the incremental unit of service under consideration, the more costs become variable."[7]

16. The fact that aircraft costs are ultimately avoidable represents an important opportunity for the mitigation of damages by Executive Airlines. Moreover, because other costs may be tied to the existence of the planes, elimination of the aircraft costs also allows for the elimination of other costs Ms. Steiner considers to be fixed (e.g., pilots and maintenance personnel, hangar space, insurance).

17. In order to incorporate reasonable mitigation by Executive Airlines into my damages estimate, I first convert the one-time capital expenditures on the aircraft into equivalent monthly rental costs, often referred to as the user cost of capital. To do this, I follow a well established methodology that combines information on the aircraft's market value, the depreciation of the market value over time, and the rate of return that could have been earned if the money spent upfront had been put in an alternative investment over time with similar risk.[8] The idea is to estimate the rental cost of the aircraft that would be set in a competitive market by an owner of the same type of aircraft that was actually purchased. This methodology is described in detail in Appendix C.

18. Parts A and B of Exhibit 1 show the various inputs used in the monthly rental cost calculation. Part C of Exhibit 1 shows the resulting monthly rental cost. These are the aircraft costs that I use in computing the total profits earned by Executive Airlines with and without early termination of the EB contract. By spreading the initial investment in the aircraft into an equivalent rental cost over time, I can then eliminate a portion of the aircraft costs and other related costs (e.g., labor, hangar space, insurance) to allow for mitigation of the damages by Executive Airlines.

19. **The adjustment period for eliminating avoidable costs.** While planes are avoidable costs, they are not perfectly liquid assets. Consequently, in my damages analysis I allow for a six month adjustment period before I eliminate the avoidable costs associated with the EB contract. I base this adjustment period on economic

---

[7] Alfred E. Kahn, *The Economics of Regulation*, Cambridge, MA: The MIT Press, 1988, p. 75.

[8] See Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 6th edition, Upper Saddle River, NJ: Prentice Hall, 2005, pp. 225-227.

research into the relationship between the selling price of used aircraft and the financial condition of the seller, as well as data on inventory turnover by aircraft dealers and brokers.[9]

19.1.   Any asset can be sold quickly if one lowers the selling price enough. Previous research into the sales of used aircraft indicates that carriers in financial distress sell aircraft at a 14 percent discount to the average market price, provided that the airline industry in general is experiencing depressed conditions.[10]

19.2.   Part C of Exhibit 1 shows that shortly after the date of early termination, the two Jetstream aircraft would have had a combined market value of $1,948,908.[11] Therefore, selling the aircraft immediately at a 14 percent "fire sale" discount is equivalent to absorbing an additional rental cost of approximately $270,000.

19.3.   In order to determine the length of time equivalent to absorbing a one-time reduction in market value of approximately $270,000, I start at the contract termination date and cumulatively add in one month increments the rental cost values from Part C of Exhibit 1. After six months I reach approximately $270,000. This indicates that a 6 month adjustment period is approximately equal to requiring Executive Airlines to sell the aircraft immediately at "fire sale" prices, and is therefore consistent with previous economic research.

19.4.   An average adjustment period of six months is also consistent with data on the sales and inventories reported by aircraft dealers and brokers. In the second quarter of 2000, according to aviation market statistics (AMSTAT) data made available by the National Aircraft Resale Association, 282 turboprop aircraft were sold out of a total supply of 1,115, indicating on average a 33 percent chance of an acceptable offer in

---

[9] Leasing was another option for Executive Airlines to eliminate avoidable aircraft costs. Leasing has grown significantly since the mid-1980s and lessors are active participants in the market for used aircraft. See Allesandro Gavazza, "Leasing and Secondary Markets: Theory and Evidence from Commercial Aircraft," Yale School of Management Working Paper, July 2006, pp. 2-3, available at http://www.som.yale.edu/faculty/ag562/aircraftleasing.pdf.

