# EXHIBIT E (PART 2)

## List of Appendixes and Exhibits

Appendixes

Appendix A:  CV of George Kosicki (Includes Testimony in the Last Four Years)

Appendix B:  Documents Considered

Appendix C:  Methodology for Calculating the Monthly Aircraft Rental Cost


Exhibits

Exhibit 1:  Monthly Rental Cost for Jetstream Aircraft

Exhibit 2:  Plaintiff Estimates of Costs Associated with EB Contract

Exhibit 3:  Damages from Early Termination of EB Contract

Exhibit 4:  Operating Profit Margins by Airline:  1999 Q3 – 2001 Q2

Exhibit 5:  Distribution of Airline Profit Margins:  1999 Q3 – 2001 Q2

**APPENDIX A**

**GEORGE KOSICKI, Ph.D.**
**Vice President**

Phone: (617) 425-8162
Fax: (617) 425-8001
gkosicki@analysisgroup.com

111 Huntington Avenue
Tenth Floor
Boston, MA 02199

Dr. Kosicki specializes in applied microeconomics and has consulted in the areas of antitrust, mergers and acquisitions, labor economics, and pharmacoeconomics. He has also served as an expert witness on liability and damages in cases involving antitrust and labor economics. Dr. Kosicki has worked extensively on issues of cost pass through and damages in indirect purchaser litigation stemming from global price fixing conspiracies. He is experienced in market definition analyses, including those in the pharmaceutical industry, and the estimation of demand elasticities using retail scanner data. Dr. Kosicki worked with Analysis Group academic affiliate Robert S. Pindyck on behalf of P&O Princess Cruises plc during the Federal Trade Commission's review of Princess Cruises' merger with Carnival. For a proposed merger in the telecommunications industry, he analyzed competition and pricing for international long distance service. Dr. Kosicki's research in pharmacoeconomics has focused on measuring the cost-effectiveness of treatment for cancer patients.

Prior to joining Analysis Group, Dr. Kosicki served as Chair of the Economics Department at the College of the Holy Cross, where he spent 15 years on the faculty teaching principles of economics, microeconomic theory, industrial organization, and labor economics. He also wrote the book *Labor Market Problems and Applications* to accompany the best selling labor economics textbook *Modern Labor Economics* by Ehrenberg and Smith. Dr. Kosicki's research has been published in several peer-reviewed journals, including *Southern Economic Journal* and *Journal of Economic Education*.

## EDUCATION

Ph.D. in Economics, Cornell University, 1985

M.A. in Economics, Cornell University, 1984

B.A. in Economics, John Carroll University, 1981

## SELECTED CASEWORK

- **Non Participating Manufacturer (NPM) Adjustment Proceeding Under the Tobacco Master Settlement Agreement Between the Settling States and the Participating Manufacturers**
  *Arbitration Proceeding Before Professor Daniel McFadden and the Brattle Group*
  On behalf of the Settling States, supported Professors Robert Pindyck and Jonathan Gruber in an analysis of whether the disadvantages of the 1998 Master Settlement Agreement were a "significant factor" contributing to the Market Share Loss of the Participating Manufacturers in 2003. The NPM Adjustment Proceeding pertained to a potential adjustment in settlement payments totaling approximately one billion dollars.

- **HDC Medical, Inc. v. Minntech Corporation**
  *United States District Court, District of Minnesota, File No. 04-CV-143 ADM/AJB*
  Expert report and deposition testimony in rebuttal of plaintiff's claim of attempted monopolization and anticompetitive tying; report addressed market definition, liability, and damages issues pertaining to defendant's sales of kidney dialysis reprocessing equipment and supplies. Judge approved defendant's motion for summary judgment, citing expert report.

- **Agri-King, Inc., et al. v. Akzo Nobel, Inc., et al.**
  *State of Minnesota, District Court, County of Ramsey, Second Judicial District*
  **Pratt Feeders, LLC, et al. v. F. Hoffman-La Roche, Ltd., et al.**
  **Steven L. Cox, et al. v. Aventis Animal Nutrition, Inc., et al.**
  *District Court of Wyandotte County Kansas*
  Analyzed damages claims by indirect purchasers of vitamin-containing animal feed products that were artificially inflated in price.

- **Remeron Antitrust Litigation**
  *United States District Court, District of New Jersey*
  Supported Professor Janusz Ordover in an analysis of market definition for antidepressant drugs.

- **Northland Cranberries v. Ocean Spray Cooperative**
  *United States District Court, District of Massachusetts*
  Supported Professor Robert Pindyck in an analysis related to allegations of monopolization and unfair competition pertaining to sales of cranberries, concentrate, and retail juice products.

- **Verizon New England, Inc. v. D.W. White Construction Company, et al.**
  *Commonwealth of Massachusetts (Suffolk County), Superior Court C.A. No. 00-0723-G*
  Deposition testimony (March 14, 2003) evaluated the wage rate and total labor costs billed by Verizon New England in its attempt to recover damages from D.W. White and others for an excavation accident.

- **Kellogg Company v. BASF AG, et al.**
  *United States District Court, District of Columbia*
  Supported Professor Robert Pindyck in an analysis of the lost profits incurred by an indirect purchaser of an input that was artificially inflated in price.

- **P&O Princess Cruises plc**
  *Before the Federal Trade Commission*
  Supported Professor Robert Pindyck in an analysis of the economic effects of a proposed merger in the cruise industry.

- **EF Institute for Cultural Exchange, et al. v. Explorica, Inc., et al.**
  *United States District Court, District of Massachusetts, C.A. No. 01-10645-MEL*
  Expert affidavit addressed the economic effect that the electronic collection of publicly available price information by a competitor has on market competition.

- **WorldCom-Sprint Merger**
  *Before the Antitrust Division of the U.S. Department of Justice*
  Analysis of the market power implications of the proposed merger; potential unilateral price increases were predicted through market simulations within a differentiated products framework.

## PRIOR RESEARCH EXPERIENCE

Dr. Kosicki has conducted several empirical studies of the effects of community consumption standards on individual decisions to work and save. These studies utilized large micro data sets, including the Consumer Expenditure Survey, the Current Population Survey, and the National Longitudinal Survey.

## PUBLICATIONS

### Refereed Journals

"Economics of Cost Pass Through and Damages in Indirect Purchaser Antitrust Cases" (with Miles Cahill), *The Antitrust Bulletin*, forthcoming, Fall 2006.

"Cost-Minimization Analysis of Once-Weekly Versus Thrice-Weekly Epoetin Alfa for Chemotherapy-Related Anemia" (with Pierre Y. Cremieux, John M. Fastenau, Catherine T. Piech, A. Mark Fendrick), *Journal of Managed Care Pharmacy*, November/December 2004, 531-537.

"Exploring Economic Models Using Excel" (with Miles Cahill), *Southern Economic Journal*, January 2000, 770-792.

"Interpersonal Comparisons and Labor Supply: An Empirical Analysis," *The American Economist*, Spring 1993, 20-34.

"Linking the Production Possibilities Curve, the Supply Curve, and the Competitive Norm," *Journal of Economic Education*, Fall 1991, 307-311.

"Income Redistribution and Aggregate Consumption: Implications of the Relative Income Hypothesis," *The American Economist*, Spring 1990, 40-44.

"A Note about Savings as a Nonpositional Good," *Eastern Economic Journal*, July-September 1988, 271-276.

"A Test of the Relative Income Hypothesis," *Southern Economic Journal*, October 1987, 422-434.

"The Relative Income Hypothesis: A Review of the Cross Section Evidence," *Quarterly Journal of Business and Economics*, Autumn 1987, 65-80.

### Books

*Student Learning Guide: Labor Market Problems and Applications* to accompany Ehrenberg and Smith *Modern Labor Economics*, 6th edition. Reading, MA: Addison Wesley, 1997. (5th edition published in 1994 by Harper Collins.)

**Other Articles**

"A Framework for Developing Spreadsheet Applications in Economics" (with Miles Cahill), *Social Science Computer Review*, Summer 2001, 186-200 (invited article).

"Using Spreadsheets to Explore Neoclassical Assumptions in a New Keynesian Model" (with Miles Cahill), *Computers in Higher Education Economics Review*, Volume 14, No. 2, 2000.

"Antitrust Policy" and "The Relative Income Hypothesis" in *Survey of Social Science: Economics*, edited by Frank N. Magill, Pasadena: Salem Press, 1991, 55-61 and 1980-1985 (subsequently published as *International Encyclopedia of Economics*, Fitzroy Dearborn Publishers, 1997).

"The Temporary Workforce: An Economic Appraisal," *The Margin*, September/October 1990, 27.

**Book Reviews**

*The Antitrust Revolution*, edited by John E. Kwoka, Jr. and Lawrence J. White, *The American Economist*, Spring 1991.

*The New Unionism: Employee Involvement in the Changing Corporation* by Charles C. Heckscher, *Southern Economic Journal*, October 1989.

*Deindustrialization and Plant Closure,* edited by Paul D. Staudohar and Holly E. Brown, *Southern Economic Journal*, April 1988.

*The New Industrial Organization* by Alexis Jacquemin, *The American Economist*, Fall 1987.

## OTHER PROFESSIONAL ACTIVITIES

Referee for the *Journal of Economic Behavior and Organization, Journal of Economic Education, Quarterly Review of Economics and Business, The American Economist, Defence and Peace Economics*

Textbook reviewer for Harper Collins, McGraw Hill, Oxford University Press

Member of the American Economic Association, associate member of the American Bar Association

## TESTIMONY IN THE LAST FOUR YEARS

- **Verizon New England, Inc. v. D.W. White Construction Company et al.**
  *Commonwealth of Massachusetts (Suffolk County), Superior Court C.A. No. 00-0723-G*
  Deposed March 14, 2003.