[10] See Todd C. Pulvino, "Do Asset Fire Sales Exist? An Empirical Investigation of Commercial Aircraft Transactions," *Journal of Finance*, Vol. 53(3), June 1998, pp. 939-978. It is not at all clear that the airline industry was experiencing depressed conditions during 2000. In fact, airline industry stock indexes constructed by Bloomberg, Standard & Poor's, and the American Stock Exchange, are higher at the end of 2000 than around the time of contract termination.

[11] See the market value figure for contract month 3 in column [1] of Exhibit 1, Part C.

that quarter. At that rate of turnover, the probability of at least one acceptable offer after two quarters increases to approximately 56 percent.[12] While the data indicate that in the third and fourth quarters of 2000 inventory turnover did slow, the probability of at least one acceptable offer in a six month period remains about 50 percent.

19.5.    Finally, the empirical evidence in support of a six month adjustment period is consistent with informal anecdotal evidence found in a search of various online appraisal and brokerage companies dealing with used aircraft. For example, Brian M. Jacobson, author of the book "Purchasing & Evaluating Airplanes," states: "In my experience, an airplane that is properly priced will sell within 90 days, while it can take as long as six months or more to sell an airplane that has been overpriced."[13] Similarly, Capital Aircraft Sales advises prospective clients on its website that: "The length of time it takes to sell your aircraft is dependent on a number of factors and can range from a few days to much longer. The average is right around 90-120 days hence the normal Listing Agreement period of 120 days used by most brokers."[14]

20.    As Part A of Exhibit 1 indicates, the aircraft acquired by Mr. Peragine because of the EB contract were not sold until 2003. From an economic perspective, the actual date of sale does not determine the relevant adjustment period. Executive Airlines may have simply retained these assets in the hope of new business that never materialized. There were a number of factors that occurred well after the contract termination date that may have made it difficult for Executive Airlines to find new business—lingering concerns regarding the May 2000 crash, the national recession that occurred during 2001, and of course the events of September 11, 2001.[15] Regardless of the reasons, however, the fact that Executive Airlines did not eliminate the avoidable costs of the EB contract within a reasonable period of time means that Ms. Steiner's damages estimate is seriously overstated.

---

[12] Probabilities are computed in Excel using the formula for a binomial distribution. Probabilities based on these data understate the true probability of making a sale given that not all sales are made through dealers/brokers. Moreover, actual data on unsold inventory will reflect some sellers who have overpriced their aircraft.

[13] See http://www.aeroappraisers.com/Online%20Evaluation%20Page.htm.

[14] See http://www.capital-aircraft.com/Selecting%20a%20Broker.htm. Capital Aircraft Sales appears to deal primarily in general aviation aircraft. Aircraft Shopper Online, which was founded in 1995 and lists aircraft such as the Jetstream 31, contains numerous testimonials from customers selling planes in less than six months. See http://www.aso.com/i.aso3/staticcontent.jsp?which=asoinfo/testimnl&iaso3sid=1.

[15] The 2001 recession in the U.S. began in March 2001 and continued until November 2001. See Robert Hall et al., "The NBER's Business-Cycle Dating Procedure," October 21, 2003, p. 1, available at http://www.nber.org/cycles/recessions.pdf.

## LOST PROFIT DAMAGES FROM EARLY TERMINATION

21.   **Overview.**  In this section I describe the methodology I use to compute lost profit damages.  I first estimate Executive Airlines' profits without early termination by EB.  Then, I estimate Executive Airlines profit with early termination, but with the elimination of avoidable costs after the six month adjustment period described above.  Damages are then simply Executive Airline's profits *without* early termination minus the profits earned *with* early termination, assuming reasonable mitigation of damages by Executive Airlines in the latter scenario.

22.   The first step in constructing these scenarios was described earlier in connection with the expected revenues of the EB contract after the May 2000 crash.  When estimating Executive Airlines' profits without early termination, I use the minimum of 15 flights per month specified in the contract for all months after the first month.  The second step is to classify properly Executive Airlines' costs and identify the fixed but avoidable costs ignored by Ms. Steiner.

23.   **Classification of plaintiff costs.**  According to Mr. Peragine, the EB contract represented a significant increase in business, and as a result he undertook a number of activities to begin to fulfill that contract, including the acquisition of additional aircraft, leasing additional hangar space, and adding flight crew and maintenance personnel.  As discussed previously, Exhibit 1 shows the capital costs associated with the aircraft acquired because of the EB contract.