- **HDC Medical, Inc. v. Minntech Corporation**
  *United States District Court, District of Minnesota, File No. 04-CV-143 ADM/AJB*
  Deposed August 26, 2005.

**Appendix B**
**Documents Considered**

### Court Filings

Affidavit of Michael S. Peragine, Docket #02-CV-194 (JCH), October 31, 2004.

"Defendant Electric Boat Corporation's Answer, Affirmative Defenses, and Counterclaim in Response to Plaintiff's Second Amended Complaint Dated June 14, 2004," Civil Action No. 02-CV-194 (JCH), October 8, 2004.

"Defendant's Motion for Summary Judgment," Civil Action No. 02-CV-194 (JCH), October 29, 2004.

"Disclosure Pursuant to Rule 26, Fed. R. Civ. Proc.," 02-CV-194 (GLG), July 12, 2002.

"Exhibits on Plaintiff's Motion for Summary Judgment," Civil Action No. 02-CV-194 (JCH), November 7, 2004.

Expert Report of Diane S. Steiner, CPA, May 31, 2006, including Exhibits.

"Local Rule 56(A)1 Statement," Civil Action No. 02-CV-194 (JCH), October 29, 2004.

"Plaintiff, Answering Defendant's First Set of Interrogatories," Civil Action No. 02-CV-194 (GLG), November 6, 2002.

"Plaintiff Executive Airlines' Memorandum of Law on its Motion for Summary Judgment," Civil Action No. 02-CV-194 (JCH), November 7, 2004.

"Second Amended Complaint," Docket #02-CV-194 (JCH), June 14, 2004.

Summary Judgment Decision of Judge Gerard L. Goettel, No. 3:02CV0194 (GLG), July 17, 2003.

### Depositions

Deposition of James B. Ahlfeld, Civil Action No. 02-CV-194 (GLG), May 20, 2004 (including Exhibits).

Deposition of Bill de Decker, 3:02-CV-194 (WWE), June 13, 2006 (including Exhibits).

Deposition of Michael Peragine, Volume 1, Docket No. 02-CV-194 (GLG), December 16, 2003 (including Exhibits).

Deposition of Michael Peragine, Volume 2, Docket No. 20-CV-194 (GLG), March 20, 2004 (including Exhibits).

Deposition of Diane S. Steiner, CPA, Civil Action No. 3:02-CV-194 (WWE), June 15, 2006 (including Exhibits).

### Economic Methodology and Research

Alfred E. Kahn, *The Economics of Regulation,* Cambridge, MA: The MIT Press, 1988, p. 75.

Dennis W. Carlton, & Jeffrey M. Perloff, *Modern Industrial Organization,* 3rd Edition, Reading, MA: Addison-Wesley, 2000, pp. 28-29.

Hal R. Varian, *Intermediate Microeconomics,* 5th Edition, New York: W.W. Norton, 1999, pp. 353-354.

Robert Hall, et al., "The NBER's Business Cycle Dating Procedure," October 21, 2003, p. 1. Available at: http://www.nber.org/cycles/recessions.pdf.

Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics,* 6th Edition, Upper Saddle River, NJ: Prentice Hall, 2005, pp. 225-227.

Roger W. Fones, "Predation in the Airline Industry." Remarks Before the American Bar Association Forum on Air & Space Law, Seattle, Washington, June 12, 1997. Available at http://www.usdoj.gov/atr/public/speeches/1188.pdf.

Todd Pulvino, "Do Asset Fire Sales Exist? An Empirical Investigation of Commercial Aircraft Transactions," *The Journal of Finance,* June 1998, Vol. 53, No. 3: pp. 939-978.

### Industry Background

Air Transport Association – Annual Reports: 2000, 2001, 2002. Available at: http://www.airlines.org/econ/d.aspx?nid=8156.

"Aircraft Shopper Online" webpages (company overview, BAe Jetstream 31 ad, testimonials). Available at: http://www.aso.com/.

Allesandro Gavazza, "Leasing and Secondary Markets: Theory and Evidence from Commercial Aircraft," Yale School of Management Working Paper, July 2006. Available at: http://www.som.yale.edu/faculty/ag562/aircraftleasing.pdf.

Description of used aircraft sales by Brian M. Jacobson. Available at: http://www.aeroappraisers.com/Online%20Evaluation%20Page.htm.

"Selecting a Broker" webpage. Available at:http://www.capital-aircraft.com/Selecting%20a%20Broker.htm.

Thomas W. Gilligan, "Lemons and Leases in the Used Business Aircraft Market," *Journal of Political Economy,* Vol. 112, No. 5, October 2004, pp. 1157-1180.

### Data

Airline industry stock price indexes (from Bloomberg).

AMSTAT, "Market Statistics for Retail Sales, Number of Aircraft for Sale by Quarter 2000-2005." Available through National Aircraft Resale Association, Available at: http://www.nara-dealers.com/resourcelib/mkttrends/NARAmktstat063005.pdf.

Bureau of Transportation Statistics, Air Carrier Financial Reports Schedule: P-11 and P-12. Available at: http://www.transtats.bts.gov/databases.asp?Mode_ID=1&Mode_Desc=Aviation&Subject_ID2=0

*Cost of Capital 2000 Yearbook,* Chicago: Ibbotson Associates, 2000: pp. ii-iii; 1-48; 4-11.

# APPENDIX C

## METHODOLOGY FOR CALCULATING THE MONTHLY AIRCRAFT RENTAL COST

This Appendix describes the economic methodology used to convert one-time capital expenditures to an equivalent monthly rental cost (often referred to as the user cost of capital).[1]

The equivalent monthly rental cost ($R$) is computed by multiplying the market value of the aircraft ($V$) at the beginning of the month by the sum of the economic depreciation rate ($D$) and the rate of return ($I$) that could have been earned by the owner had the money been invested in an alternative investment with similar risk. That is,

$$R = V(D + I).$$

Exhibit 1 shows the rental cost calculation pertaining to the two Jetstream aircraft acquired by Mr. Michael Peragine, President of Executive Airlines, for purposes of serving the EB account.[2] Part A of Exhibit 1 shows the calculation of the average monthly economic depreciation based on the purchase and sales records of the two aircraft. These aircraft were purchased slightly before the starting date of the EB contract, and at the time of purchase had a combined market value of $2,059,312.

An estimate of the rate of return on investments with similar risk ($I$) is given by the weighted average cost of capital (WACC) associated with all airline industry investments in 2000. In this case, I convert the annual WACC of 13.51 percent reported

---

[1] See Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 6th edition, Upper Saddle River, NJ: Prentice Hall, 2005, pp. 225-227.

[2] According to Executive Airlines' flight/maintenance logs (Steiner report, Exhibit C), three aircraft were actually used for the EB account (N16EJ, N16EX, and N404GJ). Because no information was provided on the N16EJ or N16EX aircraft, I use the information on the N404GJ and N16EN. Mr. Peragine testified that the N16EN aircraft would have been used on EB flights, but was in the process of being renovated when the contract began. He indicated that the renovation "may have been 80 or 90 percent completed" (Peragine deposition, vol. 2, pp. 246-47). No documentation was submitted on the cost of this renovation. The final sales price of the N16EN aircraft should reflect the renovation, however, so my economic depreciation rate may be understated. Similarly the document titled "March 31, 2001 Snap-Shot of Aircraft Values & Operating Losses" prepared by Mr. Peragine implies a faster depreciation rate than I compute. Because the aircraft rental cost becomes avoidable at some point, however, using such a higher economic depreciation rate would only serve to reduce my damages estimate.

by Ibbotson Associates into a monthly WACC of 1.06 percent.[3]  This is shown in Part B of Exhibit 1.

In Part C of Exhibit 1, I combine the economic depreciation and WACC estimates into an estimate of the monthly rental cost.  In the first month, the combined aircraft market value at the beginning of month ($1,999,881) is multiplied by the sum of the economic depreciation rate and the WACC, which I refer to as the equivalent rental rate (2.34 percent).  This multiplication yields a monthly rental cost of $46,882 for the two Jetstream aircraft.  At the beginning of the second month, the first month's market value is depreciated by 1.28 percent, and then that market value is multiplied by the rental rate of 2.34 percent to yield a rental cost in the second month of $46,280.  The same procedure is followed for subsequent months and the rental cost values are shown in Part C of Exhibit 1.

---

[3] See Ibbotson Associates, *Cost of Capital 2000 Yearbook*, Chicago:  Ibbotson Associates, 2000, p. 4-11.