24.   In Exhibit 2, I summarize the plaintiff's filings regarding other contract costs.[16]

   24.1.   Ms. Steiner computes a cost per flight of $1,850 using information provided by Mr. de Decker.  Mr. de Decker provided Ms. Steiner with one of his standard cost reports for the Jetstream aircraft, with the exception of fuel and labor cost figures, which were provided by Ms. Steiner and/or Mr. Peragine.[17]

---

[16] I subsequently use these plaintiff-provided costs in my damages calculations, but this should not be taken as an endorsement of the accuracy of these costs.  My work in this matter is ongoing and I reserve the right to modify these inputs to my analysis should further study reveal them to be incorrect.

[17] See de Decker deposition, pp. 42, 71-72.  Mr. de Decker was not provided any supporting documentation for these fuel and labor cost figures.  In addition, Ms. Steiner indicates that eight of the flights purchased by EB in the first month were subcontracted to another airline, but she did not obtain the costs charged by the subcontractor to Executive Airlines (Steiner report, p. 6; Steiner deposition, p. 137).  If the subcontractor has a similar cost structure to Executive Airlines and adds a profit margin to its costs, the profit earned by Executive Airlines on those flights would be reduced.  If Executive Airlines maintained this practice of subcontracting flights throughout the contract period, Ms. Steiner's damages estimate would be overstated.

24.2.     Mr. Peragine provided estimates of additional contract costs in earlier interrogatory responses and in documents prepared for earlier parts of the case. Ms. Steiner treats all of these costs as fixed. In most cases, I agree that these costs will not vary with the number of flights.[18] As described earlier, however, it is important to assess whether any of these fixed costs are avoidable. Consequently, in Exhibit 2 I separate the costs identified in earlier plaintiff submissions into those that are not recoverable (sunk costs) and those that are recoverable (avoidable costs).[19]

25.    Exhibit 3 pulls together the various elements of the damages analysis described above and shows how I arrive at my damages estimate.

25.1.     Part A shows Executive Airlines' profits without early termination of the contract. In this scenario, EB is considered to be a rational consumer and purchases as few flights as possible without violating the contract after the crash experienced by Executive Airlines in May 2000.[20] Given the fixed costs that occur throughout the length of the contract, I estimate that Executive Airlines would experience a loss on the contract of $650,663.[21]

25.2.     Part B shows Executive Airlines' profits with early termination of the contract on June 7, 2000. As discussed earlier, I allow for a six month adjustment period for the elimination of avoidable fixed costs. Consequently, I allow Executive Airlines to continue to absorb the avoidable fixed costs of the EB contract through December 7, 2000, at

---

[18] Mr. Peragine testified that some pilots were paid by the day, and so these labor costs would vary with the number of flights (Peragine deposition, volume 2, p. 296).

[19] I did not include in this summary the additional maintenance costs, loss of fuel discount, or financing costs claimed by Mr. Peragine (see response to defendant's first set of interrogatories, November 6, 2002, p. 2). Ms. Steiner's variable cost estimate supposedly incorporates fuel and ongoing maintenance costs. Financing costs are captured by my equivalent rental cost estimates in Exhibit 1.

[20] My understanding is that EB also had the right to terminate the contract without penalty after giving six months advance notice of termination. If I were to allow EB to give advance notice on 6/07/00, there would be no sales in Part A of Exhibit 3 after 12/07/00. My damages estimate would be approximately the same or lower after allowing for a reasonable adjustment period for the elimination of avoidable costs after flight operations end.

[21] Provided the various operating cost and purchase/sale documents produced by the plaintiff are correct, Executive Airlines would have incurred an economic loss during the first year of the contract until the number of flights reached approximately 36 per month. The contract required Executive Airlines to have the capacity to handle 12 round trip flights per week or approximately 52 flights per month. See Purchase Order SNL022-096 Supplement 001, p. 3 (Exhibit A to the Steiner report).

which point I eliminate all avoidable costs.[22]   In this scenario, as expected, Executive Airlines does worse, incurring a greater loss of $734,301.