Exhibit 1
Monthly Rental Cost for Jetstream Aircraft

**[A] Economic Depreciation of Jetstream Aircraft**

| Aircraft Tail No. | [1] Date of Purchase | [2] Date of Sale | [3] Total No. of Months Owned | [4] No. of Months Owned before Contract Start | [5] Transaction Prices Purchase | [6] Transaction Prices Sale | [7] Economic Depreciation Monthly | [8] Economic Depreciation Annual |
|---|---|---|---|---|---|---|---|---|
| N404GJ | 12/21/99 | 10/01/03 | 45.4 | 3.9 | $ 1,295,000 | $ 775,000 | 1.12% | 14.36% |
| N16EN | 03/30/00 | 08/11/03 | 40.4 | 0.6 | $ 764,312 | $ 425,000 | 1.44% | 18.73% |
| N16EX | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| N16EJ* | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Total | | | | | $ 2,059,312 | $ 1,200,000 | | |
| Average | | | | 2.3 | | | 1.28% | 16.54% |

**[B] Weighted Average Cost of Capital (WACC)**

| [1] Annual | [2] Monthly |
|---|---|
| 13.51% | 1.06% |

**[C] Calculation of Monthly Rental Cost**

| Contract Month | Begin Date | End Date | [1] Aircraft Market Value | [2] Economic Depreciation | [3] WACC | [4] Rental Rate | [5] Aircraft Rental Cost |
|---|---|---|---|---|---|---|---|
| 1 | 04/17/00 | 05/16/00 | $ 1,999,881 | 1.28% | 1.06% | 2.34% | $ 46,882 |
| 2 | 05/17/00 | 06/16/00 | 1,974,230 | 1.28% | 1.06% | 2.34% | 46,280 |
| 3 | 06/17/00 | 07/16/00 | 1,948,908 | 1.28% | 1.06% | 2.34% | 45,687 |
| 4 | 07/17/00 | 08/16/00 | 1,923,911 | 1.28% | 1.06% | 2.34% | 45,101 |
| 5 | 08/17/00 | 09/16/00 | 1,899,235 | 1.28% | 1.06% | 2.34% | 44,522 |
| 6 | 09/17/00 | 10/16/00 | 1,874,875 | 1.28% | 1.06% | 2.34% | 43,951 |
| 7 | 10/17/00 | 11/16/00 | 1,850,827 | 1.28% | 1.06% | 2.34% | 43,387 |
| 8 | 11/17/00 | 12/16/00 | 1,827,088 | 1.28% | 1.06% | 2.34% | 42,831 |
| 9 | 12/17/00 | 01/16/01 | 1,803,654 | 1.28% | 1.06% | 2.34% | 42,282 |
| 10 | 01/17/01 | 02/16/01 | 1,780,520 | 1.28% | 1.06% | 2.34% | 41,739 |
| 11 | 02/17/01 | 03/16/01 | 1,757,682 | 1.28% | 1.06% | 2.34% | 41,204 |
| 12 | 03/17/01 | 04/16/01 | 1,735,138 | 1.28% | 1.06% | 2.34% | 40,675 |

Notes and Sources:

* Aircraft crashed May 21, 2000.

[A1] Deposition of Michael S. Peragine, Vol. 2, March 20, 2004, Exhibit 1, pp. 3-26.

[A2] Deposition of Michael S. Peragine, Vol. 2, March 20, 2004, Exhibit 1, pp. 27-39.

[A3] = ([A2] - [A1] + 1) x (12/365).

[A4] = (04/17/00 - [A1] + 1) x (12/365).

[A5] Deposition of Michael S. Peragine, Vol. 2, March 20, 2004, Exhibit 1, pp. 3-26.

[A6] Deposition of Michael S. Peragine, Vol. 2, March 20, 2004, Exhibit 1, pp. 27-39.

[A7] = 1 - ([A6]/[A5])$^{1/[A3]}$.

[A8] = (1 + [A7])$^{12}$ - 1.

[B1] Ibbotson Associates, *Cost of Capital 2000 Yearbook*, composite WACC for airline industry (SIC 4512), p. 4-11.

[B2] = (1 + [B1])$^{1/12}$ - 1.

[C] See, for example, Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 6th edition, Upper Saddle River, NJ: Prentice Hall, 2005, pp. 225-227.

[C1] = Total market value from previous month x (1 - economic depreciation rate).

Market value at start of contract equals total purchase price depreciated by average number of months aircraft were owned prior to the start of the contract.  Market values are shown as of the beginning of the month.

[C2] = Average of [A7].

[C3] = [B2].

[C4] = [C2] + [C3].

[C5] = [C1] x [C4].

**Exhibit 2**

**Plaintiff Estimates of Costs Associated with EB Contract**

|  |  | Amount | Source |
|---|---|---:|---|
| **Per Flight Costs** |  |  |  |
| [A] | No. of Flights without early termination | 326 | [1] |
| [B] | Cost of operating additional flights | $ 603,075 | [1] |
| [C] | Variable costs per flight | $ 1,850 | [C] = [B]/[A] |

**Other Costs Associated with EB Contract**

|  |  | Amount | Source |
|---|---|---:|---|
| [D] | *Sunk Costs* |  |  |
|  | Moving costs & signage | $ 1,827 | [2] |
|  | Telephone installation at new location | $ 6,690 | [2] |
|  | Additional pilot/maintenance training | $ 64,125 | [2] |
|  | Aircraft certification & equip. list development | $ 4,600 | [2] |
|  | Contract prep expenses | $ 3,600 | [2] |
|  | Jetstream N4Q4GJ certification | $ 25,000 | [3] |
|  | Jetstream N16EN certification | $ 65,000 | [3] |
|  | Total | $ 170,842 |  |

|  |  | Annual | Monthly | Source |
|---|---|---:|---:|---|
| [E] | *Avoidable Costs* |  |  |  |
|  | Additional utility charges at new location | $ 5,475 | $ 456 | [2] |
|  | Expanded facilities (hangar, ramp & office space) | $ 120,000 | $ 10,000 | [3] |
|  | Increase in crew & maintenance personnel | $ 245,000 | $ 20,417 | [3] |
|  | Additional insurance | $ 112,000 | $ 9,333 | [3] |
|  | Total | $ 482,475 | $ 40,206 |  |

Notes and Sources:
[1]  Steiner report, May 31, 2006.
[2]  March 31, 2001 Snap-Shot of Aircraft Value & Operating Losses.
[3]  Plaintiff, Answering Defendant's First Set of Interrogatories, Nov. 6, 2002.
[D]  Sunk costs are costs that are not recoverable.
[E]  Avoidable costs do not vary with the number of flights, but can be eliminated
      if no service is provided.

Exhibit 3
Damages from Early Termination of EB Contract

**[A] Profits without Early Termination**

| | | | [1] | | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contract Month | Begin Date | End Date | | Price | No. of Flights | Revenue | Flight Costs (Steiner) | Aircraft Rental Costs | Other Avoidable Costs (Labor & Ins.) | Sunk Costs (Certification & Training) | Total Costs | Profit (Loss) |
| 1 | 04/17/00 | 05/16/00 | $ | 4,553 | 30 | 136,605 | 55,498 | 46,882 | 40,206 | 170,842 | 313,428 | (176,823) |
| 2 | 05/17/00 | 06/16/00 | $ | 4,553 | 15 | 68,302 | 27,749 | 46,280 | 40,206 | - | 114,235 | (45,933) |
| 3 | 06/17/00 | 07/16/00 | $ | 4,553 | 15 | 68,302 | 27,749 | 45,687 | 40,206 | - | 113,642 | (45,339) |
| 4 | 07/17/00 | 08/16/00 | $ | 4,553 | 15 | 68,302 | 27,749 | 45,101 | 40,206 | - | 113,056 | (44,753) |
| 5 | 08/17/00 | 09/16/00 | $ | 4,553 | 15 | 68,302 | 27,749 | 44,522 | 40,206 | - | 112,477 | (44,175) |
| 6 | 09/17/00 | 10/16/00 | $ | 4,553 | 15 | 68,302 | 27,749 | 43,951 | 40,206 | - | 111,906 | (43,604) |
| 7 | 10/17/00 | 11/16/00 | $ | 4,553 | 15 | 68,302 | 27,749 | 43,387 | 40,206 | - | 111,343 | (43,040) |
| 8 | 11/17/00 | 12/16/00 | $ | 4,553 | 15 | 68,302 | 27,749 | 42,831 | 40,206 | - | 110,786 | (42,484) |
| 9 | 12/17/00 | 01/16/01 | $ | 4,553 | 15 | 68,302 | 27,749 | 42,282 | 40,206 | - | 110,237 | (41,934) |
| 10 | 01/17/01 | 02/16/01 | $ | 4,553 | 15 | 68,302 | 27,749 | 41,739 | 40,206 | - | 109,694 | (41,392) |
| 11 | 02/17/01 | 03/16/01 | $ | 4,553 | 15 | 68,302 | 27,749 | 41,204 | 40,206 | - | 109,159 | (40,857) |
| 12 | 03/17/01 | 04/16/01 | $ | 4,553 | 15 | 68,302 | 27,749 | 40,675 | 40,206 | - | 108,631 | (40,328) |
| **Total** | | | | | 195 | 887,931 | 360,735 | 524,542 | 482,475 | 170,842 | 1,538,594 | (650,663) |

**[B] Profits with Early Termination & Mitigation**

| [Ba] | Contract Initiation Date | 04/17/00 |
|---|---|---|
| [Bb] | Contract Termination Date | 06/07/00 |
| [Bc] | Adjustment/Mitigation Period (Months) | 6 |
| [Bd] | End of Avoidable Costs | 12/07/00 |

| | | | [1] | | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contract Month | Begin Date | End Date | | Price | No. of Flights | Revenue | Flight Costs (Steiner) | Aircraft Rental Costs | Other Avoidable Costs (Labor & Ins.) | Sunk Costs (Certification & Training) | Total Costs | Profit (Loss) |
| 1 | 04/17/00 | 05/16/00 | $ | 4,553 | 30 | 136,605 | 55,498 | 46,882 | 40,206 | 170,842 | 313,428 | (176,823) |
| 2 | 05/17/00 | 06/16/00 | $ | 4,553 | 4 | 18,214 | 7,400 | 46,280 | 40,206 | - | 93,886 | (75,672) |
| 3 | 06/17/00 | 07/16/00 | $ | 4,553 | 0 | - | - | 45,687 | 40,206 | - | 85,893 | (85,893) |
| 4 | 07/17/00 | 08/16/00 | $ | 4,553 | 0 | - | - | 45,101 | 40,206 | - | 85,307 | (85,307) |
| 5 | 08/17/00 | 09/16/00 | $ | 4,553 | 0 | - | - | 44,522 | 40,206 | - | 84,728 | (84,728) |
| 6 | 09/17/00 | 10/16/00 | $ | 4,553 | 0 | - | - | 43,951 | 40,206 | - | 84,157 | (84,157) |
| 7 | 10/17/00 | 11/16/00 | $ | 4,553 | 0 | - | - | 43,387 | 40,206 | - | 83,594 | (83,594) |
| 8 | 11/17/00 | 12/16/00 | $ | 4,553 | 0 | - | - | 29,982 | 28,144 | - | 58,126 | (58,126) |
| 9 | 12/17/00 | 01/16/01 | $ | 4,553 | 0 | - | - | - | - | - | - | - |
| 10 | 01/17/01 | 02/16/01 | $ | 4,553 | 0 | - | - | - | - | - | - | - |
| 11 | 02/17/01 | 03/16/01 | $ | 4,553 | 0 | - | - | - | - | - | - | - |
| 12 | 03/17/01 | 04/16/01 | $ | 4,553 | 0 | - | - | - | - | - | - | - |
| **Total** | | | | | 34 | 154,819 | 62,897 | 345,792 | 309,588 | 170,842 | 889,120 | (734,301) |