25.3.   Part C summarizes the lost profit damages.  In each of the prior scenarios Executive Airlines experiences a loss, but the loss is smaller without early termination of the contract.  Damages in this case represent the reduction in Executive Airlines' loss.  Consequently, damages equal $83,638.  This is less than one-tenth of the amount claimed by Ms. Steiner.

## PROFITS IN THE AIRLINE INDUSTRY

26.   As a check on the reasonableness of my damages estimate, I compute the rate of return on sales associated with the damages estimate.  As shown in Part C of Exhibit 3, my estimated damages of $83,638 represent a 9.4 percent return on the sales that would have occurred absent the early termination.  In contrast, Ms. Steiner's damages estimate of $881,362 represents a 99.3 percent return on sales.

27.   The rate of return on sales associated with my damages estimate is generally consistent with the operating profit margins earned by the airline industry over time, and Executive Airlines in particular.

27.1.   When asked about the gross profit margin for Jetstream aircraft operated by Executive Airlines, Mr. James B. Ahlfeld, a former accountant at Executive Airlines, could not recall an exact figure, but he testified that "from my experience in the business in some of the airlines I have worked for, if you could get to the bottom line and be at five percent of revenue, you were doing pretty good."[23]

27.2.   When Mr. Ahlfeld was asked whether he ever calculated a gross margin for Executive Airlines on its [Jetstream] 3100 aircraft that was materially better than five percent of revenue, he replied:  "I don't think materially better.  I might have calculated some numbers that could have been in the range of eight percent, but I would be very surprised."[24]

---

[22] Sunk cost investments for certification and training are accounted for in the first contract month in both Parts A and B of Exhibit 3.  Because the sunk costs appear in both parts, they do not affect total damages.

[23] See Ahlfeld deposition, p. 53.

[24] See Ahlfeld deposition, p. 54.

28.   For additional perspective on operating profit margins during the period in question, I computed the operating profit margins for the airline industry using data compiled by the Department of Transportation's Bureau of Transportation Statistics (BTS).

29.   Exhibit 4 lists the operating profits, revenues, and operating profit margins for all airlines in the BTS data operating continuously from the third quarter of 1999 through the second quarter of 2001.[25] The period analyzed begins with the quarter during which the contract was being negotiated and extends through the full term of the contract.  The time period does not include the severe downturn in the airline industry caused by the events of September 11, 2001.  By focusing on airlines in continuous operation, I overstate the margin for the industry as a whole, which includes a number of failing firms with abnormally low margins.

30.   Exhibit 4 shows a wide variation in the operating margins experienced by individual airlines.  In Exhibit 4 the airlines are ranked from smallest to largest in term of total revenue over the period.  In general, airlines with higher revenues had higher margins.  For this group of airlines as a whole, the profit margin is 3.8 percent over the period, with a median margin of only 1.0 percent.  Note that the list of airlines includes Trans States Airlines (margin = 1.2 percent), a company that also flew the Jetstream aircraft used by Executive Airlines.[26]

31.   The distribution of airline industry margins is summarized by the histogram shown in Exhibit 5.  The histogram shows that a profit to sales ratio of 9.4 percent is located well into the upper end of the distribution of returns.  This additional perspective on airline industry profitability confirms that a damages award of $83,638 would be more than reasonable.

32.   In contrast, Ms. Steiner's damages estimate of $881,362 represents a 99.3 percent return on the sales that would have occurred absent the early termination by EB.  This extreme upward bias in her damages estimate results from: (1) her failure to account for the effect of the May 2000 crash on the number of flights EB was willing to purchase; and (2) her failure to allow for any mitigation of damages through the elimination of avoidable costs.  There is simply no economic justification for such a large overstatement of Executive Airlines' lost profits.

---

[25] Operating profits reported by the BTS are net of general and administrative expenses and depreciation, but not interest and taxes.

[26] See de Decker deposition, pp. 67-68.

July 17, 2006

George Kosicki