**[C] Damages Summary**

| | | |
|---|---|---|
| [C1] Profit (Loss) without Early Termination | $ | (650,663) |
| [C2] Profit (Loss) with Early Termination & Mitigation | $ | (734,301) |
| [C3] Lost Profit Damages from Early Termination | $ | 83,638 |
| [C4] Damages as % of Sales without Early Termination | | 9.4% |

Notes and Sources:

[A1]  = Price per round trip flight net of excise tax, Steiner report.
[A2]  = Actual flights used by EB in month 1 (Steiner report, Exhibit B); minimum number of flights specified by contract thereafter.
[A3]  = [A1] x [A2].
[A4]  = [C] from Exhibit 2 (Variable costs per flight from Steiner report) x [A2].
[A5]  = [C5] from Exhibit 1.
[A6]  = Total monthly avoidable costs from Exhibit 2.
[A7]  = Total sunk costs from Exhibit 2.
[A8]  = [A4] + [A5] + [A6] + [A7].
[A9]  = [A3] - [A8].  Negative values (i.e., losses) shown in parentheses.
[Ba]  = Start date of EB charter contract; Steiner report, Exhibit A.
[Bb]  = Date of early termination as instructed by counsel.
[Bc]  = Period of time within which aircraft and other assets could be sold, leased, or redeployed to other accounts.
[Bd]  = [Bb] + [Bc].
[B1]  = Price per round trip flight net of excise tax, Steiner report.
[B2]  = Actual flights used by EB in months 1 & 2 (Steiner report, Exhibit B);  0 thereafter.
[B3]  = [B1] x [B2].
[B4]  = [C] from Exhibit 2 (Variable costs per flight from Steiner report) x [B2].
[B5]  = [A5] x (Number of days in contract month prior to [Bd] / Number of days in contract month)
[B6]  = [A6] x (Number of days in contract month prior to [Bd] / Number of days in contract month)
[B7]  = Total sunk costs from Exhibit 2.
[B8]  = [B4] + [B5] + [B6] + [B7].
[B9]  = [B3] - [B8].  Negative values (i.e., losses) shown in parentheses.
[C1]  = Total [A9].
[C2]  = Total [B9].
[C3]  = [C1] - [C2].
[C4]  = [C3]/Total [A3].

**Exhibit 4**
**Operating Profit Margins by Airline**
**1999 Q3 - 2001 Q2**

| Airline (Sorted by Revenue) | Profit (thousands) | | | Revenue (thousands) | | | Profit as % of Revenue | | |
|---|---|---|---|---|---|---|---|---|---|
| Qtr. Begin / End | 1999 Q3 / 2000 Q2 | 2000 Q3 / 2001 Q2 | Total | 1999 Q3 / 2000 Q2 | 2000 Q3 / 2001 Q2 | Total | 1999 Q3 / 2000 Q2 | 2000 Q3 / 2001 Q2 | Total |
| Golf Air Caribbean Cargo | (62) | 0.1 | (62) | 628 | 561 | 1,189 | -9.8% | 0.0% | -5.2% |
| Trans-Air-Link Corporation | (349) | (359) | (708) | 876 | 763 | 1,639 | -39.8% | -47.0% | -43.2% |
| Sierra Pacific Airlines | 568 | 832 | 1,400 | 6,549 | 7,488 | 14,038 | 8.7% | 11.1% | 10.0% |
| Asia Pacific | (402) | (11) | (413) | 7,692 | 11,480 | 19,172 | -5.2% | -0.1% | -2.2% |
| Allegiant Air | (5,303) | (5,010) | (10,314) | 11,618 | 9,938 | 21,556 | -45.6% | -50.4% | -47.8% |
| Custom Air Transport | (4,409) | (4,618) | (9,028) | 18,596 | 4,519 | 23,114 | -23.7% | -102.2% | -39.1% |
| Southeast Airlines | 392 | (279) | 113 | 9,888 | 18,496 | 28,385 | 4.0% | -1.5% | 0.4% |
| Sunworld Intl Airlines | 652 | (2,931) | (2,280) | 17,461 | 16,709 | 34,170 | 3.7% | -17.5% | -6.7% |
| Zantop International | 5,014 | (3,463) | 1,551 | 25,230 | 12,064 | 37,294 | 19.9% | -28.7% | 4.2% |
| Tatonduk Flying Service | 2,562 | 1,364 | 3,926 | 21,729 | 23,493 | 45,222 | 11.8% | 5.8% | 8.7% |
| Express Net Airlines | (2,255) | (953) | (3,208) | 8,805 | 42,921 | 51,727 | -25.6% | -2.2% | -6.2% |
| Casino Express | (3,779) | (5,678) | (9,456) | 27,949 | 29,174 | 57,122 | -13.5% | -19.5% | -16.6% |
| Pan American Airways Corp. | (12,285) | (22,294) | (34,580) | 16,784 | 43,190 | 59,974 | -73.2% | -51.6% | -57.7% |
| Northern Air Cargo Inc. | (3,935) | 534 | (3,401) | 37,173 | 40,818 | 77,990 | -10.6% | 1.3% | -4.4% |
| Tradewinds Airlines | 1,209 | 1,081 | 2,290 | 26,374 | 55,481 | 81,855 | 4.6% | 1.9% | 2.8% |
| Capital Cargo International | 1,836 | (7,629) | (5,793) | 37,304 | 46,517 | 83,821 | 4.9% | -16.4% | -6.9% |
| Florida West Airlines Inc. | (867) | (750) | (1,616) | 38,721 | 48,341 | 87,062 | -2.2% | -1.5% | -1.8% |
| Transmeridian Airlines | 933 | (5,457) | (4,524) | 58,939 | 36,679 | 95,618 | 1.6% | -14.9% | -4.7% |
| Lynden Air Cargo Airlines | 6,765 | 6,847 | 13,612 | 49,173 | 47,644 | 96,817 | 13.8% | 14.4% | 14.1% |
| Falcon Air Express | (6,614) | 2,396 | (4,218) | 53,399 | 44,386 | 97,785 | -12.4% | 5.4% | -4.3% |
| Omni Air Express | 4,575 | 8,017 | 12,592 | 65,666 | 91,388 | 157,054 | 7.0% | 8.8% | 8.0% |
| North American Airlines | (423) | 2,505 | 2,081 | 73,589 | 89,999 | 163,588 | -0.6% | 2.8% | 1.3% |
| Amerijet International | (2,163) | (13,371) | (15,534) | 105,231 | 85,911 | 191,142 | -2.1% | -15.6% | -8.1% |
| Miami Air International | (1,709) | 461 | (1,248) | 94,771 | 122,993 | 217,765 | -1.8% | 0.4% | -0.6% |
| Express One Int'l Inc. | 5,928 | 2,564 | 8,492 | 119,187 | 111,238 | 230,425 | 5.0% | 2.3% | 3.7% |
| Vanguard Airlines Inc. | (17,143) | (29,948) | (47,091) | 132,668 | 122,821 | 255,489 | -12.9% | -24.4% | -18.4% |
| Centurion Cargo Inc. | (26,232) | (23,603) | (49,835) | 146,665 | 112,916 | 259,581 | -17.9% | -20.9% | -19.2% |
| Arrow Air Inc. | 17,377 | (80,223) | (62,847) | 95,013 | 175,536 | 270,549 | 18.3% | -45.7% | -23.2% |
| Champion Air | 14,490 | 18,876 | 33,367 | 127,004 | 160,600 | 287,605 | 11.4% | 11.8% | 11.6% |
| Gemini Air Cargo Airways | 3,365 | 6,332 | 9,697 | 134,824 | 192,632 | 327,456 | 2.5% | 3.3% | 3.0% |
| Executive Airlines* | 11,064 | 9,174 | 20,238 | 171,753 | 185,369 | 357,123 | 6.4% | 4.9% | 5.7% |
| Trans States Airlines | (1,786) | 6,677 | 4,891 | 219,304 | 189,808 | 409,112 | -0.8% | 3.5% | 1.2% |
| Ryan International Airlines | 2,763 | 3,268 | 6,031 | 205,183 | 232,533 | 437,716 | 1.3% | 1.4% | 1.4% |
| National Airlines | (36,028) | (45,702) | (81,731) | 168,864 | 301,672 | 470,536 | -21.3% | -15.1% | -17.4% |
| Kitty Hawk Aircargo | 8,899 | 5,149 | 14,048 | 303,347 | 210,629 | 513,975 | 2.9% | 2.4% | 2.7% |
| Sun Country Airlines d/b/a Mn Airlines | (29,433) | (43,202) | (72,635) | 269,030 | 274,165 | 543,194 | -10.9% | -15.8% | -13.4% |
| World Airways Inc. | (8,449) | (11,557) | (20,006) | 256,006 | 289,556 | 545,562 | -3.3% | -4.0% | -3.7% |
| Pace Airlines | 4,151 | 251,463 | 255,613 | 177,214 | 370,147 | 547,361 | 2.3% | 67.9% | 46.7% |
| Aloha Airlines Inc. | (10,194) | (8,815) | (19,008) | 253,257 | 298,361 | 551,817 | -4.0% | -3.0% | -3.4% |
| Midway Airlines Inc. | (6,154) | (29,222) | (35,376) | 241,694 | 312,124 | 553,818 | -2.5% | -9.4% | -6.4% |
| Evergreen Int'l Inc. | 24,427 | 26,966 | 51,393 | 320,383 | 277,503 | 597,885 | 7.6% | 9.7% | 8.6% |

| Airline (Sorted by Revenue) | Qtr. Begin End | Profit (thousands) 1999 Q3 2000 Q2 | Profit (thousands) 2000 Q3 2001 Q2 | Profit (thousands) Total | Revenue (thousands) 1999 Q3 2000 Q2 | Revenue (thousands) 2000 Q3 2001 Q2 | Revenue (thousands) Total | Profit as % of Revenue 1999 Q3 2000 Q2 | Profit as % of Revenue 2000 Q3 2001 Q2 | Profit as % of Revenue Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Air Transport International | | 9,152 | 710 | 9,862 | 300,660 | 299,622 | 600,282 | 3.0% | 0.2% | 1.6% |
| Spirit Air Lines | | (10,879) | 10,232 | (648) | 271,948 | 356,542 | 628,490 | -4.0% | 2.9% | -0.1% |
| Polar Air Cargo Airways | | (7,614) | (40,486) | (48,100) | 342,887 | 368,741 | 711,628 | -2.2% | -11.0% | -6.8% |
| Air Wisconsin Airlines Corp | | 10,748 | 8,570 | 19,318 | 323,135 | 396,695 | 719,830 | 3.3% | 2.2% | 2.7% |
| Frontier Airlines Inc. | | 53,263 | 66,654 | 119,917 | 364,743 | 483,384 | 848,127 | 14.6% | 13.8% | 14.1% |
| Midwest Airline, Inc. | | 40,607 | (5,510) | 35,096 | 414,976 | 440,987 | 855,963 | 10.8% | -1.2% | 4.1% |
| Mesaba Airlines | | 44,583 | 24,413 | 68,995 | 414,210 | 447,202 | 861,412 | 9.8% | 5.5% | 8.0% |
| Horizon Air | | 15,762 | (26,206) | (10,444) | 431,984 | 445,291 | 877,275 | 3.6% | -5.9% | -1.2% |
| Continental Micronesia | | 39,806 | 86,771 | 126,577 | 514,079 | 508,971 | 1,023,050 | 7.7% | 17.0% | 12.4% |
| Hawaiian Airlines | | (43,397) | (15,288) | (58,685) | 547,136 | 620,714 | 1,167,851 | -7.9% | -2.5% | -5.0% |
| Atlantic Southeast Airlines | | 141,723 | 72,540 | 214,263 | 562,926 | 651,379 | 1,214,305 | 25.2% | 11.1% | 17.6% |
| AirTran Airways Corporation | | 88,752 | 96,187 | 184,939 | 556,757 | 710,423 | 1,267,181 | 15.9% | 13.5% | 14.6% |
| Atlas Air, Inc. | | 206,230 | 74,580 | 280,810 | 713,747 | 761,620 | 1,475,367 | 28.9% | 9.8% | 19.0% |
| Emery Worldwide Airlines | | (1,236) | 15,223 | 13,988 | 902,263 | 754,064 | 1,656,327 | -0.1% | 2.0% | 0.8% |
| ATA Airlines d/b/a ATA | | 58,743 | 9,435 | 68,178 | 1,096,488 | 1,221,905 | 2,318,393 | 5.4% | 0.8% | 2.9% |
| American Eagle Airlines Inc. | | 66,233 | (51,992) | 14,241 | 1,135,165 | 1,343,339 | 2,478,504 | 5.8% | -3.9% | 0.6% |
| Astar Air Cargo Inc. | | (2,311) | (152,361) | (154,672) | 1,453,813 | 1,509,242 | 2,963,054 | -0.2% | -10.1% | -5.2% |
| Alaska Airlines Inc. | | 88,226 | (26,165) | 62,061 | 1,729,640 | 1,813,601 | 3,543,241 | 5.1% | -1.4% | 1.8% |
| America West Airlines Inc. | | 136,082 | (154,967) | (18,885) | 2,254,959 | 2,308,399 | 4,563,358 | 6.0% | -6.7% | -0.4% |
| United Parcel Service | | 106,154 | 148,040 | 254,194 | 2,343,668 | 2,712,743 | 5,056,411 | 4.5% | 5.5% | 5.0% |
| Trans World Airways LLC | | (412,070) | (282,088) | (694,158) | 3,442,050 | 3,353,811 | 6,795,862 | -12.0% | -8.4% | -10.2% |
| Southwest Airlines Co. | | 831,045 | 1,051,324 | 1,882,369 | 5,142,966 | 5,928,700 | 11,071,666 | 16.2% | 17.7% | 17.0% |
| Continental Air Lines Inc. | | 408,181 | 501,847 | 910,028 | 8,557,377 | 9,173,481 | 17,730,858 | 4.8% | 5.5% | 5.1% |
| US Airways Inc. | | (132,502) | (233,111) | (365,613) | 8,630,188 | 9,442,292 | 18,072,480 | -1.5% | -2.5% | -2.0% |
| Northwest Airlines Inc. | | 773,826 | 119,914 | 893,740 | 10,466,069 | 10,856,743 | 21,322,812 | 7.4% | 1.1% | 4.2% |
| Delta Air Lines Inc. | | 1,614,916 | 505,220 | 2,120,136 | 14,983,624 | 15,031,895 | 30,015,519 | 10.8% | 3.4% | 7.1% |
| Federal Express Corporation | | 947,530 | 785,014 | 1,732,544 | 15,196,781 | 15,424,893 | 30,621,674 | 6.2% | 5.1% | 5.7% |
| American Airlines Inc. | | 1,281,292 | (89,449) | 1,191,843 | 17,200,147 | 18,085,651 | 35,285,798 | 7.4% | -0.5% | 3.4% |
| United Air Lines Inc. | | 1,727,804 | (980,807) | 746,997 | 18,917,694 | 18,766,266 | 37,683,960 | 9.1% | -5.2% | 2.0% |
| **Total** | | 8,017,648 | 1,527,671 | 9,545,318 | 123,367,623 | 128,967,957 | 252,335,580 | 6.5% | 1.2% | 3.8% |
| **Median** | | | | | | | | 3.2% | 0.1% | 1.0% |

Notes:
* These data do not pertain to the plaintiff in this case; this airline is a Puerto Rico-based affiliate of American Eagle.
Only those airlines reporting non-zero revenue in each period are included.
Operating profit reported is net of accounting depreciation, but not interest and taxes.

Sources:
Bureau of Transportation Statistics, Air Carrier Financial Reports Schedule: P-11 and P-12.
Available at http://www.transtats.bts.gov/databases.asp?Mode_ID=1&Mode_Desc=Aviation&Subject_ID2=0



**Exhibit 5**
**Distribution of Airline Profit Margins**
**1999 Q3 - 2001 Q2**

9.4% Profit Margin on Sales

Operating Margin

% of Airlines in Category

Source: Bureau of Transportation Statistics, Air Carrier Financial Reports Schedule: P-11 and P-12.

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXECUTIVE AIRLINES,                                     :

      **Plaintiff,**            :     **CIVIL ACTION NO.**
                         **3:02-CV-194 (WWE)**
                     :

**vs.**                                                 :

**ELECTRIC BOAT CORPORATION**                           :

      **Defendant.**            :

                             :

                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# SUPPLEMENTAL EXPERT REPORT OF GEORGE KOSICKI, Ph.D.

## INTRODUCTION

1.    My name is George Kosicki, and I prepared an expert report in this matter dated July 17, 2006. An updated copy of my curriculum vitae is attached as Appendix A.

2.    As I indicated in my initial report, I was asked by counsel for the defendant, Electric Boat Corporation ("EB"), to review, assess, and comment on the report "Analysis of Economic Losses" submitted by plaintiff's expert, Ms. Diane Steiner. I was also asked by counsel to make an independent estimate of the lost profit damages incurred by the plaintiff Executive Airlines because of EB's early termination of the March 2000 purchase order agreement (No. SNL022-096).

3.    Since that time, I was provided by counsel with the August 7, 2006 report submitted by the plaintiff's new expert, Mr. Anthony Ciccodicola, as well as the transcript and exhibits from Mr. Ciccodicola's deposition taken on December 14, 2006 and February 20, 2007. I was also provided by counsel with a number of additional

documents produced by the plaintiff, as well as the deposition transcript and exhibits from the December 6, 2006 deposition of Mr. Michael Peragine. I was asked by counsel to review and assess these additional materials and update my original report as necessary.

4.   This supplemental report and the opinions expressed in it are based on my analysis of the information available to me as of this date. I reserve the right to further update my work in the event that new information becomes available to me after this date. A complete list of the additional materials I considered for this supplemental report is included as Appendix B. I do not repeat any materials listed in my initial report.

## SUMMARY OF CONCLUSIONS

5.   As a result of my additional work in this case, I have come to the following basic conclusions regarding the damages report prepared by Mr. Ciccodicola:

5.1.    There is nothing in Mr. Ciccodicola's report that would lead me to revise upward my previous estimate of Executive Airlines' lost profits, or any of the economic analysis presented in my initial report.

5.2.    Mr. Ciccodicola's report is essentially a repackaging of the analysis presented by Ms. Steiner. Both reports are seriously flawed and overstate by more than ten times the amount by which the plaintiff was actually damaged.

5.3.    Mr. Ciccodicola's criticisms of my initial report are all incorrect.

6.   The additional materials provided by the plaintiff since my initial report help to confirm certain inputs used in my initial analysis, and also provide for a straightforward alternative method of estimating damages that confirms my original estimate. In fact, the additional materials suggest that my original damages estimate of $83,638 may be overstated in favor of the plaintiff. This alternative method for estimating damages results in total lost profit damages of $56,626.

## DISCUSSION OF THE PLAINTIFF'S EXPERT REPORT

7.   **Fixed costs.** Mr. Ciccodicola's damages report differs from Ms. Steiner's in that he estimates certain "fixed overhead expenditures" incurred by Executive Airlines in order to serve the EB contract. He then inexplicably subtracts these costs from

his estimate of the lost profits, and then add these costs back, thereby returning to his original estimate. Mr. Ciccodicola indicates that he performs these additional steps in order to comply with Connecticut law and was advised on this subject by the plaintiff's attorney, Mr. Daniel Hayes. From the standpoint of basic economics, these steps are totally unnecessary and only cause confusion as to the factors that drive Mr. Ciccodicola's damages estimate.

8.      From an economic perspective, lost profit damages are computed by comparing the profits that actually occur (provided the plaintiff took reasonable steps to mitigate any damages) and the profits that would have occurred "but-for" the improper conduct (in this case the early termination of the contract). By basic arithmetic, any costs that have the same value in each scenario drop out of the lost profits calculation.[1] No additional subtraction or addition of these fixed costs is necessary.

9.      The fundamental point that Mr. Ciccodicola's obscures through these additional steps is that while some of Executive Airlines' costs are fixed from the perspective of carrying an extra passenger or operating an extra flight, the costs may still vary across the two scenarios used to compute lost profit damages from early termination. As I discussed in my initial report, a good example of such a cost is the annual salary of a pilot. The salary of the pilot may be fixed with respect to the number of flights, but if the EB account is terminated, the pilot can be laid off, fired, or redeployed to other routes, and so his or her salary is variable from the perspective of serving the EB account. This is what I refer to in my initial report as fixed but avoidable cost. Another way to express the same point would be to characterize the cost as fixed from the perspective of adding another flight, but variable from the perspective of serving the EB contract. From an economic perspective, only the costs that are variable from the perspective of serving the EB contract are relevant to the calculation of lost profit damages.

10.     The extent to which certain costs vary between the actual and but-for world is precisely the issue taken up by the United States District Court for the District of Connecticut in the March 30, 2004 *Retepromaca* decision that Mr. Hayes referred to Mr. Ciccodicola's attention.[2] In that decision the court discussed the issue of whether the plaintiff would have incurred additional expenses along with additional sales in the but-for world, and it concluded that any additional expenses should be considered when computing lost profit damages.

---

[1] This is the reason that Mr. Ciccodicola obtains essentially the same damages estimate as Ms. Steiner, who focused only on variable costs.

[2] See Retepromaca Representaciones Tecnicas Proyectos y Sistemas, C.A. v. The Ensign-Bickford Company, U.S. District Court for the District of Connecticut, Civil Action No. 3:98cv1857 (SRU), March 30, 2004. Mr. Hayes' e-mail to Mr. Ciccodicola is contained in Exhibit 2 to Mr. Ciccodicola's December 14, 2006 deposition at CIC0194.

11.  In this matter, it is clear that costs such as labor, insurance, and the capital costs associated with the aircraft were not locked in place when the EB contract was terminated and so changes in these costs should be considered when computing lost profit damages.

12.  While Mr. Ciccodicola's fixed cost estimates play no role in his damages estimate, he offer four criticisms of my report, all of which relate to the issue of fixed costs. All of his criticisms are incorrect.

12.1.  First, Mr. Ciccodicola takes issue with the *plaintiff-provided* estimates of the costs associated with the EB contract. In particular, he singles out the additional labor cost estimate, and notes that "salary/wages and related payroll taxes average approximately $4,349.08 per month per Jetstream aircraft."[3]  In fact, Executive Airlines allocated approximately $11,000 per month for salaries, taxes, and benefits for each Jetstream aircraft.[4]  In his December 6, 2006 deposition, Mr. Peragine reaffirmed his November 6, 2002 interrogatory responses, which were the source of the cost estimates that I used in Exhibit 2 of my initial report.[5]  In addition, the business records produced by the plaintiff since my initial report are consistent with these cost estimates.[6]

12.2.  Second, Mr. Ciccodicola indicates that I overstated the rate of economic depreciation on the Jetstream aircraft by basing my depreciation rate on the purchase and sale price of the aircraft. He states that the calculation should be based on purchase prices and aircraft markets values around April 16, 2001. In fact, Mr. Peragine provided estimates of the aircraft values as of March 31, 2001 and testified that these estimates were based on independent appraisals.[7]  These appraisal values are the same or lower than the sale prices I use. Therefore, by depreciating the aircraft to essentially the March 31, 2001 values over a longer period, I actually *understate* the rate of economic depreciation, and this serves to increase my damages estimate in favor of the plaintiffs.

---

[3] Ciccodicola report, p. 7.

[4] See EXECAIR00000354-356 showing Executive Airlines master budget for 2000.

[5] See Peragine deposition, December 6, 2006, p. 129.  Mr. Peragine's response to Question 4 of the interrogatories contains the cost information.

[6] For example, see EXECAIR00000178 for a summary of Executive Airlines' insurance costs for 2000. The incremental office rent can be verified using the monthly expenses recorded in EXECAIR00001207.

[7] See Peragine deposition, December 6, 2006, p. 122.

12.3.    Third, Mr. Ciccodicola states that I should have used a lower rate of return in my monthly aircraft rental cost calculations, specifically the rate of return on short-term U.S. Treasury bills. As a fundamental matter of economics this is simply incorrect. It is well established in the economics and finance literature that the opportunity cost of capital depends on the return that the owner of the asset could have earned if the money had been invested in an alternative investment with *similar risk*.[8] Therefore, the short-term Treasury bill rate, which is essentially a risk-free rate, is not appropriate for evaluating capital investments in the airline industry.

12.4.    Finally, Mr. Ciccodicola includes a strange criticism of my position regarding the extent to which the aircraft costs associated with the EB contract were avoidable. First, he mischaracterizes my report by stating: "A major item discussed in this report indicates that Executive Airlines should have sold two aircraft (N404G5 [*sic*] and N16EN) within six (6) month from the breach of the contract."[9] I have not taken any position regarding what Executive Airlines "should have" done in any particular circumstance. Instead, I simply present economic evidence that shows Executive Airlines could have reasonably avoided charging the aircraft costs to the EB contract by redeploying, selling, or leasing the planes within 6 months of termination.[10] Second, Mr. Ciccodicola goes on to largely confirm my point by reasoning that at most one aircraft could have been sold because the other had been redeployed to serve other customers.

13.    **Lost revenue.** In addition to confusing important issues on the cost side of the damages analysis, Mr. Ciccodicola's report includes errors with respect to the calculation of lost revenue.

14.    Most importantly, he assumes that Executive Airlines lost 30 flights per month because of the early termination. This assumption ignores the fact that EB made a conscious choice to terminate the contract. As I indicated in my initial report, the number of lost flights per month can be determined from an economic perspective by asking how many flights Executive Airlines could have reasonably expected if EB had been forced to comply with the terms of the purchase order contract. Because EB eventually decided to terminate the contract after the fatal plane crash on May 21, 2000, it is clear that EB preferred to make alternative arrangements for

---

[8] See Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 6th edition, Upper Saddle River, NJ: Prentice Hall, 2005, p. 555; Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 8th edition, Boston, MA: McGraw-Hill Irwin, 2006, pp. 215-217.

[9] Ciccodicola report, p. 6.

[10] See my initial report, ¶ 15, p. 5.

all of its air travel needs. Consequently, if forced to comply with the terms of the contract, the only logical economic response by EB would have been to allocate as little business as possible to Executive Airlines, specifically 15 flights per month (the contract minimum). Moreover, one would also expect EB to invoke the 6-month early termination provision of the contract, meaning that Executive Airlines lost 90 flights (15 x 6) because of EB's early termination, not 326 as Mr. Ciccodicola argues.[11]

15.    In addition, Mr. Ciccodicola assumes that Executive Airlines would have been entitled to collect an additional $500 fee on a certain proportion of the lost EB flights as compensation for "positioning legs" that may have been needed (i.e., flights between Executive Airlines' hangar in Farmingdale, New York and the origin of the flight requested by EB). The plaintiff's first expert, Ms. Steiner, did not include such revenue. I do not make any allowance for positioning flights in my damages calculation because I see no evidence in the contract that such flights would be needed if Executive Airlines flew the contract minimum of 15 flights per month. Positioning flights are described in point (3) of the Itinerary section of purchase order SNL022-096 under the heading "Additional Aircraft." This suggests that charges for positioning flights were appropriate only if additional aircraft (beyond the two needed to meet the minimum charter schedule) had to be brought into service from Farmingdale.

16.    However, *even if* additional revenue from positioning flights could have been expected under the contract, one must also consider the incremental costs associated with such flights. Mr. Ciccodicola did not compute the additional costs associated with these flights, and so he effectively treated the entire $500 charge as lost profit.[12]

16.1.    Mr. Peragine testified in his deposition that Executive Airlines possibly made a small profit of "maybe fifty, sixty dollars" on positioning flights, and that the $500 charge was primarily to reimburse Executive Airlines for its costs.[13]

16.2.    Mr. Ciccodicola assumes 10 positioning flights for every 33 round-trip flights, or approximately 100 positioning flights for the 326 round-trip flights he claims Executive Airlines lost because of early termination. At

---

[11] Electric Boat purchase order SNL022-096, p. 6. Mr. Ciccodicola's estimate of the number of lost flights is reported in Schedule 2 of his report.

[12] Ciccodicola deposition, December 14, 2006, p. 102.

[13] Peragine deposition, December 6, 2006, pp. 202-203.

his assumed profit margin of $500 per positioning flight, this means he inappropriately adds about $50,000 to his damages estimate.

16.3.   In fact, if the number of additional positioning flights claimed by Mr. Ciccodicola were lost, they would add *at most* $6,000 [100 positioning flights x $60 per flight] to damages.   At 90 lost round-trip flights, positioning flights would add at most $1,800 to damages [30 positioning flights x $60 per flight].

## FLIGHTS SUBCONTRACTED BY EXECUTIVE AIRLINES

17.   The plaintiff's document production of October 31, 2006 contained business records regarding seven EB flights over the period April 17, 2000 through May 10, 2000 that were subcontracted by Executive Airlines to Boston-Maine Airways. Boston-Maine Airways operated a Jetstream aircraft for these flights and was approved by EB as a subcontractor.[14]

18.   From an economic perspective, the price charged by Boston-Maine Airways to Executive Airlines for operating an additional flight represents an independent market-based estimate of the incremental cost of serving the EB contract. Consequently, the price charged by Executive Airlines to EB minus the price charged by Boston-Maine to Executive Airlines represents a direct alternative measure of the lost profits per flight.

19.   Exhibit 1 shows the dates of the seven subcontracted flights, the prices charged by Boston-Maine Airways to Executive Airlines, and the prices charged by Executive Airlines to EB for the same flights.   These seven transactions together indicate a lost profit per flight of $629.

20.   This estimate of the lost profit per flight is consistent with the deposition testimony of Mr. Michael Leeds, a potential investor in Executive Airlines at the time the EB contract was being negotiated.[15]   Mr. Leeds testified that he discussed with Mr. Peragine the profit per flight from the Electric Boat account and that they expected "a gross profit per trip of about $750."[16]

---

[14] Peragine deposition, December 6, 2006, p. 183.  Boston-Maine Airways is referred to as "Pan Am" by Mr. Peragine.

[15] Leeds deposition, November 14, 2005, pp. 22-23.

[16] Leeds deposition, November 14, 2005, p. 32.

21. The total lost profit damages to Executive Airlines can then be estimated by multiplying the lost profit per flight by the number of lost flights. Consequently, in Exhibit 1, I multiply 90 lost flights by the lost profit per flight of $629 to obtain an alternative damages estimate of $56,626, which confirms the reasonableness of the estimate of $83,638 I derived using the methodology in my initial report.

22. The advantage of this alternative approach is that the subcontractor payments to Boston-Maine Airways are clearly costs that directly and immediately vary with the number of flights, and so must be classified as variable costs associated with serving the EB contract. In fact, both of the plaintiff's experts, Ms. Steiner, and Mr. Ciccodicola, readily acknowledged in their depositions that the difference between the price paid to Executive Airlines and the price paid to a subcontractor represented "profit" to Executive Airlines.[17]

23. While Mr. Ciccodicola is aware of these subcontractor invoices (some were used as Exhibits in Mr. Peragine's December 6, 2006 deposition) he nevertheless continues to base his damages estimate on a profit per flight of $2,857, more than four times the profit indicated by these competitive arm's length transactions between Executive Airlines and Boston-Maine Airways. Mr. Ciccodicola's damages estimate represents a rate of return on sales of over 60 percent, which far exceeds the operating profit margins in the airline industry over this period.[18] In contrast, a profit of $629 per flight represents a rate of return on sales of 11.4 percent (see Exhibit 1), which is much closer to, but still above, the industry average for this period.

## CONCLUSIONS

24. Mr. Ciccodicola's report provides no assistance to the trier of fact beyond any information that may have been contained in Ms. Steiner's report. In fact, his report and deposition testimony serve to obscure the two fundamental reasons for the large difference in our damages estimates.

24.1. Mr. Ciccodicola does not take into account that by the very action of terminating the contract, EB exhibited a clear preference for transacting as little business as possible with Executive Airlines. Consequently, if EB were forced to comply with the terms of the contract, it is a fantasy to think that EB would have continued to purchase flights at a rate of 30 per

---

[17] See Steiner deposition, June 15, 2006, p. 137; Ciccodicola deposition, December 14, 2006, p. 188.

[18] The ratio of Mr. Ciccodicola's damages per flight ($2,857) to his estimated lost revenue per flight ($4,705) is 0.607. The average operating profit margin in the airline industry over the period July 1999 through June 2001 was 3.8 percent. See Exhibits 4 and 5 of my initial report.

month. Instead, economic logic dictates that EB would fulfill just the minimum terms of the contract.

24.2. Despite acknowledging the fact that Executive Airlines had realistic options for mitigating damages (e.g., sell one plane, redeploy one to serve other accounts), Mr. Ciccodicola does not integrate any mitigation into his damages calculation. Instead, he assumes that all of the incremental expenditures initially made to serve the EB contract remain locked in place throughout the length of the contract.

25. Finally, Mr. Ciccodicola ignores important economic information contained in the subcontractor invoices from Boston-Maine Airways when it operated on the EB route. From an economic perspective, the price charged by Boston-Maine Airways is the incremental cost faced by Executive Airlines on any subcontracted flights. In a competitive market, the subcontractor price also serves as an excellent proxy for Executive Airlines' incremental costs on any flights that it operates. These data indicate that the relevant lost profit to Executive Airlines is about $629 per flight, not $2,857 per flight as Mr. Ciccodicola claims.

March 12, 2007                                    _George Kosicki_

                                                     George Kosicki

**List of Appendixes and Exhibits**

<u>Appendixes</u>

Appendix A:  CV of George Kosicki (Includes Testimony in the Last Four Years)

Appendix B:  Documents Considered

<u>Exhibits</u>

Exhibit 1:  Lost Profits to Executive Airlines Based on EB Flights Subcontracted by
Executive Airlines to Boston-Maine Airways

# APPENDIX A

## GEORGE KOSICKI, Ph.D.
### Vice President

Phone: (617) 425-8162

Fax: (617) 425-8001

gkosicki@analysisgroup.com

111 Huntington Avenue

Tenth Floor

Boston, MA 02199

Dr. Kosicki specializes in applied microeconomics and has consulted in the areas of antitrust, mergers and acquisitions, labor economics, and pharmacoeconomics. He has also served as an expert witness on liability and damages in cases involving antitrust and labor economics. Dr. Kosicki has worked extensively on issues of cost pass through and damages in indirect purchaser litigation stemming from global price fixing conspiracies. He is experienced in market definition analyses, including those in the pharmaceutical industry, and the estimation of demand elasticities using retail scanner data. Dr. Kosicki worked with Analysis Group academic affiliate Robert S. Pindyck on behalf of P&O Princess Cruises plc during the Federal Trade Commission's review of Princess Cruises' merger with Carnival. For a proposed merger in the telecommunications industry, he analyzed competition and pricing for international long distance service. Dr. Kosicki's research in pharmacoeconomics has focused on measuring the cost-effectiveness of treatment for cancer patients.

Prior to joining Analysis Group, Dr. Kosicki served as Chair of the Economics Department at the College of the Holy Cross, where he spent 15 years on the faculty teaching principles of economics, microeconomic theory, industrial organization, and labor economics. He also wrote the book *Labor Market Problems and Applications* to accompany the best selling labor economics textbook *Modern Labor Economics* by Ehrenberg and Smith. Dr. Kosicki's research has been published in several peer-reviewed journals, including *Southern Economic Journal* and *Journal of Economic Education*.

## EDUCATION

Ph.D. in Economics, Cornell University, 1985

M.A. in Economics, Cornell University, 1984

B.A. in Economics, John Carroll University, 1981

## SELECTED CASEWORK

- **Non Participating Manufacturer (NPM) Adjustment Proceeding Under the Tobacco Master Settlement Agreement Between the Settling States and the Participating Manufacturers**
  *Arbitration Proceeding Before Professor Daniel McFadden and the Brattle Group*
  On behalf of the Settling States, supported Professors Robert Pindyck and Jonathan Gruber in an analysis of whether the disadvantages of the 1998 Master Settlement Agreement were a "significant factor" contributing to the Market Share Loss of the Participating Manufacturers in 2003 and 2004.

- **HDC Medical, Inc. v. Minntech Corporation**
  *United States District Court, District of Minnesota, File No. 04-CV-143 ADM/AJB*
  Expert report and deposition testimony in rebuttal of plaintiff's claim of attempted monopolization
  and anticompetitive tying; report addressed market definition, liability, and damages issues pertaining
  to defendant's sales of kidney dialysis reprocessing equipment and supplies. Judge approved
  defendant's motion for summary judgment, citing expert report. Decision affirmed by U.S. Court of
  Appeals, Eighth Circuit.

- **Agri-King, Inc., et al. v. Akzo Nobel, Inc., et al.**
  *State of Minnesota, District Court, County of Ramsey, Second Judicial District*
  **Pratt Feeders, LLC, et al. v. F. Hoffman-La Roche, Ltd., et al.**
  **Steven L. Cox, et al. v. Aventis Animal Nutrition, Inc., et al.**
  *District Court of Wyandotte County Kansas*
  Analyzed damages claims by indirect purchasers of vitamin-containing animal feed products that
  were artificially inflated in price.

- **Remeron Antitrust Litigation**
  *United States District Court, District of New Jersey*
  Supported Professor Janusz Ordover in an analysis of market definition for antidepressant drugs.

- **Northland Cranberries v. Ocean Spray Cooperative**
  *United States District Court, District of Massachusetts*
  Supported Professor Robert Pindyck in an analysis related to allegations of monopolization and unfair
  competition pertaining to sales of cranberries, concentrate, and retail juice products.

- **Verizon New England, Inc. v. D.W. White Construction Company, et al.**
  *Commonwealth of Massachusetts (Suffolk County), Superior Court C.A. No. 00-0723-G*
  Deposition testimony (March 14, 2003) evaluated the wage rate and total labor costs billed by
  Verizon New England in its attempt to recover damages from D.W. White and others for an
  excavation accident.

- **Kellogg Company v. BASF AG, et al.**
  *United States District Court, District of Columbia*
  Supported Professor Robert Pindyck in an analysis of the lost profits incurred by an indirect purchaser
  of an input that was artificially inflated in price.

- **P&O Princess Cruises plc**
  *Before the Federal Trade Commission*
  Supported Professor Robert Pindyck in an analysis of the economic effects of a proposed merger in
  the cruise industry.

- **EF Institute for Cultural Exchange, et al. v. Explorica, Inc., et al.**
  *United States District Court, District of Massachusetts, C.A. No. 01-10645-MEL*
  Expert affidavit addressed the economic effect that the electronic collection of publicly available
  price information by a competitor has on market competition.

- **WorldCom-Sprint Merger**
  *Before the Antitrust Division of the U.S. Department of Justice*
  Analysis of the market power implications of the proposed merger; potential unilateral price increases were predicted through market simulations within a differentiated products framework.

## PRIOR RESEARCH EXPERIENCE

Dr. Kosicki has conducted several empirical studies of the effects of community consumption standards on individual decisions to work and save. These studies utilized large micro data sets, including the Consumer Expenditure Survey, the Current Population Survey, and the National Longitudinal Survey.

## PUBLICATIONS

### Refereed Journals

"Economics of Cost Pass Through and Damages in Indirect Purchaser Antitrust Cases" (with Miles Cahill), *The Antitrust Bulletin*, Fall 2006, 599-630.

"Cost-Minimization Analysis of Once-Weekly Versus Thrice-Weekly Epoetin Alfa for Chemotherapy-Related Anemia" (with Pierre Y. Cremieux, John M. Fastenau, Catherine T. Piech, A. Mark Fendrick), *Journal of Managed Care Pharmacy*, November/December 2004, 531-537.

"Exploring Economic Models Using Excel" (with Miles Cahill), *Southern Economic Journal*, January 2000, 770-792.

"Interpersonal Comparisons and Labor Supply: An Empirical Analysis," *The American Economist*, Spring 1993, 20-34.

"Linking the Production Possibilities Curve, the Supply Curve, and the Competitive Norm," *Journal of Economic Education*, Fall 1991, 307-311.

"Income Redistribution and Aggregate Consumption: Implications of the Relative Income Hypothesis," *The American Economist*, Spring 1990, 40-44.

"A Note about Savings as a Nonpositional Good," *Eastern Economic Journal*, July-September 1988, 271-276.

"A Test of the Relative Income Hypothesis," *Southern Economic Journal*, October 1987, 422-434.

"The Relative Income Hypothesis: A Review of the Cross Section Evidence," *Quarterly Journal of Business and Economics*, Autumn 1987, 65-80.

### Books

*Student Learning Guide: Labor Market Problems and Applications* to accompany Ehrenberg and Smith *Modern Labor Economics*, 6th edition. Reading, MA: Addison Wesley, 1997. (5th edition published in 1994 by Harper Collins.)

**Other Articles**

"A Framework for Developing Spreadsheet Applications in Economics" (with Miles Cahill), *Social Science Computer Review*, Summer 2001, 186-200 (invited article).

"Using Spreadsheets to Explore Neoclassical Assumptions in a New Keynesian Model" (with Miles Cahill), *Computers in Higher Education Economics Review*, Volume 14, No. 2, 2000.

"Antitrust Policy" and "The Relative Income Hypothesis" in *Survey of Social Science: Economics,* edited by Frank N. Magill, Pasadena: Salem Press, 1991, 55-61 and 1980-1985 (subsequently published as *International Encyclopedia of Economics*, Fitzroy Dearborn Publishers, 1997).

"The Temporary Workforce: An Economic Appraisal," *The Margin*, September/October 1990, 27.

**Book Reviews**

*The Antitrust Revolution*, edited by John E. Kwoka, Jr. and Lawrence J. White, *The American Economist*, Spring 1991.

*The New Unionism: Employee Involvement in the Changing Corporation* by Charles C. Heckscher, *Southern Economic Journal*, October 1989.

*Deindustrialization and Plant Closure,* edited by Paul D. Staudohar and Holly E. Brown, *Southern Economic Journal*, April 1988.

*The New Industrial Organization* by Alexis Jacquemin, *The American Economist*, Fall 1987.

**Poster Abstracts**

"The Impact of Psoriasis on Health Care Costs and Work Loss" and "The Direct and Indirect Cost Burden Associated with Seborrheic Dermatitis" (with Joseph Fowler et al.), *Supplement to Journal of the American Academy of Dermatology*, February 2007, AB6, AB106.

## OTHER PROFESSIONAL ACTIVITIES

Referee for the *Journal of Economic Behavior and Organization, Journal of Economic Education, Quarterly Review of Economics and Business, The American Economist, Defence and Peace Economics*

Textbook reviewer for Harper Collins, McGraw Hill, Oxford University Press

Member of the American Economic Association, associate member of the American Bar Association

## TESTIMONY IN THE LAST FOUR YEARS

- **Verizon New England, Inc. v. D.W. White Construction Company et al.**
  *Commonwealth of Massachusetts (Suffolk County), Superior Court C.A. No. 00-0723-G*
  Deposed March 14, 2003.

- **HDC Medical, Inc. v. Minntech Corporation**
  *United States District Court, District of Minnesota, File No. 04-CV-143 ADM/AJB*
  Deposed August 26, 2005.

**Appendix B**
**Documents Considered**

**Supplemental Document Production by Plaintiff**

Supplemental Production of October 31, 2006.

Additional Supplemental Production (including table of contents prepared by Day Pitney).

Plaintiff's Response to Document Request, February 9, 2007.

**Court Filings**

Expert Report of Anthony Ciccodicola, August 7, 2006 (including Schedules).

Defendant's Notice of Deposition and Request for Production of Documents, July 24, 2006.

Defendant's Motion to Preclude the Testimony of Plaintiff's Proposed Expert (Steiner), July 13, 2006.

**Depositions**

Deposition of Michael Leeds, Civil Action No. 3:02-CV-194 (JCH), November 14, 2005 (including Exhibit).

Deposition of Michael Peragine, Civil Action No. 02-CV-194 (WWE), December 6, 2006 (including Exhibits).

Deposition of Anthony Ciccodicola, Civil Action No. 02-CV-194 (WWE), December 14, 2006 (including Exhibits).

Continued Deposition of Anthony Ciccodicola, Civil Action No. 02-CV-194 (WWE), February 20, 2007 (including Exhibits).

Updated List of Litigation Support by Bill de Decker.

**Economic Methodology**

Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics,* 6th edition, Upper Saddle River, NJ: Prentice Hall, 2005, p. 555.

Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance,* 8th edition, Boston, MA: McGraw-Hill Irwin, 2006, pp. 215-217.

**Court Decision**

Retepromaca Representaciones Tecnicas Proyectos y Sistemas, C.A. v. The Ensign-Bickford Company, U.S. District Court for the District of Connecticut, Civil Action No., 3:98cv1857 (SRU), March 30, 2004.

**Exhibit 1**
**Lost Profits to Executive Airlines Based on**
**EB Flights Subcontracted by Executive Airlines to Boston-Maine Airways**

|  | Trip date | Price Charged by Boston-Maine | | Price Charged by Executive Airlines* | | Profit to Executive Airlines | |
|---|---|---|---|---|---|---|---|
| [1] | Monday, April 17, 2000 | $ | 4,800 | $ | 4,973 | $ | 173 |
| [2] | Wednesday, April 19, 2000 | $ | 4,800 | $ | 5,970 | $ | 1,170 |
| [3] | Monday, April 24, 2000 | $ | 4,948 | $ | 6,066 | $ | 1,118 |
| [4] | Wednesday, April 26, 2000 | $ | 4,948 | $ | 4,895 | $ | (53) |
| [5] | Monday, May 01, 2000 | $ | 4,948 | $ | 5,970 | $ | 1,022 |
| [6] | Monday, May 08, 2000 | $ | 4,948 | $ | 5,970 | $ | 1,022 |
| [7] | Wednesday, May 10, 2000 | $ | 4,948 | $ | 4,903 | $ | (46) |
| [A] | Total | $ | 34,342 | $ | 38,747 | $ | 4,404 |
| [B] | Profit as % of Sales | | | | | | 11.4% |
| [C] | Profit per Flight | | | | | $ | 629 |
| [D] | Lost Flights with 6 Months Early Termination Notice | | | | | | 90 |
| [E] | **Lost Profits to Executive Airlines** | | | | | $ | **56,626** |

Sources:

|  | Bates (EXECAIR) | Boston-Maine Invoice No. | Executive Airlines Reference No. |
|---|---|---|---|
| [1] | 00014906-14907 | 7223 | 3219 |
| [2] | 00014908-14909 | 7238 | 3239 |
| [3] | 00014914-14915 | 7331 | 3268 |
| [4] | 00014912-14913 | 7386 | 3276 |
| [5] | 00014904-14905 | 7541 | 3398 |
| [6] | 00014910-14911 | 7647 | 3493 |
| [7] | 00014916-14917 | 7726 | 3422 |

* Includes fuel surcharges reported in Schedule 7 of Ciccodicola report, August 7, 2006.

Notes:
[A]  = Sum of [1] through [7].
[B]  = Profit in [A]/Sum of Sales by Executive Airlines in [A].
[C]  = Profit in [A]/7 Flights.
[D]  = 15 Flights per Month x 6 Months as specified in Purchase Order SNL022-096.
[E]  = [C] x [D].